UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY AND SUBSIDIARIES, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cnsl. Cv. No. 1:05-cv-11048-RCL |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

| | | |
|---|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY AND SUBSIDIARIES, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Former Cv. No. 1:05-cv-11049-RCL |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

PLAINTIFFS' EXTENDED REPLY MEMORANDUM
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
ITS OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Peter H. Winslow
Gregory K. Oyler
Samuel A. Mitchell
Scribner, Hall & Thompson, LLP
1875 Eye Street, N.W., Suite 1050
Washington, DC 20006
Telephone: (202) 331-8585
Fax: (202) 331-2032
Attorneys for Plaintiff

November 15, 2006

# TABLE OF CONTENTS

I.  Summary of Argument ............................................................................................... 1

II.  Liberty Companies are entitled to a Fresh Start on gross salvage. ........................................ 2

III.  Liberty Companies are entitled to gross-up their net salvage.............................................. 15

IV.  Defendant is deemed to admit material facts it did not oppose. ........................................... 22

V.  Liberty Companies are entitled to negative inferences based on defendant's discovery
     abuses. ............................................................................................................... 22

VI.  Conclusion .......................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

Atlantic Mut. Ins. Co. v. United States, 532 U.S. 382 (1998) ..................................................... 15

Bituminous Cas. Corp. v. Commissioner, 57 T.C. 58 (1971)......................................................... 8

Bonwit Teller & Co. v. United States, 283 U.S. 258 (1931) ........................................................ 4

Chevron U.S.A., Inc. v. National Res. Def. Council, 467 U.S. 837 (1984) ................................. 13

Citizen's Nat. Bank v. United States, 417 F.2d 675 (5th Cir. 1969) ............................................ 15

Continental Ins. Co. v. United States, 474 F.2d 661 (Ct. Cl. 1973) .............................................. 8

Estate of Bullard v. Commissioner, 87 T.C. 261 (1986) ............................................................ 15

Estate of Morris v. Commissioner, 55 T.C. 636 (1971), aff'd, 454 F.2d 208 (4th Cir. 1972) ........ 4

Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26 (1988)........................................................... 9

Helvering v. Wardman, 68 F.2d 418 (D.C. Cir. 1933) ................................................................ 4

Hollander v. United States, 248 F.2d 247 (2d Cir. 1957).............................................................. 4

Howard v. United States, 161 F. Supp. 527 (E.D. Ky. 1958) ...................................................... 4

Johnston v. Commissioner, 33 B.T.A. 551 (1935) ....................................................................... 4

Kelly-Springfield Tire Co. v. United States, 81 F.2d 533 (3d Cir. 1935) ..................................... 4

Knightsbridge Mktng. Serv., Inc. v. Promociones y Projectos, S.A., 728 F.2d 572 (1st Cir. 1984) ......... 23

Lykes Bros. S.S. Co., Inc. v. United States, 513 F.2d 1342 (Ct. Cl. 1975) ................................... 4

Merritt v. Commissioner, T.C. Memo. 1992-443, 64 T.C.M. (CCH) 397 (1992)......................... 4

National Muffler Dealers Assoc. Inc. v. U.S., 440 U.S. 472 (1979) ........................................... 13

Peoples Fed. Sav. & Loan v. Commissioner, 948 F.2d 289 (6th Cir. 1991) ............................... 13

Samonds v. Commissioner, T.C. Memo. 1993-329, 66 T.C.M. (CCH) 235 (1993) ..................... 4

Snowa v. Commissioner, 123 F.3d 190 (4th Cir. 1997) ............................................................. 13

United States v. Charles George Trucking Co., 823 F.2d 685 (1st Cir. 1987).............................. 6

United States v. Mead Corp., 533 U.S. 218 (2001) ................................................................... 13

United States v. Vogel Fertilizer Co., 455 U.S. 16 (1982) ......................................................... 13

Vines v. Commissioner, 126 T.C. 279 (2006) ........................................................................... 12

West Virginia Univ. Hosp., Inc. v. Casey, 499 U.S. 83 (1991)..................................................... 2

Wing v. Commissioner, 278 F.2d 656 (8th Cir. 1960) ................................................................ 4

Younger v. Commissioner, T.C. Memo. 1992-387, 64 T.C.M. (CCH) 90 (1992) ........................ 5

**Statutes & Administrative Codes**

26 U.S.C. § 446 ............................................................................................. 8, 10, 21
26 U.S.C. § 481 ................................................................................................. 1, 2, 5
26 U.S.C. § 7805(a) ................................................................................................ 13
26 U.S.C. § 832(b) ................................................................................................... 8
26 U.S.C. § 832(b)(1)(A) ......................................................................................... 8
26 U.S.C. § 832(b)(5)(A) .......................................................................................... 3
26 U.S.C. § 832(b)(5)(A)(ii) .................................................................................... 17
26 U.S.C. § 832(b)(5)(A)(iii) .............................................................................. 17, 19
26 U.S.C. § 846 ................................................................................................. 15, 17

**Other**

Rev. Proc. 2001-46, 2001-2 C.B 263 ....................................................................... 12
Rev. Proc. 91-48, ........................................................................................ 10, 21, 22
Rev. Proc. 92-77 ............................................................................................. *passim*

Declaration of Dennis Van Meighem ........................................................................ 6

Revenue Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388 ....................... *passim*

## I.    Summary of Argument

Liberty Companies are entitled to the full benefit of the transition rule for Gross Lines in section 11305 of the 1990 Act as well as the gross-up for their Net Lines allowed by Treas. Reg. § 1.832-4(d).  As to Gross Lines, defendant has never disputed that the plain language of section 11305 grants a Fresh Start for the 26 U.S.C. § 481 adjustment.  Instead, defendant asks this Court to find that, despite the clear words in the statute, Congress did not really intend to enact a transition rule at all for Gross Lines for taxpayers who also had Net Lines.  According to defendant, for these taxpayers, Congress intentionally declined to provide any transition rule, or even any guidance, leaving the IRS to impose any transition rule it desired for such taxpayers with both Net and Gross Lines.  Nothing in the statute, the legislative history, the regulations or IRS pronouncements supports defendant's extraordinary argument that, despite the plain language of the statute, this Court should infer that Congress did not intend to specify a transition rule for a large class of taxpayers – "partial netters."

