IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY AND SUBSIDIARIES, | ) ) ) | |
| Plaintiff, | ) | Civil No. 1:05-11048-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY AND SUBSIDIARIES, | ) ) ) | |
| Plaintiff, | ) | Civil No. 1:05-11049-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY TO PLAINTIFFS' DECEMBER 15, 2006 RESPONSE
SUGGESTING GOVERNMENT DECEPTION**

**LEAVE TO FILE GRANTED ON JANUARY 22, 2007**

On November 30, 2006, the United States filed a motion for leave to file out of time a

memorandum in support of its motion for summary judgment and in opposition to Plaintiffs'

motion for summary judgment in light of the Court's November 16, 2006 order striking, as

exceeding the page limit, the memorandum originally timely submitted on October 30, 2006.  A

copy of the memorandum which the government sought to file was attached to the government's

November 30th motion (hereinafter "November 30th memorandum").  On December 7th, Plaintiffs

responded to the government's motion for leave to file the November 30th memorandum and on

December 14th the government filed a motion for leave to file a reply to that response.  The

attachment to the government's December 14th motion, explained, among other things, that while

the footnotes in the government's original memorandum were in 12-point font and the footnotes in the November 30th memorandum were in 11-point font, the use of the smaller-font footnotes did not effect the pagination of the memorandum. As further indicated in the government's attachment to its December 14th motion, on December 8th the government provided Plaintiffs' counsel with a copy of the November 30th memorandum with the footnotes increased to 12-point font and the memorandum with the 12-point-font footnotes was within the 25-page limit.

On December 15th, Plaintiffs filed a response to the government's December 14th motion incorrectly stating:

> . . . defendant incorrectly states that it chose a smaller font size in its out-of-time brief for stylistic reasons and that the small font size did not affect the page-length of the brief. Defendant neglects to inform the Court, however, that the alternative hard-copy brief it provided plaintiffs' counsel had a reconfigured margin style that differed from the margin in the out-of time brief defendant submitted to the Court. If reconfigured to the margin style defendant used in the brief it submitted to the Court, the alternative brief would exceed the Court's 25-page limit.
> Plaintiffs December 15th Response, pp.1-2.

Contrary to Plaintiffs' contentions, no changes were made to the margins of the memorandum provided to Plaintiffs' counsel on December 8th; the only change made to the memorandum provided to Plaintiffs' counsel on December 8th was to increase the footnotes to 12-point font. The memorandum provided to Plaintiffs' counsel on December 8th, however, was a hard copy printed from WordPerfect to a laser printer whereas the memorandum filed on November 30th was printed from WordPerfect to Adobe Acrobat and filed and served electronically through the ECF system. This difference, not a change in margins as there was none, created a difference in the appearance of the two documents. Undersigned counsel pointed this out to Plaintiffs' counsel during a telephone conversation on December 14th. A copy of the November 30th memorandum with the footnotes increased to 12-point font is attached to this reply. It is the PDF version (WordPerfect document printed to Adobe Acrobat) of the WordPerfect document which was printed to a laser printer and provided to Plaintiffs' counsel on December 8th.

The government apologizes to the Court for taking its time to address a dispute about page margins and font size. It was, however, determined to be important to respond to Plaintiffs' December 15th suggestion of government deception.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Karen Wozniak
KAREN WOZNIAK
Trial Attorney, Tax Division
U.S. Department of Justice
P. O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-1927
E-mail: karen.e.wozniak@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that the United States' *Reply to Plaintiffs' December 15, 2006 Response Suggesting Government Deception - Leave to File Granted January 22, 2007* - filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). There are no non-registered case participants.

January 23, 2007

/s/ Karen Wozniak
KAREN WOZNIAK

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY AND SUBSIDIARIES, | ) | |
| | ) | Civil No. 1:05-11048-RCL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| LIBERTY MUTUAL FIRE INSURANCE | ) | |
| COMPANY AND SUBSIDIARIES, | ) | |
| | ) | Civil No. 1:05-11049-RCL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

MICHAEL J. SULLIVAN
United States Attorney


KAREN WOZNIAK
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044

Telephone: (202) 307-1927
E-mail: karen.e.wozniak@usdoj.gov

**Statement of the Case**

Plaintiffs seek income tax refunds totaling over $43 million with respect to the 1990 tax period.  Plaintiffs claim, in the alternative, that: (1) they are entitled to claim both the fresh start adjustment and the special deduction provided in section 11305 of Revenue Reconciliation Act of 1990, 104 Stat. 1388 ("the 1990 Act"); and (2) they are entitled to use the year-end gross-up adjustment provided in § 4.02 of Revenue Procedure 92-77.  As set forth below, Plaintiffs are not entitled to the year-end gross-up adjustment or to claim the fresh start adjustment along with the special deduction.

**Statement of Facts**

The undisputed material facts are set forth in the United States' Statement of Undisputed Material Facts which is incorporated herein by reference.

**Introduction**

Section 832 of the Internal Revenue Code (hereinafter "IRC") includes underwriting income within the gross income of an insurance company.  Section 832(b)(3) defines "underwriting income" as "premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred."  Under § 832(b)(5)(A), losses incurred are computed by taking into account paid losses, unpaid losses, salvage and reinsurance.[1]

For taxable years before 1990, salvage recoverable was taken into account as a reduction to paid losses.  <u>See</u> Rev. Proc. 91-48, § 2.  Regulations for those years, however, only required salvage recoverable to be taken into account to the extent that it could be treated as an asset for state statutory accounting purposes.  <u>Id.</u>  Companies that used an accounting method that did not take salvage recoverable into account were called grossers.  Companies that used an accounting

---

[1] For tax purposes, salvage includes subrogation.  Salvage is money recovered by the insurer through the sale of damaged property.  Subrogation is the right of the insurer to proceed against third parties for recovery of amounts paid in claims.

method that did take salvage recoverable into account were called netters.

The 1990 Act amended § 832(b)(5)(A), establishing a new method of accounting for salvage recoverable which eliminated the "grosser" method of accounting. The amendment required: (1) that all estimated salvage recoverable (hereinafter "salvage recoverable") be taken into account in computing the deduction for losses incurred regardless of whether or not it could be treated as an asset for state statutory accounting purposes; (2) that salvage recoverable be taken into account separately, rather than simply as a reduction to paid losses; and (3) that salvage recoverable be separately discounted. Under § 832(b)(5)(A), as amended, the computation of losses incurred is made in three steps:

(A) In General. --The term "losses incurred" means losses incurred during the taxable year on insurance contracts computed as follows:

(i)     To losses paid during the taxable year, deduct salvage and reinsurance recovered during the taxable year.

