# SCRIBNER, HALL & THOMPSON, LLP

THOMAS C. THOMPSON, JR.
MARK H. KOVEY
STEPHEN P. DICKE
PETER H. WINSLOW
SUSAN J. HOTINE
BIRUTA P. KELLY
GREGORY K. OYLER
LORI J. JONES
SAMUEL A. MITCHELL
LYNLEE C. BAKER-GARBETT

SUITE 1050
1875 EYE STREET, N. W.
WASHINGTON, D. C. 20006-5409
———
(202) 331-8585
FAX (202) 331-2032

FRED C. SCRIBNER, JR. (1908-1994)
LEONARD W. HALL (1900-1979)

Writer's Direct Dial: (202) 434-9164
Writer's Email Address:
pwinslow@scribnerhall.com

April 25, 2007

*via e-filing (original by mail)*

Honorable Magistrate Judge Joyce London Alexander
United States District Court
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way - Suite 2300
Boston, MA 02210

Re:     Liberty Mutual Ins. Co. v. United States (1:05-CV-11048(RCL)) and
        Liberty Mutual Fire Ins. Co. v. United States (1:05-CV-11049(RCL)) (cnsl.)

Dear Judge Alexander:

At oral argument, Defendant's counsel submitted a notebook of authorities that, she asserted, support Defendant's position.  Because of the manner in which these authorities were presented to the Court, Plaintiffs were not given an opportunity to respond.  This letter will provide very brief comments on the authorities to place them in perspective.

## Defendant's Tabs 1 through 3 and 6 through 17

These authorities are used by Defendant to support an assertion that the National Association of Insurance Commissioners and many states had adopted rules that required unpaid losses to be reported gross of salvage, i.e., salvage was required to be reported only after it was reduced to cash.  Defendant apparently argues that prior to 1990 this same method was required for tax purposes.  Defendant, however, has ignored the statute.  26 U.S.C. § 832(b)(1) and § 846(f) expressly provide that unpaid losses are required to be those actually reported on the Annual Statement.  The statute did not permit taxpayers to claim a tax deduction for their unpaid losses gross of salvage if they were not reported that way on the Annual Statement.  In addition, Defendant omitted from its submission a copy of a document it provided to Plaintiffs by letter dated April 13, 2007, a copy of which is attached.  (See Proceedings of the National Association

Honorable Magistrate Judge Joyce London Alexander
April 25, 2007
Page 2

of Insurance Commissioner, 1992-2 NAIC Proc. 226). The omitted document demonstrates "that there are a substantial number of companies who have discounted loss reserves for anticipated salvage and subrogation." (See page 16, 18-26, listing the salvage amounts reported by approximately 130 companies, including Plaintiffs).

### Defendant's Tab 5

Defendant has included Treas. Reg. § 1.832-7T(c), which purports to require unpaid losses to be reported net of salvage. Defendant has neglected to point out that this regulation never became effective. See KPMG Peat Marwick, FEDERAL TAXATION OF INSURANCE COMPANIES, ¶ 14.19, p. 1436-C, attached.

### Defendant's Tab 18

Attached is a complete copy of the treatise discussion of the tax treatment of salvage, including the excerpts omitted by Defendant. See FEDERAL TAXATION OF INSURANCE COMPANIES, ¶ 14.19, pp. 1430-1436-C.

### Defendant's Tab 23

This document reflects a proposal to legislatively reverse the provision in the regulations that imposes a cut-off method for unpaid losses incurred prior to 1990 for taxpayers that claimed the special deduction, thereby denying a fresh start for those taxpayers. The proposal was included in a pamphlet prepared by the Staff of the Joint Committee on Taxation for hearings held by the House Committee on Ways and Means on July 11-13, 1995. See Joint Committee on Taxation, Description of Miscellaneous Tax Proposals (JCS-19-95), July 10, 1995. The proposal was included as a possible "technical correction" to reconfirm Congress' intent to permit the fresh start for all Gross Lines whether or not a special deduction was claimed. That is, the document in Defendant's Tab 23 reconfirms that the regulations were not in conformity with Congressional intent because they effectively deny a fresh start by imposing a cut-off method. This particular proposal was included among hundreds of others summarized in the pamphlet. It is our understanding that this proposal never went beyond the staff level as a possible technical correction because Joint Committee staff advised Congress that the statute already was clear that the fresh start applies to all taxpayers, i.e., no technical correction was needed because the statute already plainly provided for the result Congress intended.

Honorable Magistrate Judge Joyce London Alexander
April 25, 2007
Page 3


Of course, the rule in the regulations which denied the fresh start to taxpayers who claimed the special deduction is not relevant here anyway because: (1) it is contrary to the plain language of the statute; (2) Defendant has contended in this case that Plaintiffs are not entitled to use the cut-off method (which is the only provision in the regulations that effectively would deny the fresh start) (Liberty Mutual Answer ¶ 43, 50, Liberty Fire Answer ¶ 43, 50); and (3) Plaintiffs elected to gross-up their unpaid losses under Treas. Reg. § 1.832-4(d) and thereby do not claim the special deduction.


Sincerely yours,

Peter H. Winslow


PHW:lmh

Attachments

cc:    Karen E. Wozniak



U.S. Department of Justice
Tax Division

APR 16

*Karen Wozniak*
*Telephone (202) 307-1927*
*Facsimile (202) 514-5238*

*Civil Trial Section, Northern Region*
*P.O. Box 55*
*Ben Franklin Station*
*Washington, D.C. 20044*

2005104939   5-36-10230     2005104933   5-36-10229

**VIA FEDERAL EXPRESS**                                      April 13, 2007

Peter H. Winslow
Gregory K. Oyler
Samuel A. Mitchell
Scribner, Hall & Thompson LLP
1875 Eye Street, NW
Washington, DC 20006

Re:    *Liberty Mutual Insurance Company and Subsidiaries v. United States*
       *Liberty Mutual Fire Insurance Company and Subsidiaries v. United States*
       <u>Consolidated Case No. 1:05-cv-11048-RCL</u>

Dear Gentlemen:

        Enclosed with respect to the above-referenced action and in anticipation of the oral argument on April 20th, please find the following documents to which I may refer:

1.      Proceedings of the National Association of Insurance Commissioners:
        a.      1970 Vol. II, pp.603-11;
        b.      1976 Vol. II, pp.16, 50-51;
        c.      1992 Vol. IA, pp.322, 326-27, 354; and
        d.      1992 Vol. IIA, pp.226-28; 246-255
        (printouts from Lexis are enclosed)

2.      1989 Annual Statement Instructions, Property and Casualty, published by the National Association of Insurance Commissioners (relevant excerpts from the instructions are enclosed)

        If you have any questions, please contact me at (202) 307-1927.

                                            Sincerely yours,

                                            *Karen Wozniak*

                                            Karen Wozniak
                                            Trial Attorney
                                            Civil Trial Section
                                            Northern Region

cc:    Via Federal Express

       Paul F. Lynch
       Latronico, Black & Whitestone
       200 Berkeley Street
       Boston, MA 02116

1992-2 NAIC Proc. 226, *

1 of 1 DOCUMENT

Copyright © National Association of Insurance Commissioners, 1992.
Proceedings of the National Association of Insurance Commissioners, 1992, Volume IIA

1992 Summer National Meeting, Washington, D.C.

June 7, 1992

- June 11, 1992

1992-2 NAIC Proc. 226

LENGTH: 44194 words

TITLE: FINANCIAL CONDITION (EX4) SUBCOMMITTEE; Blanks (EX4) Task Force

REFERENCE: 1991 Proc. II p. 301, 1992 Proc. I p. 322

NOTE: Formulas may not appear exactly as they do in the printed version of the Proceedings.

[*227]  MINUTES

The Blanks (EX4) Task Force met in the Sheraton Ballroom South of the Sheraton Hotel in Washington, D.C., at 8 a.m. on June 9, 1992. A quorum was present and Louis E. Bergeron (N.H.) chaired the meeting. The following task force members or their representatives were present: Tom Gallagher, Vice Chair (Fla.); David J. Walsh (Alaska); John Garamendi (Calif.); Harry C. Walrath (Idaho); Stephen T. Selcke (Ill.); David J. Dykehouse (Mich.); Lewis Melahn (Mo.); George Dale (Miss.); Andrea "Andy" Bennett (Mont.); William H. McCartney (Neb.); Samuel F. Fortunato (N.J.); Salvatore R. Curiale (N.Y.); Jim Long (N.C.); Elaine A. McReynolds (Tenn.); Georgia D. Flint (Texas); Harold C. Yancey (Utah); Richard "Dick" Marquardt (Wash.); and Robert D. Haase (Wis.).

1. Modify Schedule X in the Quarterly Blank to Include Loss Adjustment Expenses (Quarterly Statement Working Group) (Property/Casualty)

Modify Investment Schedules in the Quarterly Blank to Allow for Reporting NAIC/SVO Classifications (Quarterly Statements Working Group) (All Blanks)

Upon motion duly made and seconded, these items were added to the agenda under the unanimous consent rule.

Martin Carus (N.Y.) advised that the minutes of the Quarterly Statements Working Group (Attachment One) contain two items for incorporation in the 1993 quarterly statements. Mr. Carus explained that the reason for the change to Schedule X in the property/casualty quarterly (Attachment One-A1) is to assist the regulators in analyzing the development of losses and loss adjustment expenses on a quarterly basis. Mr. Carus advised that this change is easily incorporated in the 1993 quarterly statement which has not been finalized by the printers.

Mr. Carus advised that the change to the investment schedules in all quarterly blanks (Attachments One-B) is to require quarterly acquisitions and disposals by NAIC designation. Mr. Carus noted that a proposal would be on the October 1992 Blanks agenda to require subtotals by designations.

Upon motion duly made and seconded, these items were adopted.

2. Modify Part 3A of the Underwriting and Investment Exhibit and Schedule F - Part 1A - Section 1 of the Property/Casualty Blank

Upon motion duly made and seconded, this item was added to the agenda under unanimous consent.

Mr. Carus introduced this item. Mr. Carus explained that these changes (Attachment Two) were necessary to clarify the reporting of incurred but not reported loss adjustment expenses. He noted that this change would eliminate the crosscheck between Schedule F and Part 3A.

Upon motion duly made and seconded, this item was adopted.

1992-2 NAIC Proc. 226, *

[*228] 3. Consider Changes to Schedule D - Part 1A to Require Reporting Bonds in Categories of "Highly Marketable" and "Other Private Placements" in Lieu of "Publicly Traded" and "Privately Placed" (All Blanks) (Original Agenda Item #79)

This agenda item was withdrawn by the sponsor.

4. Modify Instructions for Actuarial Opinion to Establish Procedures for Auditing the Underlying Data (CPA (EX4) Working Group) (Property/Casualty Blank)

Robert Solitro (N.H.) advised that this item was on the October 1991 Blanks agenda but was deferred until language could be developed that would be acceptable to both the CPAs and the actuaries. Mr. Solitro noted that this language deals with auditing the underlying financial records that are depended upon for the actuarial opinion.

Upon motion duly made and seconded, modifications to the Actuarial Opinion and the CPA Audit instructions (Attachment Three) were adopted.

5. Modify Annual Statement Instructions to Allow Reporting Loss Reserves Net of Anticipated Salvage and Subrogation (Salvage and Subrogation Working Group) (Property/Casualty Blank)

Mr. Solitro advised that in December 1991 the Blanks Task Force took the position that netting anticipated salvage and subrogation against unpaid losses and unpaid loss adjustment expenses was not allowed. However, the Financial Condition (EX4) Subcommittee, the parent of this task force, requested that the task force reconsider this issue. A working group was formed and the consensus of the working group was that it should be an NAIC position to allow such netting. Mr. Solitro noted that the working group minutes (Attachment Four) contain guidance for Page 4 treatment of amounts resulting from changes in accounting method for anticipated salvage and subrogation. Mr. Solitro advised that a proposal to modify the annual statement instructions (Attachment Four-C) is being offered for the 1992 annual statement, as a result of this working group decision.

Mr. Solitro also noted that a proposal to modify Schedule P to allow for disclosure of anticipated salvage and subrogation (Attachment Four-D) will be placed on the October 1992 Blanks agenda

Upon motion duly made and seconded, the change to the annual statement instructions was adopted. Five states voted in the negative.