Defendant's argument regarding Liberty Companies' Net Lines is equally strained.  Defendant agrees that Treas. Reg. § 1.832-4(d)(2) and Rev. Proc. 92-77 allow a gross-up of Net Lines to convert them to Gross Lines for tax purposes, but argues that the gross-up is limited to taxpayers who file an amended return to claim the gross-up after having previously filed a tax return on which they double-counted salvage on Net Lines.  Defendant's reading of the regulation and Revenue Procedure is irrational.  The IRS and Treasury do not issue regulations and revenue procedures that limit their scope to such a narrow class of taxpayers without making that intention clear.  This is particularly the case here because there would be no policy justification for the restrictive reading that defendant seeks to impose on Treas. Reg. § 1.832-4(d)(2) and Rev. Proc. 92-77.  As in the case of the transition statute for Gross Lines, the

governing regulation for the gross-up of Net Lines is plain on its face.  Liberty Companies are permitted to gross-up their Net Lines for tax year 1990.

      **II.**      **Liberty Companies are entitled to a Fresh Start on gross salvage.**

Section 11305 of the 1990 Act provides a specific transition rule for any taxpayer who was required to change its method of computing salvage, (i.e., any taxpayer who was required to convert Gross Lines to Net Lines for tax purposes beginning in 1990).  The gross salvage transition statute first treats the required change as a change in method of accounting initiated by the taxpayer and consented to by the IRS.  1990 Act § 11305(c)(2)(A).  It then provides, without restriction, that "***any taxpayer*** who is required by reason of the amendments made by this section to change his method of computing losses incurred" is entitled to a Fresh Start equal to 87 percent of the 26 U.S.C. § 481 adjustment that otherwise would apply to a change in method of accounting (emphasis added).  Liberty Companies qualify as "***any taxpayer***," and they were required by the terms of the 1990 Act to convert their gross salvage to net salvage as if the conversion were a change in their method of computing losses incurred.

*There is no ambiguity in the statute.*  Defendant does not dispute that the plain language of the transition rule for gross salvage provides the Fresh Start Liberty Companies claim.  This should be the end of the inquiry.  After the plain meaning of the statute is determined, there is no room for speculation as to Congress' *real* intent and no authority for examination of the legislative history.  *West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83 (1991).

Recognizing the principle that the plain meaning of the statute governs, defendant invents an ambiguity in the statute by focusing on the separate transition rule for net salvage in an attempt to create an overlap between the two rules and suggest that Congress could not really have meant what it plainly provided in the gross salvage rule.  The rule for net salvage provides as follows:

> [I]n the case of ***any insurance company which took into account salvage recoverable*** in determining losses incurred for its last taxable year beginning before January 1, 1990, 87 percent of the discounted amount of estimated salvage recoverable as of the close of such last taxable year shall be allowed as a deduction ratably over its 1st 4 taxable years beginning after December 31, 1989. [Emphasis added; 1990 Act § 11305(c)(3).]

Defendant argues that a possible literal reading of this rule would result in a windfall if applied to a company that also had gross salvage (i.e., a "partial netter"). Defendant reads the net salvage transition rule to allow a Special Deduction for 87 percent of the entire 1989 year-end salvage balance, including any amount attributable to Gross Lines. The windfall would occur because a taxpayer with Gross and Net Lines would get a double benefit on Gross Lines (under defendant's nonsensical interpretation) from both the Special Deduction and the Fresh Start forgiveness. Reasoning that Congress could not have intended such a windfall, defendant concludes that Congress decided not to provide a transition rule at all for partial netters and instead wanted the IRS to fashion its own transition rule to impose on these taxpayers, without any Congressional guidance.

Defendant's reading of the rule for net salvage is illogical. Liberty Companies agree that Congress did not intend to provide a double transition benefit for Gross Lines, and not surprisingly, the statute does not do so.[1] The opening phrase applies the rule to "any insurance company which ***took into account salvage recoverable*** in determining losses incurred," and the following clause limits the Special Deduction to 87 percent of the discounted[2] ***salvage recoverable*** (emphasis added). Thus, the "salvage recoverable" on which the Special Deduction

---

[1] Defendant itself does not read the statute to provide the windfall because the amount of the Special Deduction it forced upon Liberty Companies on audit was limited to the actual salvage taken into account as of year-end 1989; no Special Deduction was allowed for Gross Lines.

[2] The word "discounted" refers to the requirement of the amendment that, just as unpaid losses are discounted for tax purposes, estimated salvage must be discounted. 26 U.S.C. § 832(b)(5)(A) flush language.

is based" is the same "salvage recoverable" (referred to in the first phrase) which was taken into account in losses incurred; salvage on Gross Lines is not considered. There is no illogic or ambiguity in the statute. Moreover, the transition rule for net salvage, like the gross salvage rule, applies to "*any insurance company.*" It does not exclude a company that also had gross salvage.[3] The net-salvage transition rule does not have any impact on any change-in-accounting transition rule for gross salvage because for Net Lines the timing of salvage remained the same before and after the 1990 Act.

Defendant cites some authorities in its brief for the proposition that deductions and offsets to income should be construed narrowly. Df. Br. at 21, citing cases. These cases do not support an interpretation that would completely negate a transition rule. Federal tax legislation that is intended to be remedial is to be construed broadly in favor of a taxpayer.[4] Moreover, none of the cases defendant cites even deals with a transition rule. There is ample authority to support the proposition that transition rules must be interpreted liberally and in favor of the taxpayer.[5] Resort to such authorities, however, is not necessary in this case because defendant's interpretation is so manifestly contrary to the plain language of the statute.

---

[3] In a further departure from logic, defendant contends that the "any insurance company" of the rule for net salvage applies to a company with both Net Lines and Gross Lines, but the "any insurance company" of the gross salvage rule somehow excludes such a company.