(ii)    To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses (as defined in section 846) outstanding at the end of the taxable year and deduct all unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year.

(iii)   To the results so obtained, add estimated salvage and reinsurance recoverable as of the end of the preceding taxable year and deduct estimated salvage and reinsurance recoverable as of the end of the taxable year.

The amount of estimated salvage recoverable shall be determined on a discounted basis in accordance with procedures established by the Secretary.

26 U.S.C. § 832(b)(5)(A).[2] The statute clearly requires: (1) a separate calculation for losses paid, which are reduced by salvage and reinsurance recovered during the year; (2) a separate calculation

---

[2] Because in computing losses incurred, unpaid losses at the end of the year are added and unpaid losses at the end of the prior year are deducted, the deduction for losses incurred is increased by an increase in unpaid losses over the year. Conversely, because salvage recoverable at the end of the prior year is added and salvage recoverable at the end of the year is deducted, the deduction for losses incurred is decreased by an increase in salvage recoverable over the year.

for the changes over the taxable year in unpaid losses, with unpaid losses on nonlife insurance contracts discounted; and (3) a separate calculation for the changes over the taxable year in salvage and reinsurance recoverable, with salvage recoverable determined on a discounted basis. These separate calculations are significant, because both unpaid losses on nonlife insurance contracts and salvage recoverable are reported on a discounted basis and different discount factors can apply to these different items.[3]

### Argument

I.  26 C.F.R. § 1.832-4(f)(3)(iii) PRECLUDES CLAIMING BOTH THE SPECIAL DEDUCTION AND THE FRESH START UNDER THE 1990 ACT.

The 1990 Act treats the change in method of computing losses incurred required by its amendment of § 832(b)(5)(A) as a change in method of accounting. See 1990 Act § 11305(2)(A) ("[i]n the case of any taxpayer who is required by reason of the amendments made by [§ 11305] to change his method of computing losses incurred," . . . "such change shall be treated as a change in method of accounting.") Under IRC § 481(a), a taxpayer that changes its method of accounting must take into account those adjustments that are necessary to prevent amounts from being duplicated or omitted as a result of the change. Ordinarily the 481 adjustment, for insurance companies which did not take salvage recoverable into account in computing losses incurred prior to the 1990 tax period (grossers), would be equal to the discounted amount of salvage recoverable at the end of 1989. However, § 11305(c)(2)(B) of the Act provides that only 13% of the amount of the adjustment otherwise required by § 481 must be taken into account ratably over a period not to exceed

---

[3] The first IRS guidance with respect to the new treatment of salvage recoverable required by the 1990 Act and transitional rules associated with the change was provided in the proposed regulations. See 56 FR 11127-01. Further guidance was provided by Rev. Proc. 91-48 and Notice 92-1. Final regulations regarding salvage recoverable were issued in January 1992. See T.D. 8390, 57 FR 3130-01. On September 4, 1992, Rev. Proc. 92-77 was issued to provide guidance with respect to a regulatory provision designed to relieve a potential double counting of salvage recoverable in computing losses incurred under § 832(b)(5)(A), as amended. Rev. Proc. 92-77 was published on September 4th and 8th in commercial tax service publications and in the Internal Revenue Bulletin on September 21st.

four taxable years beginning with the 1990 tax period. The remaining 87% of the 481 adjustment is not taken into account in computing taxable income. See Rev. Proc. 91-48, § 8.03. This forgiveness of 87% of the § 481 adjustment under § 11305(c)(2)(B) is referred to as a "fresh start" provision.

For insurance companies that took salvage recoverable into account in determining losses incurred for the 1989 tax period (netters), § 11305(c)(3) of the 1990 Act provided that 87% of the discounted amount of salvage recoverable as of the end of 1989 would be allowed as a deduction ratably over the first four tax periods beginning with the 1990 tax period. This deduction is referred to as the "special deduction." See Rev. Proc. 91-48, § 2.04.

Section 1.832-4(f)(3)(iii) of the Treasury regulations provides that a company that claims the special deduction under § 11305(c)(3) of the 1990 Act is precluded from also claiming the fresh start under § 11305(c)(2)(B) of the Act. See 26 C.F.R.§ 1.832-4(f)(3)(iii).[4] Accordingly, Plaintiffs cannot claim the special deduction with respect to salvage recoverable associated with the lines of business for which they accounted for salvage recoverable on a net basis and also the fresh start with respect to salvage recoverable associated with the portion of the auto physical damage line of business for which they accounted for salvage on a gross basis.

For tax purposes, the term "method of accounting" includes not only a taxpayer's overall method of accounting but also the accounting treatment of any item, such as salvage recoverable. See 26 C.F.R. § 1.446-1(a). Prior to the 1990 Act, there were two permissible methods of accounting for salvage recoverable for tax purposes: (1) a gross method (a cash method) and (2) a

---

[4] The text of § 1.832-4(f)(3)(iii) reads, "A company that claims the special deduction is precluded from also claiming the section 481 adjustment provided in paragraph (e)(2)(ii) of this section for pre-1990 accident years." Section 1.832-4(f) labels the deduction provided in § 11305(c)(3) of the 1990 Act as the "special deduction." Section 1.832-4(e)(2)(ii) provides that "[i]f a company does not claim the deduction under section 11305(c)(3) of the 1990 Act, the company must take into account 13 percent of the adjustment that would otherwise be required under section 481 for pre-1990 accident years as a result of the change in accounting method." This tracks the fresh start provision in § 11305(c)(2)(B) of the 1990 Act.

net method (an accrual method). Under the gross method, salvage was not taken into account until it was reduced to cash. The gross method was permitted by the regulations in effect for tax periods prior to 1990 for a company which transacted business in any state in which salvage recoverable could not be reported for state statutory accounting purposes by reason of express state statutory provisions, or rules or regulations of the state insurance department. See 26 C.F.R.§ 1.832-7T(c); Continental Ins. Co. v. United States, 474 F.2d 661 (1973). Under the net method, salvage recoverable was taken into account in computing losses incurred as an adjustment to paid losses. The net method was required by the regulations in effect for taxable periods prior to 1990 for a company which did not transact business in any state in which salvage recoverable could not be reported for state statutory accounting purposes. See 26 C.F.R. § 1.832-7T(c). A partial net (or partial gross) "method" whereby some, but not all, salvage recoverable was taken into account in computing losses incurred was not a permissible method of accounting because by reporting some, but not all, salvage recoverable, salvage recoverable was not treated consistently. Treasury regulations require consistency in the treatment of an item of income for a method to be a valid method of accounting. See 26 C.F.R. § 1.446-1.[5] Since Plaintiffs used a partial net approach in dealing with salvage recoverable prior to 1990, they were not using a permissible method of accounting for salvage recoverable.