6. Discuss Changes to the Blank Relative to the Asset Valuation Reserve

Mr. Solitro advised that the Financial Condition (EX4) Subcommittee adopted changes to the Asset Valuation Reserve and the Interest Maintenance Reserve in March 1992. He noted that additional changes were made to these items in May 1992. Mr. Solitro advised that these changes (Attachment Five) are reflected in the minutes of the Financial Condition (EX4) Subcommittee and the June 7, 1992, minutes of the Plenary Session. However, these changes will be incorporated with the Blanks minutes for mailing to Blanks subscribers.

7. Any Other Matters Brought Before the Task Force

a. Modifications to the Life, Health & Annuity Guaranty Association Model Act Assessment Base Reconciliation Exhibit

James Hanson (Ill.) explained that the National Organization of Life and Health Guaranty Associations (NOLHGA) has recently completed a survey for the years 1989 through 1991 using the form that will be incorporated into the life annual statement for 1992. Mr. Hanson advised that NOLHGA had discovered a discrepancy in the form that could be corrected by this proposal (Attachment Six).

[*229] Upon motion duly made and seconded, this item was added to the agenda under the unanimous consent rule.

Upon motion duly made and seconded, this item was adopted by the task force.

b. Reconsider October 1991 Adoption of the Adjustments to the Life, Health & Annuity Guaranty Association Model Act Assessment Base Reconciliation Exhibit

Mr. Hanson advised that this form was not intended to be part of the NAIC life blank. He also advised that this form would be made available by NOLHGA upon request from any state. He requested that the task force reconsider its October 1991 decision on this issue. He referred to a letter from NOLHGA (Attachment Seven) that explains the intent of this proposal.

(b) The AAA Committee on Property and Liability Financial Reporting should review and approve the above proposal [Dave Hartman to present the proposal through mail/phone communications with the Committee.]

[*245]  2.  By the June 1992 NAIC meeting in Washington, D.C.:

(a) The proposed changes to the scope paragraph of the Statement of Opinion should be prepared for presentation to the Blanks Task Force. [Dave Hartman and Pat Grannan will develop the initial draft, which will be substantially similar to Exhibit 1.]

(b) The proposed changes to the general instruction regarding Annual Audited Financial Reports should be prepared for presentation to the Blanks Task Force. [Laurie Harris and Ellise Konigsberg will develop the initial draft.]

(c) An outline of the guidance to be issued by the AICPA should be available for discussion with the Blanks Task Force. [Laurie Harris and Ellise Konigsberg will develop the initial draft.]

3.  By year end:

(a) The AAA's guidance on the "evaluation of the data for reasonableness" should be issued. [Dave Hartman and Pat Grannan will develop the initial draft.]

(b) The AICPA's guidance should be issued.

Exhibit 1

Statement of Actuarial Opinion - Instructions December 1991 Wording

(9) If the actuary has examined the underlying records and/or summaries, the scope paragraph should also include a sentence such as the following:

My examination included such review of the actuarial assumptions and methods used and of the underlying basic records and/or summaries and such test of the calculations as I considered necessary.

(10) If the actuary has not examined the underlying records and/or summaries, but has relied upon those prepared by the company, the scope paragraph should include a sentence such as one of the following:

(a) I relied upon data underlying loss and loss adjustment expense reserves prepared by the responsible officers or employees of the company or group to which it belongs.  In other respects, my examination included such review of the actuarial assumptions and methods used and such tests of the calculations as I considered necessary.

or

(b) I relied upon company-produced data underlying loss and loss adjustment expense reserves as reported upon by (name of accounting firm) on (date).  In other respects, my examination included such review of the underlying actuarial assumptions and methods used and such tests of the calculations as I considered necessary.

Proposed Replacement of Paragraphs 9, 10(a) and (b) for 12/92

(9) The scope paragraph should include a paragraph such as the following regarding the data used by the actuary in forming the opinion:

In forming my opinion on the loss and loss adjustment expense reserves, I relied upon data prepared by the responsible officers or employees of the company or group to which it belongs.  I evaluated that data for reasonableness and consistency.  I also reconciled that data to Schedule P-Part 1 of the company's current annual statement.  In other respects, my examination included such review of the actuarial assumptions and methods used and such tests of the calculations as I considered necessary.

Paragraphs (10) through (16) would need to be renumbered and paragraph (b) would need to reflect the new paragraph numbers.

[*246]  ATTACHMENT FOUR

Salvage and Subrogation Working Group of the Blanks (EX4) Task Force, Washington, D.C., June 8, 1992

The Salvage and Subrogation Working Group of the Blanks (EX4) Task Force met in the Dover Room of the Sheraton Hotel in Washington, D.C., at 4 p.m. on June 8, 1992.  A quorum was present and Robert Solitro (N.H.) chaired the meeting.  The following working group members or their representatives were present: Richard Roth (Calif.); John Kummer (Fla.); James Oetting (Mo.); and Vincent Laurenzano (N.Y.).

1992-2 NAIC Proc. 226, *

Robert Solitro (N.H.) advised that the March 30, 1992, minutes of the working group (Attachment Four-A) reflect the decision of the working group to allow reporting of unpaid losses and unpaid loss adjustment expenses net of anticipated salvage and subrogation. Mr. Solitro presented a report (Attachment Four-B) that he prepared showing comparisons of amounts from the Note to Financial Statements relative to salvage and subrogation to surplus and to losses for 1990 and 1991. Mr. Solitro advised that these reports are not intended to be the complete industry and each of these reports contain the same companies but are sorted by different criteria. Mr. Solitro indicated that these reports will be distributed to the states with the caveat that this is not representative of all companies in the NAIC database. Mr. Solitro then called on Keith Bell (Aetna) to explain the proposals that will be taken to the Blanks Task Force on June 9, 1992, relative to the decision made by this working group.

Keith Bell explained that the advisory group prepared two formats for the Note to Financial Statements, one with Page 10 line of business format and the other with Schedule P line of business format. Mr. Solitro asked if the Schedule P format was required for Internal Revenue Service compliance. Mr. Bell agreed that this is correct.

Upon motion duly made and seconded, the proposal to amend the 1992 annual statement instructions (Attachment Four-C) was adopted.

The working group then took up for discussion the proposal to amend Schedule P to include a column for disclosing anticipated salvage and subrogation. Richard Roth (Calif.) advised that he preferred the presentation that was similar to the disclosure of salvage and subrogation received.

Upon motion duly made and seconded the proposal to amend the 1993 annual statement and instructions (Attachment Four-D) was adopted.

Mr. Solitro asked Mr. Bell if the advisory committee developed a recommendation on the appropriate reporting of the change in accounting method for anticipated salvage and subrogation. Mr. Bell advised that the advisory committee had not discussed the issue. After some discussion it was determined that the following was the proper method for reporting this item in the annual statement:

Companies which have previously reported reserves gross of salvage and subrogation should report the change to the net method as a change in accounting principle. The cumulative effect on prior years of this change should be reported as a write-in item in the surplus section of the annual statement. The change in the reserve calculated using the net method should be included in net income for the year of the change and for all future years.

Having no further business, the Salvage and Subrogation Working Group of the Blanks (EX4) Task Force adjourned at 5 p.m.

ATTACHMENT FOUR-A

Salvage and Subrogation Working Group of the Blanks (EX4) Task Force, Seattle, Washington, March 30, 1992

The Salvage and Subrogation Working Group of the Blanks (EX4) Task Force met in the East Ballroom B of the Sheraton Hotel in Seattle, Wash., at 9 a.m. on March 30, 1992. A quorum was present and Robert Solitro (N.H.) chaired the meeting. The following working group members or their representatives were present: Richard Roth (Calif.); John Kummer (Fla.); James Oetting (Mo.); Vincent Laurenzano (N.Y.); and Michael Lamb (Ore.).

Robert Solitro (N.H.) explained that this working group was formed for purposes of determining the proper accounting and reporting of anticipated salvage and subrogation. He advised that there are a substantial number of companies who have discounted loss reserves for anticipated salvage and subrogation. He also advised that some companies had not properly filed the Notes to Financial Statements in the 1991 annual statement and some companies did not follow the disclosure requirement in the actuarial opinion. Mr. Solitro noted that as a result of these discrepancies, some companies may be required to refile the 1991 annual statement.

[*247] Mr. Solitro distributed a copy of a letter (Attachment Four-A1) from David Hartman (Chubb & Son) that discusses this issue. Mr. Solitro advised that this is an industry problem and the regulators are looking to the industry to come forward with whatever evidence they consider necessary to get the NAIC to reconsider its historical position on not allowing the recognition of salvage and subrogation until such time as it is reduced to cash or its equivalent. Richard Roth (Calif.) advised that the Casualty Actuarial (Technical) Task Force would prefer to see Schedule P prepared net of anticipated salvage and subrogation. Mr. Roth noted that the reality is that most companies have reported Schedule P net in the past. He advised that this change could be accomplished by adding a column to Schedule P requiring disclosure of the amount of anticipated salvage and subrogation that had been used to discount losses.

1992-2 NAIC Proc. 226, *

Discussion was held regarding the feasibility of requiring companies to report reserves on a gross basis. Vincent Laurenzano (N.Y.) pointed out that statutory accounting language prohibiting certain practices often encourages companies to find creative ways to circumvent these requirements. Mr. Solitro noted that it was practical to adopt the less conservative approach and any states that chose to require companies to file on a gross basis would be taking a more conservative approach and should not encounter problems in the accreditation process. He also noted that several states have statutes that would require amendments in order to allow netting of salvage and subrogation.

Upon motion duly made and seconded it was agreed that companies should be allowed to report loss reserves net of anticipated salvage and subrogation.

It was determined that the Note to Financial Statements should be expanded for 1992 to require accident year reporting. The annual statement and accounting manual should be changed for 1993 reporting. The Advisory Committee was charged with developing the language for these changes. It was noted that the working group would need to meet in June 1992 prior to the Blanks Task Force in order to approve the proposed changes.

Having no further business, the Salvage and Subrogation Working Group of the Blanks (EX4) Task Force adjourned at 10 a.m.

ATTACHMENT FOUR-A1

Letter Regarding Proper Accounting and Reporting of Anticipated Salvage and Subrogation

Chubb Group of Insurance Companies, 15 Mountain View Road, P.O. Box 1615, Warren, NJ 07061-1615

March 27, 1992

Mr. Robert M. Solitro, Deputy Commissioner, New Hampshire Insurance Department, 169 Manchester Street, Concord, NH 03301

Re: Salvage/Subrogation Working Group

Dear Mr. Solitro:

Thank you very much for inviting me to be a member of the Advisory Committee to the Salvage/Subrogation Working Group of the Blanks Task Force. I am very interested in this topic, but unfortunately I will not be able to attend the NAIC meeting in Seattle due to a conflict with a company meeting scheduled for all those same days. I thought that I would share with you some thoughts to consider. These comments do not necessarily represent Chubb's point of view.

1. Uniformity

From my work on the risk-based capital project, it is highly desirable that all companies calculate their surplus in a standard fashion in order that they all be evaluated on a level playing field. This suggests a uniform requirement (either all gross or all net).

2. GAAP vs. Statutory

In my opinion, it is desirable to eliminate differences between generally accepted accounting principles and statutory accounting. One of the most significant differences today between the two accounting models in the loss reserves area is that statutory requires loss reserves be gross of salvage/subrogation recoverable and GAAP allows loss reserves to be net.

3. Reserve Run-Off Tests

Schedule P run-off tests allow recovered salvage/subrogation to be reflected in the testing of prior period reserves.

[*248]  4.  Surplus Impact

Reporting loss reserves net of salvage will artificially inflate surplus. You should have received a letter from Steve Lowe dated March 24, 1992 (Attachment Four-A1a), showing a reconciliation for publicly traded insurers of their statutory reserves to their GAAP reserves as of 12-31-87. Of the 52 groups shown, 22 apparently carried reserves net of salvage/subrogation and have already bolstered their surplus.

By the way, the American Academy of Actuaries takes no position on this question of reporting loss reserves gross or net of anticipated salvage/subrogation recoveries.

1992-2 NAIC Proc. 226, *

As the Working Group discusses this issue, in addition to addressing reserves assumed from pools and associations and/or reinsurance cedents, another area that should be addressed is surety reserves, where collateralized recoveries can be used to reduce a gross reserve. Also, are second injury funds to be considered salvage/subrogation or negative paid? How is salvage expense to be handled?