[4] *See, e.g., Bonwit Teller & Co. v. United States,* 283 U.S. 258, 263 (1931); *Kelly-Springfield Tire Co. v. United States,* 81 F.2d 533, 535 (3d Cir. 1935); *Lykes Bros. S.S. Co., Inc. v. United States*, 513 F.2d 1342, 1353 (Ct. Cl. 1975); *Wing v. Commissioner,* 278 F.2d 656, 661 (8th Cir. 1960); *Hollander v. United States,* 248 F.2d 247, 251 (2d Cir. 1957); *Helvering v. Wardman,* 68 F.2d 418, 419 (D.C. Cir. 1933); *Estate of Morris v. Commissioner,* 55 T.C. 636, 642 (1971), *aff'd*, 454 F.2d 208 (4th Cir. 1972); *Johnston v. Commissioner*, 33 B.T.A. 551, 553 (1935); *Howard v. United States,* 161 F. Supp. 527, 529 (E.D. Ky. 1958).

[5] *See, e.g., Samonds v. Commissioner,* T.C. Memo. 1993-329, 66 T.C.M. (CCH) 235, 238 (1993) ("In so holding [in favor of taxpayer], we recognize that we are dealing with a transitional provision of limited applicability and with a relief provision which should be liberally

Defendant also suggests that the transition rule for Gross Lines should be construed strictly because it represents an exclusion from gross income.  This is not true.  Section 11305(c)(2) deems the conversion of Gross Lines to Net Lines for tax purposes to be a change in method of accounting subject to a modified 26 U.S.C. § 481 aggregate adjustment equal to 13 percent of the discounted balance of year-end 1989 estimated salvage.  It is the transition rule that created the taxable income and specified the amount; absent the transition rule there would be no increase in taxable income.  Therefore, contrary to defendant's assertion, this is not a gross income exclusion situation.  It is merely a transition rule that should be construed to avoid the type of inappropriate and punitive distortion of taxable income that defendant seeks to impose on Liberty Companies.

*There is no ambiguity in the legislative history.*  Although defendant has not argued that there is ambiguity in the part of the statute that relates to gross salvage, defendant turns to the legislative history of the 1990 Act to try to create ambiguity.  But, it is a fundamental rule of statutory construction that legislative history cannot be used to create ambiguity in a statute. *West Virginia Univ. Hosp.*, *supra* at 98-99 ("Where [the statute] contains a phrase that is unambiguous – that has a clearly accepted meaning in both legislative and judicial practice – we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process.")  Moreover, a perceived void in legislative history does not create ambiguity in the plain language of the statute.  *See United*

---

construed"); *Merritt v. Commissioner,* T.C. Memo. 1992-443, 64 T.C.M. (CCH) 397, 400 (1992) ("We also emphasize that the transitional rule at issue is a relief provision of limited applicability, which should be liberally construed . . . ."); *Younger v. Commissioner,* T.C. Memo. 1992-387, 64 T.C.M. (CCH) 90, 92-93 (1992) ("We think it important to emphasize that we are dealing with a transitional provision of limited applicability and with a relief provision which should be liberally construed").

*States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir. 1987) (Parties may not

"capitalize upon what they see as a void in the legislative history"). Nevertheless, simply

because the legislative history does not specifically refer to "partial netters," "partial grossers,"

"pure netters" or "pure grossers," defendant reads the history to imply that Congress did not

intend to specify any transition rule at all for such taxpayers with both Gross and Net Lines. But,

the terms partial netter, et al. are just labels defendant coined for this litigation. More

importantly, the legislative history contains no reference, or even hint, that Congress intended to

limit the scope of its transition rules. Defendant's reliance on the absence of these concepts in

legislative history to glean a specific Congressional intent to exclude "partial grossers" is

nothing more than a "grope past the letter of the law into its legislative history in a clumsy

attempt to muddy the waters." *Charles George Trucking Co., supra*, at 688.

In fact, most large insurance companies had both Net Lines and Gross Lines in 1989, and

Congress certainly was aware of this when it enacted the salvage transition.[6] The IRS and

Treasury also knew that many companies subject to the transition rules were partial netters. This

is why, in Treas. Reg. § 1.832-4(d)(2)(ii), they allowed companies to identify net salvage for

purposes of the transition rule as late as March 17, 1992. Defendant's interpretation, therefore,

cannot be correct because it would exclude most companies from the gross salvage transition

rule. Van Mieghem Decl. ¶¶ 5-6. Nothing in the legislative history suggests that the transition

rules do not apply to this large class of taxpayers. Why would Congress have wanted to leave a

gaping hole in the statute without providing any guidance? Certainly, had defendant's

---

[6] Many mandatory insurance pools, which a company was required by state legislation to
participate in, were perhaps reported unpaid losses on a net basis. Van Mieghem Decl. ¶ 5. The
Van Mieghem declaration is attached. *See also* Kress dep. 13-14 (Govt. Ex. A, pt. 1).

interpretation been intended, the legislative history would have explained what alternative, non-statutory transition rule applies to partial netters.

The ambiguity defendant finds in the legislative history is completely illusory. Because the legislative history refers to "companies" that had taken salvage into account (Net Lines) and "companies" that had not (Gross Lines), defendant leaps to the conclusion that Congress did not intend to provide a transition rule for companies that did both. But, defendant's conclusion does not follow. In fact, it is more reasonable to conclude that Congress believed that "companies" could have both Gross and Net Lines. Moreover, defendant neglects to quote or even mention the relevant portion of the legislative history that describes a gross salvage transition rule without any restrictions:

> The bill provides a partial "Fresh Start," i.e., a permanent forgiveness of income that would otherwise be includible in gross income with respect to salvage recoverable as of the effective date of the provision. [136 Cong. Rec., S15695 (Oct. 18, 1990)]

*Defendant's argument that Congress did not intend the gross salvage transition rule to apply to a taxpayer with both gross and net salvage is based on the false premise that it was improper in prior years for Liberty Companies to be such a "partial netter" for tax purposes.* According to defendant, partial netting violated a general rule under Treas. Reg. § 1.446-1 that a taxpayer cannot adopt a hybrid accounting method. This appears to be the fundamental premise underlying defendant's interpretation of the transition rule. Defendant reasons that Congress could not have intended to grant transition relief to a company that previously used an impermissible method.