The 1990 Act imposed a single permissible method of accounting for salvage recoverable that was different from either of the two existing permissible methods of accounting; under the new method, salvage recoverable must be taken into account in computing losses incurred and it must be separately taken into account and discounted. See 1990 Act 11305(a). A company which

---

[5] As an example, the regulations permit a taxpayer to use an accrual method of accounting with respect to purchases and sales and a cash method of accounting with respect to all other items of income and expense, but do not provide for the use of an accrual method with respect to some purchases and a cash method with respect to other purchases. See 26 C.F.R. § 1.446-1(c)(1)(iv)(a).

did not previously take salvage recoverable into account in computing losses incurred (hereinafter "grossers") had to change its method of accounting to take salvage recoverable into account. A company which previously took salvage recoverable into account in computing losses incurred (hereinafter "netters") also had to change its method of accounting. Although netters previously took salvage recoverable into account, they had not taken it into account separately so they had to change their method of accounting to take salvage recoverable into account separately.

The transitional relief set forth in the 1990 Act, a fresh start for grossers and a special deduction for netters, is directed to taxpayers that were following permissible methods of accounting prior to 1990.

It is clear from the language of the 1990 Act that the transitional relief was directed at companies following the permissible "pure gross" or "pure net" methods of accounting prior to 1990. It did not contemplate that there would be companies, such as Plaintiffs, which were using an improper accounting treatment which mixed the two proper methods. The special deduction equaling "87 percent of the discounted amount of estimated salvage recoverable as of the close of [the 1989 taxable year]" only makes sense if a company previously netted all of its salvage recoverable. It would not make sense for Congress to base the special deduction on salvage recoverable as of the close of 1989 that was never taken into account. Thus, if Congress had intended the special deduction to be directed at partial netters as well as pure netters, it would have provided that the amount of the special deduction was equal to 87% of the salvage recoverable taken into account in determining losses incurred for the 1989 tax period. Any such provision would also have constituted a congressional endorsement of an improper accounting method. If Congress were to have intended to endorse an improper accounting method, one would expect some explanation in the legislative history for such an unusual act. There is no such explanation.

The emphasis in the 1990 Act that any change in method of computing losses incurred

- 6 -

required by the Act is a change in method of accounting indicates that Congress properly regarded the reporting of salvage recoverable as a company-wide issue, that is, that a company would have been taking all or none of its salvage recoverable into account in computing losses incurred prior to 1990.[6] As explained above, an accounting method for an item is to be applied consistently, not on a pick-and-choose basis. The emphasis on a change in method of accounting also indicates that Congress intended the transitional relief to be applied on a consistent company-wide basis. Accordingly, the transitional relief was directed at companies which were pure grossers and pure netters.

Given that the transitional relief in the 1990 Act was directed at companies which were pure grossers or pure netters, it follows that Congress never intended both the fresh start provision and the special deduction to be claimed by one company. The fresh start provision would not apply to a company which netted all of its salvage recoverable in reporting unpaid losses and the special deduction would not apply to a company which reported all of its salvage on a gross method. By precluding a company which claims the special deduction from also claiming the fresh start, § 1.832-4(f)(3)(iii) of the regulations appropriately sought to limit the fresh start and special deduction provisions in accordance with Congress' intent.

If it is not sufficiently implicit from the language of the statute as a whole that Congress meant the transitional relief to be addressed to companies that used a proper method of accounting, either as pure grossers or pure netters, and meant the transition rules to apply on a company-wide basis, instead of endorsing an improper accounting treatment by permitting favorable transition treatment on a line of business basis or a within line of business basis for partial netters, the legislative history substantially reinforces the view.

In addition to the literal statutory language, it is necessary to read the statute as a whole and

---

[6] As seen below, the legislative history also reveals an emphasis that the new requirement with respect to salvage recoverable was a change in method of accounting.

consider its intended effect:

> The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will.

Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 93-94 (1934).

The House Bill provided only "fresh start" relief in the form of permanent forgiveness of the § 481(a) adjustment that would otherwise result from the change in method of accounting from "grossing" to "netting" of discounted estimated salvage recoverable. Ways and Means Committee Print No. 101-37, at 39-40 (October 15, 1990). The House Bill provided no special deduction of any kind for companies that netted prior to 1990.

The Senate provided that 77% of the adjustment otherwise required by section 481 would be taken into account over a period not to exceed four years, and the remaining 23% would be permanently forgiven. In addition, the Senate provided that companies which took salvage recoverable into account in determining losses incurred for the 1989 tax period could deduct over a four-year period 23% of the discounted amount of the salvage recoverable as of the end of 1989. See 136 Cong. Rec. S15965 (October 18, 1990). The Conference Report modified this approach: the 77% taken in account over four years became 13%; the 23% of permanent forgiveness became 87%; and the special deduction of 23% over four years became 87% over four years. See Conference Report, H.R. REP. NO. 101-964, at 1071-72 (October 27, 1990).

In describing their respective forms of transitional relief, the Senate and Conference Bills each speak in terms of "companies." Further, in describing the purpose of the transitional relief, they speak in terms of companies. For example, the Senate Finance Committee Report indicated that its version of the special deduction was intended "to treat companies that have been taking estimated salvage recoverable into account in determining losses incurred in the same manner as

companies that have not been taking estimated salvage recoverable into account." Senate Report, 136 CONG. REC. S15695 (emphasis added). The language strongly suggests only two possible scenarios: (1) that Congress was operating under the assumption that property and casualty companies were either grossers or netters, or (2) that Congress chose not to tailor transitional relief down to separate lines of business.

Prior to the 1990 tax period, Plaintiffs were partial netters using an impermissible method of accounting for salvage recoverable. In computing losses incurred prior to the 1990 tax period, Plaintiffs took into account salvage recoverable with respect to a portion of the auto physical damage line of business and also took into account salvage recoverable with respect to all other lines of business. Salvage recoverable with respect to another portion of the auto physical damage line was not taken into account (hereinafter referred to as "the gross portion of the auto physical damage line"). The transitional relief provided in the 1990 Act, therefore, does not contemplate their situation.