Again, I am sorry I will not be able to meet with you in Seattle. Please keep me informed of the group's work and, if there is another meeting, I will try my best to attend it.

Best regards.

Very truly yours,

David G. Hartman

Senior Vice President & Actuary

ATTACHMENT FOUR-A1a

Reconciliation of Publicly Traded Insurers' Statutory and GAAP Reserves

Tillinghast, 175 Powder Forest Drive, Weatogue, CT 06089-9658, (203) 843-7000

March 24, 1992

Mr. Robert Solitro, Deputy Commissioner, New Hampshire Insurance Department, 169 Manchester Street, Concord, New Hampshire 03301

Dear Bob:

I understand that you are leading an NAIC Working Group that is studying whether or not statutory accounting should be changed to permit loss reserves to be held net of anticipated subrogation and salvage.

I thought you and the other Working Group members might be interested in the attached chart which summarizes information drawn from Securities and Exchange Commission 10K reports of publicly traded insurers. In the 10K, insurers are required to provide a reconciliation between their statutory and generally accepted accounting principles (GAAP) reserves. Differences between statutory and generally accepted accounting principles (GAAP) reserves can arise for a number of reasons, including different accounting treatment of reinsurance (particularly financial reinsurance), different approaches to discounting, etc. The most obvious difference would be the treatment of anticipated subrogation and salvage: GAAP reserves should reflect estimates of net costs whereas statutory reserves should reflect estimates of gross costs.

As you can see from the exhibit, more than a few companies report no adjustment for anticipated subrogation and salvage. This may be because the difference is immaterial, such that the anticipated amount rounds to zero. Alternatively it may be because they are building statutory reserves on a net basis.

For those companies who do report an adjustment for anticipated subrogation and salvage, the amounts reported are generally immaterial when compared to the total held reserves, usually representing only one or two percent of reserves.

These statistics are somewhat dated, as they are based on year-end 1987 reserves. They were the most readily available, as I had already compiled them for another purpose. They could be updated to year-end 1991 if you thought more current statistics would be useful.

I look forward to your comments.

Sincerely,

Stephen P. Lowe, FCAS, MAAA

Statutory/GAAP Reserve Reconciliation
for Publicly Traded Insurers
Based on SEC Loss Reserve Disclosures for 1987

| Company | Statutory Reserve | Anticipated Subrogation and Salvage | Other Adjustments | GAAP Reserve | Subrogation and Salvage as a Percent of Statutory |
|---|---|---|---|---|---|

1992-2 NAIC Proc. 226, *

| | | | | | Reserve |
|---|---|---|---|---|---|
| Aetna Life & Casualty & American Re-Insurance | 10,327 | 145 | 0 | 10,182 | 1.40% |
| Allcity Insurance Company | 64 | 0 | 2 | 62 | 0.00% |
| American Financial Corporation | 2,074 | 34 | 16 | 2,024 | 1.64% |
| American General Corporation | 1,419 | 17 | 0 | 1,402 | 1.20% |
| American Indemnity Financial Corp. | 59 | 0 | -3 | 62 | 0.00% |
| American International Group, Inc. | 8,671 | 0 | 0 | 8,671 | 0.00% |
| W.R. Berkley Corporation | 407 | 0 | -16 | 423 | 0.00% |
| Celina Financial Corporation | 14 | 0 | -5 | 19 | 0.00% |
| The Chubb Corporation | 3,072 | 46 | 208 | 2,818 | 1.50% |
| CIGNA Corporation | 8,478 | 40 | -346 | 8,784 | 0.47% |
| Cimarron Investment Company, Inc. | 11 | 0 | 1 | 10 | 0.00% |
| Cincinnati Financial Corporation | 534 | | 0 | 534 | 0.00% |
| Classified Financial Corporation | 31 | 1 | 0 | 30 | 3.23% |
| CNA Financial Corporation | 8,281 | 26 | 0 | 8,255 | 0.31% |
| The Commerce Group, Inc. | 76 | 5 | 1 | 70 | 6.58% |
| The Continental Corporation | 5,794 | 93 | 60 | 5,641 | 1.61% |
| Fireman's Fund Corporation | 5,421 | 127 | -16 | 5,310 | 2.34% |
| GEICO Corporation | 1,124 | 46 | 85 | 993 | 4.09% |
| General Re Corporation | 4,738 | -1 | -105 | 4,844 | -0.02% |
| Guaranty National Corporation | 74 | 1 | 0 | 73 | 1.35% |
| The Hanover Insurance Co. | 1,048 | 40 | 0 | 1,008 | 3.82% |
| The Home Insurance Company | 3,187 | 75 | 0 | 3,112 | 2.35% |
| ITT Corporation | 6,286 | 0 | -806 | 7,092 | 0.00% |
| Kemper Corporation | 1,587 | 23 | 0 | 1,564 | 1.45% |
| Lincoln National Corporation | 2,033 | 26 | -13 | 2,020 | 1.28% |
| MCM Corporation | 103 | 0 | 0 | 103 | 0.00% |
| Meridian Insurance Group | 67 | 0 | 0 | 67 | 0.00% |
| Motor Club of America | 35 | 3 | -1 | 33 | 8.57% |
| NAC Re Corporation | 201 | 0 | 0 | 201 | 0.00% |
| The Navigators Group, Inc. | 51 | 0 | 0 | 51 | 0.00% |
| New York Marine and General Ins. Co. | 96 | 6 | -1 | 91 | 6.25% |
| Nobel Insurance | 44 | 0 | 0 | 44 | 0.00% |

1992-2 NAIC Proc. 226, *

Limited

| Company | | | | | |
|---|---|---|---|---|---|
| North East Insurance Company | 20 | 0 | -2 | 22 | 0.00% |
| Ohio Casualty Corporation | 1,171 | 0 | 0 | 1,171 | 0.00% |
| Orion Capital Corporation | 403 | 14 | -13 | 402 | 3.47% |
| Piedmont Management Company, Inc. | 161 | 0 | 0 | 161 | 0.00% |
| The Progressive Corporation | 493 | 22 | 0 | 471 | 4.46% |
| Reliance Insurance Company | 1,568 | 74 | 0 | 1,494 | 4.72% |
| Rockwood Holding Company | 155 | 0 | -17 | 172 | 0.00% |
| Safeco Corporation | 1,311 | 62 | -1 | 1,250 | 4.73% |
| Sears, Roebuck and Co. | 8,166 | 301 | 0 | 7,865 | 3.69% |
| The Seibels Bruce Group, Inc. | 145 | 8 | 0 | 137 | 5.52% |
| Selective Insurance Group, Inc. | 394 | 5 | -1 | 390 | 1.27% |
| Seneca Insurance Group | 91 | 0 | -33 | 124 | 0.00% |
| Transamerica Corporation | 1,394 | 0 | -75 | 1,469 | 0.00% |
| The Travelers Corporation | 7,520 | 91 | 1 | 7,428 | 1.21% |
| Trenwick Group, Inc. | 123 | 0 | 0 | 123 | 0.00% |
| 20th Century Industries | 314 | 17 | -1 | 298 | 5.41% |
| United Fire & Casualty Company | 72 | 0 | 1 | 71 | 0.00% |
| USF&G Corporation | 4,399 | 60 | -435 | 4,774 | 1.36% |
| Xerox Corporation | 5,036 | 66 | -96 | 5,066 | 1.31% |
| Zenith National Insurance Corp. | 287 | 0 | 0 | 287 | 0.00% |
| Total | 108,630 | 1,473 | -1,611 | 108,768 | 1.36% |

[*250]  ATTACHMENT FOUR-B

Report Showing Comparison Amounts from Notes to the Financial Statement Relative to Salvage and Subrogation to Surplus and Loss for 1990 and 1991

| Company Name | 1990 Sal/Sub | 1990 Surplus | Ratio | 1990 Losses | Ratio |
|---|---|---|---|---|---|
| AIU INS CO | 3.40 | 196.33 | 1.73% | 198.98 | 1.71% |
| ALLIANZ INS CO | 1.60 | 88.39 | 1.81% | 235.02 | 0.68% |
| ALLSTATE INS CO | 136.40 | 4,710.30 | 2.90% | 11,103.00 | 1.23% |
| AMERICAN AUTOMOBILE INS CO | 11.10 | 62.50 | 17.76% | 373.68 | 2.97% |
| AMERICAN CASUALTY CO OF READING | 14.80 | 218.24 | 6.78% | 621.68 | 2.38% |
| AMERICAN EMPLOYERS INS CO | 12.30 | 128.47 | 9.57% | 245.20 | 5.02% |
| AMERICAN HARDWARE MUTUAL INS CO | 2.40 | 81.83 | 2.93% | 144.01 | 1.67% |
| AMERICAN HOME ASR CO | 51.10 | 1,140.71 | 4.48% | 3,988.63 | 1.28% |
| AMERICAN INS CO | 31.60 | 240.39 | 13.15% | 1,066.88 | 2.96% |
| AMERICAN INTERNATIONAL INS CO | 3.60 | 62.08 | 5.80% | 111.20 | 3.24% |
| AMERICAN MANUFACTURERS | 1.20 | 119.30 | 1.01% | 323.67 | 0.37% |

1992-2 NAIC Proc. 226, *

| Company Name | 1990 Sal/Sub | 1990 Surplus | Ratio | 1990 Losses | Ratio |
|---|---|---|---|---|---|
| MUTUAL INS | | | | | |
| AMERICAN MOTORISTS INS CO | 3.80 | 143.80 | 2.64% | 675.72 | 0.56% |
| AMERICAN ROYAL REINSURANCE CO | 0.97 | 56.41 | 1.73% | 89.54 | 1.09% |
| AMERICAN & FOREIGN INS CO | 10.30 | 53.14 | 19.38% | 246.88 | 4.17% |
| AMICA MUTUAL INS CO | 8.810 | 411.95 | 2.14% | 598.54 | 1.47% |
| AMWEST SURETY INS CO | 9.02 | 22.99 | 39.24% | 9.02 | 100.04% |
| ASSOCIATED INDEMNITY CORP | 31.56 | 31.91 | 98.90% | 54.16 | 58.28% |
| ATHENA ASSURANCE CO | 1.03 | 22.74 | 4.53% | 29.15 | 3.53% |
| BALBOA INS CO | 0.00 | 117.49 | 0.00% | 45.85 | 0.00% |
| BANKERS & SHIPPERS INS CO | 0.59 | 33.47 | 1.76% | 16.57 | 3.56% |
| BIRMINGHAM FIRE INS CO OF PA | 7.09 | 149.19 | 4.75% | 557.66 | 1.27% |
| BOSTON OLD COLONY INS CO | 1.82 | 27.15 | 6.70% | 83.49 | 2.18% |
| CENTRAL MUTUAL INS CO | 1.08 | 65.03 | 1.66% | 110.09 | 0.98% |
| CENTURY INDEMNITY CO | 0.40 | 12.39 | 3.23% | 35.41 | 1.13% |
| CHARTER OAK FIRE INS CO | 9.50 | 92.29 | 10.29% | 403.54 | 2.35% |
| CHICAGO INS CO | 1.95 | 27.68 | 7.05% | 55.49 | 3.51% |
| CIGNA FIRE UNDERWRITERS INS CO | 0.24 | 28.36 | 0.85% | 21.25 | 1.13% |
| CIGNA INS CO | 4.14 | 212.75 | 1.95% | 403.71 | 1.03% |
| CIGNA PROPERTY & CASUALTY INS CO | 28.90 | 765.81 | 3.77% | 2,528.49 | 1.14% |
| CITY INS CO | 0.11 | 24.89 | 0.45% | 31.22 | 0.36% |
| CLARENDON NATIONAL INS CO | 0.63 | 103.98 | 0.61% | 238.10 | 0.26% |
| COMMERCE & INDUSTRY INS CO | 14.20 | 288.56 | 4.92% | 1,105.96 | 1.28% |
| COMMERCIAL INS CO OF NEWARK NJ | 4.85 | 78.25 | 6.20% | 222.64 | 2.18% |
| COMMERCIAL UNION INS CO | 36.75 | 267.26 | 13.75% | 735.60 | 5.00% |
| CONTINENTAL CASUALTY CO | 241.30 | 3,147.49 | 7.67% | 10,089.73 | 2.39% |
| CONTINENTAL INS CO | 30.30 | 409.12 | 7.41% | 1,391.49 | 2.18% |
| EMCASCO INS CO | 0.36 | 17.60 | 2.03% | 33.17 | 1.08% |
| EMPLOYERS FIRE INS CO | 5.40 | 48.72 | 11.08% | 108.98 | 4.96% |
| EMPLOYERS INS OF WAUSAU A MUTUAL CO | 13.90 | 369.66 | 3.76% | 1,709.22 | 0.81% |
| EMPLOYERS MUTUAL CAS CO | 3.40 | 208.11 | 1.63% | 313.00 | 1.09% |
| EXCELSIOR INS CO | 0.230 | 23.47 | 0.98% | 33.70 | 0.68% |
| FEDERAL INS CO | 1.60 | 1,404.63 | 0.11% | 2,935.64 | 0.05% |
| FIDELITY & CASUALTY CO OF NY | 8.50 | 210.98 | 4.03% | 389.62 | 2.18% |
| FIDELITY & DEPOSIT INS CO | 4.40 | 187.44 | 2.35% | 125.84 | 3.50% |
| FIREMANS FUND INS CO | 104.30 | 1,420.47 | 7.34% | 3,538.81 | 2.95% |
| FIREMENS INS CO OF NEWARK NJ | 28.50 | 493.90 | 5.77% | 1,308.00 | 2.18% |
| FOREMOST INS CO | 2.30 | 115.49 | 1.99% | 112.72 | 2.04% |
| GLENS FALLS INS CO | 1.80 | 26.44 | 6.81% | 83.49 | 2.16% |
| GRAPHIC ARTS MUTUAL INS CO | 0.50 | 12.07 | 4.14% | 40.07 | 1.25% |
| GREAT NORTHERN INS CO | 0.14 | 68.81 | 0.20% | 167.80 | 0.08% |
| GULF INSURANCE CO | 13.50 | 128.73 | 10.49% | 189.96 | 7.11% |
| HANOVER INS CO | 9.40 | 508.84 | 1.85% | 1,129.38 | 0.83% |
| HIGHLANDS INS CO | 10.90 | 252.16 | 4.32% | 532.60 | 2.05% |
| HOME INDEMNITY CO | 1.13 | 72.17 | 1.57% | 59.09 | 1.91% |
| HOME INS CO OF IN | 0.11 | 13.10 | 0.86% | 31.22 | 0.36% |
| INDEMNITY INS CO OF NORTH AMERICA | 1.70 | 172.84 | 0.98% | 148.73 | 1.14% |
| INSURANCE CO OF THE STATE OF PA | 14.20 | 297.87 | 4.77% | 1,115.33 | 1.27% |
| JOHN HANCOCK INDEMNITY CO | 0.30 | 12.51 | 2.40% | 10.28 | 2.92% |
| JOHN HANCOCK PROP & CAS INS CO | 0.33 | 83.31 | 0.40% | 98.96 | 0.33% |