Stated bluntly, defendant does not understand insurance taxation. Since 1921, the Internal Revenue Code has required insurance companies to compute their underwriting income on the basis of Annual Statement accounting approved by the National Association of Insurance

Commissioners.  26 U.S.C. § 832(b)(1)(A).  *See also* Treas. Reg. § 1.832-4(a)(2).  Numerous

cases have confirmed that the Annual Statement method of accounting governs for tax purposes.

*See, e.g., Bituminous Cas. Corp. v. Commissioner*, 57 T.C. 58 (1971), *acq.* 1973-1 C.B. 1.  The

use of Annual Statement accounting for tax purposes was specifically required for salvage under

pre-1990 law.  *Continental Ins. Co. v. United States,* 474 F.2d 661 (Ct. Cl. 1973); *Allstate Fire*

*Ins. Co. v. United States,* 44 A.F.T.R. 2d 79-5132 (1979).  The Supreme Court in *Commissioner*

*v. Standard Life & Accident Ins. Co.,* confirmed this fundamental principle of insurance taxation:

> In defining "gross income" and "expenses incurred" for purposes of taxing certain
> other insurance companies, Congress expressly requires computations to follow
> the Annual Statement approved by the National Convention of Insurance
> Commissioners.  [433 U.S. 148, 162 (1977).]

And, Treas. Reg. § 1.832-4(c), as in effect prior to 1990, specifically deferred to Annual

Statement treatment of salvage.  Pl. Br. 3.  Defendant does not cite a single authority for the

proposition that partial netters were required to depart from Annual Statement treatment as

mandated by 26 U.S.C. § 832(b).

Defendant's suggestion that 26 U.S.C. § 446 required a uniform method of estimating

loss reserves for each line of business and type of insurance claim is equally misguided.

Although an insurance company's overall method of accounting for tax purpose must conform to

Annual Statement treatment, within that overall accounting method there are many "material

items" for which more individualized accounting methods, even within a single line of business,

can be adopted.  For example, it would be surprising indeed if an insurance company were to use

exactly the same method to estimate its liability for unpaid losses on long-term workers

compensation claims as it uses for short-term auto physical damage claims.  Similarly, prior to

1990, it was permissible, and common, for salvage to be treated differently depending on the

nature and type of the claim and the type of reserve.  For example, for short-term lines like auto

physical damage, it may be appropriate to report claims gross of salvage because salvage

recoveries shortly follow payment of claims, but for other lines or sublines the same netting may

not be appropriate because salvage may come in much later and its deferred recognition could

distort earnings.  Moreover, as explained in the companies' deposition, it was standard industry

practice to treat case reserves (reserves set by claims adjustors rather than actuaries) on a gross

basis because it was difficult to estimate salvage on such reserves.  Morell dep. 24-26 (Govt. Ex.

B, pts. 1 and 2).

Defendant's more general suggestion that hybrid methods of accounting are not

permissible also is wrong.  Section 446(c)(4) (26 U.S.C.) specifically provides that taxpayers

may use any combination of methods permitted under the regulations, and Treas. Reg. § 1.446-

1(c)(1)(iv) provides that "any combination of . . . methods of accounting will be permitted . . . if

such combination clearly reflects income and is consistently used."  Courts recognize that the

consistency rule does not require a uniform accounting method for factually distinct items.  *See,*

*e.g., Hallmark Cards, Inc. v. Commissioner*, 90 T.C. 26 (1988); *Hospital Corp. of Am. v.*

*Commissioner,* T.C. Memo. 1996-105.

*Defendant's own regulation and revenue procedures expose the error of its premise that*

*partial netting is impermissible*.  Defendant boldly states that applying both transition rules to a

partial netter would have "constituted a congressional endorsement of an improper method of

accounting."  Df. Br. 14.  This is a remarkable statement, given the fact that the regulation on

which defendant relies endorses that very method.  Treas. Reg. § 1.832-4(e)(2)(iii).  The

regulation imposes a "cut-off method" under which a partial netter must continue its old method

on Gross Lines for pre-1990 accident years (i.e., account for the salvage on a cash basis as it is

recovered) and use the new, required estimated method for the very same Gross Lines in all

future accident years.  Rev. Proc. 91-48 also requires the cut-off method for partial netters.  In other words, defendant's own regulation and revenue procedure perpetuate – and, in fact, endorse – the hybrid treatment that defendant now contends is impermissible.  Moreover, in citing *Continental, supra*, defendant fails to mention that defendant argued in that case that insurance companies operating in more than one state were required to treat estimated salvage on a net basis in some states and on a gross basis in others.  In other words, defendant affirmatively argued in that case what it now characterizes as impermissible.  The court rejected the argument, not on the basis of 26 U.S.C. § 446, but because it was inconsistent with the company's Annual Statement accounting.

*Defendant's argument proves too much*.  According to defendant, "[i]t is clear from the language of the [net salvage transition rule] that the transitional relief was directed at companies following permissible 'pure gross' or 'pure net' methods of accounting prior to 1990."  Df. Br. 14.  Yet, defendant ignores its own argument and, in fact, requires Liberty Companies to follow the net salvage transition rule in this case, even though Liberty Companies sought affirmative adjustments and filed tax returns disavowing the Special Deduction and electing the treatment of Rev. Proc. 92-77.  Moreover, the amount of the Special Deduction defendant imposed on Liberty Companies is 87 percent of the actual net salvage, not the entire salvage including the Gross Lines.  Thus, defendant not only has applied the transition rule to a partial netter in this case, it has done so in accordance with the only logical way to read statute, and not in accordance with the strained reading it spins in its brief that would double count transition relief for gross salvage.[7]

---

[7] Of course, if defendant had applied the transition rule in accordance with its own strained reading of the statute for net salvage, Liberty Companies would obtain a larger refund for 1990.

Defendant also ignores the logical consequences of its argument. It is the gross salvage transition rule in the 1990 Act that deems the required conversion of Gross Lines to Net Lines to be a change in method of accounting, and it is for this reason that a section 481 adjustment is necessary in the first place. If defendant is correct that the transition rule for gross salvage does not apply, then there would be no change in method of accounting or section 481 adjustment at all. Defendant cannot have it both ways. Either the transition rules apply or they do not. In either case, defendant's imposition of a full section 481 adjustment is improper.