Plaintiffs, however, claim that they are entitled to the special deduction with respect to their net lines and the fresh start with respect to their "gross lines." See Complaints, ¶¶ 49. Plaintiffs' Memorandum, p.12. Plaintiffs' reference to "gross lines" is inaccurate and misleading as they did not have gross lines, or even a single gross line; they only had the auto physical damage line, for which some of the salvage recoverable was netted against the unpaid losses shown on their annual statements and some was not. Contrary to Plaintiffs' position, it is apparent from the plain language of the statute that Congress contemplated transitional relief on a company-wide basis for pure netters and pure grossers, not partial netters like Plaintiffs. There is no mention whatsoever in the statute of providing transition relief on a line-of-business basis, let alone on a within-line-of-business basis. Plaintiffs' interpretation of the Act is overly expansive and lacking authority in the plain language of the statute.

Section 1.832-4(f)(3)(iii) of the regulations which precludes a company that claims the

special deduction from also claiming the fresh start provision is supported by the statutory language and legislative intent, or alternatively, is a reasonable interpretation of the statute. IRC § 7805(a) provides that the Secretary of the Treasury "shall prescribe all needful rules and regulations for the enforcement of this title [26 U.S.C.] . . . ." It is well established that regulations issued pursuant to this authority merit deference from the courts. See United States v. Boyle, 469 U.S. 241, 241, n.4 (1985) citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). As the Supreme Court has explained, deference to the Commissioner's regulations is warranted because "Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Code. 26 U.S.C. § 7805(a)." United States v. Correll, 389 U.S. 299, 307 (1967). Under Chevron, unless Congress has spoken to the precise issue presented, thereby leaving no gap to be filled by an agency, an agency's construction of a statute warrants deference so long as the construction is "permissible" or "reasonable," or is "a reasonable policy choice for the agency to make." Chevron, 467 U.S. at 842-845; FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000); Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 125 S.Ct. 2688, 2702 (2005). The Supreme Court has explained that regulations are entitled to "Chevron deference" if issued pursuant to an agency's "generally conferred authority . . . to speak with the force of law." United States v. Mead Corp., 533 U.S. 218, 229 (2001). This reference to regulations having the "force of law" is not confined to so-called "legislative" regulations, i.e. regulations issued pursuant to "expressly delegated authority or responsibility to . . . fill a particular gap," but applies equally to regulations issued pursuant to an agency's "generally conferred authority" to interpret and enforce the law. Id.

The first issue to be addressed in determining whether § 1.832-4(f)(3)(iii), which precludes a company that claims the special deduction from also claiming the fresh start, merits deference is whether the governing statute itself directly resolves the issues presented. When "Congress has

directly spoken to the precise question at issue" and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-843; Lugo v. Schweiker, 776 F.2d 1143, 1146-1147 (3d Cir. 1985). If it is determined that Congress has not spoken to the precise question, a second issue, the reasonableness of the construction, must be addressed in determining whether the regulation is entitled to deference. When Congress has not spoken to the precise question at issue, that is where the statute language contains a gap, or element of ambiguity, thereby leaving a vacuum to be filled by an agency, an agency's construction of a statute warrants deference so long as the construction is "permissible" or "reasonable," or is "a reasonable policy choice for the agency to make." Chevron, 467 U.S. at 842-45. As detailed above, although § 11305 of the 1990 Act does not explicitly state that a company cannot claim both the special deduction and the fresh start, the statute by necessary implication of its plain terms and supported by the legislative history precluded a company from claiming both the special deduction and fresh start. To the extent, if any, the Court may find the statute ambiguous or silent on this issue, § 1.832-4(f)(3)(iii) is reasonably based on the statute passed by Congress and appropriately seeks to limit the fresh start and special deduction provision to what was intended by Congress. The Treasury Regulations promulgated in connection with § 11305 of the 1990 Act attempted to clarify application of the Act. Notice of the proposed rulemaking and invitation to comment was provided prior to issuance of the final regulations. See 56 FR 11127-01. The Supreme Court has emphasized that the Commissioner's interpretation need not be the "best" interpretation, but merely a "reasonable" one. Atlantic Mut. Ins. Co. v. Commissioner, 523 U.S. 382, 390 (1998). The Supreme Court has stated that a regulation "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." Commissioner v. Portland Cement Co. of Utah, 450 U.S. 156 (1981), *quoting* Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501 (1948). In addition to the consistency of § 1.832-4(f)(3)(iii) with the Congressional intent as indicated in the language and

the legislative history, the regulation is reasonable on other grounds.  The special deduction is an extraordinary form of relief in and of itself, and to couple it with the fresh start, another extraordinary, diametrically opposite form of relief, arguably causes a conceptual breakdown.  As discussed above, Congress crafted § 11305 as a change in method of accounting, which signals that Congress intended transitional relief to be applied on a consistent, company-wide basis.  In addition to Congress' intent, general principles of consistency also apply and demand the application of the transition rules on a company-wide basis, not on a line of business basis or, as Plaintiffs seek, on a within line basis.  Furthermore, transition rules are to be construed narrowly. The Congressional intent to provide parity is a general one, and is necessarily limited by the language Congress chose to express it.

Deductions under the tax code, including the special deduction, are a matter of legislative grace.  See  Deputy v. Dupont, 308 U.S. 488, 493 (1940); New Colonial Ice v. Helvering, 292 U.S. 435, 440 (1934).  Deductions and exclusions of items from gross income, such as the special deduction or the income forgiveness under § 11305(c)(2), are to be narrowly construed.  See Butka v. Commissioner, 91 T.C. 110, 117 (1988) aff'd without published opinion, 886 F.2d 442 (D.C. Cir. 1989).  Furthermore, transitional rules are to be construed strictly in accordance with Congress' intent.  See Helvering v. Northwest Steel Mills, 311 U.S. 46, 49 (1949) (provisions of tax statutes granting exemptions are to be strictly construed).  Courts will generally not impute to Congress an unstated intention.  United States v. Hemme, 476 U.S. 558, 566 (1986).  Accordingly, it should not be inferred that Congress intended the special deduction and fresh start to apply by separate lines of business within a company or intended the special deduction and fresh start to apply within the same line of business, when there is no language in the statute or the legislative history that supports such application and when such treatment would constitute endorsement of improper accounting.