1992-2 NAIC Proc. 226, *

| Company Name | 1990 Sal/Sub | 1990 Surplus | Ratio | 1990 Losses | Ratio |
|---|---|---|---|---|---|
| KANSAS CITY FIRE & MARINE INS CO | 0.60 | 16.49 | 3.64% | 27.83 | 2.16% |
| LIBERTY INS CORP | 16.00 | 174.18 | 9.19% | 827.36 | 1.93% |
| LIBERTY MUTUAL FIRE INS CO | 26.60 | 288.05 | 9.23% | 1,378.93 | 1.93% |
| LIBERTY MUTUAL INS CO | 223.80 | 2,132.57 | 10.49% | 11,583.05 | 1.93% |
| LUMBERMENS MUTUAL CAS CO | 12.10 | 1,313.26 | 0.92% | 3,155.92 | 0.38% |
| MAIN STREET AMERICA ASSURANCE CO | 0.750 | 21.08 | 3.56% | 46.29 | 1.62% |
| MARYLAND CASUALTY CO | 103.50 | 697.29 | 14.84% | 2,165.10 | 4.78% |
| MERCANTILE & GEN REINS CO OF AMERICA | 3.50 | 102.05 | 3.43% | 142.15 | 2.46% |
| METROPOLITAN PROPERTY & CAS INS CO | 24.50 | 273.43 | 8.96% | 589.80 | 4.15% |
| MICHIGAN MUTUAL INS CO | 19.70 | 222.14 | 8.87% | 499.28 | 3.95% |
| MID-CENTURY INS CO | 3.20 | 33.75 | 9.48% | 89.42 | 3.58% |
| MIDDLESEX INS CO | 12.60 | 43.29 | 29.10% | 118.17 | 10.66% |
| MORTGAGE GUARANTY INS CORP | 39.40 | 161.43 | 24.41% | 305.98 | 12.88% |
| NATIONAL CONTINENTAL INS CO | 14.20 | 51.61 | 27.51% | 41.26 | 34.42% |
| NATIONAL FIRE INS CO OF HARTFORD | 25.30 | 367.61 | 6.88% | 1,058.18 | 2.39% |
| NATIONAL GRANGE MUTUAL INS CO | 2.200 | 80.76 | 2.72% | 138.86 | 1.58% |
| NATIONAL SURETY CORP | 11.20 | 84.50 | 13.25% | 379.10 | 2.95% |
| NATIONAL UNION FIRE INS CO OF PITTSB | 53.93 | 1,162.43 | 4.64% | 4,239.89 | 1.27% |
| NATIONWIDE MUTUAL FIRE INS CO | 7.01 | 414.53 | 1.69% | 811.86 | 0.86% |
| NATIONWIDE MUTUAL INS CO | 41.40 | 2,604.04 | 1.59% | 4,883.63 | 0.85% |
| NETHERLANDS INS CO (THE) | 0.150 | 13.79 | 1.09% | 22.44 | 0.67% |
| NEW HAMPSHIRE INS CO | 28.20 | 491.00 | 5.74% | 1,073.63 | 2.63% |
| NEWARK INS CO | 8.86 | 44.80 | 19.78% | 211.61 | 4.19% |
| NIAGARA FIRE INS CO | 1.82 | 25.95 | 7.01% | 83.49 | 2.18% |
| NORFOLK & DEDHAM MUTUAL FIRE INS CO | 1.64 | 54.34 | 3.02% | 68.22 | 2.40% |
| NORTH AMERICAN REINSURANCE CORP | 18.60 | 230.39 | 8.07% | 502.50 | 3.70% |
| NORTHERN ASSURANCE CO OF AMERICA | 13.60 | 140.08 | 9.71% | 272.44 | 4.99% |
| PACIFIC EMPLOYERS INS CO | 2.43 | 191.25 | 1.27% | 212.48 | 1.14% |
| PACIFIC INDEMNITY CO | 0.75 | 321.26 | 0.23% | 804.09 | 0.09% |
| PENNSYLVANIA MANUF ACTURERS ASN IN | 44.20 | 218.83 | 20.20% | 837.05 | 5.28% |
| PHOENIX INSURANCE CO | 34.20 | 572.51 | 5.97% | 1,452.74 | 2.35% |
| PMI MORTGAGE INS CO | 3.45 | 247.87 | 1.39% | 120.89 | 2.85% |
| PROGRESSIVE CAS INS CO | 11.20 | 349.07 | 3.21% | 499.68 | 2.24% |
| PRUDENTIAL COMERCIAL INS CO | 0.01 | 15.56 | 0.06% | 0.99 | 0.91% |
| PRUDENTIAL GENERAL INS CO | 0.12 | 13.74 | 0.90% | 6.49 | 1.91% |
| PRUDENTIAL PROPERTY & CAS INS CO | 19.20 | 615.81 | 3.12% | 984.04 | 1.95% |
| PRUDENTIAL REINSURANCE CO | 3.40 | 508.96 | 0.67% | 1,530.23 | 0.22% |
| RAMSEY INS CO | 1.00 | 22.39 | 4.47% | 29.15 | 3.43% |
| RANGER INS CO | 0.52 | 85.61 | 0.61% | 188.86 | 0.28% |
| REPUBLIC WESTERN INS CO | 0.92 | 111.12 | 0.83% | 230.72 | 0.40% |

1992-2 NAIC Proc. 226, *

| Company Name | 1990 Sal/Sub | 1990 Surplus | Ratio | 1990 Losses | Ratio |
|---|---|---|---|---|---|
| ROYAL INDEMNITY CO | 22.14 | 147.61 | 15.00% | 529.04 | 4.18% |
| ROYAL INS CO OF AMERICA | 53.16 | 280.54 | 18.95% | 1,269.69 | 4.19% |
| SAFEGUARD INS CO | 14.76 | 79.38 | 18.59% | 352.69 | 4.18% |
| SEA INS CO LTD US BR | 0.10 | 96.13 | 0.10% | 134.08 | 0.07% |
| SEABOARD SURETY CO | 14.02 | 72.17 | 19.43% | 59.09 | 23.73% |
| SENTRY INS A MUTUAL CO | 12.61 | 657.86 | 1.92% | 984.64 | 1.28% |
| SKANDIA AMERICA REINSURANCE CORP | 3.90 | 311.61 | 1.25% | 604.78 | 0.64% |
| ST PAUL FIRE & MARINE INS CO | 0.20 | 1,464.59 | 0.01% | 5,713.49 | 0.00% |
| SUN INS OFFICE LTD US BR | 0.16 | 149.24 | 0.11% | 223.98 | 0.07% |
| SWISS REINSURANCE CO US BR | 22.70 | 337.60 | 6.72% | 636.59 | 3.57% |
| TOA-RE INS CO OF AMERICA | 0.94 | 51.95 | 1.82% | 36.28 | 2.60% |
| TRANSAMERICA INS CO | 32.40 | 767.05 | 4.22% | 969.02 | 3.34% |
| TRANSCONTINENTAL INS CO | 9.49 | 140.33 | 6.76% | 396.82 | 2.39% |
| TRANSPORTATION INS CO | 4.75 | 56.82 | 8.36% | 198.41 | 2.39% |
| TRAVELERS INDEMNITY CO | 132.90 | 2,072.41 | 6.41% | 5,636.37 | 2.36% |
| TRAVELERS INDEMNITY CO OF AMERICA | 5.70 | 66.41 | 8.58% | 242.12 | 2.35% |
| TRAVELERS INDEMNITY CO OF IL | 1.90 | 22.15 | 8.58% | 80.71 | 2.35% |
| TRAVELERS INDEMNITY CO OF RI | 5.70 | 193.58 | 2.94% | 603.36 | 0.94% |
| UNIGARD SECURITY INS CO | 7.70 | 125.32 | 6.14% | 224.19 | 3.43% |
| UNION MUTUAL INS CO OF PROVIDENCE | 0.11 | 6.44 | 1.72% | 10.36 | 1.07% |
| UNITED GTY RESIDENTIAL INS CO | 5.22 | 275.43 | 1.90% | 88.06 | 5.93% |
| UNITED SERVICES AUTOMOBILE ASN | 68.82 | 2,739.86 | 2.51% | 1,843.13 | 3.73% |
| UTICA MUTUAL INS CO | 10.01 | 173.29 | 5.78% | 737.35 | 1.36% |
| VALLEY FORGE INS CO | 7.91 | 115.49 | 6.85% | 330.68 | 2.39% |
| VIGILANT INS CO | 0.32 | 200.59 | 0.16% | 468.95 | 0.07% |
| WAUSAU UNDERWRITERS INS CO | 0.59 | 28.07 | 2.10% | 68.38 | 0.86% |
| WESTERN ATLANTIC REINSURANCE CORP | 0.01 | 29.03 | 0.04% | 14.77 | 0.08% |
| WORCESTER INS CO | 1.30 | 38.02 | 3.42% | 91.22 | 1.43% |
| ZURICH INS CO US BR | 46.60 | 456.13 | 10.22% | 1,600.33 | 2.91% |

| Company Name | 1991 Sal/Sub | 1991 Surplus | Ratio | 1991 Losses | Ratio | % Change |
|---|---|---|---|---|---|---|
| AIU INS CO | 3.30 | 228.79 | 1.44% | 248.47 | 1.33% | -2.94% |
| ALLIANZ INS CO | 1.40 | 96.57 | 1.45% | 260.12 | 0.54% | -12.50% |
| ALLSTATE INS CO | 79.30 | 5,421.70 | 1.46% | 12,172.00 | 0.65% | -41.86% |
| AMERICAN AUTOMOBILE INS CO | 9.70 | 77.90 | 12.45% | 376.15 | 2.58% | -12.61% |
| AMERICAN CASUALTY CO OF READING | 17.20 | 271.43 | 6.34% | 687.17 | 2.50% | 16.22% |
| AMERICAN EMPLOYERS INS CO | 12.50 | 143.33 | 8.72% | 285.15 | 4.38% | 1.63% |
| AMERICAN HARDWARE MUTUAL INS CO | 2.50 | 51.71 | 4.83% | 174.33 | 1.43% | 4.17% |
| AMERICAN HOME ASR CO | 44.50 | 1,493.56 | 2.98% | 4,292.98 | 1.04% | -12.92% |
| AMERICAN INS CO | 27.80 | 273.65 | 10.16% | 1,073.94 | 2.59% | -12.03% |
| AMERICAN INTERNATIONAL INS CO | 2.90 | 69.35 | 4.18% | 124.16 | 2.34% | -19.44% |
| AMERICAN MANUFACTURERS MUTUAL INS | 1.90 | 134.67 | 1.41% | 369.65 | 0.51% | 58.33% |
| AMERICAN MOTORISTS INS CO | 2.70 | 234.67 | 1.15% | 765.52 | 0.35% | -28.95% |
| AMERICAN ROYAL REINSURANCE CO | 0.88 | 61.66 | 1.43% | 89.27 | 0.99% | -9.55% |