*Defendant's reliance on Treas. Reg. § 1.832-4(f)(3)(iii) is misplaced.* As explained above, defendant offers an illogical interpretation of the transition rule for net salvage that it does not even follow, to support the false notion that Congress did not intend the plain language of the transition rule for gross salvage to apply to partial netters. This argument appears designed to support defendant's reliance on Treas. Reg. § 1.832-4(f)(3)(iii), which, defendant asserts, fills an illusory "gap" defendant reads into the statute. Df. Br. 20. However, as explained in our initial brief, the regulation merely states the consequence of the rule that, if the cut-off method was adopted for pre-1990 accident years for gross salvage, there is no section 481 adjustment.

Treas. Reg. § 1.832-4(f)(3)(iii) is irrelevant in this case. The subsection provides: "A company that claims the special deduction is precluded from also claiming the section 481 adjustment provided in paragraph (e)(2)(ii) of this section for pre-1990 accident years." The first prerequisite in subsection (f)(3)(iii) does not apply because Liberty Companies do not claim a Special Deduction on Net Lines, but rather claim a gross-up under Rev. Proc. 92-77. More importantly, subsection (f)(3)(iii) makes sense only if it is read to apply to a taxpayer that used the cut-off method for Gross Lines. The literal language of subsection (f)(3)(iii) precludes a

company from "claiming the section 481 adjustment provided in paragraph (e)(2)(ii)."

Subsection (e)(2)(ii), in turn, requires a company that does not claim the special deduction to

include in taxable income "13 percent of the adjustment that would otherwise be required under

section 481 for pre-1990 accident years as a result of the change in method of accounting …."

Accordingly, by its reference to subsection (e)(2)(ii) and the full section 481 adjustment, the

regulation merely makes clear that a section 481 adjustment does not apply at all to a taxpayer

that used the cut-off method for pre-1990 accident years.  Subsection (f)(3)(iii) does not

authorize the 100 percent section 481 adjustment defendant seeks to impose here.  The plain

language of subsection (f)(3)(iii), which provides that there is no section 481 adjustment at all, is

reconfirmed in the very next subparagraph of subsection (e)(2) – subparagraph (iii) – which

provides that a taxpayer that takes a special deduction for net salvage must implement the

change in method of accounting pursuant to a "cut-off method" for post-1989 accident years.  As

explained above, this means that the regulation requires a taxpayer that claims the special

deduction to continue to use its old method for pre-1990 accident years and to use the new

method required by the 1990 Act for post-1990 accident years.  Because the taxpayer is required

to use the old method for pre-1990 years, there is no 481 adjustment at all.  *See Vines v.*

*Commissioner*, 126 T.C. 279, fn.18 (2006) (explaining that a cut-off method does not result in a

section 481 adjustment); Rev. Proc. 2001-46, 2001-2 C.B. 263 § 6.03(4) (same).  In short,

defendant has no authority under the statute or the regulation to impose a full section 481

adjustment.  If the regulation is read out of context to apply here, where a cut-off method was not

used, there would be no section 481 adjustment at all, giving Liberty Companies a windfall.[8]

---

[8] In keeping with its hide-the-ball litigation strategy, defendant has avoided any discussion of the cut-off method, which would have resulted in a refund for Liberty Companies.  In fact, defendant denied in its answer that the cut-off method applies to Liberty Companies' 1990 taxable year.

*If the regulation means what defendant asserts, it is invalid.*  It is not necessary to invalidate the regulation in this case because the portion relied upon by defendant is not relevant. Further, it is not necessary even to consider the regulation because the language of the statute is abundantly clear.  *Chevron U.S.A., Inc. v. National Res. Def. Council*, 467 U.S. 837, 842-843 (1984).  Nevertheless, even if one assumes, for the sake of argument, that defendant's interpretation of the regulation is correct, it is evident the interpretation cannot stand because it is inconsistent with the origin and purpose of the statute.  A regulation will not be sustained unless it is reasonable and consistent with the statute's plain language, purpose and origin.  *National Muffler Dealers Assoc. Inc. v. U.S.,* 440 U.S. 472, 477 (1979).[9] Defendant's interpretation of Congressional intent is not reasonable because it leads to the absurd results described above and would virtually negate the Gross Lines transition rule.  Moreover, it is predicated on the dubious notion that Congress intended the relief for Gross Lines to apply only to "pure grossers," a label that is not found in the statute or legislative history, but only surfaced in defendant's brief to suggest a perceived void in the legislative history.

---

Answers ¶¶ 43, 50.  Now, having avoided any discussion of the cut-off method, defendant attempts to rely on another section of the regulation that is inextricably intertwined with the cutoff method.

[9] Defendant incorrectly argues that the regulation is entitled to *Chevron* deference, under which a regulation will be upheld if it is a reasonable construction of the statute.  *Chevron, supra.* Defendant, however, admits that the regulation is an interpretative regulation promulgated pursuant to 26 U.S.C. § 7805(a), as opposed to a legislative regulation promulgated by direction of Congress in the particular statute.  Interpretive regulations are entitled to a lesser deference prescribed in *National Muffler*, *supra*.  *See United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26 (1982); *Snowa v. Commissioner,* 123 F.3d 190, 197 (4th Cir. 1997); *see also United States v. Mead Corp.,* 533 U.S. 218 (2001) (regulation that does not comply with the notice and comment requirements in the Administrative Procedure Act is not entitled to *Chevron* deference); *cf. Peoples Fed. Sav. & Loan v. Commissioner,* 948 F.2d 289, 304-305 (6th Cir. 1991).  In any event, defendant's interpretation of the regulation cannot withstand review under either standard because it contradicts the plain language of the statute and is unreasonable.