It may be that the size of Plaintiffs' special deduction would have been larger if they had

been netters on all lines of business, or that if they had been grossers on all lines they would have had a greater benefit under the transitional rules than they presently have. However, Congress did not consider it necessary to provide perfect symmetry, or specially tailored relief to all conceivable variations of general circumstances being addressed by the statute. The essence of Plaintiffs' contention is that, even though they were following an impermissible method of accounting prior to 1990, the transitional relief that they receive should equal the transitional relief of taxpayers that followed a permissible method of accounting. The contention lacks merit. Not only is there nothing unreasonable about treating taxpayers that were following an impermissible method of accounting in a different manner than those following a permissible method of accounting, the mechanics of the change in method of accounting preclude providing these two different groups with the equivalent relief.

What Justice Scalia said about the regulation at issue in <u>Atlantic Mutual</u> is equally applicable to the instant case:

> It should be borne in mind that the provision at issue here is a limitation upon an <u>extraordinary deduction</u> accorded to PC insurers. There was certainly no need for that deduction to be microscopically fair, and the interpretation adopted by the Treasury Regulation seems to us a reasonable accommodation–and one that the statute very likely intended–of the competing interests of fairness, administrability, and avoidance of abuse. 523 U.S. at 390-391. (emphasis added).

The special deduction in this case is likewise an "extraordinary deduction" provided by Congress. Similarly, the fresh start is an extraordinary form of relief for companies that did not previously take salvage recoverable into account. Plaintiffs have benefitted substantially from the special deduction for their respective "netter" lines of business (which account for the vast majority of their total salvage and subrogation).

## II.  PLAINTIFFS ARE NOT ENTITLED TO THE YEAR-END GROSS-UP IN REV. PROC. 92-77.

A.  <u>Plaintiffs do not qualify for the year-end gross-up provision in Rev. Proc. 92-77 intended to eliminate the double counting of salvage recoverable because they did not double count any salvage recoverable.</u>

The sole purpose of Revenue Procedure 92-77 is to provide administrative guidance on the gross-up provision in the final regulations, § 1.832-4(d), which permits an insurance company which was a netter to, in certain circumstances, increase its unpaid losses for tax purposes by the amount of salvage recoverable taken into account in determining the amount of unpaid losses shown on its annual statement.  As explicitly indicated in the announcement of the regulatory provision, in the notice issued with the final regulations, and in Rev. Proc. 92-77, the purpose of the gross-up provision is to address a potential double counting of salvage recoverable in computing losses incurred under § 832(b)(5)(A), as amended by the 1990 Act.[7,8]  See Notice 92-1;

---

[7] As indicated in § 832(b)(5)(A)(ii), "discounted unpaid losses" taken into account in computing losses incurred are defined in IRC § 846.  Under § 846(b), discounted unpaid losses are based on the unpaid losses <u>shown in the annual statement</u> filed by the insurance company.  The relationship between § 832(b)(5)(A), as amended by the 1990 Act, and the § 846 definition of unpaid losses creates a potential for salvage recoverable to be "double counted" in the computation of losses incurred for a company that netted salvage recoverable in determining unpaid losses <u>in its annual statement</u>.  Under § 832(b)(5)(A)(ii) the change in discounted unpaid losses over the year is determined using the annual statement numbers.  If the unpaid losses on the annual statement are net of salvage recoverable, the change in the discounted unpaid losses over the year also reflects the change in salvage recoverable over the year.  Because under § 832(b)(5)(A)(iii) the change in salvage recoverable over the year must be determined separately from the change in discounted unpaid losses over the year in computing losses incurred, salvage recoverable would be taken into account a second time in computing losses incurred if unpaid losses are net of salvage recoverable.  Under the regulatory gross-up provision, because the unpaid losses shown on the annual statement would be increased by the amount by which they had been reduced by salvage recoverable, the discounted unpaid losses used in the computation of losses incurred for tax purposes would be gross of salvage recoverable.  Accordingly, the change in discounted unpaid losses over the year computed in accordance with § 832(b)(5)(A)(ii) would not reflect any change in salvage recoverable.  The change in salvage recoverable would only be taken into account under § 832(b)(5)(A)(iii).  Thus, salvage recoverable would not be double counted.

[8] An illustration of the double-counting problem is provided in the Appendix to this brief.

T.D. 8390; Rev. Proc. 92-77, § 2.[9]  Section 4.02 of Rev. Proc. 92-77 provides that if an insurance company first increases unpaid losses pursuant to § 1.832-4(d) for a tax year beginning on or before January 1, 1993, the company is to only adjust the reserve for unpaid losses at the end of that year; no adjustment is made to the reserve for unpaid losses at the end of the prior tax year. By only increasing the reserve for unpaid losses at the end of the tax year, the entire effect of the double counting of salvage recoverable is eliminated in one year.[10]

Plaintiffs did not double count any salvage recoverable in computing losses incurred for the 1990 tax period and, therefore, for 1990, do not qualify for the year end gross-up adjustment provided for Rev. Proc. 92-77, § 4.02.  See U.S. Fact Statement, ¶4.  The unpaid losses shown on Plaintiffs' 1989 and 1990 annual statements and used as the basis for determining the discounted unpaid losses taken into account in computing losses incurred for tax purposes was net of salvage

---

[9] In Notice 92-1, the IRS acknowledged property and casualty companies' concern that computing losses incurred under § 832(b)(5)(A), as amended by the 1990 Act, could result in a double counting of salvage recoverable and announced that in response to this concern, the final regulations under § 832 would provide that, in certain circumstances, a company that reports on its annual statement unpaid losses reduced by an amount of salvage recoverable (a netter) would be allowed for Federal tax purposes to increase those unpaid losses to the extent they had been reduced by salvage recoverable.  See Notice 92-1.  The explanation issued with the final regulations containing the gross-up provision, § 1.832-4(d), explained that it was a response to comments that the requirement that salvage recoverable be taken into account separately in computing losses incurred may result in a double counting of salvage for companies that had taken salvage recoverable into account in determining the unpaid losses on their annual statements.  See T.D. 8390.  Rev. Proc. 92-77 explained for a third time that the gross-up provision in the regulations was intended to address a potential double counting of salvage recoverable in computing losses incurred under § 832(b)(5)(A).  See Rev.Proc. 92-77, §2.