1992-2 NAIC Proc. 226, *

| Company Name | 1991 Sal/Sub | 1991 Surplus | Ratio | 1991 Losses | Ratio | % Change |
|---|---|---|---|---|---|---|
| AMERICAN & FOREIGN INS CO | 9.20 | 61.20 | 15.03% | 244.33 | 3.77% | -10.68% |
| AMICA MUTUAL INS CO | 0.000 | 513.08 | 0.00% | 641.91 | 0.00% | -100.00% |
| AMWEST SURETY INS CO | 8.50 | 26.12 | 32.54% | 8.50 | 99.96% | -5.76% |
| ASSOCIATED INDEMNITY CORP | 27.80 | 31.24 | 88.97% | 54.51 | 51.00% | -11.91% |
| ATHENA ASSURANCE CO | 1.28 | 26.95 | 4.75% | 31.16 | 4.11% | 24.27% |
| BALBOA INS CO | 0.87 | 102.78 | 0.85% | 53.93 | 1.62% | ERR |
| BANKERS & SHIPPERS INS CO | 0.96 | 35.43 | 2.72% | 25.87 | 3.72% | 63.05% |
| BIRMINGHAM FIRE INS CO OF PA | 6.19 | 189.72 | 3.26% | 597.70 | 1.04% | -12.69% |
| BOSTON OLD COLONY INS CO | 1.86 | 26.23 | 7.09% | 82.28 | 2.26% | 2.20% |
| CENTRAL MUTUAL INS CO | 1.03 | 77.22 | 1.33% | 109.00 | 0.94% | -4.63% |
| CENTURY INDEMNITY CO | 0.09 | 13.86 | 0.65% | 36.32 | 0.25% | -77.50% |
| CHARTER OAK FIRE INS CO | 10.38 | 106.76 | 9.72% | 421.20 | 2.46% | 9.26% |
| CHICAGO INS CO | 2.77 | 32.51 | 8.52% | 57.59 | 4.81% | 42.05% |
| CIGNA FIRE UNDERWRITERS INS CO | 0.05 | 30.60 | 0.17% | 21.79 | 0.24% | -77.92% |
| CIGNA INS CO | 0.90 | 237.72 | 0.38% | 370.50 | 0.24% | -78.26% |
| CIGNA PROPERTY & CASUALTY INS CO | 6.33 | 914.43 | 0.69% | 2,593.52 | 0.24% | -78.10% |
| CITY INS CO | 0.15 | 24.90 | 0.60% | 30.24 | 0.50% | 32.74% |
| CLARENDON NATIONAL INS CO | 0.50 | 102.10 | 0.49% | 197.40 | 0.25% | -20.63% |
| COMMERCE & INDUSTRY INS CO | 12.40 | 350.15 | 3.54% | 1,189.81 | 1.04% | -12.68% |
| COMMERCIAL INS CO OF NEWARK NJ | 4.97 | 89.77 | 5.54% | 219.43 | 2.27% | 2.47% |
| COMMERCIAL UNION INS CO | 37.54 | 349.86 | 10.73% | 855.45 | 4.39% | 2.15% |
| CONTINENTAL CASUALTY CO | 280.40 | 3,928.00 | 7.14% | 11,151.04 | 2.51% | 16.20% |
| CONTINENTAL INS CO | 31.00 | 419.35 | 7.39% | 1,371.41 | 2.26% | 2.31% |
| EMCASCO INS CO | 0.42 | 18.16 | 2.33% | 37.49 | 1.13% | 18.77% |
| EMPLOYERS FIRE INS CO | 5.60 | 54.52 | 10.27% | 126.73 | 4.42% | 3.70% |
| EMPLOYERS INS OF WAUSAU A MUTUAL CO | 19.70 | 428.80 | 4.59% | 1,800.83 | 1.09% | 41.73% |
| EMPLOYERS MUTUAL CAS CO | 4.00 | 246.87 | 1.62% | 353.82 | 1.13% | 17.65% |
| EXCELSIOR INS CO | 0.000 | 24.36 | 0.00% | 37.30 | 0.00% | -100.00% |
| FEDERAL INS CO | 2.30 | 1,670.13 | 0.14% | 3,175.05 | 0.07% | 43.75% |
| FIDELITY & CASUALTY CO OF NY | 8.60 | 212.86 | 4.04% | 384.00 | 2.24% | 1.18% |
| FIDELITY & DEPOSIT INS CO | 5.00 | 246.42 | 2.03% | 142.61 | 3.51% | 13.64% |
| FIREMANS FUND INS CO | 91.90 | 1,536.99 | 5.98% | 3,554.55 | 2.59% | -11.89% |
| FIREMENS INS CO OF NEWARK NJ | 29.20 | 488.87 | 5.97% | 1,289.13 | 2.27% | 2.46% |
| FOREMOST INS CO | 2.20 | 143.80 | 1.53% | 103.91 | 2.12% | -4.35% |
| GLENS FALLS INS CO | 1.90 | 30.55 | 6.22% | 82.28 | 2.31% | 5.56% |
| GRAPHIC ARTS MUTUAL INS CO | 0.50 | 14.29 | 3.50% | 42.45 | 1.18% | 0.00% |
| GREAT NORTHERN INS CO | 0.15 | 82.60 | 0.18% | 182.40 | 0.08% | 6.38% |
| GULF INSURANCE CO | 10.00 | 121.00 | 8.26% | 164.09 | 6.09% | -25.93% |
| HANOVER INS CO | 7.40 | 573.85 | 1.29% | 1,219.11 | 0.61% | -21.28% |
| HIGHLANDS INS CO | 11.50 | 259.04 | 4.44% | 593.99 | 1.94% | 5.50% |
| HOME INDEMNITY CO | 1.50 | 92.44 | 1.62% | 54.35 | 2.76% | 32.74% |
| HOME INS CO OF IN | 0.15 | 13.99 | 1.07% | 30.24 | 0.49% | 31.86% |
| INDEMNITY INS CO OF NORTH AMERICA | 0.37 | 199.87 | 0.19% | 152.56 | 0.24% | -78.24% |
| INSURANCE CO OF THE STATE OF PA | 12.40 | 371.39 | 3.34% | 1,195.39 | 1.04% | -12.68% |
| JOHN HANCOCK INDEMNITY CO | 0.30 | 13.13 | 2.28% | 8.75 | 3.43% | 0.00% |
| JOHN HANCOCK PROP & CAS INS CO | 0.34 | 87.68 | 0.39% | 81.67 | 0.42% | 3.03% |
| KANSAS CITY FIRE & MARINE INS CO | 0.56 | 16.61 | 3.37% | 27.43 | 2.04% | -6.67% |

1992-2 NAIC Proc. 226, *

| Company Name | 1991 Sal/Sub | 1991 Surplus | Ratio | 1991 Losses | Ratio | % Change |
|---|---|---|---|---|---|---|
| LIBERTY INS CORP | 18.30 | 191.61 | 9.55% | 854.06 | 2.14% | 14.37% |
| LIBERTY MUTUAL FIRE INS CO | 30.50 | 330.05 | 9.24% | 1,423.44 | 2.14% | 14.66% |
| LIBERTY MUTUAL INS CO | 256.20 | 2,366.98 | 10.82% | 11,956.90 | 2.14% | 14.48% |
| LUMBERMENS MUTUAL CAS CO | 18.60 | 1,738.80 | 1.07% | 3,601.63 | 0.52% | 53.72% |
| MAIN STREET AMERICA ASSURANCE CO | 0.000 | 25.58 | 0.00% | 51.24 | 0.00% | -100.00% |
| MARYLAND CASUALTY CO | 108.40 | 865.08 | 12.53% | 2,043.36 | 5.30% | 4.73% |
| MERCANTILE & GEN REINS CO OF AMERICA | 3.70 | 108.87 | 3.40% | 153.32 | 2.41% | 5.71% |
| METROPOLITAN PROPERTY & CAS INS CO | 20.50 | 330.80 | 6.20% | 499.12 | 4.11% | -16.33% |
| MICHIGAN MUTUAL INS CO | 25.00 | 227.69 | 10.98% | 473.39 | 5.28% | 26.90% |
| MID-CENTURY INS CO | 3.70 | 38.25 | 9.67% | 96.35 | 3.84% | 15.63% |
| MIDDLESEX INS CO | 9.10 | 48.95 | 18.59% | 133.31 | 6.83% | -27.78% |
| MORTGAGE GUARANTY INS CORP | 32.30 | 205.59 | 15.71% | 406.53 | 7.95% | -18.02% |
| NATIONAL CONTINENTAL INS CO | 16.80 | 58.03 | 28.95% | 45.83 | 36.66% | 18.31% |
| NATIONAL FIRE INS CO OF HARTFORD | 29.40 | 451.78 | 6.51% | 1,169.64 | 2.51% | 16.21% |
| NATIONAL GRANGE MUTUAL INS CO | 0.000 | 94.15 | 0.00% | 153.71 | 0.00% | -100.00% |
| NATIONAL SURETY CORP | 9.90 | 91.38 | 10.83% | 381.60 | 2.59% | -11.61% |
| NATIONAL UNION FIRE INS CO OF PITTSB | 47.05 | 1,420.95 | 3.31% | 4,544.56 | 1.04% | -12.76% |
| NATIONWIDE MUTUAL FIRE INS CO | 9.85 | 508.97 | 1.94% | 818.69 | 1.20% | 40.51% |
| NATIONWIDE MUTUAL INS CO | 59.10 | 3,101.08 | 1.91% | 4,998.89 | 1.18% | 42.75% |
| NETHERLANDS INS CO (THE) | 0.000 | 13.95 | 0.00% | 24.78 | 0.00% | -100.00% |
| NEW HAMPSHIRE INS CO | 25.00 | 494.20 | 5.06% | 1,102.43 | 2.27% | -11.35% |
| NEWARK INS CO | 7.85 | 49.46 | 15.87% | 209.42 | 3.75% | -11.40% |
| NIAGARA FIRE INS CO | 1.86 | 26.25 | 7.08% | 82.28 | 2.26% | 2.20% |
| NORFOLK & DEDHAM MUTUAL FIRE INS CO | 2.50 | 62.66 | 3.99% | 81.74 | 3.06% | 52.44% |
| NORTH AMERICAN REINSURANCE CORP | 17.30 | 255.96 | 6.76% | 506.57 | 3.42% | -6.99% |
| NORTHERN ASSURANCE CO OF AMERICA | 13.90 | 177.20 | 7.84% | 316.83 | 4.39% | 2.21% |
| PACIFIC EMPLOYERS INS CO | 0.53 | 201.19 | 0.26% | 217.94 | 0.24% | -78.07% |
| PACIFIC INDEMNITY CO | 0.65 | 389.79 | 0.17% | 908.61 | 0.07% | -13.85% |
| PENNSYLVANIA MANUF ACTURERS ASN IN | 45.20 | 251.83 | 17.95% | 871.08 | 5.19% | 2.26% |
| PHOENIX INSURANCE CO | 37.50 | 632.07 | 5.93% | 1,516.33 | 2.47% | 9.65% |
| PMI MORTGAGE INS CO | 2.34 | 242.10 | 0.97% | 85.33 | 2.74% | -32.17% |
| PROGRESSIVE CAS INS CO | 11.60 | 333.10 | 3.48% | 521.92 | 2.22% | 3.57% |
| PRUDENTIAL COMERCIAL INS CO | 0.08 | 17.95 | 0.43% | 1.12 | 6.85% | 755.56% |
| PRUDENTIAL GENERAL INS CO | 0.13 | 15.11 | 0.83% | 6.24 | 2.00% | 0.81% |
| PRUDENTIAL PROPERTY & CAS INS CO | 18.90 | 601.84 | 3.14% | 961.50 | 1.97% | -1.56% |
| PRUDENTIAL REINSURANCE CO | 2.90 | 590.28 | 0.49% | 1,674.77 | 0.17% | -14.71% |
| RAMSEY INS CO | 1.30 | 26.54 | 4.90% | 31.16 | 4.17% | 30.00% |
| RANGER INS CO | 0.46 | 95.22 | 0.48% | 196.44 | 0.23% | -11.54% |
| REPUBLIC WESTERN INS CO | 1.12 | 124.95 | 0.90% | 240.47 | 0.47% | 21.74% |
| ROYAL INDEMNITY CO | 19.60 | 158.01 | 12.40% | 523.55 | 3.74% | -11.47% |
| ROYAL INS CO OF AMERICA | 47.12 | 305.71 | 15.41% | 1,256.53 | 3.75% | -11.36% |