Moreover, defendant's interpretation is inconsistent with the purpose of the transition rules set forth in the very legislative history on which defendant relies. Defendant acknowledges that Congress enacted the transition rules to provide parity among taxpayers that netted salvage and those that grossed salvage. Df. Br. 21. On this much the parties agree. However, in light of this Congressional intent and the language in the statute applying the relief to "any taxpayer," it is unreasonable to suggest that Congress intended to provide full 87 percent relief to taxpayers that did not take any estimated salvage into account (i.e., "pure grossers" in defendant's parlance), full 87 percent relief to taxpayers that took all estimated salvage into account (i.e., "pure netters"), but no relief to a taxpayer that took some salvage, but not all into account (i.e., a "partial netter"). After all, defendant's argument is predicated on the notion that Congress intended to exclude "partial netters" and "partial grossers" from any transition relief. Thus, under defendant's interpretation, any primarily gross company that had even one dollar of net salvage would be excluded from the purview of the transition rule for both gross and net salvage because it used what defendant characterizes as an impermissible accounting method. This is the necessary conclusion that defendant's illogical argument leads to, and it cannot possibly be a correct interpretation of Congressional intent.

With considerable understatement, defendant admits that its position does not "provide perfect symmetry" and is based on the premise that Congress did not intend to specify a transition rule for all circumstances. Df. Br. 22. But, defendant fails to acknowledge that the plain language of the transition rule does provide for perfect symmetry and is a comprehensive rule. That symmetry is defeated and statutory gaps are created only by defendant's wishful thinking. In short, defendant is attempting to impose its own transition rule that does not exist in the plain language of the rule, was not contemplated by Congress, and is inconsistent with

14

Congress' purpose for enacting the rule.  Defendant is not permitted to do this.  *Citizen's Nat. Bank v. United States*, 417 F.2d 675, 679 (5th Cir. 1969); *Estate of Bullard v. Commissioner*, 87 T.C. 261, 280 (1986) (same principle applies even under the highest level of deference afforded to legislative regulations).[10]

### III.   Liberty Companies are entitled to gross-up their net salvage.

Treas. Reg. § 1.832-4(d) provides that a taxpayer that has reported its unpaid losses net of salvage on its Annual Statement (i.e., a taxpayer with Net Lines) is permitted to gross-up its unpaid losses for tax purposes and thereby convert Net Lines to Gross Lines for tax purposes. The gross-up applies to all years beginning in 1990 if the required disclosure is made. Treas. Reg. § 1.832-4(d)(3) specifically provides that the gross-up requires IRS consent only where the taxpayer, after first qualifying for the gross-up, fails to satisfy the disclosure requirement in a subsequent year.  Except for this limited situation, no IRS consent is required.

Rev. Proc. 92-77 describes the procedure for the gross-up permitted by the regulation.  It merely implements the regulation – it does not, and cannot, narrow the scope of the regulation. Like the regulation, it permits a gross-up of all Net Lines for tax purposes for 1990 and all subsequent years without the IRS' prior consent as long as the disclosure rule is satisfied.  In this case, Liberty Companies made the proper disclosure by reporting the closing 1990 estimated

---

[10] In an attempt to place a restriction on the statute that Congress did not intend, defendant relies on *Atlantic Mut. Ins. Co. v. United States*, 532 U.S. 382 (1998).  In that case, however, the Court dealt with an express Congressional limitation on a fresh start transition rule related to the new requirement in the 1986 Tax Reform Act § 1023 to discount loss reserves under 26 U.S.C. § 846. Tax Reform Act of 1986, Pub. L. No. 99-514, § 1023(e)(3)(B).  Congress specifically excluded "reserve strengthening" from the fresh start, and the case centered on what Congress meant by that limiting term.  In this case, on the other hand, defendant is creating a limitation that is not expressed in the language of the statute and is not supported by legislative history.  The two cases could not be more dissimilar, and *Atlantic Mutual* does not support defendant's strained attempt to limit the statute in this case.  Nevertheless, *Atlantic Mutual* does confirm that where a statute has a plain meaning, a regulation which applies a different reading cannot stand.  A court, as well as the agency, must give effect to the unambiguous intent of Congress as expressed in the

salvage on Net Lines on their 1991 Annual Statements.  Therefore, Liberty Companies are entitled to the gross-up treatment provided by Treas. Reg. § 1.832-4(d)(3).

*The gross-up is not limited to amended tax returns to eliminate double-counting of salvage*.  Defendant correctly points out that one of the purposes of the gross-up provided in the regulation and the Revenue Procedure is to avoid potential double-counting of salvage for Net Lines.  Having identified this purpose (but ignoring the other reasons for the Revenue Procedure), defendant leaps to the conclusion that the Revenue Procedure cannot apply unless the taxpayer filed an original tax return on which it double-counted estimated salvage and now seeks to file an amended return to claim the gross-up.  Thus, even though there is no dispute that Liberty Companies satisfied all the prerequisites for the gross-up in the regulation, defendant asserts that Liberty Companies do not qualify for the gross-up because they failed to satisfy an additional, but unstated, requirement of Rev. Proc. 92-77 – namely, to have double-counted salvage for Net Lines on their original tax return for 1990.

Defendant's position is obviously incorrect.  It is Treas. Reg. § 1.832-4(d) that gives Liberty Companies the right to gross-up their losses incurred on Net Lines for 1990 without the consent of the IRS, not the Revenue Procedure.  Rev. Proc. 92-77 merely describes how the gross-up is to be accomplished.  There is no provision in the regulation or in Rev. Proc. 92-77 that suggests that the gross-up is limited to taxpayers that previously filed returns on which they double-counted salvage for Net Lines.  Such a reading of the regulation and Rev. Proc. 92-77 would be irrational.  In essence, defendant is saying that the regulation applies only to taxpayers who file an amended return claiming a refund after previously filing a return for the year the gross-up is claimed reporting a double-counting of salvage.  According to defendant's reading,

statute. 532 U.S. at 387.