[10] The insurance industry and insurance tax advisors recognized that the purpose of the year end adjustment provided for in § 4.02 is to eliminate the effect of double counting in one year.  Upon publication of the final regulations, the American Insurance Association complained that the gross-up provision contained in the regulations, § 1.832-4(d), did not expressly state that only the ending unpaid loss reserves are to be grossed-up in the first year the provision is applied and indicated that "such a statement would ensure that the double counting can be fully eliminated by a gross-up of tax loss reserves."  See Letter from AIA to Assistant Secretary of the Treasury of 3/25/92 in THE INSURANCE TAX REVIEW, 625 (May 1992).  Describing the operation of the year-end gross-up in § 4.02, one insurance tax advisor explained, "[a]s a result, the entire effect of the double-counting of salvage was eliminated in one year."  Ernst & Young LLP, FEDERAL INCOME TAXATION OF PROPERTY AND CASUALTY INSURANCE COMPANIES § 6.7 (1996).  An illustration of how the year-end gross-up in § 4.02 eliminates the double-counting problem is provided in the Appendix to this brief.

recoverable with respect to a portion of Plaintiffs' auto physical damage line of business and net of salvage recoverable with respect to all other lines of business.  See U.S. Fact Statement, ¶3; Morell Deposition, p. 15, l.13 - p.18, l.3 and p.41, ll.12-21 (Exh. B.).  In computing the deduction for losses incurred for the 1990 tax period, the only salvage recoverable separately taken into account by Plaintiffs under § 832(5)(A)(iii) was salvage recoverable that did not reduce Plaintiffs' unpaid losses--the salvage recoverable with respect to the portion of the auto physical damage line that was not net against the unpaid loss reserves (the gross portion of the auto physical damage line). See U.S. Fact Statement, ¶4.  Because none of the salvage recoverable that reduced the unpaid losses was separately taken into account under § 832(5)(A)(iii), there was no double counting of salvage recoverable.  Without a double counting situation, Plaintiffs simply and obviously do not qualify for the year-end gross-up provided in § 4.02 and there is no basis in the statute, regulations, or Rev. Proc. 92-77 for retroactively creating a double-counting problem in order to qualify for the corrective adjustment. To the contrary, as discussed below, Rev. Proc. 92-77 specifically prohibits such a manipulation.

Rev. Proc. 92-77 explicitly requires the existence of double counting in order to increase unpaid losses for tax purposes under the gross-up provision in the regulations, § 1.832-4(d). Section 4.01 of Rev. Proc. 92-77 provides that a company may increase unpaid losses for tax purposes by the amount of salvage recoverable taken into account as a reduction to unpaid losses shown on its annual statement only if the following two conditions are met: (1) the taxpayer complies with the disclosure requirement set forth in § 1.832-4(d)(2) of the regulations and (2) "[t]he estimated salvage recoverable that reduced unpaid losses is separately taken into account in accordance with section 832(b)(5)(A)(iii) of the Internal Revenue Code" (emphasis added). Under the second condition, a company may not increase unpaid losses for tax purposes by the amount of salvage recoverable taken into account as a reduction to unpaid losses shown on its annual statement unless that salvage recoverable is separately taken into account in accordance with

§ 832(b)(5)(A)(iii). Obviously if the salvage recoverable that reduced the unpaid losses was not separately taken into account, there would be no double counting and no need for the corrective increase of the unpaid losses. As detailed above, for the 1990 tax period Plaintiffs did not separately take into account under § 832(b)(5)(A)(iii) the salvage recoverable <u>that reduced</u> the unpaid losses. The only salvage recoverable separately taken into account under § 832(b)(5)(A)(iii) by Plaintiffs was the salvage recoverable <u>that did not reduce</u> their unpaid losses, the salvage recoverable with respect to the gross portion of the auto physical damage line of business. <u>See</u> U.S. Fact Statement, ¶4. Plaintiffs, therefore, do not meet this prerequisite condition for making the gross-up adjustment.

Completely contradicting the explicit language of the second condition in § 4.01, Plaintiffs brazenly contend that the condition pertains to "salvage for Gross Lines," that is, salvage <u>that did not reduce</u> their unpaid losses. <u>See</u> Plaintiffs' Memorandum, pp.16-17. The second condition requires that "the estimated salvage recoverable <u>that reduced</u> unpaid losses" be separately taken into account, *not* that the salvage recoverable with respect to the gross portion of the auto physical damage line <u>that did not reduce unpaid losses</u>, be separately taken into account.

Section 4.06 provides examples which illustrate the principles of Rev. Proc. 92-77. The examples, which pertain to the 1990 tax period, distinguish between the application of the year-end gross-up for a company which did not claim the special deduction under § 11305(c)(3) of the 1990 Act and a company which did claim the special deduction. At the end of the 1990 tax period, a property and casualty company will have unpaid losses and salvage recoverable attributable to the 1990 accident year as well as unpaid losses and salvage recoverable attributable to pre-1990 accident years. As demonstrated by the first example in § 4.06, in applying the year-end gross-up, a company which did not claim the special deduction will increase its 1990 year-end unpaid losses attributable to all accident years. <u>See</u> Rev. Proc. 92-77, § 4.06, Ex. 1. In contrast, as demonstrated by the second example, a company which claimed the special deduction will only increase its 1990

year-end unpaid losses attributable to the 1990 accident year.  See Rev. Proc. 92-77, § 4.06, Ex. 2.

As explained in Rev. Proc. 92-77, under Rev. Proc. 91-48, for a company that claimed the special

deduction, the requirement under § 832(b)(5)(A)(iii) that salvage recoverable be separately taken

into account does not apply to salvage recoverable attributable to pre-1990 accident years.[11]

Because the salvage recoverable attributable to pre-1990 accident years was not taken into account

separately, there was no double-counting of this salvage recoverable and no need for the gross-up of

unpaid losses attributable to pre-1990 accident years to correct double-counting.  This example not

only, once again, emphasizes that the purpose of the year-end gross-up in § 4.02 is to eliminate

double counting, it also demonstrates that the adjustment provided by the year-end gross-up is not

intended as an alternative to the special deduction.

This point is explicitly made in § 4.04 of Rev. Proc. 92-77, which provides that if a

company claimed the special deduction, any change in method of computing undiscounted unpaid

losses to "remove" salvage recoverable for accident years in which salvage recoverable was not

separately taken into a account is a change in method of accounting for which the taxpayer must

receive approval.  This provision makes clear that Rev. Proc. 92-77 does not grant companies which

claimed the special deduction, as did Plaintiffs, the permission to increase unpaid losses by the

salvage recoverable for accident years in which salvage recoverable was not separately taken into

account.  (Removing, as used in § 4.04, means increasing.  Removing the salvage recoverable

reduction from the (net) unpaid loss results in the (gross) unpaid loss.  When the (net) unpaid loss is

increased by the salvage recoverable which had been employed to reduce the (gross) unpaid loss,

the result is the original (gross) unpaid loss.)