1992-2 NAIC Proc. 226, *

| Company Name | 1991 Sal/Sub | 1991 Surplus | Ratio | 1991 Losses | Ratio | % Change |
|---|---|---|---|---|---|---|
| SAFEGUARD INS CO | 13.08 | 86.60 | 15.10% | 349.04 | 3.75% | -11.38% |
| SEA INS CO LTD US BR | 0.12 | 94.11 | 0.12% | 145.16 | 0.08% | 18.56% |
| SEABOARD SURETY CO | 15.91 | 92.44 | 17.21% | 54.35 | 29.28% | 13.48% |
| SENTRY INS A MUTUAL CO | 9.20 | 753.58 | 1.22% | 1,083.11 | 0.85% | -27.04% |
| SKANDIA AMERICA REINSURANCE CORP | 4.10 | 353.01 | 1.16% | 724.32 | 0.57% | 5.13% |
| ST PAUL FIRE & MARINE INS CO | 0.25 | 1,683.52 | 0.01% | 6,106.74 | 0.00% | 25.00% |
| SUN INS OFFICE LTD US BR | 0.20 | 144.77 | 0.14% | 242.34 | 0.08% | 20.73% |
| SWISS REINSURANCE CO US BR | 21.20 | 427.57 | 4.96% | 646.94 | 3.28% | -6.61% |
| TOA-RE INS CO OF AMERICA | 1.14 | 66.18 | 1.72% | 45.15 | 2.52% | 20.76% |
| TRANSAMERICA INS CO | 35.80 | 823.43 | 4.35% | 1,024.94 | 3.49% | 10.49% |
| TRANSCONTINENTAL INS CO | 11.03 | 170.10 | 6.48% | 438.62 | 2.51% | 16.23% |
| TRANSPORTATION INS CO | 5.51 | 68.12 | 8.09% | 219.31 | 2.51% | 16.00% |
| TRAVELERS INDEMNITY CO | 145.20 | 2,373.60 | 6.12% | 5,912.30 | 2.46% | 9.26% |
| TRAVELERS INDEMNITY CO OF AMERICA | 6.22 | 71.94 | 8.65% | 252.72 | 2.46% | 9.12% |
| TRAVELERS INDEMNITY CO OF IL | 2.10 | 39.49 | 5.32% | 84.24 | 2.49% | 10.53% |
| TRAVELERS INDEMNITY CO OF RI | 6.22 | 201.04 | 3.09% | 629.37 | 0.99% | 9.12% |
| UNIGARD SECURITY INS CO | 7.62 | 130.71 | 5.83% | 169.03 | 4.51% | -1.04% |
| UNION MUTUAL INS CO OF PROVIDENCE | 0.13 | 6.89 | 1.92% | 11.72 | 1.13% | 18.92% |
| UNITED GTY RESIDENTIAL INS CO | 5.00 | 276.07 | 1.81% | 96.24 | 5.20% | -4.21% |
| UNITED SERVICES AUTOMOBILE ASN | 71.63 | 3,168.12 | 2.26% | 2,036.34 | 3.52% | 4.08% |
| UTICA MUTUAL INS CO | 9.41 | 201.15 | 4.68% | 781.09 | 1.20% | -5.99% |
| VALLEY FORGE INS CO | 9.20 | 138.63 | 6.64% | 365.51 | 2.52% | 16.31% |
| VIGILANT INS CO | 0.34 | 237.87 | 0.14% | 521.69 | 0.06% | 4.32% |
| WAUSAU UNDERWRITERS INS CO | 0.84 | 33.69 | 2.49% | 72.13 | 1.16% | 42.37% |
| WESTERN ATLANTIC REINSURANCE CORP | 0.01 | 101.69 | 0.01% | 21.61 | 0.06% | 8.33% |
| WORCESTER INS CO | 1.64 | 41.83 | 3.92% | 109.90 | 1.49% | 26.15% |
| ZURICH INS CO US BR | 61.20 | 504.55 | 12.13% | 1,843.27 | 3.32% | 31.33% |

[*253]  ATTACHMENT FOUR-C

Amended P/C Annual Statement Instructions Regarding Lines of Business Breakdown Relative to Anticipated Salvage and Subrogation

Blanks Agenda Item Submission Form

FOR NAIC USE ONLY

Agenda Item

#

Year

INSTRUCTIONS

1. Complete this form for EACH Blanks proposal.  Under "Identification of Item(s) to be Changed", include Pg., Sch. or Exh., Part, Column, Line or Item.

2. Attach illustration of proposal which clearly shows changes from prior year's annual statement.

3. If change will require revision of annual statement instructions manual(s), attach instruction change with this submission.

1992-2 NAIC Proc. 226, *

NOTES

DATE 6/8/92

SUBMITTED BY: Robert Solitro

ON BEHALF OF: Salvage & Subrogation Working Group

NAME: Robert Solitro

TITLE: Deputy Commissioner

AFFILIATION: New Hampshire Insurance Department

ADDRESS: 169 Manchester Street Concord, NH 03301

TELEPHONE: 603-271-2261

DISPOSITION

[ ] ADOPTED

[ ] REJECTED

[ ] REFERRED TO NAIC TASK FORCE

[ ] OTHER (SPECIFY)

BLANK(S) TO WHICH PROPOSAL APPLIES

[X] ANNUAL STATEMENT

[ ] QUARTERLY STATEMENT

[ ] Life and Accident & Health

[ ] Separate Accounts

[ ] LHSO

[X] Fire & Casualty

[ ] Fraternal

[ ] Title

[ ] HMDI

[ ] HMO

[ ] CCRC

[ ] Other (Specifiy)

IDENTIFICATION OF ITEM(S) TO BE CHANGED

Annual Statement Instructions

PURPOSE & DESCRIPTION OF PROPOSED CHANGE

Modify Annual Statement Instructions to require lines of business breakdown in Note relative to anticipated salvage and subrogation and to correct references to recognition of salvage and subrogation only after reduction to cash.

[*254] Salvage And Subrogation

Proposed Changes To

1992 Annual Statement Instructions And Accounting Manual

ANNUAL STATEMENT INSTRUCTIONS

9-1

1992-2 NAIC Proc. 226, *

Underwriting And Investment Exhibit Part 3 - Losses Paid And Incurred

[Salvage

Salvage and subrogation should be recognized in the annual statement only after such salvage and subrogation has been reduced to cash or its equivalent.]

Column 1 - Losses Paid Less Salvage-Direct Business. . .

10-1

Underwriting And Investment Exhibit Part 3a - Unpaid Losses And Loss Adjustment Expenses

[Salvage and subrogation should be recognized in the annual statement only after such salvage and subrogation has been reduced to cash or its equivalent.] The reserves for unpaid losses and loss adjustment expenses should take into account the explicit or implicit impacts of the various factors affecting claim frequency or ultimate claim cost. The estimated amount of anticipated salvage and subrogation incorporated in the reserves must be disclosed in the Notes to Financial statement.

Columns 1a and 44. . .

57-1

Schedule P

. . . Discounting (including the discount in tabular reserves) is allowed only if expressly permitted by the state insurance department to which this Annual Statement is being filed.

[Salvage and subrogation should be recognized in Schedule P only after such salvage and subrogation has been reduced to cash or its equivalent.] The reserves for unpaid losses and loss adjustment expenses should take into account the explicit or implicit impacts of the various factors affecting claim frequency or ultimate claim cost. The estimated amount of anticipated salvage and subrogation incorporated in the reserves must be disclosed in the Notes to Financial Statements.

For guidelines on completing Schedule P, see Appendix B immediately following Page 83-2 of the instructions. . .

Schedule P - Part 2

Part 2 displays net losses and allocated loss expenses incurred data reported in Schedule P, Part 1, of the current and prior years, except as directed in the footnote. Unallocated loss expenses should be excluded. The schedule format provides a loss and allocated expense development overview to test the adequacy of the insurer's reserves.

Amounts reported are to be net of salvage and subrogation [received].

As in the rest of Schedule P, all reserves. . .

ACCOUNTING MANUAL

Chapter 10

Losses

Page 10-3

Recoveries from Salvage and Subrogation

[Because of the difficulty of ascertaining an estimate of value of anticipated salvage and subrogation, most state regulations and the annual statement instructions provide that salvage and subrogation should be recognized in the annual statement only after such salvage and subrogation has been reduced to cash or its equivalent.] Anticipated salvage and subrogation should be taken into account when determining ultimate incurred losses and unpaid losses, to the same extent that other factors affecting ultimate claim costs are taken into account. The company is expected to maintain appropriate data and perform appropriate actuarial tests to support the reasonableness of the anticipated salvage and subrogation recoveries.

[*255] 17. Salvage and Subrogation at December 31, 1992 ($ thousands):

|  | Prior | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | Balance 1991 | 1992 |
|---|---|---|---|---|---|---|---|---|---|---|---|

12/31/92

SCHEDULE P LINES:

Homeowners/Farmowners

Private Passenger
Auto Liability/Medical

Commercial Auto/Truck
Liability/Medical

Workers' Compensation

Commercial Multiple
Peril

Medical Malpractice

Special Liability
(Ocean Marine,
Aircraft,
(All Perils),
Boiler
and Machinery)

Other Liability

Special Property (Fire,
Allied Lines, Inland
Marine, Earthquake,
Glass, Burglary
and Theft)

Auto Physical Damage

Fidelity, Surety,
Financial Guaranty,
Mortgage Guaranty

Other (Including
Credit, Accident and
Health)

International

Products Liability

Reinsurance A

Reinsurance B

Reinsurance C

Reinsurance D

Total

Case 1:05-cv-11048-RCL  Document 63-3  Filed 04/25/2007  Page 1 of 10

The establishment of catastrophe reserves is also prohibited for tax purposes under the regulations.[2] Since the accuracy of predictions of catastrophes over short periods is subject to wide variations, they would not meet the requirements of the regulations.

## ¶14.18  EXCESS SCHEDULE P RESERVES

As previously explained, for Schedule P lines a company may be required to maintain reserves in excess of case basis reserves. This occurs when the total actual incurred losses and loss expenses for a year are less than a prescribed percentage of that year's earned premium. When this occurs, the excess Schedule P reserve is established through a direct charge to surplus. This handling of the excess reserves, i.e., charged directly to surplus, was a result of a controversy between the industry and the IRS. At one time, these additional reserves were reflected through losses incurred in the underwriting and investment exhibit. This raised the question of whether these reserves should be deducted on the tax return. The controversy was resolved when the annual statement treatment was changed to show the excess Schedule P reserves as surplus adjustments rather than income statement adjustments, thereby precluding the deduction of the amounts on the tax return.