16

the regulation does not apply on a prospective basis to any taxpayer which has yet to file a return reporting double-counting, or which seeks the gross-up to avoid the risk that the IRS on audit will require a double-counting of salvage for Net Lines.[11]  In other words, although defendant goes to great lengths to argue that the regulation and Rev. Proc. 92-77 were intended to prevent double-counting of Net Lines by allowing a conversion of the Net Lines to Gross Lines, defendant argues that the IRS wanted to solve the double-counting problem exclusively for a narrow (and perhaps non-existent) class of taxpayers that previously interpreted the statute to require double-counting and seek to file amended returns.  This is not a rational interpretation of the regulation or Rev. Proc. 92-77.  Treas. Reg. § 1.832-4(d), just like other regulations which interpret the Internal Revenue Code, provides guidance for taxpayers to follow in filing their tax returns.  We are not aware of any Treasury Regulation of general applicability that has been construed only to apply to amended returns filed after the taxpayer has first ignored the regulation.  The plain language of the regulation applies to all taxpayers without limitation, including Liberty Companies, who would potentially have a double-counting issue for Net Lines.

*Liberty Companies separately took into account all salvage as required by Rev. Proc. 92-77.*  To find support for its position, defendant completely ignores the regulation and focuses on the second condition in section 4.01 of the Revenue Procedure, which provides that "the

---

[11] Taxpayers were concerned that IRS agents would require the "unpaid losses" calculation in 26 U.S.C. § 832(b)(5)(A)(ii) to be taken directly off the Annual Statement (prior to discounting under 26 U.S.C. § 846) and thus to be net of (i.e., reduced by) estimated salvage for Net Lines, and then to be taken into account a second time in accordance with the new requirement in 26 U.S.C. § 832(b)(5)(A)(iii) to reduce unpaid losses by discounted estimated salvage.  As explained by Dennis Van Mieghem in his declaration, although taxpayers were concerned about this as a potential audit adjustment by the IRS, no company he is aware of actually double counted salvage on its original tax return.  Thus, under the IRS' new-found interpretation of Rev. Proc. 92-77, no company was actually covered by the Revenue Procedure because no one actually double counted on its original return.

estimated salvage recoverable that reduced unpaid losses is separately taken into account in

accordance with section 832(b)(5)(A)(iii)." As explained in Liberty Companies' initial brief,

this condition means that a taxpayer cannot gross-up its Net Lines unless it also takes into

account the estimated salvage income that reduces unpaid losses in those lines to the net amount.

Pl. Br. 15-18. That is, the second condition of section 4.01 merely ensures that the requirements

of the 1990 Act will be complied with and losses incurred on all lines will be reported net of

salvage, once and only once, after Net Lines have been grossed-up. This is the very treatment

that Liberty Companies sought by their 92-77 Election and have claimed in this case, but which

defendant denies.

      Defendant misreads this second requirement of section 4.01 as a condition precedent

applicable only to Net Lines – that the gross-up applies only if a tax return already has been filed

that double-counts salvage. As explained above, such a narrow reading cannot be right; it

implements no rational policy and would narrow impermissibly the scope of the regulation. Had

the IRS intended the Revenue Procedure to apply only to a limited class of taxpayers (despite the

broad scope of the regulation), certainly it would have made that intent clear. Were this position

correct, the IRS could simply have said: "This revenue procedure only applies to taxpayers that

previously filed tax returns on which they double-counted salvage and now seek to file amended

returns to claim a gross-up." Of course, the IRS did not say this because it had no intent

administratively to overrule or narrow Treas. Reg. § 1.832-4(d). Thus, even if section 4.01 of

Rev. Proc. 92-77 operates the way defendant says, Liberty Companies still are entitled to the

gross-up in 1990, because Treas. Reg. § 1.832-4(d) allows the gross-up, not Rev. Proc. 92-77.

      Furthermore, defendant has completely ignored the fact that Liberty Companies included

a statement on their 1990 tax return that reserved the right to amend the return to conform with

the IRS administrative guidance.  The substance of Liberty Companies' 92-77 Election was to

conform to the IRS' position by grossing-up unpaid losses by the estimated salvage on Net

Lines, as allowed by the regulations, and at the same time take that salvage into account as

provided in 26 U.S.C. § 832(b)(5)(A)(iii).

Defendant attempts to support its position by citing examples in section 4.06 of the

Revenue Procedure for the proposition that a taxpayer which claims the special deduction cannot

also claim the gross-up.  This is true, once Net Lines are converted to Gross Lines by the gross-

up, the special deduction does not apply.  But here, Liberty Companies have not elected to claim

the Special Deduction.  In making their 92-77 Election, Liberty Companies eliminated any

Special Deduction.  Instead, the IRS imposed the Special Deduction on Liberty Companies in an

attempt to deny Liberty Companies the gross-up permitted by Treas. Reg. § 1.832-4(d) and Rev.

Proc. 92-77.[12]

*The gross-up allowed by Treas. Reg. § 1.832-4(d) did not require IRS consent.*

Defendant relies on section 4.04 of Rev. Proc. 92-77 to suggest that claiming the gross-up

required IRS consent.  Defendant makes this argument despite the fact that Treas. Reg. § 1.832-

4(d) specifically provides that consent is not required.  Nothing in the Revenue Procedure

suggests that IRS consent is needed for a gross-up.  As Liberty Companies pointed out in their

original brief, the meaning of section 4.04 of Rev. Proc. 92-77 is clear – it merely reiterates that,

where taxpayer used the cut-off method for Gross Lines (because it claimed the special

deduction), it must obtain the consent of the IRS to depart from the cut-off method to remove

--------

[12] Thus, defendant's statement (Df. Br. 18) that Liberty Companies claim they are entitled to
both the Special Deduction and the Fresh Start is fiction.  Df. Br. 18. Defendant's citation to
Plaintiffs' Brief is in error.  Liberty Companies claim the gross-up and the Fresh Start.  It is
defendant which seeks to impose a Special Deduction here.

19

salvage from unpaid losses.  Pl. Br. 18-21.  In any event, in this case section 4.04 has no

application because Liberty Companies do not claim the Special Deduction and did not use the

cut-off method for their Gross Lines.  Indeed, by denying that the cut-off method applied,

defendant necessarily concedes that the change was proper.  Answers ¶¶ 43, 50.

    *Defendant has shifted its position.*  When discovery closed in this case, defendant

apparently was in agreement with Liberty Companies' reading of section 4.04 of Rev. Proc. 92-

77 – that it referred to a change from the cut-off method for Gross Lines to a net salvage method.