---

[11] For a company which claimed the special deduction, the change in method of accounting to
separately account for salvage recoverable was to be implemented pursuant to a cut-off method
under which only salvage recoverable attributable to the 1990 and succeeding accident years is
taken into account separately.  See Rev. Proc. 91-48, § 9.01; 26 C.F.R. § 1.832-4(e)(2)(iii).  This
cut-off method prevents salvage recoverable attributable to pre-1990 accident years, that has
already reduced the unpaid losses attributable to those years, from being double-counted.

Plaintiffs' request for an affirmative adjustment pertaining to Rev. Proc. 92-77 states, in part: "Rev. Proc. 92-77 allows taxpayers a choice between effectively taking the special deduction for salvage and subrogation in one year or spreading it over four years. . . . In order to implement the one year deduction option allowed under Rev-Proc 92-77, we request an affirmative issue on audit." Rev. Proc. 92-77 neither explicitly or implicitly provides an insurance company with the option of taking the special deduction in one year rather than in four years. Rev. Proc. 92-77 pertains to the correction of double counting, not to the timing of the special deduction. Plaintiffs mischaracterize the revenue procedure in a manner which contravenes the 1990 Act. While the IRS has the authority to provide a corrective measure which eliminates the effects of double counting, it would have no authority to give taxpayers the special deduction in one year when Congress mandated that the special deduction be taken ratably over four years. See 1990 Act, § 11305(c)(3). And Plaintiffs' attempt to manipulate Rev. Proc. 92-77 to unlawfully obtain the special deduction in one year cannot be tolerated.

B.    The changes in method of accounting with respect to the 1990 tax period required by the Plaintiffs' 1993 request for an affirmative adjustment under Rev. Proc. 92-77 require IRS approval which can only be sought on a prospective basis.

As indicated above, § 4.04 of Rev. Proc. 92-77 provides that if a company claimed the special deduction under the 1990 Act, "any change in method of computing undiscounted unpaid losses to remove estimated salvage recoverable for accident years in which estimated salvage was not separately taken into account is a change in method of accounting for which the taxpayer must receive approval by the Commissioner." This provision applies to Plaintiffs because they claimed the special deduction for 1990 and 1991 and subsequently sought, with their request for "Affirmative Adjustment under Rev-Proc. 92-77," to increase their unpaid losses at the end of the 1990 tax period for accident years in which salvage recoverable was not separately taken into

account.[12]  As provided in § 4.04, increasing their unpaid losses for tax purposes for the 1990 tax period by the amount of salvage recoverable taken into account as a reduction to unpaid losses shown on the annual statement for accident years in which salvage recoverable was not separately taken into account would be a change in method of accounting for which Plaintiffs would have had to have received approval by the Commissioner.  Plaintiffs have not presented any evidence that they filed Form 3115, Application for Change in Accounting Method, in connection with their affirmative adjustment request.  "[I]n order to secure the Commissioner's consent to a change of a taxpayer's method of accounting, the taxpayer must file an application on Form 3115 with the Commissioner."  26 C.F.R. § 1.446-1(c)(3)(i).  Even if Plaintiffs had submitted Form 3115 in connection with their request for adjustment, the application would have been untimely; Form 3115 must be filed "within 180 days after the beginning of the taxable year in which it is desired to make a change."  Id.  Thus, a taxpayer that seeks to change its method of accounting may only request to change the method of accounting prospectively.  Plaintiffs' request for adjustment was submitted in 1993 and contemplated a change of method in accounting with respect to the 1990 tax period.  See Kress Declaration, ¶20.

Plaintiffs contend that § 4.04 pertains to salvage recoverable with respect to gross lines. The contention is frivolous. The purpose of Rev. Proc. 92-77 is to provide guidance concerning the gross-up provision in the regulations which is designed to address the double-counting of salvage recoverable by some netters.  A double-counting situation arises when salvage recoverable which has already reduced unpaid losses is also taken into account separately under § 832(b)(5)(A)(iii). Salvage recoverable with respect to gross lines is never involved in a double-counting situation

---

[12] For a company which claimed the special deduction and implemented the change of method of accounting to separately account for salvage recoverable pursuant to the cut-off method required by Rev. Proc. 91-48 and Treas. Reg. § 1.832-4(e)(2)(iii), the prohibition contained in § 4.04 applies to unpaid losses and salvage recoverable attributable to pre-1990 accidents. For Plaintiffs, the prohibition applies to unpaid losses and salvage recoverable attributable to all accident years because they did not separately account for any of the salvage recoverable netted against unpaid losses.

because by definition unpaid losses associated with the gross lines are not reduced by salvage recoverable and that salvage recoverable is, therefore, only ever taken into account once. In addition to Plaintiffs' claim not making any sense in the context of Rev. Proc. 92-77 as a whole, the claim does not make sense given the plain language of § 4.04. Section 4.04 refers to "removing" salvage recoverable from unpaid losses. Salvage recoverable with respect to gross lines cannot be removed from unpaid losses because it has never been taken into account in computing unpaid losses.

The change of method of accounting described in § 4.04 is not the only change in method of accounting which is implicated by Plaintiffs' request for an affirmative adjustment with respect to Rev. Proc. 92-77. Claiming the special deduction under § 11305(c) of the 1990 Act is a method of accounting. "Reversing" or "eliminating" the special deduction to: (1) claim the fresh start in § 11305(c)(2) of the 1990 Act with respect to the salvage recoverable that was taken into account as a reduction to unpaid losses shown on the 1989 annual statement and (2) increase unpaid losses for tax purposes by the amount of salvage recoverable taken into account as a reduction to unpaid losses shown on the 1990 annual statement (this is what Plaintiffs sought to do with their affirmative adjustment request) would be a change in method of accounting because a change in the timing of a reduction to taxable income is a method of accounting. That change was not provided for by the 1990 Act, so that Plaintiffs would have had to have received IRS approval for that change.