## ¶14.19  SALVAGE AND SUBROGATION

In determining the deduction for losses incurred, losses paid in the tax year must be adjusted for the change during the year in salvage and reinsurance revocable.[1] Salvage consists of amounts recovered by the insurer by selling damaged property for which it has title. Subrogation is the right of the insurer to proceed against third parties for recovery of amounts paid in claims.

Historically, property and liability insurers have followed the annual statement method of accounting for salvage and subrogation for federal income tax purposes. Under this method, salvage and subrogation were not recognized as income until reduced to cash. Pursuant to the Omnibus Budget Reconciliation Act of 1990, property and liability insurance companies are required to reduce their losses incurred by estimated recoveries of salvage and subrogation claims, regardless of statutory accounting treatment. This change is effective for taxable years beginning after December 31, 1989.

The transition to accrual of salvage is to be accounted for as a combination of fresh start and an accounting method change. The balance of discounted salvage recoverable as of the close of the last taxable year beginning before January 1, 1990 (generally December 31, 1989) is subject to fresh start to the extent of 87%. The balance of 13% is subject to income inclusion. The income inclusion is gener-

[Footnote ¶14.17 continued]
(2)  Reg. §1.832-4(b).
[Footnote ¶14.19]  (1)  IRC §832(b)(5).

©1991 Macmillan, Inc.—Federal Taxation of Insurance Companies

ally over a four-year period beginning with the first taxable year beginning after December 31, 1989.

Some companies have previously reduced unpaid losses for estimated salvage in determining deductions for losses incurred. For these companies an alternative fresh start is available. The fresh start amount is equal to 87% of the discounted amount of the estimated salvage recoverable as of the close of the last taxable year beginning before January 1, 1990. The fresh start amount is allowed as a deduction ratably over a four-year period beginning with the first taxable year beginning after December 31, 1989.

No guidance exists as to how salvage recoverable should be estimated. However a special rule applies to limit overestimates of salvage subject to fresh start. After determining gross undiscounted salvage recoverable as of the transition date (generally December 31, 1989), companies must monitor the development of this amount. If, in years after 1989, the original undiscounted salvage recoverable at December 31, 1989 exceeds actual salvage receipts on pre-1990 accident years plus the estimate of any remaining salvage recoverable relating to those accident years, then the excess must be included in income in the year or years in which the excess is developed. The income inclusion is to be based on 87% of the discounted amount of the excess.

The Treasury Department was required by OBRA '90 to issue regulations dealing with discounting of salvage recoverable. On March 15, 1991, these regulations were issued as proposed regulations. The proposed regulations provide that, for tax years beginning before 1992, salvage recoverable must be discounted either by using the discount factors for salvage recoverable that will be published by the IRS in a forthcoming revenue procedure (see Revenue Procedure 91-48, explained below) or by using the same discount factors as are used in discounting unpaid loss reserves. In 1992, the IRS is required to redetermine loss payment patterns for purposes of discounting loss reserves. The proposed regulations indicate that at that time the IRS also will redetermine salvage recovery patterns and will consider circumstances in which it would be appropriate to allow companies to discount salvage on the basis of their own experience.

In conjunction with the 87% fresh start for the amount of discounted salvage recoverable as of the beginning of 1990, OBRA '90 provided a special rule for overestimates. Under this rule, if the sum of pre-1990 salvage recoveries for post-1989 accident years plus estimated future recoveries for these years exceeds the amount of undiscounted salvage as of the beginning of 1990, then 87% of the discounted amount of this excess must be included in taxable income. The proposed regulations indicate that companies should be prepared to submit detailed information as to actual experience with salvage for pre-1990 accident years to establish that estimated salvage recoverable at the beginning of 1990 did not exceed actual salvage recoveries.

OBRA '90 also allows property and liability insurance companies that had anticipated salvage in determining loss reserves before 1990 to deduct over a four-year period 87% of the discounted amount of this anticipated salvage. The proposed regulations require property and liability insurance companies to establish the amount of anticipated salvage recoverable to the satisfaction of the IRS, and indicate that this requirement cannot be met merely by stating that anticipated salvage is included in

loss reserves. Under the proposed regulations, the requirement can be satisfied if the company either:

- disclosed on its 1989 annual statement the extent to which anticipated salvage was taken into account in computing losses incurred in the 1989 annual statement; or
- files with the appropriate state regulatory authority on or before July 15, 1991, a statement disclosing the extent to which anticipated salvage recoverable was so taken into account.

Because it can be presumed that no company made the first disclosure in its 1989 annual statement, only the second disclosure seems to have any effect. Discussions with personnel in the IRS National Office have clarified that this disclosure is merely a "safe harbor" provision and is not the only means by which it can be established that salvage was anticipated in setting December 31, 1989, loss reserves.

Following the issuance of the March 15, 1991 proposed regulations, the IRS published Revenue Procedure 91-48 in August 1991.[2] The revenue procedure supplements the proposed regulations and addresses other previously unresolved issues.

The revenue procedure allows property and liability insurance companies to use either of the following methods to determine the discount factors to be applied to estimated salvage recoverable for the 1990 and prior accident years.

- *Alternative 1.*  IRS published discount factors for salvage recoverable contained in Revenue Procedure 91-48.
- *Alternative 2.*  Applicable discount factors used to discount unpaid losses under IRC §846.

Under Alternative 2, companies that have elected to use their own historical experience to discount unpaid losses must use those discount factors to discount estimated salvage recoverable. Companies that have anticipated salvage in 1989 must use Alternative 2 to discount estimated salvage recoverable for the 1991 and prior accident years.

The discounting method that a company elects applies to all lines of business. Thus, companies cannot elect Alternative 1 for some lines of business and Alternative 2 for other lines of business. The election applies to all accident years before 1992. For any line of business that is not specifically referenced in the revenue procedure, companies must use the "miscellaneous casualty" discount factors to determine discounted estimated salvage recoverable for that line of business. The discount factors published in Revenue Procedure 91-48 apply to pre-1991 accident years. The IRS will annually publish new discount factors for each accident year after 1990. Revenue Procedure 92-52[2.1] and Advance Revenue Procedures 92-52A and 92-70[2.2] contain the salvage discount factors for the 1991 and 1992 accident years.

To elect between Alternative 1 and Alternative 2, companies must attach an election statement to their timely filed income tax return (determined with regard to extensions) for 1990. The election statement must state which alternative is elected.

---

[Footnote ¶14.19 continued]

(2) Rev. Proc. 91-48, IRB 1991-34, p. 12.

(2.1) IRB 1992-27 (July 6, 1992).

(2.2) IRB 1992-35 (August 10, 1992).

The revenue procedure also provides additional guidelines for property and liability insurance companies that had anticipated salvage. Companies claiming the special deduction for anticipated salvage must establish to the district director's satisfaction that the deduction represents only the discounted amount of estimated salvage recoverable that was actually taken into account in computing losses incurred in 1989. Companies claiming this special deduction must attach a schedule to their 1990 income tax return setting out the following information:

1. Discounted unpaid losses as of December 31, 1988
2. Discounted unpaid losses as of December 31, 1989
3. Discounted estimated salvage recoverable that was included in (1)
4. Salvage recovered during 1989
5. Discounted estimated salvage recoverable that was included in (2)
6. Discounted unpaid losses gross of anticipated salvage recoverable for 1988
7. Discounted unpaid losses gross of anticipated salvage recoverable for 1989

To meet the safe-harbor requirements in the proposed regulations, companies will be deemed to have taken salvage recoverable into account only if the company:

- filed a statement by September 16, 1991, with the insurance regulatory authority of the state of domicile disclosing the extent to which losses incurred for each line of business reported on the 1989 annual statement were reduced by estimated salvage recoverable and
- attaches a statement to the 1990 income tax return agreeing to apply the special rule for overestimates to the amount of estimated salvage recoverable for which it has taken the special deduction (see below).

Each insurance company, subject to tax under IRC §831, included in a consolidated group must agree to apply the special rule for overestimates to its special fresh start deduction.

If a company complies with the above requirements, the district director will not adjust the amount claimed as a special deduction in the absence of fraud. The revenue procedure added this language making the safe harbor a true "safe harbor."

Several provisions in the revenue procedure are unduly harsh on companies that anticipated salvage in 1989. The revenue procedure creates an "unpaid loss disallowance rule." Under the unpaid loss disallowance rule, a company must include in taxable income estimated salvage recoverable for 1990 and later accident years despite the fact that the anticipated salvage recoverable has already been recognized in statutory income. This may have the effect of doubling up on salvage recoverable if companies do not change their annual statement method of accounting for salvage for post-1989 accident years (post-1990 accident years if the one-year deferral is elected). Changing the annual statement method, however, may have a negative effect on mandatory surplus. It was initially thought that the IRS would not allow a company to gross-up its statutory unpaid losses, for computing discounted tax reserves, by the amount of the post-1989 accident year anticipated salvage recoverable due to limitations under IRC §846. However, Notice 92-1, is-

sued in December 1991, provided a compromise between the insurance industry and the IRS with respect to this issue (see discussion below).

Companies can elect to defer this treatment until 1991. A company must attach a statement to its 1990 income tax return identifying the amount of estimated salvage recoverable taken into account in determining the undiscounted unpaid losses for the 1990 accident year as shown on the annual statement. Also, the statement must set out the company's agreement to apply the special rule for overestimates.

The revenue procedure also creates a "mutually exclusive rule." Under this rule, a company is prohibited from taking the position that it has anticipated salvage in some instances but not in other instances. Different rules apply to companies that anticipated salvage and to companies that did not anticipate salvage. Presumably, a company may have to choose between the fresh-start benefit accorded unanticipated salvage and the special deduction for anticipated salvage. Companies that have anticipated salvage have the option to forgo the special deduction and apply the rules for unanticipated salvage.

The revenue procedure also addresses overestimates of salvage. To the extent that the fresh start is overstated, an anti-abuse provision requires that the discounted excess be included in taxable income. There is no increase, however, in fresh start for any shortfall.

The overestimate provision requires tracking of post-1989 recoveries of salvage for pre-1990 accident years. The discounting for this purpose is based on an average discount rate for salvage recoverable as of 1989. This provision applies to companies that (1) did not anticipate salvage in 1989, (2) anticipated salvage in 1989 and elected the safe-harbor provisions, and (3) anticipated salvage in 1989 and elected the one-year deferral.

If a company changes its estimate for salvage recoverable in any tax year because of additional information from expected salvage recoverable, the change will be treated as a change in estimate and not a change in accounting method. Any change in estimate that defers the application of the special rule for overestimates, however, will be disallowed.

If a company fails to change its method of accounting for 1990 under this revenue procedure, the company must obtain the IRS's consent to make the change under Revenue Procedure 84-74.[3]

In addition to the controversial positions contained in Revenue Procedure 91-48, described above, the revenue procedure also raises some other issues. The revenue procedure requires a great deal of detailed information to be included with the 1990 income tax return. A question exists as to whether amended tax returns can be filed at a later date to include the detailed information that is required but not available before filing the original tax return, or to elect different treatment if the IRS's positions change.

In certain lines of insurance, such as title and surety, it is not unusual to record salvage as a reduction of losses paid before the salvage is converted to cash or cash equivalent. It appears that the revenue procedure does not allow the special deduction for anticipated salvage in that circumstance.

---

[Footnote ¶14.19 continued]

(3)   Rev. Proc. 84-74, 1984-2 CB 736.

It is apparent that the IRS will not allow a company to use its own historical experience for salvage recoveries before 1992. It is uncertain whether companies will be able to use their own historical experience in 1992 because the IRS is still inviting comments identifying circumstances in which it would be appropriate to allow taxpayers to use discount factors computed on the basis of their own historical experience with salvage recoveries.

As discussed previously, OBRA '90 recognized that, before 1990, some property and liability insurance companies had been anticipating salvage recoverable in determining reserves for unpaid losses. To provide equivalent fresh-start treatment to those property and liability insurance companies that had anticipated salvage, OBRA '90 permits a deduction over a period of four years of 87% of the discounted amount of this anticipated salvage recoverable as of the end of 1989.