 In response to discovery, United States' Revised Response to Request to Admit #7 of Plaintiffs'

First Set of Requests for Admissions, provided to Liberty Companies on September 28, 2006

(App. A. to Pl. Mtn. to Compel 35), defendant contended that Liberty Companies did not

separately account for salvage recoverable for pre-1990 accident years and that to modify that

treatment would be a change in accounting requiring the Commissioner's consent.  A few days

later defendant's counsel advised Liberty Companies' counsel in a telephone conversation that

defendant would again revise this Revised Response because this contention had been based on

defendant's erroneous understanding that Liberty Companies had employed the cut-off method

for Gross Lines and thus had not taken that salvage recoverable for pre-1990 accident years into

account.  Thus, defendant's initial discovery response agreed with Liberty Companies' position

that section 4.04 refers to a taxpayer that used the cut-off method for pre-1990 accident years.  In

the meantime, Liberty Companies filed their motion for summary judgment which made clear

that defendant's original interpretation actually supports the tax refunds Liberty Companies

claim.  Recognizing that its prior interpretation of section 4.04 was the same as Liberty

Companies, and supports their position, defendant now has a new position on the meaning of

section 4.04, exactly opposite of its prior reading, that the change referred to in section 4.04 is a

change with respect to Net Lines rather than Gross Lines. Defendant now ignores the fact that section 4.04 simply reiterates section 9.03 of Rev. Proc. 91-48 with respect to the cut-off method for Gross Lines and instead explains, "increasing the unpaid loss by estimated salvage recoverable that reduced the unpaid loss is the same as reviving from the unpaid loss the estimated salvage recoverable that reduced the unpaid loss." Df. Br. 29. Simply stated, defendant got it right the first time.

*The IRS has consented to the gross-up.* At the close of its brief, defendant makes several assertions, the essence of which are that the gross-up permitted by Treas. Reg. § 1.832-4(d) represents a change in method of accounting for which IRS consent is needed. But, as pointed out in Liberty Companies' initial brief, claiming the gross-up for 1990 is not a change in method of accounting because it is a one-time event affecting only the taxable income for the year of the gross-up. A method of accounting is not involved unless the timing of a material item is in issue. Treas. Reg. § 1.446-1(e)(2)(ii)(a); *see* Pl. Br. 22-23. Recognizing this problem, defendant asserts that a method of accounting is involved when the special deduction and the gross-up are looked at together because the overall timing of taxable income may be changed. But defendant ignores the fact that, under 26 U.S.C. § 446, each material item is looked at separately for purposes of analyzing whether there has been a change in method of accounting; the overall effect on taxable income of two separate items is not a single method of accounting. *See Leonhart v. Commissioner*, T.C. Memo. 1968-98 ("It is obvious that 'material item' should be read in context as 'material item of gross income or deductions' and should not be construed as meaning 'a material item of net income.'")

More important, the purported accounting method change is not even relevant in this case. Consent to the gross-up treatment has been given expressly by Treas. Reg. § 1.832-4(d)

and Rev. Proc. 92-77.  Nowhere does the regulation or the Revenue Procedure require additional

IRS approval or a Form 3115 (Application for Change in Accounting Method) filing.

### IV.     Defendant is deemed to admit material facts it did not oppose.

Defendant declined to respond to several of Liberty Companies' statements of material

undisputed facts, including numbers 27, 30, 31, 39 and 41.  *See* Defendant's Response to

Plaintiffs' Statement of Undisputed Material Facts.  The stated facts stem from the complaint,

are relevant, and are therefore deemed admitted under Local Rule 56.1.[13]

### V.     Liberty Companies are entitled to negative inferences based on defendant's discovery abuses.

As explained in pending motions, defendant refused to produce the background files

regarding Treas. Reg. § 1.832-4, Rev. Proc. 91-48 and Rev. Proc. 92-77.  Defendant, moreover,

after having received contention interrogatories, concealed its position in this case until ***after***

Liberty Companies filed their motion for summary judgment.  Defendant claimed that the

documents are not relevant and not available for review because of an IRS building closure.

These arguments turned out to be incorrect and untrue.  Now, in support of its motion for

summary judgment, defendant places a gloss on the salvage transition rule in order to try to

convince the court that a purported limitation on the rule in the applicable regulation is the

proper reading.  Moreover, defendant argues that the sole purpose of Rev. Proc. 92-77 was to

solve a double-counting problem that, it turns out, applies to few, if any, taxpayers.  Further, in

its brief, defendant shamelessly refers to documents that are contained in the background files it

previously stated were not relevant.  Defendant, in short, has committed abusive discovery

violations designed to hide its positions and conceal relevant materials.  In view of these

---

[13] Damages in a tax case refer to the tax and interest calculations, not the essential facts that
drive those calculations.

violations, Liberty Companies request adverse inferences that documents in defendant's background files would demonstrate what Liberty Companies assert, namely that (1) Treas. Reg. § 1.832-4(f)(3)(iii) was intended to apply only to taxpayers that used the cut-off method for pre-1990 accident years, and (2) the gross-up allowed by Treas. Reg. § 1.832-4(d) and Rev. Proc. 92-77 was not intended to be limited to taxpayers that double counted salvage on their original tax returns.

Such adverse inferences are well within this Court's discretion. *See Knightsbridge Mktng. Serv., Inc. v. Promociones y Projectos, S.A.* 728 F.2d 572, 575 (1st Cir. 1984). ("The district court was entitled, as are we, to draw an adverse inference against the defendant for its failure to produce . . .") (Also quoting *Wigmore on Evidence,* § 291, at 228 (Chadbourne rev. 1979)).

## VI.     Conclusion

For the reasons stated above, and in their initial brief, Liberty Companies are entitled to the Fresh Start for salvage on their Gross Lines and the gross-up in 1990 for salvage on their Net Lines.

Respectfully submitted,


Date:  November 15, 2006                    /s/ *Peter H. Winslow*_____
                                            Peter H. Winslow
                                            Admitted Pro Hac Vice
                                            1875 Eye Street, NW, Ste. 1050
                                            Washington, D.C.  20006
                                            Tel: (202) 434-9162
                                            Fax: (202) 331-2032
                                            Attorney for Plaintiffs