Separately taking into account salvage recoverable in accordance with § 832(b)(5)(A)(iii) is a method of accounting because unpaid losses and salvage recoverable are reported on a discounted basis and different discount factors can apply to different items. The salvage recoverable that reduced the unpaid loss shown on the 1990 annual statement was not separately taken into account in accordance with § 832(b)(5)(A)(iii) in computing Plaintiffs' losses incurred for the 1990 tax period. Changing the method of computing losses incurred to take that salvage into account

separately in accordance with § 832(b)(5)(A)(iii) would be a change in method of accounting for which Plaintiffs would have had to have received approval. (<u>See</u> 26 C.F.R. § 1.832-4(2).) (Unpaid losses cannot be increased for tax purposes by the amount of salvage recoverable taken into account as a reduction to unpaid losses shown on the annual statement unless that salvage recoverable is taken into account separately.)

As with the change of method of accounting set forth in § 4.04, Plaintiffs have not presented any evidence that they properly sought approval of the other changes in method of accounting implicated by Plaintiffs' affirmative adjustment request. And, once again, if Plaintiffs had sought consent for the changes in method of accounting, they would have been impermissibly seeking a retroactive change in method of accounting.

C.    <u>Plaintiffs' refund action seeks a windfall impermissible under the transitional rules guidance associated with the 1990 Act.</u>

While Plaintiffs' request for an affirmative adjustment under Rev. Proc. 92-77 recognizes that they would not be entitled to both the year-end gross-up in Rev. Proc. 92-77 and also the special deduction under the 1990 Act, in this action they are pursuing over $43 million in refunds on the basis that they are entitled to the year-end gross-up in Rev. Proc. 92-77 even though they have already received the special deduction in an amount equal to 87% of the $200,469,189 in total discounted estimated salvage recoverable with respect to their net lines at the end of 1989, ratably over the 1990 through 1993 tax periods.

Had Plaintiffs qualified for the year-end gross-up adjustment under § 4.02 and otherwise met the requirements of Rev. Proc. 92-77, the adjustment under § 4.02 could not be made unless the special deduction was brought back into income in each of the years 1990 through 1993 and the entire § 481 adjustment provided in § 11305(c)(2) of the 1990 Act was made. Since Plaintiffs have not included in income the amount of the special deduction in its tax returns for the years 1991, 1992, and 1993, nor paid tax based on the § 481 adjustment provided in § 11305(c)(2) of the 1990

Act for those years, they would receive a windfall if permitted to take the adjustment for 1990 under § 4.02 of Rev. Proc. 92-77.

**Conclusion**

For the foregoing reasons, the government's motion for summary judgment should be granted and Plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ *Karen Wozniak*
KAREN WOZNIAK
Trial Attorney, Tax Division

## APPENDIX

<u>Illustration 1: Double-Counting Problem under § 832(b)(5)(A), as Amended</u>

The following example illustrates the potential double counting of salvage recoverable in the computation of losses incurred under § 832(b)(5)(A), as amended by the 1990 Act, for a company that netted salvage recoverable in determining unpaid losses in its annual statement:

|                                              | Year 1   | Year 2 (the tax year) |
|----------------------------------------------|----------|-----------------------|
| Gross unpaid losses                          | $1,000   | $1,100                |
| Estimated salvage recoverable                | ($100)   | ($110)                |
| Net unpaid losses (shown on annual statement)| $900     | $990                  |

On its <u>annual statements</u> for Years 1 and 2, the company reported unpaid losses net of salvage recoverable.  (Assume there are no loss payments or salvage received during Year 2 and there is no discounting of the unpaid losses for tax purposes.)  Under § 832(b)(5)(A), as amended by the 1990 Act, losses incurred for Year 2, the tax year, would be computed as follows:

| 832(5)(A)(ii)   | add unpaid losses at the end of the tax year <br> (based on unpaid loss on annual statement)       | $990    |
|-----------------|----------------------------------------------------------------------------------------------------|---------|
| 832(5)(A)(ii)   | deduct unpaid losses at the end of the prior tax year <br> (based on unpaid loss on annual statement) | ($900)  |
| 832(5)(A)(iii)  | add estimated salvage recoverable at the end of the prior tax year                                 | $100    |
| 832(5)(A)(iii)  | deduct estimated salvage recoverable at the end of the tax year                                    | ($110)  |
| losses incurred |                                                                                                    | $80     |

Because the unpaid losses are <u>net</u> of salvage recoverable, the $10 change in salvage recoverable over the year is taken into account twice: first when the change in the unpaid losses is computed under § 832(5)(A)(ii) and a second time when the change in salvage recoverable is computed under § 832(5)(A)(iii).  Using <u>gross</u> unpaid losses in the computation of losses incurred, the losses incurred would be $90 ($10 more) because the salvage recoverable is not double counted.

- 24 -

Illustration 2: Elimination of Double-Counting Problem by Year End Gross-Up

Using the same facts regarding gross unpaid losses, estimated salvage recoverable, and net unpaid losses as in Illustration 1, the following example illustrates how the year-end gross-up in § 4.02 of Rev. Proc. 92-77 eliminates the double-counting problem. Applying § 1.832-4(d) in accordance with § 4.02 of Rev. Proc. 92-77 by grossing-up the year-end unpaid losses, losses incurred for Year 2, the tax year, would be computed as follows:

| 832(5)(A)(ii) | add unpaid losses at the end of the tax year <br> (grossed-up pursuant to § 4.02 of Rev. Proc. 92-77 ($990 + $110)) | $1,100 |
|---|---|---|
| 832(5)(A)(ii) | deduct unpaid losses at the end of the prior tax year | ($900) |
| 832(5)(A)(iii) | add estimated salvage recoverable at the end of the prior tax year | $100 |
| 832(5)(A)(iii) | deduct estimated salvage recoverable at the end of the tax year | ($110) |
| losses incurred | | $190 |

Applying § 1.832-4(d) in accordance with § 4.02, *i.e.*, the year-end gross-up, the deduction for losses incurred for Year 2 is $190. Not applying § 1.832-4(d), the deduction for losses incurred would be $80 ($990 - $900 + $100 - $110), as shown in Illustration 1. Thus, the difference between applying the year-end gross-up and not grossing-up is a $110 deduction ($190 less $80), an amount equal to the salvage recoverable at the end of the taxable year. Thus, applying the year-end gross-up, the company gets the benefit of a full deduction for all salvage recoverable at the end of Year 2, here $110. Because the change in salvage recoverable over the year is $10 ($110 less $100), the double-counting issue for the year only involves $10 of the $110. However, the remaining $100 has the potential to be double counted in subsequent years. Thus, the year-end gross-up provision under § 4.02 is understood to eliminate, in a single year, the potential double-counting problem for subsequent years, as well as the double-counting problem for the year in which it is applied.