OBRA '90 further provided that despite the fresh start and the four-year spread, 100% of unanticipated salvage should be included in 1990 earnings and profits. This provision in turn raised an issue for alternative minimum tax purposes. For 1990 and subsequent years, alternative minimum taxable income includes an adjustment for 75% of the excess of adjusted current earnings over regular taxable income (as adjusted for certain tax preference items). Generally, adjusted current earnings is determined by adding to regular taxable income amounts that either reduce or are excluded from regular taxable income, but that either do not reduce or are included in earnings and profits. Thus, inclusion of 100% of unanticipated salvage and subrogation in 1990 earnings and profits would also require an inclusion in adjusted current earnings and effectively result in alternative minimum tax on the fresh start.

To prevent this problem, OBRA '90 provided that, in computing adjusted current earnings, the 87% fresh start for unanticipated salvage recoverable should be excluded, and the remaining 13% should be included over a four-year period. In other words, for unanticipated salvage, alternative minimum taxable income should equal regular taxable income. Unfortunately, OBRA '90 did not clearly provide a similar rule for anticipated salvage, so that 75% of the 87% fresh-start deduction allowed in computing regular taxable income might have to be added back in determining alternative minimum taxable income.

Through discussions with the staff of the Joint Committee on Taxation, it became clear that the staff felt that different treatment of anticipated and unanticipated salvage in determining alternative minimum taxable income had not been intended by Congress and that a technical correction would be appropriate. As a result, the Technical Corrections Act of 1991, introduced in the House by Representative Dan Rostenkowski, and in the Senate by Lloyd Bentsen, includes an amendment to allow the 87% fresh-start deduction for anticipated salvage in determining adjusted current earnings. Thus, whether salvage has been anticipated or not, there should be no adjusted current earnings adjustment attributable to the treatment of salvage in determining alternative minimum taxable income. Although this technical correction has not yet passed, it should be part of the next technical corrections bill to become law.

**Final Regulations.**  As discussed previously, Revenue Procedure 91-48 created an "unpaid loss disallowance rule." This required a company to include in

taxable income estimated salvage recoverable for 1990 and later accident years despite the fact that the anticipated salvage recoverable had already been recognized in statutory income. This results in a doubling up on salvage recoverable for tax purposes. However, the insurance industry reached a compromise with the IRS regarding the "unpaid loss disallowance rule." In December 1991, the IRS issued Notice 92-1 addressing this issue.[3.1]

The notice and the subsequent final regulations allow an insurance company that has anticipated estimated salvage recoverable to increase undiscounted unpaid losses by the anticipated estimated salvage recoverable. This "gross-up" of unpaid losses is permitted only if the company either:

1. Discloses on its annual statement, by line of business and accident year, the extent to which estimated salvage recoverable is taken into account in computing unpaid losses shown on the annual statement filed by the company for the calendar year ending with or within the taxable year of the company; or

2. Files a statement with the insurance department of each state in which the company files an annual statement, on or before the due date (determined without regard to extensions) of its federal income tax return or before March 17, 1992, for a taxable year ending before December 31, 1991, which discloses by line of business and accident year the extent to which estimated salvage recoverable is taken into account in computing unpaid losses. The statement must be captioned "DISCLOSURE CONCERNING LOSS RESERVES." [3.2]

The regulations provide that if a company fails in a subsequent year to meet the disclosure requirements, the company cannot increase the undiscounted unpaid losses by the anticipated salvage recoverable for that year or any subsequent years without the consent of the Commissioner.[3.3]

The final regulations issued January 27, 1992, adopt with some modification the proposed regulations previously issued concerning salvage and subrogation and incorporate some provisions contained in Revenue Procedure 91-48. The final regulations are effective for taxable years beginning after December 31, 1989.

The final regulations provide that estimated salvage recoverable must be discounted using the discount factors published by the Commissioner for salvage recoverable or by using the same discount factors as are used in discounting unpaid loss reserves except as otherwise provided in guidance published by the Commissioner.[3.4] This statement in the final regulations seemed to empower the Commissioner to consider circumstances in which a company could discount salvage on the basis of its own experience. However, in Revenue Procedures 92-52[3.5] and 92-53[3.6] use of a taxpayer's own experience is specifically prohibited by the Commissioner for the 1991 and 1992 accident years.

Like the proposed regulations, the final regulations provide that a company claiming the special deduction for anticipated salvage must establish to the satis-

[Footnote ¶14.19 continued]
  (3.1) IRB 1992-2, January 13, 1992.
  (3.2) Reg. §1.832-4(d).
  (3.3) Reg. §1.832-4(d)(3).
  (3.4) Reg. §1.832-4(c).
  (3.5) IRB 1992-27, July 6, 1992.
  (3.6) Id.

faction of the district director that the deduction represents only the discounted amount of estimated salvage recoverable that was actually taken into account by the company in computing losses incurred.[3.7] As discussed previously, the proposed regulations provided several disclosures that would satisfy this requirement. However, the proposed regulations were unclear as to whether the disclosure requirements were merely a "safe harbor" provision or the only means by which the company could establish that salvage was anticipated in setting December 31, 1989, loss reserves. Revenue Procedure 91-48 provided new disclosure requirements and clarified that these disclosure requirements were in fact a "safe harbor." The final regulations adopt the disclosure requirements of Revenue Procedure 91-48 as a "safe harbor" in establishing that salvage was anticipated in setting December 31, 1989, loss reserves.[3.8]

The final regulations provide some limitations on a company's ability to claim the special deduction. The special deduction is available only to insurance companies subject to tax under IRC §831.[3.9] In addition, the final regulations contain the "mutually exclusive rule" created in Revenue Proedure 91-48. This rule prohibits a company that claims the special deduction from also claiming the fresh-start benefit on unanticipated salvage recoverable.[3.10] Finally, the final regulations prohibit a company that claimed the benefit of fresh-start with respect to estimated salvage recoverable under Section 1023(e) of TRA '86 from also claiming the special deduction to the extent of the fresh-start previously claimed.[3.11]

An additional complexity exists if the insurance company is a participant in an insurance pool. If such participation exists, the insurance company will need to determine whether the unpaid losses reported to the company by the pool are gross or net of anticipated salvage and make all adjustments necessary.[3.12]

**Pre-OBRA '90 Cases and Rulings.** Before OBRA '90, there was ongoing controversy between the property and liability insurance industry and the IRS as to when salvage and subrogation should be accounted for for federal income tax purposes. Regulation § 1.832-4(c), adopted in 1963, provided that salvage recoverable should include salvage in the course of liquidation.

Salvage in the course of liquidation includes all property (other than cash), real or personal, tangible or intangible, except property not included by reason of express statutory provisions (or rules and regulations of an insurance department) of any state or territory or the District of Columbia in which the company does business. Such salvage must be taken into account to the extent of its value at the end of the tax year as determined from a fair and reasonable estimate based on either the facts in each case or the company's experience with similar cases.[4]

This provision led to controversy over when salvage should be estimated. In the *Continental Insurance Company* case, the Court of Claims (now the United States

---

[Footnote ¶ 14.19 continued]

(3.7)  Reg. §1.832-4(f)(1).

(3.8)  Reg. §1.832-4(f)(2).

(3.9)  Reg. §1.832-4(f)(3)(i).

(3.10)  Reg. §1.832-4(f)(3)(iii).

(3.11)  Reg. §1.832-4(f)(3)(ii).

(3.12)  See Revenue Procedure 92-78, 1992-2 CB 456.

(4)  Temp. Reg. § 1.832-4T(c).

Claims Court) held that when an insurer operates in any state that has an express prohibition against accruing salvage recoverable, losses incurred do not have to be adjusted for salvage "not in the course of liquidation" for federal tax purposes.[5] This provision applied equally to all states operated in, even if only one state prohibits the accrual. The court was reluctant to adopt a state-by-state approach or consider only certain items of salvage for exclusion. The court said that in the long run it would make no substantial difference in the amount of taxes paid whether salvage recoveries were treated on a "paid" basis or estimates were required. Sooner or later salvage recoveries had to be taken into income for tax purposes. The court did not want to overthrow a long-established practice merely to accelerate the receipt of taxes, thereby causing needless trouble and expense to insurance companies without any significant offsetting advantage to the government.

Although the *Continental* decision was favorable to the insurance industry, the issue was still subject to government scrutiny. The Treasury turned its focus to what was an express prohibition by the state and if the insurer actually transacted business in such a state. Three years later, the IRS said it would follow the *Continental* decision.[6] It specified, however, that a consistent method of reducing losses paid by an estimate of salvage recoverable is a method of accounting, and changes to the method upheld by *Continental* would require IRS consent. The ruling was supplemented by Revenue Procedure 76-42, which required the insurer to meet two conditions if its method of accounting for salvage was to be changed to follow the *Continental* decision.[7]

- The insurance company must have assumed bona fide insurance risks by the end of the tax year within a state, territory, or the District of Columbia, to be considered as having transacted business during such year in such state, territory, or the District of Columbia.
- One of the states, territories, or the District of Columbia in which the insurance company transacts business has an express statutory provision (or rules and regulations of an insurance department) that provides that estimates of future salvage recoveries will not be taken into account until reduced to cash or its equivalent.

The company would also need to file Form 3115 when requesting consent for the change in accounting method.

In 1979, the insurance industry won another decision in the *Allstate Fire Insurance Company* case.[8] The court held that the insurer could exclude anticipated salvage recoveries since one of the states in which it operated prohibited this by administrative ruling, rather than by express statutory provision. As a result, an insurance company complying with the rules and regulations of a state that had

---

[Footnote ¶ 14.19 continued]

(5)  *The Continental Ins. Co. v. United States*, 474 F.2d 661, 31 AFTR2d 73-835 (Ct. Cl. 1973).

(6)  Rev. Rul. 76-487, 1976-2 CB 210.

(7)  Rev. Proc. 76-42, 1976-2 CB 666.

(8)  *Allstate Fire Ins. Co. v. United States*, 44 AFTR2d 79-5132 (Ct. Cl. Trial Judges Op. 1979), aff'd 45 AFTR2d 80-1096 (Ct. Cl. 1980).

prohibited salvage accruals through administrative interpretation could exclude salvage accruals for federal income tax purposes.

In December 1987, the IRS issued proposed and temporary regulations which would require the accrual of salvage and subrogation on both paid and unpaid losses in determining the deduction for losses incurred. For calendar year property and liability insurance companies, these regulations were to become effective commencing for the 1988 tax year. The temporary regulations stated that estimated recoveries should be based on the company's experience and the facts in each case.[9] Subsequently, the IRS released Announcement 88-99, which provided insurance companies with a procedure to expeditiously obtain consent to make the change in method of accounting as required by the regulations. An IRC § 481(a) adjustment was to be computed for the first tax year beginning after December 31, 1987. According to the IRS, there would be no "fresh start" applicable to the required accrual of salvage and subrogation. The IRS indicated that the IRC §481(a) adjustment was to be spread over a period of up to six tax years, in accordance with the rules of Revenue Procedure 84-74 for Category B methods of accounting.

In August 1989, the IRS issued Notice 89-97, which stated that forthcoming regulations would postpone the effective date of Reg. §1.832-4T requiring the accrual of salvage and subrogation on both paid and unpaid losses until tax years beginning after December 31, 1988. In September 1989, temporary regulations were issued to officially defer the effective date to the 1989 tax year. Notice 89-97 stated that the reason for the postponement was "in response to numerous comments that make further consideration of the regulations appropriate." Then, in March 1990, the IRS again postponed the effective date of these regulations until tax years beginning after December 31, 1989.[10]

The insurance industry had many concerns with these regulations. The industry contended that the Treasury Department did not have the authority under IRC § 832 to issue regulations requiring the recognition of salvage and subrogation recoverable. It was argued that Congress must change the law to reach this result, and therefore the proposed and temporary regulations were invalid. There was consternation that the regulations did not allow a fresh start similar to that granted for discounting of unpaid losses. The regulations did not address discounting of salvage on unpaid losses. The regulation did not clarify whether salvage had to be accounted for separately with respect to paid and unpaid losses. The regulations did not address the situation where insurance companies had already anticipated salvage in establishing loss reserves.

The enactment of the salvage provisions in OBRA '90, of course, eliminated the controversies discussed above.

## ¶ 14.20    APPLICATION OF TAX BENEFIT RULE

Prior to the issuance of the proposed and temporary regulations, under certain circumstances, salvage recoveries could be excluded from gross income if the original

---

[Footnote ¶ 14.19 continued]

(9)  Temp. Reg. § 1.832-4T.

(10)  IRS Advance Notice of Proposed Rulemaking (FI-76-89) and Temporary Regulations (TD 8293).