UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY AND SUBSIDIARIES, | ) | |
| | ) | Civil No. 1:05-11048-RCL |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

LIBERTY MUTUAL FIRE INSURANCE )
COMPANY AND SUBSIDIARIES, )
)    Civil No. 1:05-11049-RCL
Plaintiff, )
)
v. )
)
UNITED STATES OF AMERICA, )
)
Defendant. )

**INDEX TO EXHIBITS IN SUPPORT OF
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND
ITS OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
ORIGINALLY FILED IN OPEN COURT ON APRIL 20, 2007 AT THE HEARING ON
THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

1.    1989 NAIC Annual Statement Instructions, Property and Casualty

2.    1970 Proceedings of the National Association of Insurance Commissioners (excerpt)

3.    1992 Proceedings of the National Association of Insurance Commissioners (excerpt)

4.    1989 Annual Statement Liberty Northwest Insurance Corporation

5.    26 C.F.R. § 1.832-7T(c)

6.    ALA. ADMIN. CODE r. 61 (effective 1977, repealed 2005)

7.      Cal. Code Regs. tit. 10, § 2302 (effective 1976)

8.      FLA. ADMIN. CODE. r. 4-42-002 (filed 1977, transferred to r. 4.138.030, r. 4.138.030 repealed 1994)

9.      ILL. ADMIN. CODE tit. 50, § 927.30 (effective 1981, amended 1993)

10.     IND. ADMIN. CODE tit. 760, r.1-22-3 (filed 1977, repealed 1993)

11.     4 MO. CODE OF STATE REGULATIONS 190-11.020 (effective 1976, moved to 20 CSR 200-1.080, 20 CSR 200-1.080 rescinded effective 1993)

12.     OHIO ADMIN. CODE § 3901-1-17 (effective 1973, repealed 1997)

13.     28 TEX. ADMIN. CODE § 7.17 (effective 1976, amended 1983, further amendments after 2000)

14.     Vermont Department of Banking and Insurance Regulation 76-2

15.     WASH. ADMIN. CODE. § 284-16-050 (filed 1976, repealed 1992)

16.     KAN. ADMIN. REGS. 40-1-30 (effective 1977, amended 1986, revoked 2001)

17.     S.C. CODE REGS. 69-26 (repealed 2002)

18.     Partners of KPMG Peat Marwick, FEDERAL TAXATION OF INSURANCE COMPANIES, ¶ 14.19, P.1436A

19.     Ernst & Young LLP, FEDERAL INCOME TAXATION OF PROPERTY AND CASUALTY INSURANCE COMPANIES § 6.7 (excerpt)

20.     Internal Revenue Service Letter 950 along with excerpt of enclosed Revenue Agent Report (incorrectly dated March 15, 1990, actually sent 1995)

21.     Liberty Mutual Insurance Company and Subsidiaries Claim for Refund

22.     Liberty Mutual Fire Insurance Company Claim for Refund

23.     Joint Committee on Taxation Joint Committee Print, Description of Miscellaneous Tax Proposals, July 10, 1995

# *ANNUAL STATEMENT INSTRUCTIONS*
# *PROPERTY AND CASUALTY*



## *NAIC*

**National Association of Insurance Commissioners**

Copyright NAIC 1989



GOVERNMENT
EXHIBIT

1

## TABLE OF CONTENTS

| Annual Statement Instructions Subject | Instructions Page # |
|---|---|
| Foreword | a |
| General | b |
| Jurat Page | 1 |
| Assets | 2 |
| Liabilities, Surplus and Other Funds | 3 |
| Statement of Income and Capital & Surplus Account | 4 |
| Cash Flow | 5 |
| U. & I. Exhibit-Part 1-Interest, Dividends and Real Estate Income | 6 |
| U. & I. Exhibit-Part 1A-Capital Gains and Losses on Investments | 6 |
| U. & I. Exhibit-Part 2-Premiums Earned | 7 |
| U. & I. Exhibit-Part 2A-Recapitulation of All Premiums | 8 |
| U. & I. Exhibit-Part 2B-Premiums Written | 8 |
| U. & I. Exhibit-Part 3-Losses Paid and Incurred | 9 |
| U. & I. Exhibit-Part 3A-Unpaid Losses and Loss Adjustment Expenses | 10 |
| U. & I. Exhibit-Part 4-Expenses | 11 |
| Exhibit 1-Analysis of Assets | 12 |
| Exhibit 2-Analysis of Non Admitted Assets | 12 |
| Reconciliation of Ledger Assets | 13 |
| Direct Business in The State Of ... | 14 |
| Medicare Supplement Insurance Experience | 15 |
| General Interrogatories | 16 |
| Instructions For Completing Ceded Reinsurance Report | 17 |
| Notes to Financial Statements | 18 |
| Special Deposit Schedule | 19 |
| Schedule of All Other Deposits | 20 |
| Five-year Historical Data | 21 |
| Schedule A-Part 1-Real Estate Owned | 23 |
| Schedule B-Long Term Mortgages Owned | 25 |
| Schedule BA-Part 1-Other Long-Term Invested Assets Owned | 26 |
| Schedule C-Part 1-Long-Term Collateral Loans In Force | 28 |
| Schedule D-Summary by Country-Long-Term Bonds and Stocks Owned | 30 |
| Schedule D-Part 1A-Quality Distribution of All + Bonds Owned | 31 |
| Schedule D-Part 1-Long-Term Bonds Owned | 32 |
| Schedule D-Part 2-Section 1-Preferred Stocks Owned | 33 |
| Schedule D-Part 2 Section 2-Common Stocks Owned | 34 |
| Schedule D-Part 3-Long-Term Bonds and Stocks Acquired During Year | 35 |
| Schedule D-Part 4-Long-Term Bonds and Stocks Sold, Redeemed or Otherwise Disposed of During Year | 36 |
| Schedule D-Part 5-Long-Term Bonds and Stocks Acquired During the Current Year and Fully Disposed of During Current Year | 37 |
| Schedule D-Part 6-Sections 1 and 2-Questionnaire Relating to the Valuation of Shares of Certain Subsidiary, Controlled or Affiliated Companies | 38 |

-2-

Schedule DA-Part 1-Short-Term Investments Owned                                    39
Schedule DA-Part 2-Verification of Short-Term Investments
                Between Years                                                      40
Schedule DB-Financial Options and Futures                                         41
Schedule DB-Parts A and B-General Instructions                                    41
Schedule DB-Part A-Section 1-Financial Options Owned                              41
Schedule DB-Part A-Section 2-Financial Options Acquired                           41
Schedule DB-Part A-Section 3-Financial Options Terminated                         42
Schedule DB-Part A-Section 4-Verification Between Years of
                Book Value of Financial Options Owned                             42
Schedule DB-Part B-Section 1-Financial Options Written and In-Force               43
Schedule DB-Part B-Section 2-Financial Options Written                            43
Schedule DB-Part B-Section 3-Financial Options Written That
                Were Terminated                                                   44
Schedule DB-Part B-Section 4-Verification Between Years of
                Consideration Received for
                Financial Options Written                                         44
Schedule DB-Part C-General Instructions                                           45
Schedule DB-Part C-Section 1-Financial Futures Contracts Open                     45
Schedule DB-Part C-Section 2-Financial Futures Contracts Opened
                During the Current Year                                           45
Schedule DB-Part C-Section 3-Financial Futures Contracts That Were
                Terminated During the Current Year                                46
Schedule DB-Part C-Section 4-Verification Between Years of
                Deferred Gain/(Loss) on Financial
                Futures Contracts                                                 46
Schedule F-Part 1A-Section 1-Ceded Reinsurance                                    47
Schedule F-Part 1A-Section 2-Assumed Reinsurance                                  48
Schedule F-Part 1B-Portfolio Reinsurance                                          49
Schedule F-Part 2A-Funds Withheld on Account of Reinsurance in
                Unauthorized Companies                                            50
Schedule F-Part 2B-Section 1.2-Provision for Overdue Authorized
                Reinsurance                                                       51
Schedule H-Accident and Health Exhibit - Part 1                                   52
Schedule H-Accident and Health Exhibit - Parts 2, 3, and 4                        53
Schedule N-Cash                                                                   56
Schedule P-Parts 1 through 1Q                                                     57
Schedule P-Part 2                                                                 72
Schedule P-Part 3                                                                 75
Schedule P-Part 5                                                                 78
Schedule P-Part 6                                                                 79
Schedule P-Interrogatories                                                        82
Schedule Y-Information Concerning Activities of Insurer Members
                of a Holding Company Group                                        85
Schedule T-Exhibit of Premiums Written Allocated By
                States & Territories                                              86
Instructions for Completing Accident and Health
  Policy Experience Exhibit                                              Sup. Inst. 1
Instructions For Completing Consolidated Annual
  Statement                                                             Sup. Inst. 2
Instructions For Completing Credit Life and Accident
  and Health Experience Exhibit                                         Sup. Inst. 3
Instructions For Completing Financial Guaranty
  Insurance Exhibit                                                     Sup. Inst. 4

9-1

<u>UNDERWRITING AND INVESTMENT EXHIBIT</u>

<u>PART 3-LOSSES PAID AND INCURRED</u>

<u>Salvage</u>

Salvage and subrogation should be recognized in the annual statement only after such salvage and subrogation has been reduced to cash or its equivalent.

Column 1-Losses Paid Less Salvage-Direct Business

> Line 32 should agree with Schedule T, Column 5, Line 98.

Column 3-Reinsurance Recovered

> Any changes in nonledger reinsurance recoverable on paid losses should be included in this column.

Column 5-Net Losses Unpaid Current Year

> Line 32 should agree with Page 3, Column 1, Line 1 or Part 3A, Column 5, Line 32.

Column 6-Net Losses Unpaid Previous Year

> Line 32 should agree with Page 3, Column 2, Line 1.

Column 7-Losses Incurred Current Year

> Line 32 should agree with Page 4, Column 1, Line 2.

Column 8-Percentages

> Percentages by line of business are calculated by dividing Column 7 by Part 2, Column 4 and then multiplying by 100.

Line 31-Aggregate Write-ins for Other Lines of Business

> Enter the total of the write-ins listed in schedule "Details of Write-ins Aggregated at Item 31."

Details of Write-ins Aggregated at Item 31

> List separately each line of business for which there is no pre-printed item on Page 9.  (See Item 6 on Page b of these instructions.)

10-1

### UNDERWRITING AND INVESTMENT EXHIBIT

### PART 3A-UNPAID LOSSES AND LOSS ADJUSTMENT EXPENSES

<u>Salvage</u>

Salvage and subrogation should be recognized in the annual statement only after such salvage and subrogation has been reduced to cash or its equivalent.

Columns 1a and 4a

> Sum of Line 32 should agree with Schedule T, Column 7, Line 98.

Columns 1a and 1b-Adjusted or in Process of Adjustment

> Include:  All losses which have been reported in any way to the Home Office of the company on or before December 31 of the current year.  Provision for losses of the current year or prior years, if any, reported after that date would be made in Columns 4a and 4b as Incurred But Not Reported.

Column 1b-Reinsurance Assumed

> Line 32 should agree with Schedule F, Part 1A, Section 2, Column 2, Grand Total.

Column 2-Recoverable from Authorized and Unauthorized Companies

> Line 32 should agree with Schedule F, Part 1A, Section 1, Column 2, Grand Total.

Column 4a and 4b and 4c-Incurred But Not Reported

> IBNR on direct, assumed and ceded business are to be reported separately in these columns.  Except where inapplicable, the reserve included in these columns should be based on past experience, modified to reflect current conditions, such as changes in exposure, claim frequency, or severity.

> Incurred but not reported reserve estimates should be sufficient to cover claims which may be reopened in future periods.

Column 5-Net Losses Unpaid

> Line 32 total should agree with Page 3, Column 1, Line 1.

> Lines 13 and 15 of this Exhibit or Part 2A should include a reserve for deferred maternity and other similar benefits for any policy which provides for the extension of benefits after termination of the policy or of any insurance thereunder.  For additional information, please refer to the instructions for Part 2A.

10-2

Total on Line 32 to agree with Schedule P - Part 1 - Summary, Column 33, total.  See Footnote (b).

Column 6-Loss Adjustment Expenses Unpaid

Line 32 total should agree with Page 3, Column 1, Line 2.

Total on Line 32 to agree with Schedule P - Part 1 - Summary, Column 34, total.

Line 31-Aggregate Write-ins for Other Lines of Business

Enter the total of the write-ins listed in schedule "Details of Write-ins Aggregated at Item 31."

Details of Write-Ins Aggregated at Item 31

List separately each line of business for which there is no pre-printed item on Page 10.  (See Item 6 on Page b of these instructions.)

FOOTNOTE (a) - See instructions for Footnote (b) under Part 2A.

FOOTNOTE (b) - This mention of discounted loss reserves neither regulates, permits, nor prohibits the practice of discounting liabilities.

57-1

## SCHEDULE P

Include only the data for the insurer identified on Page 1 of the Annual Statement. Do not include consolidated data for affiliated companies except in a Consolidated Annual Statement. If the insurer participates in a pooling agreement, show only its share of the business, not the total for all participants.

Salvage and subrogation should be recognized in the Annual Statement only after such salvage and subrogation has been reduced to cash or its equivalent.

Information in Schedule P is to be reported on an undiscounted basis in order to make effective use of the triangles in Parts 2 and 3. The reserves reported are expected to represent the ultimate amounts to be paid, including anticipated inflation. If the loss and expense reserves reported on Page 3 of this Annual Statement reflect the use of a discount, a reconciliation is provided in Schedule P – Part 1. Also, work papers relating to any discount amounts must be available for examination upon request. Only a discount implicit in tabular reserves may be included in Schedule P. Discounting (including the discount in tabular reserves) is allowed only if expressly permitted by the state insurance department to which this Annual Statement is being filed.

Earned premium is on a calendar-year basis. Losses incurred should be assigned to the year in which the event occurred that triggered coverage under the contract. This may be a date of accident (occurrence policies), a date of report (claims-made policies), or a date of discovery (fidelity and surety). Report all dollar amounts in Schedule P in thousands of dollars (000 omitted), by either rounding or truncating.

P/C                                                                 1989



*120 West 12th Street*
*Suite 1100*
*Kansas City, Missouri 64105*
*816-842-3600*

*National*
*Association*
*of Insurance*
*Commissioners*

April 1989

Dear Subscriber:

Enclosed is your 1989 update to your <u>Annual Statement Instructions Manual, Property/Casualty.</u> Because of the extensive changes added to the annual statement blanks for 1989, we have provided you with a completely new interior.

To file your update, SAVE ALL TABS as indicated in the new update pages, but discard all interior pages. Enclosed you will find three new tabs. Discard the tab that reads <u>Schedules G, K, H, N</u> and replace with the new tab that reads <u>Schedules H & N</u>. Discard tab for <u>Schedules O & P</u> and replace with <u>Schedule P</u> tab. Discard the tab for <u>Schedule T</u> and replace with tab <u>Schedule T-Y</u>.

Also note that the Medicare Supplement Insurance Exhibit is found following the State page information.

If you have any questions about filing these update pages or are missing pages, please contact me. Questions about the actual content of the manuals should be directed to the NAIC Financial Services Division.

Sincerely,

*Margaret Salvato*

Margaret Salvato
Publications Coordinator

MYS:kh

Enclosure



GEORGETOWN UNIVERSITY LAW LIBRARY

3 0700 00022984 8

# VOLUME II A
# 1970 PROCEEDINGS
## OF THE
# NATIONAL ASSOCIATION OF
# INSURANCE COMMISSIONERS
## 1970 ANNUAL MEETING

GOVERNMENT
EXHIBIT

2

## BLANKS (A4) COMMITTEE

### (Mtg. 41)

The BLANKS (A4) COMMITTEE met in the South Ballroom of the Sheraton-Cleveland Hotel at 9:30 a.m. on June 18, 1970. A quorum was present. The April 8, 1970, report on the proceedings of the COMMITTEE at its meeting held at the Americana Hotel in New York City on April 6-8, 1970, was discussed.

Mr. Tim Carmody, Chairman of the Fraternal Blank Subcommittee, pointed out that some editorial changes were necessary in order to have Items 1, 2, 3, and 4 be applicable to the Fraternal Blank. With respect to the Fraternal Blank, the words "Special Deposit Schedule" should be substituted for "Schedule of All Other Deposits."

The word "parent" be deleted in Item 2(a).

Delete the word "Parents" appearing in Item 2(b).

With respect to Item 4, the second sentence in the fourth paragraph should be deleted and in the third and fourth sentences the word "Society" should be substituted for "Insurer."

Item 18 of the April report of the BLANKS COMMITTEE was discussed and a motion was adopted to add the following language to the reason for adoption of this statistical report form: "Filing of the form is required by the individual states as part of the regulatory procedure involved in supervising the fair treatment of policyholders and as part of the checking that rates are not excessive where state laws are in effect relating to rates charged or benefits provided in relation to rates charged."

The Credit Life and Accident and Health Exhibit was discussed and a motion was adopted to change the footnote immediately appearing below the first part of the form to read as follows: "*State reserve basis including valuation standards used _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

Item 10 appearing in the April 8, 1970, report was discussed. It was pointed out by Mr. George F. Howarth and Mr. William Gould that editorial changes were in order. After a discussion, it was agreed that the footnote should be amended to read as follows: "(a) Salvage and reinsurance as used in columns 2, 3, and 4, include (1) received in cash, and (2) reinsurance recoverable (charged during year of statement) if carried as a ledger asset; as used in columns 5, 6, and 7, include (1) received in cash and not carried as a ledger asset in previous statements, and (2) reinsurance recoverable (charged during year of statement) if carried as a ledger asset."

PROCEEDINGS — 1970 VOL. II

It was agreed that "Reason," appearing in Item 10 should be expanded to include the following language: "It has been the consistent policy of this COMMITTEE that the only items of salvage which may be allowed as an admitted asset or as a deduction from losses paid or unpaid are those which are in the form of cash or in respect to which there is a clear indication that they are, or will reasonably soon be, available for the payment of claims. It is therefore, the purpose of the above change merely to reaffirm and to place emphasis upon the said policy."

The Report of the COMMITTEE with the modifications indicated above was adopted with the stipulation that further consideration will be given next year to the matter of considering acceptable methods of allocating investment income as to lines of business in addition to the specified matter which is to be given consideration at that time which will be on the agenda of the COMMITTEE next year in connection with the changes that are covered by this particular item in this year's report. It is requested that an Industry Committee be established whereby they will present to us various formula that they will be able to formulate for consideration at that meeting. It is respectfully requested that the Chairman of the Financial Condition, Examination, and Reporting Committee request the National Association of Independent Insurers, Insurance Company of North America, The American Mutual Insurance Alliance and The American Insurance Association to designate the persons to serve on an Industry Advisory Committee.

The report of the Lines of Business Subcommittee was received and adopted. It is noted that this subcommittee requested that it be discharged.

The subject of lending securities and methods for reporting such transaction in the Annual Statement was discussed. The following resolution was adopted with respect to that subject matter:

> "It was moved that since that matter is one of very questionable legality, that action by this Committee be deferred until such time that it has been clearly indicated to have the support of the statutes of our several states. Pending such decision, the Companies will be instructed to report such transactions in Schedule D, Part 5. It is requested that the subject matter be referred to the Executive Committee for an assignment to the appropriate Committee for disposition."

In order that a fuller explanation of the matter will be at hand, the Committee decided to attach to this report a copy of a letter dated December 26, 1969, addressed to Mr. Thomas J. Kelly of the New York Insurance Department, by Mr. Martin F. Raynoha, Chief of the Examining Division of the Office of the Commissioner of Insurance of the State of Wisconsin.

Mr. David Thompson, representing the National Association of Property and Casualty Reinsurers, stated the position of his Association with respect to the current rule denying credit for amounts which are over 90 days past due. It was suggested to Mr. Thompson that his Association place this matter on the agenda of the Committee for the meeting to be held in New York City during the spring of 1971.

There being no further business to come before the Committee, the meeting was adjourned.

Hon. Richards D. Barger, Chm., California by Christy P. Armstrong; Hon. Richard E. Stewart, V. Chm., New York; Hon. Thomas M. Humphrey, Arizona; Hon. Broward Williams, Florida; Hon. James Bentley, Georgia; Hon. James Baylor, Illinois; Hon. Oscar H. Ritz, Indiana; Hon. Lorne R. Worthington, Iowa; Hon. Frank Sullivan, Kansas; Hon. Robert D. Preston, Kentucky; Hon. Russell E. Van Hooser, Michigan; Hon. Benjamin C. Neff, Jr., Nebraska; Hon. Robert L. Clifford, New Jersey by W. Harold Bittel; Hon. George F. Reed, Pennsylvania; Hon. Peter F. Mullaney, Rhode Island; Hon. Milton P. Rice, Tennessee; Hon. Clay Cotten, Texas; Hon. Charles F. Black, Vermont; Hon. Everette Francis, Virginia; Hon. S. C. Du Rose, Wisconsin.

---

STATE OF WISCONSIN / Officer of the Commissioner of Insurance

Warren P. Knowles
Governor

S. C. DuROSE
Commissioner

212 North Bassett Street
Madison, Wisconsin 53703

December 26, 1969

Mr. Thomas J. Kelly, Chief Actuary
Secretary, Committee on Blanks (NAIC)
New York Insurance Department
324 State Street
Albany, New York 12210

Dear Mr. Kelly:

It has come to our attention that a number of companies are engaging in a certain type of investment transaction which they term "lending securities" but which actually appears to be an outright sale and then a later repurchase of the same or a similar security under what may amount to a repurchase agreement.

The details of the practices and the usual agreement are given in the attached copy of a December 18, 1969 letter and attachments of Mr. Group to Martin F. Raynoha of the Office of the Commissioner of Insurance of the State of Wisconsin. This communication also suggests methods for reporting such transactions in the annual statement. We are enclosing this for information only and our inclusion thereof should in no way be construed at this time as our endorsement, approval, or sanction of the company's suggested treatment pending the completion of the discussion and consideration suggested in the paragraphs following. However, despite the company's desire that this be considered a loan of securities, it is incontrovertible that the insurance company is a sophisticated investor, who fully understands that the broker will sell and transfer its stock to a new purchaser, and that it may not exercise directly the normal incidents of ownership until it again becomes the owner of record of the new shares purchased for it by the broker in due course.

Since this presently involves companies domiciled in at least 8 states, being

in column 4 include (1) received in cash and not carried as a ledger asset in previous statements, and (2) [reinsurance] recoverable (charged during year of statement) if carried as a ledger asset.

*Reason:* An inconsistency in the treatment of salvage as set forth in the headings of columns 2, 3 and 4, and the instructions in the footnote in Schedule O, page 32 of the fire and casualty annual statement blank.

## INSTRUCTIONS FOR FIRE AND CASUALTY BLANK

11. *Instructions for Part 3—Losses Paid and Incurred—Page 8 (Page 3 of Instructions)*

Delete "salvage and" and change "are" to "is".

*Reason:* Only salvage which has been reduced to cash or an admitted ledger asset should be recognized as a deduction in calculating losses paid.

12. *Instructions for Part 3A—Unpaid Losses and Loss Adjustment Expenses— Page 9 (Page 3 of Instructions)*

Between the paragraphs for Column (4) and Column (5), add the following paragraph:

"Make no deduction in Columns (1) or (4) for anticipated salvage or subrogation recoveries."

*Reason:* Since salvage and subrogation recoveries are uncertain as to amount and time of payment, they should not be reflected in loss reserves.

13. *Instructions for Part 3A—Unpaid Losses and Loss Adjustment Expenses— Page 9 (Page 3 of Instructions)*

From the paragraph headed Column (5), delete the first line reading as follows: "Lines 4 and 5 to agree with Sch. P, Part 1 Total - Section C, Col. (12)."

and move up the remaining three lines so that the line beginning "Line 16 to agree ***" follows Column (5) - in the same position as the deleted line.

From the paragraph headed Column (6), delete the first line reading as follows: "Lines 4 and 5 to agree with Sch. P, Part 1 Total - Section C, Col. (12½)."

and move up the remaining three lines so that the line beginning "Line 16 to agree***" follows Column (6) - in the same position as the deleted line.

*Reason:* To provide a two-year run-off for all Schedule O lines and to integrate the Bodily Injury portion of Homeowners Multiple Peril and Commercial Multiple Peril lines with the rest of such coverages reported in Schedule O.

## LIFE AND ACCIDENT AND HEALTH BLANK

14. (a) *Page 19, Schedule A - Part 1.* Insert "(State if occupied or leased by company or by a parent, subsidiary or affiliate)" under heading of column (1).

(b) *Page 22, Schedule B - Part 2 - Section 1.* Insert "and, with appropriate comment, those where mortgagor is an officer, director, parent, subsidiary or affiliate," in the heading after "one year,".

(c) *Page 23, Schedule B - Part 2 - Section 2.* Insert "or, where mortgagor is an officer, director, parent, subsidiary or affiliate (with appropriate comment)" in heading after "admitted assets."

(d) *Page 24, Schedule B - Part 2 - Section 3.* Insert "State if mortgagor is an officer, director, parent, subsidiary or affiliate." at end of heading.

*Reason:* With the proliferation of holding company structures in the insurance business and with the enactment of laws in many states regulating various aspects of holding companies as they affect the investments and assets of insurers, it has become necessary to identify the assets of an


GEORGETOWN UNIVERSITY LAW LIBRARY

3 0700 00322745 0

# VOLUME IA

# 1992 PROCEEDINGS

### OF THE

## National Association

## of Insurance Commissioners

### 1991 WINTER NATIONAL MEETING

GOVERNMENT
EXHIBIT

3

# BLANKS (EX4) TASK FORCE

Reference:
    1991 Proc. I p. 307
    1991 Proc. II p. 301

Louis E. Bergeron, Chair—N.H.
Tom Gallagher, Vice Chair—Fla.

## CONTENTS

December 10, 1991 Minutes ................................................................... 324
  New Asset Valuation Reserve and Interest Maintenance Reserve
    to Life, Accident & Health, Fraternal and Canadian Life Blanks
    to Replace Existing Mandatory Securities Valuation Reserve
    (Attachment One) ..................................................................... 328
  Replaced Existing Insurance Expense Exhibit with New Exhibit and
    Instructions and Modified Pages 11 and 14 (Attachment Two) ................. 336
  Amended P/C Annual Statement Instructions to Clarify Reporting
    of Incurred But Not Reported Loss Adjustment Expenses
    in Schedule F-Part 1A-Section 1 (Attachment Three) ................... 351
  Reinsurance Association of America Comments on Incurred But Not
    Reported Losses on Loss Adjustment Expenses (Attachment Four) .......... 352
  Modified P/C Actuarial Opinion to Eliminate Reference to Audited Data
    (Attachment Five) ..................................................................... 353
  Modified P/C Actuarial Opinion to Require the Opinion to Cover Anticipated
    Salvage and Subrogation Included as a Reduction to Loss and Loss
    Adjustment Reserves and Discount for Time Value of Money
    (Attachment Six) ..................................................................... 354
  New Note #17 to P/C Financial Statement Requiring Disclosure of
    Anticipated Salvage and Subrogation Used as an Offset to Loss
    and Loss Adjustment Reserves (Attachment Seven) ................... 354
  Modified Note #16 to P/C Financial Statement to Require Disclosure
    in Schedule P for Other Than Statutory Discounting of Tabular Reserves
    (Attachment Eight) ..................................................................... 355
  Schedule D Working Group Minutes (Attachment Nine) ................... 355
  Management's Discussion and Analysis of Results of Operations Working
    Group Minutes (Attachment Ten) ..................................................................... 355
    Recommended Revision to Annual Statement Instructions Relative
    to Forward Looking Information (Attachment Ten-A) ................... 356
  Financial Reporting Working Group December 8, 1991 Minutes
    (Attachment Eleven) ..................................................................... 357
    Financial Reporting Working Group October 7, 1991 Minutes
    (Attachment Eleven-A) ..................................................................... 358
    Memorandum from California on Fraternal Cash Flow Statement
    (Attachment Eleven-B) ..................................................................... 358
    Proposal to Amend Exhibit 9 and Schedule H of the Life, Accident
    and Health Blank (Attachment Eleven-C) ................... 359
  Annual Statement Instructions Working Group Minutes
    (Attachment Twelve) ..................................................................... 359
  Consolidated Annual Statement Working Group December 9, 1991 Minutes
    (Attachment Thirteen) ..................................................................... 360
    Consolidated Annual Statement Working Group September 15, 1991
    Minutes (Attachment Thirteen-A) ................... 361
    Draft of Proposed Instructions for Life, Accident and Health and P/C
    Relative to Consolidation of Financial Data (Attachment Thirteen-B) . 362
  Canadian Life Working Group Minutes (Attachment Fourteen) ................. 366
    Draft of Proposed Reporting for Port-Of-Entry Canadian Life
    Insurance Companies (Attachment Fourteen-A) ................... 366
    Draft of Proposed Reporting form for Canadian Life Insurance
    Companies (Attachment Fourteen-B) ................... 368
  Quarterly Statement Working Group Minutes (Attachment Fifteen) .......... 371
  Editorial Revisions to HMO Blank (Attachment Sixteen) ................... 371
  Revised Format of Schedule S-Part 3E (Life, Accident and Health) and
    Schedule F-Part 1 (P/C) (Attachment Seventeen) ................... 378
  October 7, 1991 Minutes (Attachment Eighteen) ................... 380
    Document Identifier Codes for Bar Code Implementation
    (Attachment Eighteen-A) ..................................................................... 385
    Modified Jurat Page Instructions to Clarify Who May Sign Financial
    Statements (Attachment Eighteen-B) ................... 391

Norris Clark (Calif.) advised that the Emerging Accounting Issues Working Group discovered some existing annual statement instructions would need to be amended in addition to adding the new language (See Attachment Eighteen-U). He noted that the Annual Statement Instructions Working Group could modify these instructions in its normal process of amending instructions.

Upon motion duly made and seconded, this proposal was adopted by the task force.

3. . Unanimous Consent Items

a. Consider Changes to 1991 Annual Statement Instructions Related to Incurred But Not Reported Loss Adjustment Expenses (P/C)

Robert Solitro (N.H.) reported that this proposal (Attachment Three) was reviewed and adopted by the Study Group on P&C Reinsurance of the Accounting Practices and Procedures Task Force. He advised that the Reinsurance Association of America also had reviewed the proposal and offered comments (Attachment Four).

Upon motion duly made and seconded, this item was added to the agenda under the unanimous consent rule and subsequently adopted.

b. Consider Changes to 1991 Annual Statement Instructions Related to Statement of Actuarial Opinion (P/C)

Robert Solitro (N.H.) advised that in June 1991 the Blanks Task Force adopted revisions to the Statement of Actuarial Opinion and that the Financial Condition (EX4) Subcommittee amended those revisions. He noted that this proposal (Attachment Five) would restore the language originally adopted by the task force. Mr. Solitro also advised that a group made up of representatives from the American Institute of Certified Public Accountants (AICPA), the American Academy of Actuaries and NAIC would be meeting to draft new language and a procedure for reviewing the underlying data. The work is anticipated to be completed before June 1992 and will amend the 1992 opinion.

Upon motion duly made and seconded, this item was added to the agenda under the unanimous consent rule and subsequently adopted.

c. Amend 1991 Annual Statement Instructions to Allow Reserves to Be Established Net of Salvage and Subrogation

A motion was made to add this proposal to the agenda under the unanimous consent rule; however, unanimous consent was not received.

d. Add New Note #17 to the 1991 Notes to Financial Statements

The chair of the task force advised that this new note (Attachment Seven) would require disclosure of the extent to which anticipated salvage and subrogation had been used to reduce loss reserves. It was noted that these instructions should be modified to clarify that pools and associations and reinsurance may be excluded if the amounts are not known.

Upon motion duly made and seconded, this item was added to the agenda under the unanimous consent rule and subsequently adopted.

e. Amend Statement of Actuarial Opinion for 1991

Robert Solitro (N.H.) advised that this proposal (Attachment Six) would modify the Statement of Actuarial Opinion to include the review of amounts attributable to anticipated salvage and subrogation that had been netted against loss reserves and disclosed in Note #17.

Upon motion duly made and seconded, this item was added to the agenda under the unanimous consent rule and subsequently adopted.

f.   Amend Note #16 to Financial Statements for 1991

Robert Solitro (N.H.) reported that the intent of this amendment to Note #16 (Attachment Eight) is to require companies that discount loss reserves to report this discount in Schedule P.

Upon motion duly made and seconded, this item was added to the agenda under the unanimous consent rule and subsequently adopted.

g.   Amend Annual Statement Instructions

Larry Gorski (Ill.) advised that the Invested Assets Working Group of the Valuation of Securities Task Force had determined that credit-tenant mortgage loans should be included in Schedule D as corporate bonds instead of Schedule B - Mortgage Loans. Mr. Gorski advised that the *Valuations of Securities* manual would be amended to include this new language and that it would be appropriate for the 1992 annual statement instructions for Schedule B and Schedule D to be amended as follows:

### Credit-Tenant Mortgage Loans

Such loans are based primarily on the credit standing of the major tenant and not on the value of the mortgaged property and are known as credit-tenant mortgage loans. These loans are structured with an assignment of the rental payments to the lender which will amortize the loan over its term with no balloon payments. The property will be pledged as collateral in the form of a first lien with the lessee paying all taxes, maintenance, and insurance expenses. All mortgage loans structured in the preceding manner are to be reported in Schedule D of the annual statement and submitted to the NAIC Securities Valuation Office for valuation. The credit tenants' lease payments alone, must equal or exceed the full debt service requirements of the loan plus all expenses.

Upon motion duly made and seconded, this item was added to the agenda under the unanimous consent rule and subsequently adopted.

4.   Reports of Working Groups

The task force chair advised that the allotted time for the meeting had elapsed and that unless a working group had something that needed individual attention, the task force would receive all reports under one motion. He explained that these working groups will continue in existence for the following year.

Upon motion duly made and seconded, the minutes of the working groups listed below were received by the task force.

a.   Schedule D (Attachment Nine)
b.   Managements' Discussion of Results of Operations (Attachment Ten)
c.   Financial Reporting (Attachment Eleven)
d.   Annual Statement Instructions (Attachment Twelve)
e.   Consolidated Annual Statement (Attachment Thirteen)
f.   Canadian Life Working Group (Attachment Fourteen)
g.   Quarterly Statement Working Group (Attachment Fifteen)

ATTACHMENT SIX

Modified P/C Actuarial Opinion to Require the Opinion to Cover
Anticipated Salvage and Subrogation Included as a Reduction to Loss
and Loss Adjustment Reserves and Discount for Time Value of Money

ANNUAL STATEMENT INSTRUCTIONS

GENERAL

12. STATEMENT OF ACTUARIAL OPINION

    8. SCOPE PARAGRAPH

        (a) Reserve for unpaid losses (Page 3, Item 1)

        <u>ADD</u>

        Anticipated salvage and subrogation recoverable included as a reduction to Loss Reserves as reported in Schedule P - ANALYSIS OF LOSSES AND LOSS EXPENSES, Part 3a - UNDERWRITING AND INVESTMENT EXHIBIT, and on Page 3 - LIABILITIES, SURPLUS AND OTHER FUNDS, line #1. $_____.

        Discount for time value of money included as a reduction to Loss Reserves and Loss Expense Reserves as reported in Schedule P - ANALYSIS OF LOSSES AND LOSS EXPENSES, Part 3a - UNDERWRITING AND INVESTMENT EXHIBIT, and on Page 3 - LIABILITIES, SURPLUS AND OTHER FUNDS, lines #1 and #2. $_____.

                        **********************************

ATTACHMENT SEVEN

New Note #17 to P/C Financial Statement Requiring Disclosure
of Anticipated Salvage and Subrogation Used as an Offset to Loss and Loss Adjustment Reserves

<u>NEW NOTE #17</u>

PAGE 18.1 NOTES TO FINANCIAL STATEMENTS

INSERT FOLLOWING AS NOTE #17 AND RENUMBER ALL NOTES THAT WERE CHANGED

17. Anticipated Salvage and Subrogation included as a reduction to Loss Reserves and Loss Adjustment Expense Reserves as reported in Schedule P - ANALYSIS OF LOSSES AND LOSS EXPENSES, Part 3a - UNDERWRITING AND INVESTMENT EXHIBIT, and on Page 3 - LIABILITIES, SURPLUS AND OTHER FUNDS, line #1.

This disclosure should be presented by annual statement line of business with Schedule P breakdown. Amounts should be presented as of December 31 of the prior year end and December 31 of the year for which this annual statement is being filed.

|  | December 31, 1990 | December 31, 1991 |
|---|---|---|
| 1. Fire | XXXXX | XXXXX |
| 2. Allied Lines | XXXXX | XXXXX |
| 3. Farmowners | XXXXX | XXXXX |
| 19. Auto Liab | | |
|     PP Auto Liab | XXXXX | XXXXX |
|     Comm Auto Liab | XXXXX | XXXXX |

                        **********************************

# ANNUAL STATEMENT

OF THE

# LIBERTY NORTHWEST INSURANCE CORPORATION

of

PORTLAND

in the

STATE OF OREGON

TO THE

Insurance Department

OF THE

STATE OF

_____

FOR THE YEAR ENDED
DECEMBER 31, 1989

**1989**

FIRE AND CASUALTY

**1989**

GOVERNMENT
EXHIBIT
4

FIRE AND CASUALTY COMPANIES ~ ASSOCIATION EDITION

Form 2

Note: In the case of reciprocal exchanges and other types of insurers using special terminology, the printed items and references in this blank, if not appropriately changed, shall be construed to apply to each insurers in respect to corresponding data and information as the context may require.

# ANNUAL STATEMENT

### FOR THE YEAR ENDED DECEMBER 31, 1989
### OF THE CONDITION AND AFFAIRS OF THE

Liberty Northwest Insurance Corporation

NAIC Group Code ____111____    NAIC Company Code ___41939___    Employer's ID Number ___93-0824674___

Organized under the laws of the State of _____OREGON_____ made to the

## INSURANCE DEPARTMENT OF THE STATE OF

### PURSUANT TO THE LAWS THEREOF

Incorporated ___January 21, 1983___    Commenced Business ___February 18, 1983___

Statutory Home Office _____825 N.E. Multnomah Street,_____ Portland, Oregon 97232
(Street and Number)                        (City or Town, State and Zip Code)

Main Administrative Office ___825 N.E. Multnomah Street, Suite 2000___
(Street and Number)

Portland, Oregon 97232                        (503) 239-5800
(City or Town, State and Zip Code)        (Area Code)    (Telephone Number)

Mail Address ___825 N.E. Multnomah Street, Suite 2000 Portland, Oregon 97232___
(Street and Number and P.O. Box)                (City or Town, State and Zip)

Primary Location of Books and Records ___825 N.E. Multnomah Street, Suite 2000___
(Street and Number)

Portland, Oregon 97232                        (503) 239-5800
(City or Town, State and Zip Code)        (Area Code)    (Telephone Number)

Annual Statement Contact Person and Phone Number ___James E. McKittrick, Jr. (503) 239-5800___

### OFFICERS

| | | |
|---|---|---|
| President | Charles Bryan Gill, Jr. | Sr. Vice Presidents | William Earl Commack |
| | | | David Arthur Davidson |
| Secretary | David Arthur Davidson | | Antonio Caldwell Ferronato |
| Chief Financial | | | John Robert Galbraith |
| Officer | John Robert Galbraith | | Robert Herbert Gruhl |
| | | Vice Presidents | Perry Clark Cole |
| | | | George Henry Kasbohm |
| | | | Gerald Thomas Minifie |
| | | | Daryl Lee Nelson |

### DIRECTORS

Chairman - Gary Lee Countryman      William Earl Commack

David Arthur Davidson      John Robert Galbraith

Charles Bryan Gill, Jr.      Robert Herbert Gruhl

Stuart Acheson Hall      Robert Edward Joseph, Jr.

State of      Oregon
County of      Multnomah      ] ss

| David Arthur Davidson | Sr. Vice President & Actuary | John Robert Galbraith | Sr. Vice President & CFO | James E. McKittrick, Jr. | Controller |
|---|---|---|---|---|---|

of the ...........Liberty Northwest Insurance Corporation............ being duly sworn, each for himself depose and says that they are the above described officers of the said insurer, and that on the thirty-first day of December last, all of the herein described assets were the absolute property of the said insurer, free and clear from any liens or claims thereon, except as herein stated, and that this annual statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to are a full and true statement of all the assets and liabilities and of the condition and affairs of the said insurer as of the thirty-first day of December last, and of its income and deductions therefrom for the year ended on that date, according to the best of their information, knowledge and belief, respectively.

Subscribed and sworn to before me this

........................................................      Sr. Vice President & Actuary
                                                          ....................................
                                                          David A. Davidson

...............      day of      February      , 1990      Sr. Vice President & CFO
........................................................      ....................................
                                                          John Robert Galbraith

                                                          Controller
........................................................      ....................................
Cheryl J. Evans                                              James E. McKittrick, Jr.
My commission expires February 20, 1993

LIB - 001575

LIB - 001576

2
Form 2

ANNUAL STATEMENT FOR THE YEAR 1989 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

2
Form 2

## ASSETS

| | 1 Current Year | 2 Previous Year |
|---|---|---|
| 1. Bonds (less $0 liability for asset transfers with put options) .................... | 282,359,765 | 231,660,082 |
| 2. Stocks: | | |
| 2.1 Preferred stocks ................................................................ | | |
| 2.2 Common stocks ................................................................ | 7,812,174 | 24,374 |
| 3. Mortgage loans on real estate ................................................ | | |
| 4. Real estate: | | |
| 4.1 Properties occupied by the company (less $0 encumbrances) ............ | | |
| 4.2 Other properties (less $0 encumbrances) ............................... | | |
| 5. Collateral loans ................................................................ | | |
| 6.1 Cash on hand and on deposit ................................................ | 1,065,901 | 1,063,385 |
| 6.2 Short-term investments ...................................................... | 20,938,947 | 6,356,944 |
| 7. Other invested assets .......................................................... | | |
| 8. Aggregate write-ins for invested assets ...................................... | | |
| 8a. Subtotals, cash and invested assets (Items 1 to 8) ..................... | 306,776,788 | 230,733,585 |
| 9. Agents' balances or uncollected premiums: | | |
| 9.1 Premiums and agents' balances in course of collection ................ | 3,152,498 | 3,115,251 |
| 9.2 Premiums, agents' balances and installments booked but deferred and not yet due | 32,109,446 | 21,991,025 |
| 9.3 Accrued retrospective premiums ........................................... | | |
| 10. Funds held by or deposited with reinsured companies ...................... | | |
| 11. Bills receivable, taken for premiums ...................................... | 664,869 | 13,735 |
| 12. Reinsurance recoverable on loss payments ................................ | | |
| 13. Federal income tax recoverable ............................................ | 444,796 | 416,187 |
| 14. Electronic data processing equipment .................................... | 6,212,873 | 4,864,048 |
| 15. Interest, dividends and real estate income due and accrued .............. | | |
| 16. Receivable from parent, subsidiaries and affiliates ...................... | | |
| 17. Equities and deposits in pools and associations .......................... | | |
| 18. Amounts receivable relating to uninsured accident and health plans ...... | | |
| 20. Aggregate write-ins for other than invested assets ........................ | 214,885 | 460,990 |
| 21. TOTALS (Items 8a through 20) .............................................. | 349,996,154 | 269,594,421 |
| DETAILS OF WRITE-INS AGGREGATED AT ITEM 8 FOR INVESTED ASSETS | | |
| 0801. | | |
| 0802. | | |
| 0803. | | |
| 0804. | | |
| 0805. | | |
| 0898. Summary of remaining write-ins for Item 8 from overflow page ........... | | |
| 0899. TOTALS (Items 0801 thru 0805 plus 0898) (Page 2, Item 8) | | |
| DETAILS OF WRITE-INS AGGREGATED AT ITEM 20 FOR OTHER THAN INVESTED ASSETS | | |
| 2001. Due from State of Oregon Workers' Compensation Department .............. | 191,057 | 400,583 |
| 2002. Recoverable Premium Taxes ................................................ | 0 | 52,405 |
| 2003. Other Receivables ........................................................ | 23,828 | 8,002 |
| 2004. | | |
| 2005. | | |
| 2098. Summary of remaining write-ins for Item 20 from overflow page .......... | | |
| 2099. TOTALS (Items 2001 thru 2005 plus 2098) (Page 2, Item 20) | 214,885 | 460,990 |

NOTE: The items on this page is agree with Exhibit 1, Col. 4.
The Notes to Financial Statements are an integral part of this statement.

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | 1<br>Current Year | 2<br>Previous Year |
|---|---|---|
| 1. Losses (Part 3A, Column 5, Item 32) | 235,002,605 | 182,865,534 |
| 1A. Reinsurance payable on paid losses (Schedule F, Part 3A, Section 2, Column 1) | 24,477,397 | 55,150,510 |
| 2. Loss adjustment expenses (Part 3A, Column 6, Item 30) | | |
| 3. Contingent commissions and other similar charges | 2,860,616 | 1,953,616 |
| 4. Other expenses (excluding taxes, licenses and fees) | 2,440,242 | 1,982,964 |
| 5. Taxes, licenses and fees (excluding federal and foreign income taxes) | 7,184,000 | 6,080,000 |
| 6. Federal and foreign income taxes (excluding deferred taxes) | | |
| 7. Borrowed money $0 and interest thereon $0 | | |
| 8. Interest, including $0 on borrowed money | 2,197,523 | 1,993,748 |
| 9. Unearned premiums (Part 2A, Column 5, Item 34) | | |
| 10. Dividends declared and unpaid: | | |
| (a) Stockholders | 745,184 | 450,397 |
| (b) Policyholders | | |
| 11. Funds held by company under reinsurance treaties | 1,069,122 | 936,343 |
| 12. Amounts withheld or retained by company for account of others | | |
| 13a. Unearned premiums on reinsurance in unauthorized companies | | |
| 13b. Reinsurance on paid losses $0 and on unpaid reported losses $0 | | |
| and on incurred but not reported losses $0 recoverable from | | |
| unauthorized companies $0 | | |
| 13c. Paid and unpaid allocated loss adjustment expenses recoverable from unauthorized companies | | |
| 13d. Less funds held or retained by company for account of such unauthorized companies as per Schedule F, Part 2A, Column 6 | | |
| 13e. Provision for overdue authorized reinsurance as per Schedule F, Part 2A, Section 2 | 0 | |
| 14. Provision for reinsurance (Items 13a + 13b + 13c + 13e – 13d) | 375,752 | 0 |
| 15. Excess of statutory reserves over statement reserves (Schedule P Interrogatories) | | |
| 16. Net adjustments in assets and liabilities due to foreign exchange rates | | |
| 17. Drafts outstanding | 1,575,604 | 1,271,006 |
| 18. Payable to parent, subsidiaries and affiliates | | |
| 19. Payable for securities | | |
| 20. Liability for amounts held under uninsured accident and health plans | | |
| 21. Aggregate write-ins for liabilities | 5,255,543 | 3,493,242 |
| 22. Total liabilities (Items 1 through 21) | 283,452,988 | 216,357,378 |
| 23. Aggregate write-ins for special surplus funds | | |
| 24A. Common capital stock | 2,500,000 | 2,500,000 |
| 24B. Preferred capital stock | | |
| 24C. Aggregate write-ins for other than special surplus funds | 58,900,000 | 52,800,000 |
| 25A. Gross paid in and contributed surplus | 4,743,166 | (2,042,557) |
| 25B. Unassigned funds (surplus) | | |
| 25C. Less treasury stock, at cost: | | |
| (1) 0 shares common (value included in Item 24A) $0 | | |
| (2) 0 shares preferred (value included in Item 24B) $0 | | |
| 26. Surplus as regards policyholders (Items 23 to 25B, less 25C) (Page 4, Item 32) | 66,143,166 | 53,237,443 |
| 27. TOTALS (Page 2, Item 23) | 349,596,154 | 269,594,823 |

### DETAILS OF WRITE-INS AGGREGATED AT ITEM 21 FOR LIABILITIES

| | | |
|---|---|---|
| 2101. Other Accounts Payable | 5,255,543 | 3,436,642 |
| 2102. Ceded Reinsurance Balance Payable | 0 | 256,600 |
| 2103. | | |
| 2104. | | |
| 2105. | | |
| 2198. Summary of remaining write-ins for item 21 from overflow page | | |
| 2199. TOTALS (Items 2101 thru 2105 plus 2198) (Page 3, Item 21) | 5,255,543 | 3,493,242 |

### DETAILS OF WRITE-INS AGGREGATED AT ITEM 23 FOR SPECIAL SURPLUS FUNDS

| | | |
|---|---|---|
| 2301. | | |
| 2302. | | |
| 2303. | | |
| 2304. | | |
| 2305. | | |
| 2398. Summary of remaining write-ins for item 23 from overflow page | | |
| 2399. TOTALS (Items 2301 thru 2305 plus 2398) (Page 3, Item 23) | | |

### DETAILS OF WRITE-INS AGGREGATED AT ITEM 24C FOR OTHER THAN SPECIAL SURPLUS FUNDS

| | | |
|---|---|---|
| 24C01. | | |
| 24C02. | | |
| 24C03. | | |
| 24C04. | | |
| 24C05. | | |
| 24C98. Summary of remaining write-ins for item 24C from overflow page | | |
| 24C99. TOTALS (Items 24C01 thru 24C05 plus 24C98) (Page 3, Item 24C) | | |

LIB - 001577

LIB - 001578

4
Form 2

ANNUAL STATEMENT FOR THE YEAR 1989 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

4
Form 2

# UNDERWRITING AND INVESTMENT EXHIBIT
## STATEMENT OF INCOME

| | 1 Current Year | 2 Previous Year |
|---|---|---|
| **UNDERWRITING INCOME** | | |
| 1. Premiums earned (Part 2, Column 4, Item 32) | 183,897,078 | 149,183,042 |
| DEDUCTIONS | | |
| 2. Losses incurred (Part 3, Column 7, Item 32) | 153,511,632 | 129,742,591 |
| 3. Loss expenses incurred (Part 4, Column 1, Item 22) | 23,680,752 | 13,768,785 |
| 4. Other underwriting expenses incurred (Part 4, Column 2, Item 22) | 12,089,382 | 11,654,514 |
| 5. Aggregate write-ins for underwriting deductions | | |
| 6.  Total underwriting deductions (Items 2 through 5) | 187,287,767 | 156,165,890 |
| 7. Net underwriting gain or (loss) (Item 1 minus 6) | (3,390,689) | (4,982,848) |
| **INVESTMENT INCOME** | | |
| 8. Net investment income earned (Part 1, Item J5) | 20,477,942 | 15,791,826 |
| 9. Net realized capital gains or (losses) (Part 1A, Item 11) | 5,815 | 102,141 |
| 9A. Net investment gain or (loss) (Item 8 + 9) | 20,483,757 | 15,893,967 |
| **OTHER INCOME** | | |
| 10. Net gain or (loss) from agents' or premium balances charged off (amount recovered 11,959 amount charged off 1875,076 ) | (873,079) | (591,649) |
| 11. Finance and service charges not included in premiums (Schedule 1, Column 8 total) | 97,874 | 89,167 |
| 12. Aggregate write-ins for miscellaneous income | | |
| 13.  Total other income (Items 10 through 12) | (775,205) | (502,482) |
| 14. Net income before dividends to policyholders and before federal and foreign income taxes (Items 7 + 9A + 13) | 16,317,864 | 10,408,637 |
| 14A. Dividends to policyholders (Exhibit 3, Item 14, plus Page 3, Item 10b, Col. 1 minus 2) | 1,353,340 | 804,587 |
| 14B. Net income, after dividends to policyholders but before federal and foreign income taxes (Item 14 minus 14A) | 14,964,524 | 9,604,050 |
| 15. Federal and foreign income taxes incurred | 7,231,103 | 6,075,994 |
| 16.  Net income (Item 14B minus 15) (to Item 18) | 7,733,421 | 3,528,056 |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 17. Surplus as regards policyholders, December 31 previous year (Page 4, Column 2, Item 32) | 53,237,443 | 48,550,685 |
| **GAINS AND (LOSSES) IN SURPLUS** | | |
| 18. Net income (from Item 16) | 7,733,421 | 3,528,056 |
| 19. Net unrealized capital gains or (losses) (Part 1A, Item 13) | (32,198) | 59,374 |
| 20. Change in nonadmitted assets (Exhibit 2, Item 14, Col. 3) | (539,740) | 1,139,328 |
| 21. Change in liability for reinsurance (Page 3, Item 14, Column 2 minus 1) | | |
| 22. Change in foreign exchange adjustment | | |
| 23. Change in excess of statutory reserves over statement reserves (Page 3, Item 15, Column 2 minus 1) | (373,752) | 0 |
| 24. Capital changes: | | |
| (a) Paid in (Exhibit 3, Item 4) | 6,100,000 | 0 |
| (b) Transferred from surplus (Stock Dive.) | | |
| (c) Transferred to surplus | | |
| 25. Surplus adjustments: | | |
| (a) Paid in (Exhibit 3, Item 7) | | |
| (b) Transferred from surplus (Stock Dive.) | | |
| (c) Transferred from capital | | |
| 26. Net remittances from or (to) Home Office (Exhibit 3, Item 4b minus 32b) | | |
| 27. Dividends to stockholders (cash) | | |
| 28. Change in treasury stock (Page 3, Item 25C (1) and (2), Column 2 minus 1) | | |
| 29. Extraordinary amounts of taxes for prior years | | |
| 30. Aggregate write-ins for gains and losses in surplus | | |
| 31. Change in surplus as regards policyholders for the year (Items 18 through 30) | 12,905,723 | 4,686,758 |
| 32. Surplus as regards policyholders, December 31 current year (Items 17 plus 31) (Page 3, Item 26) | 66,143,166 | 53,237,443 |

| DETAILS OF WRITE-INS AGGREGATED AT ITEM 5 FOR UNDERWRITING DEDUCTIONS | | |
|---|---|---|
| 0501. | | |
| 0502. | | |
| 0503. | | |
| 0504. | | |
| 0505. | | |
| 0598. Summary of remaining write-ins for Item 5 from overflow page | | |
| 0599.  TOTALS (Items 0501 thru 0505 plus 0598) (Page 4, Item 5) | | |

| DETAILS OF WRITE-INS AGGREGATED AT ITEM 12 FOR MISCELLANEOUS INCOME | | |
|---|---|---|
| 1201. Policyholder Interest Received | 97,874 | 89,167 |
| 1202. | | |
| 1203. | | |
| 1204. | | |
| 1205. | | |
| 1298. Summary of remaining write-ins for Item 12 from overflow page | | |
| 1299.  TOTALS (Items 1201 thru 1205 plus 1298) (Page 4, Item 12) | 97,874 | 89,167 |

| DETAILS OF WRITE-INS AGGREGATED AT ITEM 30 FOR GAINS AND LOSSES IN SURPLUS | | |
|---|---|---|
| 3001. | | |
| 3002. | | |
| 3003. | | |
| 3004. | | |
| 3005. | | |
| 3098. Summary of remaining write-ins for Item 30 from overflow page | | |
| 3099.  TOTALS (Items 3001 thru 3005 plus 3098) (Page 4, Item 30) | | |

ANNUAL STATEMENT FOR THE YEAR 1989 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

# CASH FLOW

| | 1 Current Year | 2 Previous Year |
|---|---|---|
| 1. Premiums collected net of reinsurance | 173,528,600 | 154,459,411 |
| 2. Loss and loss adjustment expenses paid (net of salvage and subrogation) | 114,405,140 | 93,902,519 |
| 3. Underwriting expenses paid | 10,477,647 | 11,192,142 |
| 4. Other underwriting income (expenses) | 152,781 | |
| 5. Cash from underwriting (Item 1 minus Item 2 minus Item 3 plus Item 4) | 48,798,374 | 49,743,930 |
| 6. Investment income (net of investment expense) | 19,234,023 | 14,136,844 |
| 7. Other income (expenses) | (775,205) | (502,482) |
| 8. Dividends to policyholders paid | 3,036,563 | 1,180,267 |
| 9. Federal income taxes (paid) recovered | (6,127,103) | 204,006 |
| 10. Net cash from operations (Item 5 plus Item 6 plus Item 7 minus Item 8 plus Item 9) | 60,091,526 | 62,422,051 |
| 11. Proceeds from investments sold, matured or repaid: | | |
| 11.1 Bonds | 6,943,936 | 9,572,066 |
| 11.2 Stocks | 2,800,000 | 0 |
| 11.3 Mortgage loans | | |
| 11.4 Real estate | | |
| 11.5 Collateral loans | | |
| 11.6 Other invested assets | | |
| 11.7 Net gains or (losses) on cash and short-term investments | (3,678) | 4,155 |
| 11.8 Miscellaneous proceeds | | |
| 11.9 Total investment proceeds (Items 11.1 thru 11.8) | 9,740,258 | 9,576,241 |
| 12. Other cash provided: | | |
| 12.1 Net transfers from affiliates | 304,598 | 622,556 |
| 12.2 Borrowed funds received | 6,100,000 | 0 |
| 12.3 Capital paid in | | |
| 12.4 Surplus paid in | | |
| 12.5 Other sources | 1,808,387 | 2,115,500 |
| 12.6 Total other cash provided (Items 12.1 thru 12.5) | 8,212,985 | 2,738,056 |
| 13. Total (Item 10 plus Item 11.9 plus Item 12.6) | 78,044,779 | 74,736,330 |
| 14. Cost of investments acquired (long-term only): | | |
| 14.1 Bonds | 57,928,490 | 74,584,597 |
| 14.2 Stocks | 5,200,000 | 0 |
| 14.3 Mortgage loans | | |
| 14.4 Real estate | | |
| 14.5 Collateral loans | | |
| 14.6 Other invested assets | | |
| 14.7 Miscellaneous applications | | |
| 14.8 Total investments acquired (Items 14.1 thru 14.7) | 63,128,490 | 74,584,597 |
| 15. Other cash applied: | | |
| 15.1 Dividends to stockholders paid | | |
| 15.2 Net transfers to affiliates | | |
| 15.3 Borrowed funds repaid | | |
| 15.4 Other applications | 151,770 | 162,045 |
| 15.5 Total other cash applied (Items 15.1 thru 15.4) | 151,770 | 162,045 |
| 16. Total (Item 14.8 plus Item 15.5) | 63,280,260 | 74,746,642 |
| 17. Net change in cash and short-term investments (Item 13 minus Item 16) | 14,764,519 | (10,312) |
| RECONCILIATION | | |
| 18. Cash and short-term investments: | | |
| 18.1 Beginning of year | 7,220,329 | 7,230,641 |
| 18.2 End of year (Item 17 plus Item 18.1) | 22,004,848 | 7,220,329 |

LIB - 001579

6
Form 2

ANNUAL STATEMENT FOR THE YEAR 1989 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

6
Form 2

# UNDERWRITING AND INVESTMENT EXHIBIT
## PART 1—INTEREST, DIVIDENDS AND REAL ESTATE INCOME

| | 1 | 2 Schedule | 3 Collected During Yr. Less Pd. for Accrued On Purchases | Paid in Advance | | Due and Accrued & | | 8 Earned During Year 3 + 6 + 4 − 4 − 7 |
|---|---|---|---|---|---|---|---|---|
| | | | | 4 Current Year | 5 Previous Year | 6 Current Year | 7 Previous Year | |
| 1. | U.S. government bonds | 0* | 9,513,797 | | | 2,263,026 | 2,287,617 | 9,489,195 |
| 1.1 | Bonds exempt from U.S. tax | 0* | 6,039,947 | | | 3,578,326 | 2,265,692 | 6,352,201 |
| 1.2 | Other bonds (unaffiliated) | 0* | 1,501,423 | | | 324,326 | 330,539 | 1,515,210 |
| 1.3 | Bonds of affiliates | 0 | | | | | | |
| 2.1 | Preferred stocks (unaffiliated) | 0 | | | | | | |
| 2.11 | Preferred stocks of affiliates | 0 | | | | 17,077 | | 17,077 |
| 2.2 | Common stocks (unaffiliated) | 0 | 105,000 | | | | | 105,000 |
| 2.21 | Common stocks of affiliates | 0 | | | | | | |
| 3. | Mortgage loans | B+ | | | | | | |
| 4. | Real estate | C | | | | | | |
| 5. | Collateral loans | X | | | | 30,328 | | 1,275,925 |
| 6.1 | Cash on hand and on deposit | DA* | 1,245,597 | | | | | |
| 6.2 | Short-term investments | BA | | | | | | |
| 7. | Other invested assets | DB | | | | | | |
| 8. | Financial options and futures | | 5,363 | | | | | 5,363 |
| 9. | Aggregate write-ins for investment income | | | | | | | |
| 10. | TOTALS | | 15,611,147 | | | 6,212,873 | 4,864,040 | 20,959,972 |

DEDUCTIONS

| 11. | Total investment expenses incurred (Part 4, Col. 5, Item 22) | 482,029 |
|---|---|---|
| 12. | Depreciation on real estate (for companies which depreciate annually on a formula basis) | 0 |
| 13. | Aggregate write-ins for deduction from investment income | |
| 14. | Total deductions (Items 11 to 13) | 482,029 |

14.   Total deductions (Items 11 to 13) ... 20,477,942

15.   Net investment income Earned (Item 10 minus Item 14-to Page 4, Item 9)
*Includes $192,603 accrual of discount less $205,766 amortization of premium.
*Includes $3,197,616 accrual of discount less $0 amortization of premium.
*includes $0 accrual of discount less $0 amortization of premium.
&Admitted items only. State basis of valuation None  *Includes $0 for company's occupancy of its own buildings.
$includes for asset transfers with put options accounted for as financing arrangements.   $0 Column 5.   $0 Column 8.

DETAILS OF WRITE-INS AGGREGATED AT ITEM 9 OF PART 1

| | 1 | 2 | 3 | 4 | 5 | 6 | 8 |
|---|---|---|---|---|---|---|---|
| 0901. | ASSIGNED RISK POOL | N/A | 5,363 | | | | 5,363 |
| 0902. | | | | | | | |
| 0903. | | | | | | | |
| 0904. | | | | | | | |
| 0905. | | | | | | | |
| 0998. | Summary of remaining write-ins for Item 9 from overflow page | | | | | | |
| 0999. | TOTALS (Items 0901 thru 0905 plus 0998)(Part 1, Item 9) | | 5,363 | | | | 5,363 |

DEDUCTIONS

DETAILS OF WRITE-INS AGGREGATED AT ITEM 13 OF PART 1

| | 1 | |
|---|---|---|
| 1301. | | |
| 1302. | | |
| 1303. | | |
| 1304. | | |
| 1305. | | |
| 1398. | Summary of remaining write-ins for Item 13 from overflow page | |
| 1399. | TOTALS (Items 1301 thru 1305 plus 1398) (Part 1, Item 13) | |

# PART 1A—CAPITAL GAINS AND (LOSSES) ON INVESTMENTS

| | 1 | 2 Profit on Sales or Maturity | 3 Loss on Sales or Maturity | 4 Increases by Adjustment in Book Value | 5 Decreases by Adjustment in Book Value | 6 Net Gain or (Loss) from Change in Difference between Book and Admitted Assets | 7 Total (Net of Cols. 2 to 6 incl.) (2−3+4−5+6) |
|---|---|---|---|---|---|---|---|
| 1. | U.S. government bonds | 13,273 | 8,338 | | | | 4,935 |
| 1.1 | Bonds exempt from U.S. tax | | | | | | |
| 1.2 | Other bonds (unaffiliated) | 4,556 | | | | | 4,556 |
| 1.3 | Bonds of affiliates | | | | | | |
| 2.1 | Preferred stocks (unaffiliated) | | | | | | |
| 2.11 | Preferred stocks of affiliates | | | | | | |
| 2.2 | Common stocks (unaffiliated) | | | | | (12,198) | (12,198) |
| 2.21 | Common stocks of affiliates | | | | | | |
| 3. | Mortgage loans | | | | | | |
| 4. | Real estate | | | | | | |
| 5. | Collateral loans | | | | | | |
| 6.1 | Cash on hand and on deposit | 620 | 4,296 | | | | (3,676) |
| 6.2 | Short-term investments | | | | | | |
| 7. | Other invested assets | | | | | | |
| 8. | Financial options and futures | | | | | | |
| 9. | Aggregate write-ins for capital gains and (losses) | | | | | | |
| 10. | TOTALS | 18,451 | 12,636 | | | (12,198) | (6,383) |

5,815
(12,198)

11.   Net realized capital gains or (losses) (Page 4, Item 9) (Col. 2−3, Item 10)
12.   Net unrealized capital gains or (losses)* (Page 4, Item 11) (Col. 4 − 5 + 6, Item 10)
*Attach statement or memorandum explaining basis of division.   *Excluding   $0 depreciation on real estate included in Part 1, Item 12.

DETAILS OF WRITE-INS AGGREGATED AT ITEM 9 OF PART 1A

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| 0901. | | | | | | | |
| 0902. | | | | | | | |
| 0903. | | | | | | | |
| 0904. | | | | | | | |
| 0905. | | | | | | | |
| 0998. | Summary of remaining write-ins for Item 9 from overflow page | | | | | | |
| 0999. | TOTALS (Items 0901 thru 0905 plus 0998) (Part 1A, Item 9) | | | | | | |

LIB - 001580

ANNUAL STATEMENT FOR THE YEAR 1989 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

# UNDERWRITING AND INVESTMENT EXHIBIT

PART 2 — PREMIUMS EARNED

| Line of Business | 1 Net Premiums Written Per Column 4, Part 2B | 2 Unearned Premiums Dec. 31 Previous Year — per Col. 3, Last Year's Part 2 | 3 Unearned Premiums Dec. 31 Current Year — per Col. 5, Part 2A | 4 Premiums Earned During Year Cols. 1 + 2 − 3 |
|---|---|---|---|---|
| 1. Fire .................... | | | | |
| 2. Allied lines .................... | | | | |
| 3. Farmowners multiple peril .................... | | | | |
| 4. Homeowners multiple peril .................... | | | | |
| 5. Commercial multiple peril .................... | | | | |
| 8. Ocean marine .................... | | | | |
| 9. Inland marine .................... | | | | |
| 10. Financial guaranty .................... | | | | |
| 11. Medical malpractice .................... | | | | |
| 12. Earthquake .................... | | | | |
| 13. Group accident and health .................... | | | | |
| 14. Credit accident and health (group and individual) .................... | | | | |
| 15. Other accident and health .................... | | | | |
| 16. Workers' compensation .................... | 182,907,841 | 1,373,599 | 1,468,050 | 182,813,450 |
| 17. Other liability .................... | 229,849 | 181,936 | 219,637 | 192,148 |
| 19. Auto liability .................... | 471,342 | 314,615 | 359,609 | 426,568 |
| 21. Auto physical damage .................... | 291,401 | 123,598 | 150,687 | 264,912 |
| 22. Aircraft (all perils) .................... | | | | |
| 23. Fidelity .................... | | | | |
| 24. Surety .................... | | | | |
| 25. Glass .................... | | | | |
| 26. Burglary and theft .................... | | | | |
| 27. Boiler and machinery .................... | | | | |
| 28. Credit .................... | | | | |
| 29. International .................... | | | | |
| 30A. Reinsurance * .................... | | | | |
| 30B. Reinsurance * .................... | | | | |
| 30C. Reinsurance * .................... | | | | |
| 30D. Reinsurance * .................... | | | | |
| 31. Aggregate write-ins for other lines of business .................... | | | | |
| 32. TOTALS .................... | 184,100,853 | 1,993,748 | 2,197,523 | 183,897,078 |

DETAILS OF WRITE-INS AGGREGATED AT ITEM 31

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| 3101. .................... | | | | |
| 3102. .................... | | | | |
| 3103. .................... | | | | |
| 3104. .................... | | | | |
| 3105. .................... | | | | |
| 3198. Summary of remaining write-ins for item 31 from overflow page .................... | | | | |
| 3199. TOTALS (Items 3101 thru 3105 plus 3198) (Item 31) .................... | | | | |

*See Item 30 Instructions.



LIB - 001582

9

ANNUAL STATEMENT FOR THE YEAR 1999 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

## UNDERWRITING AND INVESTMENT EXHIBIT
## PART 3—LOSSES PAID AND INCURRED

| Line of business | Direct Business | Reinsurance Assumed | Reinsurance Recovered | Net Payments 1 + 2 − 3 | Net Losses Unpaid Current Year (Part 3A, Col. 5) | Net Losses Unpaid Previous Year | Losses Incurred Current Year 4 + 5 − 6 | Percentage of Losses Incurred (Col. 7, Part 2) to Premiums Earned (Col. 4, Part 2) |
|---|---|---|---|---|---|---|---|---|
| 1. Fire | | | | | | | | |
| 2. Allied lines | | | | | | | | |
| 3. Farmowners multiple peril | | | | | | | | |
| 4. Homeowners multiple peril | | | | | | | | |
| 5. Commercial multiple peril | | | | | | | | |
| 6. Ocean marine | | | | | | | | |
| 7. Inland marine | | | | | | | | |
| 8. Financial guaranty | | | | | | | | |
| 9. Medical malpractice | | | | | | | | |
| 10. Earthquake | | | | | | | | |
| 11. Group accident and health | | | | | | | | |
| 12. Credit accident and health (group and individual) | | | | | | | | |
| 13. Other accident and health | | | | | | | | |
| 14. Workers' compensation | 99,296,259 | 3,414,673 | 1,949,778 | 101,071,169 | 239,455,982 | 141,455,256 | 191,074,565 | 83.7 |
| 15. Other liability | 5,292 | 0 | 0 | 5,292 | 1,079,842 | 625,205 | 159,929 | 116.0 |
| 16. Auto liability | 105,343 | 1,067 | 0 | 151,108 | 416,703 | 446,544 | 81,265 | 13.0 |
| 17. Auto physical damage | 144,464 | 18 | 0 | 144,902 | 55,398 | 101,467 | 94,773 | 14.5 |
| 18. Aircraft (all perils) | | | | | | | | |
| 19. Fidelity | | | | | | | | |
| 20. Surety | | | | | | | | |
| 21. Glass | | | | | | | | |
| 22. Burglary and theft | | | | | | | | |
| 23. Boiler and machinery | | | | | | | | |
| 24. Credit | | | | | | | | |
| 25. International | | | | | | | | |
| 26. Reinsurance A | X X X X | | | | | | | |
| 26A. Reinsurance B | X X X X | | | | | | | |
| 26B. Reinsurance C | X X X X | | | | | | | |
| 27. Aggregate write-ins for other lines of business | X X X X | | | | | | | |
| 28. TOTALS | 99,566,342 | 3,417,998 | 1,949,778 | 101,374,562 | 235,001,955 | 143,084,084 | 191,611,822 | 88.3 |

DETAILS OF WRITE-INS AGGREGATED AT ITEM 31

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2701. | | | | | | | | |
| 2702. | | | | | | | | |
| 2703. | | | | | | | | |
| 2798. Summary of remaining write-ins for line 31 from overflow page | | | | | | | | |
| 2799. TOTALS (lines 2701 thru 2703 plus 2798) (line 31) | | | | | | | | |

*Option not acceptable (112 month duration).
**See item 31 instructions.

Form 2

ANNUAL STATEMENT FOR THE YEAR 1999 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

## UNDERWRITING AND INVESTMENT EXHIBIT

PART 3A - LOSSES AND LOSS ADJUSTMENT EXPENSES

| Line of Business | Adjusted or in Process of Adjustment | | | | Incurred but Not Reported | | | Net Losses Unpaid Excluding Incurred But Not Reported | Unpaid Loss Adjustment Expense |
|---|---|---|---|---|---|---|---|---|---|
| | 1a Direct | 1b Reinsurance Assumed | 2 Reinsurance Ceded | 3 Net Losses (col. 1 + col. 2 − col. 3) | 4a Direct | 4b Reinsurance Assumed | 4c Reinsurance Ceded | | |
| 1. Fire | | | | | | | | | |
| 2. Allied lines | | | | | | | | | |
| 3. Farmowners multiple peril | | | | | | | | | |
| 4. Homeowners multiple peril | | | | | | | | | |
| 5. Commercial multiple peril | | | | | | | | | |
| 6. Ocean marine | | | | | | | | | |
| 8. Inland marine | | | | | | | | | |
| 9. Financial guaranty | | | | | | | | | |
| 10. Medical malpractice | | | | | | | | | |
| 11. Earthquake | | | | | | | | | |
| 12. Group accident and health | | | | | | | | | |
| 13. Credit accident and health (grp and individual)** | | | | | | | | | |
| 15. Other accident and health | | | | | | | | | |
| 16. Workers' compensation | 202,499,573 | 7,295,524 | 14,445,414 | 195,349,193 | 51,964,442 | 4,973,951 | 941,452 | 233,451,882 | 24,224,149 |
| 17. Other liability | 1,344,062 | | 325,000 | 1,039,062 | 40,000 | 0 | 0 | 1,079,062 | 167,243 |
| 18. Auto liability | 382,499 | 1,910 | 0 | 384,319 | 30,000 | 2,184 | 0 | 416,703 | 58,337 |
| 19. Auto phys. damage | 30,337 | 0 | 0 | 30,337 | 25,000 | 1 | 0 | 55,338 | 6,034 |
| 22. Aircraft (all perils) | | | | | | | | | |
| 23. Fidelity | | | | | | | | | |
| 24. Surety | | | | | | | | | |
| 26. Glass | | | | | | | | | |
| 27. Burglary and theft | | | | | | | | | |
| 28. Boiler and machinery | | | | | | | | | |
| 29. Credit | | | | | | | | | |
| 30. International | | | | | | | | | |
| 34. Reinsurance *** | X X X X | | | X X X X | X X X X | | | | |
| 34A. Reinsurance *** | X X X X | | | X X X X | X X X X | | | | |
| 34B. Reinsurance *** | X X X X | | | X X X X | X X X X | | | | |
| 34C. Reinsurance *** | X X X X | | | X X X X | X X X X | | | | |
| 35. Aggregate write-ins for other lines of business | | | | | | | | | |
| 35. TOTALS | 204,444,341 | 7,291,448 | 14,770,414 | 196,940,011 | 51,979,442 | 4,976,136 | 941,452 | 235,002,805 | 24,417,797 |

DETAILS OF WRITE-INS AGGREGATED AT ITEM 35

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3501. | | | | | | | | | |
| 3502. | | | | | | | | | |
| 3503. | | | | | | | | | |
| 3598. | | | | | | | | | |
| 3599. TOTALS (Lines 3501 thru 3503 plus 3598) (Line 35) | | | | | | | | | |

(a) Including **$ ........ for present value of life indemnity claims and $ ........ reserved for deferred maturity and other similar benefits.
**Loss(es) not exceeding 120 months duration.
***See Line 30 Instructions.

LIB - 001584

ANNUAL STATEMENT FOR THE YEAR 1989 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

## SCHEDULE P - ANALYSIS OF LOSSES AND LOSS EXPENSES
Notes to Schedule P

(1) The Parts of Schedule P:
Part 1 — detailed information on losses and loss expenses.
Part 2 — history of incurred losses and allocated expenses.
Part 3 — history of loss and allocated expense payments.
Part 4 — (deleted discount information now in Part 5 and Notes to Financial Statements. Reserved for future use.)
Part 5 — schedule for claims-made policies.
Part 6 — history of bulk and incurred-but-not reported reserves.
Schedule P Interrogatories

(2) Lines of business A through H are groupings of the lines of business used on page 14, the state page.

(3) Reinsurance A, B, C, and D (Lines H to Q) are:
Reinsurance A = nonproportional property (1988 and subsequent).
Reinsurance B = nonproportional liability (1988 and subsequent).
Reinsurance C = financial lines (1988 and subsequent).
Reinsurance D = old Schedule A line 30 (1987 and prior).

(4) The Instructions to Schedule P contain directions necessary for filling out Schedule P.

## SCHEDULE P - PART 1 - SUMMARY
(000 omitted)

| 1 | Premium Earned | | | Loss and Loss Expense Payments | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Years In Which Premium Were Earned and Losses Were Incurred | 2 Direct and Assumed | 3 Ceded | 4 Net (2 − 3) | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 − 6 + 7 − 8 + 10) | 12 Number of Claims Reported — Direct and Assumed |
| | | | | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | XXXX | XXXX | XXXX | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 2. 1980 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 3. 1981 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 4. 1982 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 5. 1983 | 2,541 | 0 | 2,541 | 2,505 | 0 | 129 | 0 | 2 | 274 | 2,908 | XXXX |
| 6. 1984 | 16,276 | 307 | 15,969 | 15,204 | 0 | 768 | 0 | 66 | 1,034 | 16,986 | XXXX |
| 7. 1985 | 53,040 | 1,063 | 51,977 | 45,046 | 190 | 2,528 | 0 | 819 | 3,135 | 50,519 | XXXX |
| 8. 1986 | 108,698 | 2,061 | 106,637 | 68,257 | 376 | 2,974 | 0 | 1,432 | 4,569 | 76,646 | XXXX |
| 9. 1987 | 143,046 | 2,947 | 140,319 | 72,104 | 99 | 2,696 | 0 | 696 | 3,961 | 80,252 | XXXX |
| 10. 1988 | 153,945 | 4,762 | 149,183 | 71,345 | 1,295 | 2,166 | 15 | 157 | 5,798 | 74,021 | XXXX |
| 11. 1989 | 193,579 | 9,482 | 183,897 | 35,471 | 1,011 | 308 | 0 | 24 | 6,452 | 39,400 | XXXX |
| 12. Totals | XXXX | XXXX | XXXX | 309,932 | 2,791 | 11,593 | 15 | 3,218 | 25,013 | 343,732 | XXXX |

Note: For "prior," report amounts paid or received in current year only. Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | 21 | 22 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Years In Which Premium Were Earned and Losses Were Incurred | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | Unallocated Loss Expenses Unpaid | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding — Direct and Assumed |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 2. 1980 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 3. 1981 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 4. 1982 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | XXXX |
| 5. 1983 | 315 | 0 | 26 | 0 | 11 | 0 | 2 | 0 | 10 | 364 | XXXX |
| 6. 1984 | 2,616 | 67 | 173 | 0 | 74 | 0 | 11 | 0 | 74 | 2,857 | XXXX |
| 7. 1985 | 9,744 | 2,305 | 774 | 0 | 332 | 0 | 69 | 0 | 286 | 8,902 | XXXX |
| 8. 1986 | 20,033 | 3,678 | 1,166 | 0 | 652 | 0 | 101 | 0 | 577 | 19,476 | XXXX |
| 9. 1987 | 23,362 | 996 | 9,962 | 17 | 3,067 | 0 | 678 | 0 | 959 | 35,030 | XXXX |
| 10. 1988 | 37,735 | 3,211 | 24,965 | 473 | 2,110 | 10 | 1,655 | 0 | 1,995 | 64,774 | XXXX |
| 11. 1989 | 59,043 | 4,726 | 62,103 | 2,224 | 3,569 | 0 | 4,149 | 0 | 6,324 | 128,076 | XXXX |
| 12. Totals | 152,926 | 15,003 | 99,737 | 2,709 | 7,816 | 10 | 6,645 | 0 | 10,025 | 259,681 | XXXX |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premium Earned) | | | Discount for Time Value of Money | | 32 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Years In Which Premium Were Earned and Losses Were Incurred | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | Inter-Company Pooling Participation Percentage | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 0 | 0 | XXXX | 0 | 0 |
| 2. 1980 | 0 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 |
| 3. 1981 | 0 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 |
| 4. 1982 | 0 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 |
| 5. 1983 | 3,272 | 0 | 3,272 | 128.8 | 0.0 | 128.8 | 0 | 0 | 0.0 | 341 | 23 |
| 6. 1984 | 19,930 | 87 | 19,843 | 122.5 | 28.3 | 124.3 | 0 | 0 | 0.0 | 2,698 | 159 |
| 7. 1985 | 61,936 | 2,695 | 59,471 | 116.7 | 234.7 | 114.3 | 0 | 0 | 0.0 | 8,295 | 607 |
| 8. 1986 | 98,976 | 3,654 | 95,322 | 91.1 | 167.0 | 89.2 | 0 | 0 | 0.0 | 16,141 | 1,335 |
| 9. 1987 | 116,389 | 1,107 | 115,282 | 81.4 | 37.6 | 82.3 | 0 | 0 | 0.0 | 32,334 | 2,696 |
| 10. 1988 | 147,299 | 5,004 | 142,295 | 96.0 | 105.1 | 95.7 | 0 | 0 | 0.0 | 58,016 | 5,758 |
| 11. 1989 | 176,459 | 7,981 | 167,478 | 90.4 | 82.4 | 91.1 | 0 | 0 | 0.0 | 114,236 | 11,842 |
| 12. Totals | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 0 | 0 | XXXX | 235,003 | 24,478 |

*Net = (24 − 25) * (11 + 22)

86
Form 2

ANNUAL STATEMENT FOR . YEAR 1949 OF THE LIBERTY NORTHWEST INSURANCE CORPORATION

86
Form 2

## SCHEDULE T - EXHIBIT OF PREMIUMS WRITTEN
### Allocated by States and Territories

| States, Etc. | Is Is Insurer Licensed? (Yes or No) | Gross Premiums, Including Policy and Membership Fees, Less Return Premiums and Premiums on Policies Not Taken - 2 Direct Premiums Written | 3 Direct Premiums Earned | 4 Dividends Paid or Credited to Policyholders on Direct Business | 5 Direct Losses Paid (Deducting Salvage) | 6 Direct Losses Incurred | 7 Direct Losses Unpaid | 8 Finance and Service Charges Not Included in Premiums | 9 Direct Premiums Written for Federal Purchasing Groups (Included in Col. 2) |
|---|---|---|---|---|---|---|---|---|---|
| 1. Alabama .............. AL | No | | | | | | | | |
| 2. Alaska ............... AK | Yes | 0 | | | 0 | 0 | 0 | 0 | |
| 3. Arizona .............. AZ | No | | | | | | | | |
| 4. Arkansas ............. AR | No | | | | | | | | |
| 5. California ........... CA | No | | | | | | | | |
| 6. Colorado ............. CO | No | | | | | | | | |
| 7. Connecticut .......... CT | No | | | | | | | | |
| 8. Delaware ............. DE | No | | | | | | | | |
| 9. Dist. Columbia ....... DC | No | | | | | | | | |
| 10. Florida ............. FL | No | | | | | | | | |
| 11. Georgia ............. GA | No | | | | | | | | |
| 12. Hawaii .............. HI | No | | | | | | | | |
| 13. Idaho ............... ID | Yes | 8,426,743 | 8,436,553 | 1,028,466 | 4,686,013 | 4,297,259 | 6,547,401 | 0 | |
| 14. Illinois ............ IL | No | | | | | | | | |
| 15. Indiana ............. IN | No | | | | | | | | |
| 16. Iowa ................ IA | No | | | | | | | | |
| 17. Kansas .............. KS | No | | | | | | | | |
| 18. Kentucky ............ KY | No | | | | | | | | |
| 19. Louisiana .......... LA | No | | | | | | | | |
| 20. Maine .............. ME | No | | | | | | | | |
| 21. Maryland ........... MD | No | | | | | | | | |
| 22. Massachusetts ...... MA | No | | | | | | | | |
| 23. Michigan ........... MI | No | | | | | | | | |
| 24. Minnesota .......... MN | No | | | | | | | | |
| 25. Mississippi ........ MS | No | | | | | | | | |
| 26. Missouri ........... MO | No | | | | | | | | |
| 27. Montana ............ MT | Yes | 1,444,663 | 1,491,494 | 87 | 325,037 | 753,343 | 999,393 | 0 | |
| 28. Nebraska ........... NE | No | | | | | | | | |
| 29. Nevada ............. NV | No | | | | | | | | |
| 30. New Hampshire ...... NH | No | | | | | | | | |
| 31. New Jersey ......... NJ | No | | | | | | | | |
| 32. New Mexico ......... NM | No | | | | | | | | |
| 33. New York ........... NY | No | | | | | | | | |
| 34. North Carolina ..... NC | No | | | | | | | | |
| 35. North Dakota ....... ND | No | | | | | | | | |
| 36. Ohio ............... OH | No | | | | | | | | |
| 37. Oklahoma ........... OK | No | | | | | | | | |
| 38. Oregon ............. OR | Yes | 175,246,077 | 175,066,743 | | 93,219,929 | 150,918,456 | 220,452,062 | 0 | |
| 39. Pennsylvania ....... PA | No | | | | | | | | |
| 40. Rhode Island ....... RI | No | | | | | | | | |
| 41. South Carolina ..... SC | No | | | | | | | | |
| 42. South Dakota ....... SD | No | | | | | | | | |
| 43. Tennessee .......... TN | No | | | | | | | | |
| 44. Texas .............. TX | No | | | | | | | | |
| 45. Utah ............... UT | No | | | | | | | | |
| 46. Vermont ............ VT | No | | | | | | | | |
| 47. Virginia ........... VA | No | | | | | | | | |
| 48. Washington ......... WA | Yes | 3,052,600 | 2,944,766 | 0 | 1,276,561 | 2,091,300 | 4,647,207 | 0 | 0 |
| 49. West Virginia ...... WV | No | | | | | | | | |
| 50. Wisconsin .......... WI | No | | | | | | | | |
| 51. Wyoming ............ WY | No | | | | | | | | |
| 52. American Samoa ..... AS | No | | | | | | | | |
| 53. Guam ............... GU | No | | | | | | | | |
| 54. Puerto Rico ........ PR | No | | | | | | | | |
| 55. U.S. Virgin Is. .... VI | No | | | | | | | | |
| 56. Canada ............. CN | No | | | | | | | | |
| 57. Aggregate Other Alien ** ... OT | No | | | | | | | | |
| 58. *Totals | ++    5 | 188,170,303 | 187,941,656 | 1,028,553 | 99,506,340 | 158,060,398 | 240,646,063 | 0 | 0 |

DETAILS OF WRITE-INS AGGREGATED AT ITEM 57 FOR OTHER ALIEN

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5701. ................. | | | | | | | | | |
| 5702. ................. | | | | | | | | | |
| 5703. ................. | | | | | | | | | |
| 5704. ................. | | | | | | | | | |
| 5705. ................. | | | | | | | | | |
| 5798. Summary of remaining write-ins for Item 57 from overflow page ... | | | | | | | | | |
| 5799. Totals (Items 5701 thru 5705 plus 5798) (Schedule T, Item 57) ... | | | | | | | | | |

Explanation of basis of allocation of premiums by states, etc.

Premiums are allocated to the State in which the employers premises are situated or where the vehicles are garaged.

*Total for Column 2 to agree with the total of Column 1 in Part 2B, Page 8. Total for Column 5 to agree with the total in Column 1 in Part 3, Page 9.
Total for Column 6 to agree with the sum of totals for Columns 5 and 7 less the total for Column 7 in the previous annual statement.
Total for Column 7 to equal Part 3A, Page 10, totals for Columns 1a and 4a. Total for Column 8 to agree with Item 11, Page 4.
**ALL U.S. business must be allocated by state regardless of license status.
+Insert the number of yes responses except for Canada and Other Alien.

LIB - 001658

Westlaw.

26 C.F.R. § 1.832-7T

Treas. Reg. § 1.832-7T

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Insurance Companies
              Other Insurance Companies

➡**§ 1.832-7T Treatment of salvage and reinsurance in computing "losses incurred" deduction, taxable years beginning before January 1, 1990 (temporary).**

**(a)** In computing "losses incurred" the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them.

**(b)** Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses stated in amounts which, based upon the facts in each case and the company's experience with similar cases, can be said to represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of such losses which in the opinion of the district director are in excess of the actual liability determined as provided in the preceding sentence will be disallowed as a deduction. The district director may require any such insurance company to submit such detailed information with respect to its actual experience as is deemed necessary to establish the reasonableness of the deduction for "losses incurred".

**(c)** That part of the deduction for "losses incurred" which represents an adjustment to losses paid for salvage and reinsurance recoverable shall, except as hereinafter provided, include all salvage in course of liquidation, and all reinsurance in process of collection not otherwise taken into account as a reduction of losses paid, outstanding at the end of the taxable year. Salvage in course of liquidation includes all property (other than cash), real or personal, tangible or intangible, except that which may not be included by reason of express statutory provisions (or rules and regulations of an insurance department) of any State or Territory or the District of Columbia in which the company transacts business. Such salvage in course of liquidation shall be taken into account to the extent of the value thereof at the end of the taxable year as determined from a fair and reasonable estimate based upon either the facts in each case or the company's experience with similar cases. Cash received during the taxable year with respect to items of salvage or reinsurance shall be taken into account in computing losses paid during such taxable year.

**(d)** This section is effective for taxable years beginning before January 1, 1990.

[T.D. 8266, 54 FR 38970, Sept. 22, 1989; T.D. 8293, 55 FR 9425, March 14, 1990]

26 C. F. R. § 1.832-7T, 26 CFR § 1.832-7T

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**GOVERNMENT EXHIBIT**

**5**

Westlaw.

AL ADC 61

AL Insurance Departmental Regulation No. 61

**ALABAMA ADMINISTRATIVE CODE**
**ALABAMA DEPARTMENTAL REGULATIONS**
**DEPARTMENT OF INSURANCE DEPARTMENTAL REGULATIONS**
**DEPARTMENTAL REGULATION NO. 61. SALVAGE AND SUBROGATION**
Current with amendments included in the Alabama Administrative Monthly,
Volume XXV, Issue Number 5, dated February 28, 2007.

**Regulation No. 61. Salvage and subrogation**

Section I. Scope: This regulation shall apply to all fire and marine and casualty
insurers authorized to do business in the state, and is promulgated to reaffirm
the Insurance Department's long-standing position regarding the treatment of
salvage and subrogation.

Section II. Recoveries must be reduced to cash before credit is taken. Due to the
difficulty in ascertaining the value of items received as salvage on losses
(whether paid or unpaid) and determining the amount which might be recovered by
subrogation on losses (whether paid or unpaid), all concerned insurance companies
licensed to do business in this state shall not take credit in any annual
statement or interim statement filed with this department for salvage or
subrogation recoveries until such recoveries shall have been reduced to cash.
Salvage or subrogation recoveries reduced to cash shall be accounted for as an
offset to losses paid in accordance with existing practices.

Section III. Effective Date: This regulation shall take effect upon the passage
of ten (10) days from the date of certification that a copy of the regulation
signed by the Commissioner of Insurance was delivered to the Secretary of State,
State Capitol, Montgomery, Alabama.

**CREDIT(S)**

Filed: 2-28-77; eff. 3-10-77

**Insurance Product Line:** General, Property/Casualty

**A-to-Z Index Terms:**

CASUALTY INSURANCE

FIRE INSURANCE

INLAND MARINE INSURANCE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GOVERNMENT
EXHIBIT

6

Westlaw.

AL ADC Chapter 482-1-061

AAC Chapter 482-1-061
Ala. Admin. Code r. Chapter 482-1-061

Use Δ RegChange to view changes.
**ALABAMA ADMINISTRATIVE CODE**
**DEPARTMENT OF INSURANCE**
**INSURANCE REGULATION**
**CHAPTER 482-1-061. SALVAGE AND SUBROGATION**
Current with amendments included in the Alabama Administrative Monthly,
Volume XXV, Issue Number 5, dated February 28, 2007.

**Chapter 482-1-061. Salvage and subrogation--Repealed**

**CREDIT(S)**

Statutory Authority: Code of Ala. 1975, §§27 2 17

History: Repealed: Filed with LRS December 21, 2005.
Repealed eff. 12/21/2005

AL ADC Chapter 482-1-061
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Barclays Official*

# CALIFORNIA CODE OF REGULATIONS

# Title 10.  Investment

Complete Title

*(continued)*

**Vol. 14**



**BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS**
425 Market Street • Fourth Floor • San Francisco, CA  94105
800–888–3600

GOVERNMENT
EXHIBIT

7

# BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

## REVISED EDITION

This edition of *Barclays Official California Code of Regulations*, revised on April 1, 1990, has been published under the direction of the California Office of Administrative Law which is solely responsible for its contents. Comments or questions regarding regulations published in this edition should be addressed to the State of California, Office of Administrative Law, 300 Capitol Mall, Suite 1250, Sacramento, CA 95814, (916) 323–6225. Errors reported will be promptly corrected in subsequent supplements.

## OFFICIAL PUBLICATION

Courts are required to take judicial notice of contents of regulations published in the *Official California Code of Regulations* (Gov. Code, § 11344.6). *Barclays Official California Code of Regulations*, as revised April 1, 1990, has been certified by the Office of Administrative Law as the official publication of the State of California for this purpose pursuant to title 1, *California Code of Regulations*, section 190.

## CODE SUPPLEMENTS

Amendments to the official Code are certified weekly by the Office of Administrative Law for publication by Barclays. These amendments, when certified and published, become part of the *Official California Code of Regulations*, beginning with Register 90, No. 14, dated April 7, 1990, and include all regulations filed with the Secretary of State on or after April 1, 1990. Amendment subscriptions to the entire revised Code, or to parts of it, are available from the publisher. For a descriptive brochure and order form, write Barclays Official California Code of Regulations, P.O. Box 2007, San Francisco, CA 94126 or telephone 800–888–3600.

## CODE CITATION

Cite all materials in the *Official California Code of Regulations* by title number and section number. Example: Title 3, *California Code of Regulations*, section 432 (Short form: Cal. Code Regs., tit. 3, § 432).

## COPYRIGHT NOTICE

© 2007, STATE OF CALIFORNIA.
This material may not be commercially reproduced or sold in print or electronic forms without written permission of Thomson/West.

of the basis herein prescribed is impossible, the reasons therefor, and shall describe the valuation actually used in such cases.

### § 2291.  Adjustment of Values in Special Cases.

In cases where the conditions of insurance companies, societies and associations may require special consideration or the immediate disposal of assets, it shall be within the discretion of the Commissioner to vary the general procedures or formulas herein set forth to the extent deemed necessary, or to adopt prices reflected by the exchanges or markets.

## Article 3.   Annual Statements

### PREMIUMS IN COURSE OF COLLECTION

### § 2300.  Premiums in Course of Collection: When May Be Treated as Admitted

For purposes of the Annual Statement required of insurers to be filed with the Insurance Commissioner of the State of California on or before March 1 of the current calendar year, the following Premiums in Course of Collection may be treated as "Admitted Assets":

(a) Premiums in course of collection, other than life insurance and annuity premiums, and not more than 3 months past due on December 31 of the preceding calendar year.

(b) Premiums in course of collection, other than life insurance and annuity premiums, for which the Government of the United States or any of instrumentalities is directly liable to the insurer, whether or not more than 3 months past due on December 31 of the preceding calendar year.

All other Premiums in Course of Collection on December 31 of the proceeding calendar year shall be reported and will be treated as "Assets Not Admitted" unless provided otherwise in the Instructions relating to the completion of annual and quarterly statements.

All annual and quarterly statements must be completed in full compliance with the instructions attached thereto and set forth therein.

NOTE: Authority cited for 2300 to 2301; Sections 923 and 12921, Insurance Code.

HISTORY
1. Amendment filed 5–30–74 as procedural and organizational; effective upon filing (Register 74, No. 22.)

### § 2301.  Schedule F, Life Statement.

All insurers authorized to transact life insurance or life and disability insurance in the State of California are hereby required hereafter to list in Schedule F, irrespective of the presence or absence of litigation, all claims in fact resisted or compromised during the year covered by the annual statement of which such Schedule F is a part, and all claims remaining resisted at the end of such year.

### § 2302.  Method of Reporting Salvage or Subrogation Recoveries on Annual or Interim Financial Statements.

For purposes of the Annual Statement required of insurers to be filed with the Commissioner on or before the first day of March of each year or any interim financial statement filed with the Commissioner during the year by an insurer, anticipated salvage recoveries or anticipated subrogation recoveries shall have been reduced to cash or any asset readily convertible to cash.

NOTE: Authority cited: Sections 923 and 12921, Insurance Code. Reference: Section 907, Insurance Code.

HISTORY
1. New section filed 11–17–76; effective thirtieth day thereafter (Register 76, No. 47).

### § 2303.  Reinsurance Accounting, Agreements and Oversight.

Sections 2303 through 2303.25 of this article set forth the principal requirements of substance and procedure in accounting for reinsurance on insurer financial statements, the general requirements applicable to reinsurance agreements, and related sanctions and oversight. The sections are applicable to all insurers licensed or accredited in California, the ap-

proved U.S. trusts of otherwise unauthorized reinsurers, and licensed reinsurance intermediaries. The sections may be referred to as the Reinsurance Oversight Regulations.

NOTE: Authority cited: Sections 720, 730, 736, 922.8, 923, 924, 1011.5, 1215.8, 1781.12 and 12921, Insurance Code; *CalFarm Insurance Company v. Deukmejian,* 48 Cal. 3d 805 (1989); and *20th Century Insurance Company v. Garamendi,* 8 Cal. 4th 216 (1994). Reference: Sections 700, 701, 717, 730, 733, 736, 900, 922.1, 922.2, 922.3, 922.4, 922.5, 922.6, 922.7, 922.8, 922.9, 923, 924, 925, 925.2, 925.4, 1011, 1011.5, 1215.5(b)(3), 1215.5(f), 1781.10 and 12921, Insurance Code.

HISTORY
1. New section filed 10–24–2006; operative 11–23–2006 (Register 2006, No. 43).

### § 2303.1.  Purpose.

Sections 2303 through 2303.25 of this article set forth requirements for the proper and uniform preparation by licensed insurers of the financial statements required by the California Insurance Code and the requirements for acceptable reinsurance arrangements. The requirements are intended to elicit from insurers a true exhibit of their financial condition and to safeguard the solvency of licensees. The sections give notice as to the manner in which the Commissioner will exercise the discretion set forth in Code Sections 700, 701, 704, 717, 730, 733, 922.2 through 922.8, 923, 924, 925, 925.2, 925.4, 1011, 1011.5, 1215.5(b)(3), 1215.5(f), 1781.10, and Section 12921 of the Code as respects accounting for reinsurance in insurer financial statements, acceptable reinsurance arrangements, and regulatory oversight. All statutory references are to the California Insurance Code ("Code") unless otherwise stated.

The duties and the discretion of the Insurance Commissioner conferred by statute to ensure proper accounting for reinsurance and oversight of reinsurance arrangements are not exhausted by these regulations.

NOTE: Authority cited: Sections 720, 730, 736, 922.8, 923, 924, 1011.5, 1215.8, 1781.12 and 12921, Insurance Code; *CalFarm Insurance Company v. Deukmejian,* 48 Cal. 3d 805 (1989); and *20th Century Insurance Company v. Garamendi,* 8 Cal. 4th 216 (1994). Reference: Sections 700, 701, 717, 730, 733, 736, 900, 922.1, 922.2, 922.3, 922.4, 922.5, 922.6, 922.7, 922.8, 922.9, 923, 924, 925, 925.2, 925.4, 1011, 1011.5, 1215.5(b)(3), 1215.5(f), 1781.10 and 12921, Insurance Code.

HISTORY
1. New section filed 10–24–2006; operative 11–23–2006 (Register 2006, No. 43).

### § 2303.2.  Definitions.

As used in this article:

(a) "Accredited reinsurer" means an insurer that has been accredited pursuant to Code Section 922.4(b) and Section 2303.4 of this article.

(b) "Alien insurer" means an insurer organized under the laws of any jurisdiction other than a State of the United States.

(c) "Approved U.S. trust" or "U.S. trust" means the multiple beneficiary trust established by an insurer or group of insurers to secure obligations under reinsurance agreements, that has been approved pursuant to the provisions of Code Section 922.4(c) and Section 2303.5 of this article.

(d) "Assuming insurer" or "reinsurer" means the insurer to which risk is transferred under a reinsurance agreement.

(e) "Ceding insurer" means the insurer that transfers risk to another insurer under a reinsurance agreement.

(f) "Commissioner" means the California Insurance Commissioner.

(g) "Department" means the California Department of Insurance.

(h) "Domestic insurer" means a licensed insurer domiciled in this state.

(i) "Domestic ceding insurer" means a domestic insurer that is a ceding insurer.

(j) "Examine" or "examination" as used in Code Section 730 includes an examination or review of any nature, scope or frequency by the Department of a licensed insurer, regardless of the location of the review or examination.

(k) "Financial statements" mean the statements and reports of an insurer filed with the Commissioner for the purpose of exhibiting the insurer's financial condition and affairs.

(*l*) "Foreign ceding insurer" means a foreign insurer that is a ceding insurer.

## CHAPTER 4-42
## PROPERTY AND CASUALTY INSURANCE SALVAGE AND SUBROGATION

4-42.001    Definitions.
4-42.002    Assertion of Values of Items Received as Salvage on Paid or Unpaid Losses.

**4-42.001 Definitions.** The term "salvage" as used herein shall include "subrogation." *Specific Authority 624.308(1) FS. Law Implemented 625.012(12), 625.021 FS. History—New 6-21-77, Formerly 4-42.01.*

**4-42.002 Assertion of Values of Items Received as Salvage on Paid or Unpaid Losses.** Insurance companies incorporated under the laws of Florida and foreign and alien companies licensed to do business in Florida shall not take credit in any annual statement or interim statement filed with this Department for salvage recoveries until such recoveries shall have been reduced to cash or its equivalent. Salvage recoveries reduced to cash or its equivalent shall be accounted for as an offset to losses paid, in accordance with existing practices. *Specific Authority 624.308(1) FS. Law Implemented 625.012(12), 625.021 FS. History—New 6-21-77, Formerly 4-42.02.*

GOVERNMENT EXHIBIT
8

Westlaw.

4 FL ADC 4-42.002

Rule 4-42.002, F.A.C.

Fla. Admin. Code Ann. r. 4-42.002

**FLORIDA ADMINISTRATIVE CODE ANNOTATED**
**TITLE 04. DEPARTMENT OF INSURANCE**
**CHAPTER 4-42. PROPERTY AND CASUALTY INSURANCE SALVAGE AND SUBROGATION**
Current with rules included in the March 9, 2007
issue of the Florida Administrative Weekly;
see scope for specific rules in effect.

**4-42.002. Assertion of Values of Items Received as Salvage on Paid or Unpaid Losses.**

Specific Authority 624.308(1) FS. Law Implemented 625.012(12), 625.021 FS. History--New 6-21-77, Formerly 4-42.02, Transferred to FAC 4-138.030.

Rule 4-42.002, F.A.C., 4 FL ADC 4-42.002

4 FL ADC 4-42.002
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

4 FL ADC 4-138.030

Rule 4-138.030, F.A.C.

Fla. Admin. Code Ann. r. 4-138.030

Page 1

FLORIDA ADMINISTRATIVE CODE ANNOTATED
TITLE 04. DEPARTMENT OF INSURANCE
CHAPTER 4-138. FINANCIAL EXAMINATIONS AND REQUIREMENTS
PART II. FINANCIAL REQUIREMENTS
Current with rules included in the March 9, 2007
issue of the Florida Administrative Weekly;
see scope for specific rules in effect.

**4-138.030. Assertion of Values of Items Received as Salvage on Paid or Unpaid Losses.(REPEALED)**

Specific Authority 624.308(1) FS. Law Implemented 625.012(12) FS. History--New 6-21-77, Formerly 4-42.02, 4-42.002, Amended 12-18-93, Repealed 5-12-94.

Rule 4-138.030, F.A.C., 4 FL ADC 4-138.030

4 FL ADC 4-138.030
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Illinois Administrative Code



## 1991
## Volume 17

Published by
**George H. Ryan**
**Secretary of State**

GOVERNMENT
EXHIBIT

9

Case 1:05-cv-11048-RCL    Document 75-10    Filed 09/04/2007    Page 2 of 3

TITLE 50:  INSURANCE
CHAPTER I:  DEPARTMENT OF INSURANCE
SUBCHAPTER 1:  PROVISIONS APPLICABLE TO ALL COMPANIES

PART 927
ANTICIPATED SALVAGE AND SUBROGATION RECOVERABLE

Section
927.10    Authority
927.20    Purpose and Scope
927.30    No Credit Permitted

AUTHORITY:  Implementing Section 136 and authorized by Section 401 of the Illinois Insurance Code (Ill. Rev. Stat. 1981, ch. 73, pars. 748 and 1013).

SOURCE:  Adopted at 5 Ill. Reg. 1034, effective January 14, 1981; codified at 7 Ill. Reg. 2362.

## Section 927.10  Authority

This Rule is promulgated by the Director of Insurance pursuant to authority contained in Section 401 of the Illinois Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 1013) which empowers the Director "... *to make reasonable rules and regulations as may be necessary to make effective* ..." insurance laws of the State of Illinois. This Rule implements particularly Section 136 of the Illinois Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 748).

## Section 927.20  Purpose and Scope

The purpose of this Rule is to continue uniformity in annual statements filed with the Director of Insurance pursuant to Section 136 of the Illinois Insurance Code as respects the treatment of salvage and subrogation recoverables.  This Rule applies to all domestic, foreign and alien companies authorized to transact business of insurance in the State of Illinois.

## Section 927.30  No Credit Permitted

Due to the difficulty in ascertaining the value of items received as salvage on losses and determining the amount which might be recoverable by subrogation on losses (whether paid or unpaid) insurance companies licensed to do business in this State shall not take credit in any annual statement or interim statement filed with the Director for salvage or subrogation recoveries until such recoveries have been reduced to cash or its equivalent.  Furthermore, past recoveries shall not be considered in the development of otherwise required reserves.

Westlaw.

50 IL ADC 927.30

50 Ill. Adm. Code 927.30

Ill. Admin. Code tit. 50, § 927.30

### WEST'S ILLINOIS ADMINISTRATIVE CODE
### TITLE 50 INSURANCE
### CHAPTER I. DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION
### SUBCHAPTER L: PROVISIONS APPLICABLE TO ALL COMPANIES
### PART 927. ANTICIPATED SALVAGE AND SUBROGATION RECOVERABLE
Current with amendments received through April 13, 2007.

927.30 No Credit Permitted

An insurance company licensed to do business in this State may take credit in any annual statement or interim statement filed with the Director for anticipated salvage and subrogation recoverable on paid or unpaid losses which has not been reduced to cash, provided the company's net reserves are adequate to meet all future claim obligations. Any credit taken under this Section shall be *in accordance with the annual statement instructions and the Accounting Practices and Procedures Manual adopted by the National Association of Insurance Commissioners* [215 ILCS 5/136 (1)] which permit the recording of reserves net of anticipated salvage and subrogation.

(Source: Amended at 17 Ill. Reg. 15834, effective September 14, 1993)

<General Materials (GM) - References, Annotations, or Tables>

50 ILAC § 927.30, 50 IL ADC 927.30

50 IL ADC 927.30
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4TH
FLOOR
KFI
3035
1992
.A28
11

1992
Edition

# INDIANA ADMINISTRATIVE CODE

**11**

Titles 680 to 832

GOVERNMENT
EXHIBIT

10

ion V(1) *[subsection
regulation until the
ached.*

*Reg 22,Sec V; filed
s and Regs. 1978, p.*

**ial reserves**

**16-10-1-6**

der that establishes
means other than
serves adequate to
expected litigation
ie claim submitted
ider. Such reserves
) days after a claim
of ' *-rance; Reg
7, ) pm: Rules*

**osits**

**6-10-1-6**

a health care pro-
ay be deposited in
i any bank located
nust be in a joint
the Commissioner
are provider. The
vithdraw accrued
*(Department of
led Jan 27, 1977,
3, p. 516)*

**into patients
sation fund;
surcharge
-9.5-4-1.1**

vider establishing
ieans other than
tie *ompensa-
to ... e hundred
of the premium
health care pro-

vider by the residual malpractice insurance
authority. The payment must be made each year
under IC 16-9.5-4-1 within 30 days after
qualification.

(b) The annual surcharge levied on all other
health care providers in Indiana shall be one
hundred twenty-five percent (125%) of the cost
to each health care provider for maintenance of
financial responsibility. *(Department of Insur-
ance; Reg 22, Sec VIII; filed Jan 27, 1977, 2:35
pm: Rules and Regs. 1978, p. 516; filed Mar 18,
1986, 10:41 am: 9 IR 2057, eff Apr 18, 1986;
filed May 28, 1987, 4:00 pm: 10 IR 2298)*

**760 IAC 1-21-9    Effective date of rule
(Repealed)**

Sec. 9. (Repealed by Department of Insurance;
filed May 28, 1987, 4:00 pm: 10 IR 2298)

**Rule 22.    Annual Statement—Subrogation
or Salvage Recovery Amounts**

Cited in: 760 IAC 1-22-1; 760 IAC 1-22-2.

760 IAC 1-22-1  Authority to promulgate rule
760 IAC 1-22-2  Purpose of rule
760 IAC 1-22-3  Reporting subrogation and salvage recov-
ery amounts

**760 IAC 1-22-1    Authority to promulgate
rule**
Authority: IC 27-1-3-7
Affected:  IC 27-1-20-21

Sec. 1. Authority. This regulation *[760 IAC
1-22]* is promulgated under the authority of I.C.
27-1-3-7. *(Department of Insurance; Reg 23,Sec
I; filed Mar 22, 1977, 12:29 pm: Rules and Regs.
1978, p. 518)*

**760 IAC 1-22-2    Purpose of rule**
Authority: IC 27-1-3-7
Affected:  IC 27-1-20-21

Sec. 2. Purpose. This regulation *[760 IAC
1-22]* is promulgated for the purposes of:

(1) To make official and formalize the existing
Insurance Department policy of not permit-
ting a credit to be taken in annual statements

and other reports concerning "Losses Paid",
estimated or anticipated subrogation, or sal-
vage recoveries, or both, until such recoveries
have been reduced to cash or its equivalent.

(2) To comply with United States Treasury
Department's Regulation Section 1.832-4(c)
(26 CFR §1.832-4(c)) and United States Inter-
nal Revenue Service's Revenue Procedure
75-56 issued December 29, 1975 (1975-2 Cum.
Bull. 596), and thereby removing an inequity
existing among insurance companies related
to a deduction for "Losses Paid" or "Claims
Paid" or an equivalent thereof for Federal
income tax liability purposes.

*(Department of Insurance; Reg 23,Sec II; filed
Mar 22, 1977, 12:29 pm: Rules and Regs. 1978,
p. 518)*

**760 IAC 1-22-3    Reporting subrogation
and salvage recovery
amounts**
Authority: IC 27-1-3-7
Affected:  IC 27-1-20-21

Sec. 3. Reporting of Subrogation or Salvage
Recovery Amounts, or Both. In any statement
which makes provision for the amount of losses
or claims, whether paid or unpaid, or an equiva-
lent therefor, such amount shall not be reduced
by, nor shall there be deducted therefrom, any
estimated or anticipated subrogation or salvage
recoveries, or both, until such recoveries have
been reduced to cash or its equivalent. Salvage
or subrogation recoveries reduced to cash or its
equivalent may be accounted for as an offset to
or reduction of the losses or claims paid amount,
or its equivalent, in any statement. *(Department
of Insurance; Reg 23,Sec III; filed Mar 22, 1977,
12:29 pm: Rules and Regs. 1978, p. 518)*

**Rule 23.    Accident and Sickness Insurance-
Claim Forms**

Cited in: 760 IAC 1-23-1.

760 IAC 1-23-1  Authority to promulgate rule; effective
date
760 IAC 1-23-2  Approved forms

Westlaw.

IN ADC T. 760, Art. 1, R.                                                    Page 1

IAC T. 760, Art. 1, R. 22, Repealed
Ind. Admin. Code T. 760, Art. 1, R. 22, Repealed

**INDIANA ADMINISTRATIVE CODE**
**TITLE 760. DEPARTMENT OF INSURANCE**
**ARTICLE 1. GENERAL PROVISIONS**
**RULE 22. ANNUAL STATEMENT--SUBROGATION OR SALVAGE RECOVERY AMOUNTS--REPEALED**
Current with amendments received through the Indiana Weekly Collection,
dated April 11, 2007.

**CREDIT(S)**

History: Repealed by Department of Insurance; filed Mar 26, 1993, 5:00 p.m.: 16
IR 1949

 IN ADC T. 760, Art. 1, R. 22, Repealed
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GOVERNMENT
EXHIBIT

11

## Title 4—DEPARTMENT OF CONSUMER AFFAIRS, REGULATION AND LICENSING
### Division 190—Division of Insurance
### Chapter 11—Chief Examiner

**4 CSR 190-11.010 Subordinated Indebtedness: Reporting, Accounting, and Approval Required**

*PURPOSE: This regulation specifies information which must be submitted to the director for prior approval of "subordinated indebtedness" agreements, the form, the consideration for "such" agreements must take and the accounting procedures to be followed. This regulation was adopted pursuant to the provisions of section 374.045 RSMo (1969), and to implement sections 375.535 and 375.540 RSMo (1969).*

(1) Application: This regulation applies to all insurance companies and reciprocal inter-insurance exchanges doing business in this state, and is applicable to any and all debts other than those shown as a legal liability of the company.

(2) Definition, Subordinated Indebtedness (Surplus Notes): "Subordinated indebtedness" for the purposes of this regulation includes any contingent obligation for the repayment of a sum of money upon a written agreement that the loan or advance with interest shall be repaid only out of surplus profits of the company in excess of the minimum surplus as required by Missouri law and as shall be deemed necessary by the director of insurance to secure the interests of the policyholders and creditors of such company.

(3) Approval by the Director
  (A) The following shall be submitted to the director of insurance for approval:
    1. duplicate copies of the entire indebtedness agreement.
    2. certified copy of the resolution of the board of directors of proper company body or committee which is empowered to authorize such agreements. The resolution shall stipulate the maximum amount of subordinated indebtedness authorized and the purpose for which it is to incurred. It shall also limit the application of the proceeds to the specific purpose for which such indebtedness is incurred.
  (B) After submission of the documents and approval thereof, the director may authorize the execution of the indebtedness agreement. All agreements shall be executed and the consideration received immediately after such approval.

(4) Consideration: The consideration tendered to the company in exchange for the agreement shall be lawful money or such other consideration as may be acceptable to and approved by the director.

(5) Reporting and Accounting of Indebtedness
  (A) The director shall be notified immediately in writing upon the execution of any such agreement as to the amount thereof and to whom payable.
  (B) Any existing subordinated indebtedness incurred prior to the effective date of this rule shall also be immediately reported in writing to the director.
  (C) All outstanding subordinated indebtedness and interest accruing thereon shall be reported at face value in the annual statement on page 3 and in other financial statements of the company as a special surplus account.

(6) Approval of Repayment by Director: Repayment of principal or payment of interest may be made only with the approval of the director when he is satisfied that the financial condition of the company warrants such action.

(7) Other Loans: Nothing in this section shall be construed to mean that a company may not otherwise borrow money, but the amount so borrowed with accrued interest thereon shall be carried by the company as a liability.

*Auth: sections 374.045, 375.535 and 375.540 RSMo (1969). Original rule filed June 12, 1970, effective July 1, 1970. Amended: Filed Aug. 5, 1974, effective Aug. 15, 1974.*

**4 CSR 190-11.020 Salvage and Subrogation Recovered as Offset to Losses**

*PURPOSE: This regulation describes the accounting procedure required by Missouri insurance law for salvage and subrogation recoveries by insurers. This regulation was adopted pursuant to the provisions of section 374.045 RSMo (1969) and to implement section 379.105 RSMo (1969).*

(1) Salvage and subrogation recovered as offset to

TOTAL P.83

## 4 CSR 190-11—CONSUMER AFFAIRS

losses: Insurance companies incorporated under the laws of this state shall not take credit in any annual statement filed with this division for salvage or subrogation recoveries until such recoveries shall have been reduced to cash or its equivalent. Salvage or subrogation recoveries reduced to cash or its equivalent shall be accounted for as an offset to losses paid, in accordance with standard insurance accounting practices.

*Auth: sections 374.045 and 379.105 RSMo (1969). Original rule filed Dec. 23, 1975, effective Jan. 2, 1976.*

### 4 CSR 190-11.030 Exchange-Traded Call Options

*PURPOSE: This regulation describes required procedures by which insurance companies may enter into certain transactions in exchange-traded call options. This regulation was adopted pursuant to the provisions of section 374.045 RSMo (1969) and to implement sections 376.305 RSMo (Supp. 1973), 376.307 RSMo (1969) and 379.080 RSMo (1969).*

(1) Definitions. For the purposes of this regulation:

(A) "Call option" means an option contract under which the holder of the option has the right, in accordance with the terms of the option to purchase the number of shares of the underlying stock covered by the option contract.

(B) "Exchange" means a national securities exchange registered under the Securities Exchange Act of 1934 which has been authorized to provide a market for option contracts pursuant to Rule 19b-4 under the Securities Exchange Act of 1934, as amended.

(C) "Exchange traded" means traded on the floor of an exchange.

(D) "Stock" means stock owned by a domestic insurance company which was acquired pursuant to the provisions of sections 376.305, RSMo (Supp. 1975), 376.307, RSMo (1969) or 379.080, RSMo (1969).

(E) "Underlying stock" means the stock subject to being purchased upon the exercise of a call option.

(F) "Exercise price" means the price per unit at which the holder of an option may purchase the underlying stock upon exercise.

(G) "Escrow receipt" means an escrow receipt issued to the options clearing corporation and a clearing member thereof with respect to escrowed stock

held on deposit by a bank or other custodian approved by the options clearing corporation for that purpose.

(H) "Escrowed stock" means stock with respect to which an escrow receipt has been issued.

(I) "Closing purchase transaction" means the purchase, on an exchange but not otherwise of an exchange-traded call option or options, the effect of which is to reduce or terminate the obligations of a call option seller with respect to an identical option or options.

(J) "Closing sale transaction" means the sale, on an exchange but not otherwise, of an exchange-traded call option or options, the effect of which is to liquidate, in whole or in part, the holding of an unexercised and unexpired identical call option or options.

(2) Sale of Exchange-Traded Call Options. Any domestic insurance company can sell, on an exchange but not otherwise, exchange-traded call options solely with respect to stock which it owns, but cannot sell any other exchange-traded call options. Any domestic insurance company selling such an option shall enter into a custodial or escrow agreement which provides that its escrowed stock shall be kept segregated by the bank or other custodian from other stock or other securities owned by the company, and from stock or other securities owned by others, which are deposited with the same bank or other custodian, and must obtain and retain in its possession a copy of an escrow receipt identifying with particularity the escrowed stock.

(3) Closing Purchase Transactions. Any domestic insurance company can engage in and effectuate closing purchase transactions.

(4) Other Purchases of Exchange-Traded Call Options. Any domestic life insurance company (but no other domestic insurance company), pursuant to and subject to the limitations of section 376.307, RSMo (1969), also can purchase exchange-traded call options, on an exchange but not otherwise, in other than closing purchase transactions; provided, that no domestic life insurance company shall purchase any such option, if after such purchase the aggregate of the exercise prices of all unexpired and unexercised such options owned by such company would exceed twenty-five percent (25%) of the lesser of ten percent (10%) of the admitted assets of such company or its capital and surplus, as such assets, capi-

(12/78) ©1978 James C. Kirkpatrick

APR-03-2007 12:23    P.03/03

Westlaw.

4 MO ADC 190-11.020

4 Mo. Code of State Regulations 190-11.020

### MISSOURI CODE OF STATE REGULATIONS
### TITLE 4 - DEPARTMENT OF ECONOMIC DEVELOPMENT
### DIVISION 190 - DIVISION OF INSURANCE
### CHAPTER 11 - CHIEF EXAMINER

The Missouri Administrative Code titles are current through February 28, 2007.

4 CSR 190-11.020 Salvage and Subrogation Recovered as Offset to Losses

(Moved to 20 CSR 200-1.080)
4 Mo. Code of State Regulations 190-11.020, 4 MO ADC 190-11.020

4 MO ADC 190-11.020
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

20 MO ADC 200-1.080

20 Mo. Code of State Regulations 200-1.080

**MISSOURI CODE OF STATE REGULATIONS**
**TITLE 20 - DEPARTMENT OF INSURANCE**
**DIVISION 200 - FINANCIAL EXAMINATION**
**CHAPTER 1 - FINANCIAL SOLVENCY AND ACCOUNTING STANDARDS**
Copr. (C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Current with amendments included in the Missouri Register,
Volume 32, Number 7, dated April 2, 2007.

20 CSR 200-1.080 Salvage and Subrogation Recovered

**CREDIT(S)**

AUTHORITY: sections 374.045 and 379.105, RSMo 1986. This rule was previously filed
as 4 CSR 190-11.020. Original rule filed Dec. 23, 1975, effective Jan. 2, 1976.
Rescinded: Filed Aug. 4, 1992, effective May 6, 1993.

20 Mo. Code of State Regulations 200-1.080, 20 MO ADC 200-1.080

20 MO ADC 200-1.080
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# OHIO ADMINISTRATIVE CODE Approved Edition



Rules of the Administrative Agencies
of the State of Ohio

## Volume Nine

**BANKS-BALDWIN LAW PUBLISHING COMPANY**
*A West Publishing Affiliated Company*

Oldest Law Publishing Company in America—Established 1804

OAC Unit 42

GOVERNMENT
EXHIBIT

12

STATE OF OHIO
Legislative Service Commission
Office of the Director

Pursuant to the authority vested in me by division (A) of section 103.05 of the Revised Code, I, Robert M. Shapiro, Director of the Ohio Legislative Service Commission, hereby certify this to be an Approved Edition of the Ohio Administrative Code, meeting the specifications of division (B) of section 103.05 of the Revised Code.

This Approved Edition adheres to the official numbering and codification system prescribed by this office. It is a compilation of the rules of all agencies filing rules under sections 111.15, 119.04, 4141.14, or 5703.14 of the Revised Code.

*Robert M. Shapiro*

Robert M. Shapiro, Director
Legislative Service Commission

Cite by title, rule number, and year
e.g. OHIO ADMINISTRATIVE CODE,
173:1-1-02, 1993

Copyright 1977, 1978, 1979, 1981, 1982, 1983, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992 by Banks-Baldwin Law Publishing Company.

Copyright 1993 by Banks-Baldwin Law Publishing Company, a West Publishing Affiliated Company. All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photo-copying, recording, or by any information storage and retrieval system, without prior permission in writing from the publisher.

ISBN 0-8322-0018-2 (18-vol. set)
ISBN 0-8322-0476-5 (Vol. 9)

said file for a period of either four years or until the filing of the next regular report on examination of the insurer, whichever is the longer period of time.

(2) Certificate of compliance

Each insurer required to file an annual statement which is now or which hereafter becomes subject to the provisions of this rule shall file with this department with its annual statement a certificate of compliance executed by an authorized officer of the insurer wherein it is stated that to the best of his knowledge, information and belief the advertisements which were disseminated by the insurer during the preceding statement year complied or were made to comply in all respects with the provisions of this rule and the insurance laws of this state as implemented and interpreted by this rule.

(R) Severability provision

If any paragraph or portion of a paragraph of this rule, or the applicability thereof to any person or circumstance is held invalid by a court, the remainder of the rule, or the applicability of such provision to other persons or circumstances, shall not be affected thereby.

(S) Existing rule superseded

This rule supersedes existing department of insurance rule 3901-1-16 of the Administrative Code.

(T) Effective date

This rule shall take effect on July 27, 1986.

HISTORY: Eff. 7-27-86 (1986-87 OMR 44)
Prior IN-23-01

### CROSS REFERENCES

RC Ch 3923, Sickness and Accident Insurance

### 3901-1-17 Recoveries from salvage or subrogation

(A) *Purpose*

This Rule is issued by the Superintendent of Insurance pursuant to Section 3901.041 of the Ohio Revised Code, which empowers the Superintendent "... to adopt, amend, and rescind rules and made adjudications necessary to discharge his duties and exercise his powers ..." under various sections of the Ohio Revised Code, subject to Sections 119.01 to 119.13, inclusive, of the Ohio Revised Code. This Rule regulates the treatment of salvage recoveries by insurance companies in any statement of condition filed with this Department.

(B) *Treatment of Salvage Recoveries*

Because of the difficulty of ascertaining the value of items received as salvage on losses whether paid or unpaid, insurance companies incorporated under the laws of the State of Ohio and foreign and alien companies licensed to do business in Ohio shall not take credit in any annual statement of condition or in any interim statement of condition filed with this Department for salvage recoveries until such recoveries shall have been reduced to cash or its equivalent. Salvage reduced to cash shall be accounted for as an offset to losses paid in accordance with existing practices. The term "Salvage" shall include "Subrogation".

(C) *Effective Date*

This Rule shall take effect on the 31st day of December, 1973.

HISTORY: Prior IN-25-01

### CROSS REFERENCES

RC 3901.041, Rule-making and adjudicating powers of the superintendent

### 3901-1-18 Ohio fair plan; plan of operation

(A) Purpose. The "Ohio Fair Plan Underwriting Association" has been formulated for the purpose of making basic property and homeowners insurance coverage, as identified in section 3929.42 of the Revised Code, available for qualified property owned by persons who have been unable to secure such insurance in the normal insurance market. This plan of operation is adopted pursuant to seetion 3929.43 of the Revised Code, and implements sections 3929.41 to 3929.49 of the Revised Code.

(B) Definitions.

(1) "Association" means the "Ohio Fair Plan Underwriting Association" created under section 3929.43 of the Revised Code.

(2) "Basic property insurance" means insurance against direct loss to property as defined and limited in standard fire policies and extended coverage endorsements thereon, as approved by the superintendent, and insurance for such types, classes and locations of property against the perils of vandalism, malicious mischief, burglary, or theft, as the superintendent shall designate. Pursuant to the designation made by the superintendent on September 30, 1985, under authority of division (A) of section 3929.42 of the Revised Code, the association is authorized to provide insurance against the perils of burglary, robbery, and theft for properties which are currently covered or eligible for coverage under the federal crime insurance program under FEMA forms 81-11 (April 1986) and 81-13 (April 1986) as administered by the federal insurance administrator prior to July 1, 1987. Such coverage is to be provided by separate policies. Basic property insurance does not include automobile insurance or insurance on manufacturing risks.

(3) "Environmental hazard" means any hazardous condition that might give rise to loss under an insurance contract, but which is beyond the control of the property owner.

(4) "Insurable risks" means property that meets the reasonable underwriting standards of the association.

(5) "Underwriting standards" means the underwriting standards for basic property insurance and homeowners insurance which have been filed with the superintendent.

(6) "Homeowners insurance" means insurance on owner-occupied dwellings providing personal multi-peril property and liability coverages, commonly known as homeowners insurance, subject to underwriting standards, exclusions, deductibles, rates and conditions as are customarily used by member insurers for similar coverages.

(7) "Location" means real and personal property consisting of and contained in a single building or in contiguous buildings under one ownership.

(8) "Urban area" means the state of Ohio having been so designated by the superintendent.

(9) "Superintendent" means the superintendent of insurance of the state of Ohio.

(10) "Member insurer" means an insurance company required to be a member of the association by section 3929.43 of the Revised Code.

(11) "Licensed agent" means any person licensed by the superintendent pursuant to section 3905.01 of the Revised Code.

(12) "Board" means ation authorized pur vised Code.

(13) "Applicant" me ce from the associati ated by the applicant an inspection.

(C) Notice of cancell shall provide writte wal for any risk eligib on, (except for non-p endiarism, or misre ays prior to cancellatic plain to the insured t on to the association ply to binders of thir

(D) Insurance agents

(1) Upon request, a l property in completir e association.

(2) No licensed agent more member insure lf out as an agent of th bind any risk for the

(E) Maximum liabili

(1) The maximum l surance and homeow te association is one i rs. The maximum lin asurance is ten thousa ability for commercial ollars.

(2) The association alicious mischief cove tended coverage.

(3) The association nce insurance covera ctions 3929.50 to 39 rovided for in the pla ence Insurance Under

(4) The association nce coverage for auton

(F) Inspections.

(1) Any person hav angible personal prop Ohio, who has been un nce or homeowners in: ation to the associatio n inspection bureau nproved by the super made only of property 1 ligibility for fair plan free of charge to the ap may be made by the o nsurer, or a licensed a

(2) All inspection r contain the informatio rule.

(3) The inspection ( ion submitted to the a

(a) Class-rated pro inspection bureau. The new applicant and arra during the inspection. ommend corrections o

Westlaw.

OAC 3901-1-17
Ohio Admin. Code § 3901-1-17

**BALDWIN'S OHIO ADMINISTRATIVE CODE**
**3901. DEPARTMENT OF INSURANCE**
**CHAPTER 3901-1. GENERAL PROVISIONS**
Current with updates available as of March 25, 2007.

**3901-1-17. Recoveries from salvage or subrogation--Repealed**

**CREDIT(S)**

HISTORY: 1996-97 OMR 2239 (R), eff. 6-1-97; Prior IN-25-01
         CHAPTER 3901-1. GENERAL PROVISIONS -- General Materials

OH ADC 3901-1-17
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Published under authority of the Secretary of State


GEORGETOWN UNIVERSITY LAW LIBRARY
3 0700 00383621 9

OFFICIAL

# Texas Administrative Code

Title 28 | Insurance

[Replaces 1988 Pamphlet and 1992–93 Supplement]

OFFICIAL

# Texas Administrative Code

## Title 28

## Insurance

---

[Replaces 1988 Pamphlet
and 1992–93 Supplement]

---

Amendments effective through
October 1, 1992



Published by
West Publishing Co.
St. Paul, Minn.

under authority of the Texas Secretary of State

**28 TAC § 7.17**                    **TEXAS DEPARTMENT OF INSURANCE**                    **CORPORATE ANI**

treat the matter of the policyholder's signa-
ture being required in order to qualify a pre-
mium note as an admissible asset, it appears
that a number of companies erroneously in-
terpreted that order as a rescission of the
board order of February 9, 1956, wherein the
board specifically established that the policy-
holder's signature must appear on the note for
it to qualify as an admissible asset. Since it
appears that those companies followed such
interpretation in good faith, notwithstanding
the general dissemination of Memo 45-ED-11,
the commissioner has authorized that premi-
um notes and other memoranda or evidences
of premiums payable accepted by a company
in good faith in connection with the issuance
of the company's own policies after the effec-
tive date of Commissioner's Order 860 and
before the effective date of Commissioner's
Order 2832 (i.e., calendar year 1958) shall not
be not-admitted as an asset solely because of
the absence of the signature of the policyhold-
er.

(B) Under date of October 21, 1958, the
commissioner issued his Order 2832 which
revokes his Order 860 dated December 31,
1957, effective January 1, 1959. Accordingly,
Memo 45-ED-11, concerning premium notes,
is likewise ineffective on and after January 1,
59. A copy of the Commissioner's Order
2832 is available upon request and may be
obtained from the Corporate Custodian and
Tax Division, State Board of Insurance, 1110
San Jacinto Street, Austin, Texas 78786. The
order clearly sets out the treatment to be
accorded premium notes as to their admissi-
bility as assets in a company's balance sheet.

**Source:** The provisions of this §7.17 adopted to be effective
August 19, 1976, 1 TexReg 2214; amended to be effective Janu-
ary 17, 1984, 9 TexReg 279.

## § 7.18.  Salvage and Subrogation

(a) Insurance companies incorporated under
the laws of this state and foreign and alien compa-
nies licensed to do business in this state shall not
take credit against any open claim or loss reserve
nor as an admitted asset in any annual statement
or interim statement filed with this department
for salvage or subrogation recoveries until such
recoveries shall have been reduced to cash or to
an item which qualifies as an admitted asset un-
der the Insurance Code. The proceeds from the
sale of salvage and the recovery of subrogation

shall be accounted for as a reduction to losses
paid in accordance with existing practices.

(b) This section conforms to the National Asso-
ciation of Insurance Commissioners' instructions
on the annual statement blank form, which are
adopted annually under the Insurance Code, Arti-
cle 1.10(9).

**Source:** The provisions of this §7.18 adopted to be effective
August 19, 1976, 1 TexReg 2214; amended to be effective April 1,
1983, 8 TexReg 923.

## § 7.19.  Depreciation of Real Estate

Effective July 1, 1959, in reporting the values of
its real estate to the State Board of Insurance in
annual statements and other financial reports,
each insurer admitted to do business in Texas
shall, as a minimum, reflect normal depreciation
accrued for periods after June 30, 1959, computed
by a recognized accounting method selected by
the company, which shall include wear and tear,
deterioration, and normal obsolescence. This sec-
tion does not exclude from consideration the oth-
er factors enumerated in the Texas Insurance
Code, Article 1.15, 1951, as amended, bearing
upon the value of real estate.

**Source:** The provisions of this §7.19 adopted to be effective
February 20, 1976; amended to be effective April 1, 1983, 8
TexReg 923.

## § 7.20.  Premium Notes and Premium In-
come, Chapter 17 Companies

Any and all charges, by whatever name called,
made, imposed, and/or collected from an insured
and/or premium payor by a county mutual insur-
ance company, shall constitute taxable premiums
to the county mutual; except any interest or fi-
nance charge clearly identified in a premium note
or other evidence of premium payable shall not be
included as taxable premiums. The provisions of
this section shall not apply to any county mutual
insurance company whose business is devoted ex-
clusively to the writing of industrial fire insurance
policies covering dwellings, household goods, and
wearing apparel on a weekly, monthly, or quarter-
ly basis on a continuous premium payment plan.

**Source:** The provisions of this §7.20 adopted to be effective
January 1, 1976; amended to be effective January 13, 1983, 7
TexReg 4565.

## § 7.21.  Admitted Assets, the Texas Insurance
Code, Article 6.12, §5, and Article
8.07, §2

To be classified as an "admitted asset" of an
insurance company in accordance with the provi-

sions of the Texas
and 8.07, all electr
data processing sys
office equipment, f
saving devices here
for and used in con
insurance company
quirements.

(1) The total v
constitute less tha
ted assets of such

(2) The total v
exceed $2,000.

(3) All such pro
30, 1965, may b
market value by
ed that the comp
cash market val
value thus shown
a period not to e

(4) All such pr
August 30, 1965,
the cost of all su
in full over a peri
date of acquisitio

**Source:** The provision
April 20, 1983, 8 TexReg

## § 7.22.  Certific:
Paid,
Taxes
Catast
sociat:
Code,

(a) On or before
each year, the Texa
ance Association sh
Insurance the total
members and the t
the association du
year, which certific
of the total amour
preceding calendar
in which the losses
aggregate amount
claims paid on los
single calendar ye
association shall li
excess of $100 milli
individual insurer.
ing the amount a
member insurer of
two or more indivi



Published under authority of the Secretary of State



GEORGETOWN UNIVERSITY LAW LIBRARY

3 0700 00383621 9

OFFICIAL

# Texas Administrative Code

Title 28 | Insurance

[Replaces 1988 Pamphlet and 1992–93 Supplement]

GOVERNMENT EXHIBIT

13

OFFICIAL

# Texas Administrative Code

## Title 28
## Insurance

---

[Replaces 1988 Pamphlet
and 1992–93 Supplement]

---

Amendments effective through
October 1, 1992



**Published by
West Publishing Co.
St. Paul, Minn.**

under authority of the Texas Secretary of State

28 TAC § 7.17 | TEXAS DEPARTMENT OF INSURANCE | CORPORATE ANI

treat the matter of the policyholder's signa-
re being required in order to qualify a pre-
..ium note as an admissible asset, it appears
that a number of companies erroneously in-
terpreted that order as a rescission of the
board order of February 9, 1956, wherein the
board specifically established that the policy-
holder's signature must appear on the note for
it to qualify as an admissible asset. Since it
appears that those companies followed such
interpretation in good faith, notwithstanding
the general dissemination of Memo 45-ED-11,
the commissioner has authorized that premi-
um notes and other memoranda or evidences
of premiums payable accepted by a company
in good faith in connection with the issuance
of the company's own policies after the effec-
tive date of Commissioner's Order 860 and
before the effective date of Commissioner's
Order 2832 (i.e., calendar year 1958) shall not
be not-admitted as an asset solely because of
the absence of the signature of the policyhold-
er.

(B) Under date of October 21, 1958, the
commissioner issued his Order 2832 which
revokes his Order 860 dated December 31,
1957, effective January 1, 1959. Accordingly,
Memo 45-ED-11, concerning premium notes,
·s likewise ineffective on and after January 1,
)59. A copy of the Commissioner's Order
∠832 is available upon request and may be
obtained from the Corporate Custodian and
Tax Division, State Board of Insurance, 1110
San Jacinto Street, Austin, Texas 78786. The
order clearly sets out the treatment to be
accorded premium notes as to their admissi-
bility as assets in a company's balance sheet.

Source: The provisions of this §7.17 adopted to be effective
August 19, 1976, 1 TexReg 2214; amended to be effective Janu-
ary 17, 1984, 9 TexReg 279.

## § 7.18.  Salvage and Subrogation

(a) Insurance companies incorporated under
the laws of this state and foreign and alien compa-
nies licensed to do business in this state shall not
take credit against any open claim or loss reserve
nor as an admitted asset in any annual statement
or interim statement filed with this department
for salvage or subrogation recoveries until such
recoveries shall have been reduced to cash or to
an item which qualifies as an admitted asset un-
der the Insurance Code. The proceeds from the
sale of salvage and the recovery of subrogation

shall be accounted for as a reduction to losses
paid in accordance with existing practices.

(b) This section conforms to the National Asso-
ciation of Insurance Commissioners' instructions
on the annual statement blank form, which are
adopted annually under the Insurance Code, Arti-
cle 1.10(9).

Source: The provisions of this §7.18 adopted to be effective
August 19, 1976, 1 TexReg 2214; amended to be effective April 1,
1983, 8 TexReg 923.

## § 7.19.  Depreciation of Real Estate

Effective July 1, 1959, in reporting the values of
its real estate to the State Board of Insurance in
annual statements and other financial reports,
each insurer admitted to do business in Texas
shall, as a minimum, reflect normal depreciation
accrued for periods after June 30, 1959, computed
by a recognized accounting method selected by
the company, which shall include wear and tear,
deterioration, and normal obsolescence. This sec-
tion does not exclude from consideration the oth-
er factors enumerated in the Texas Insurance
Code, Article 1.15, 1951, as amended, bearing
upon the value of real estate.

Source: The provisions of this §7.19 adopted to be effective
February 20, 1976; amended to be effective April 1, 1983, 8
TexReg 923.

## § 7.20.  Premium Notes and Premium In-
come, Chapter 17 Companies

Any and all charges, by whatever name called,
made, imposed, and/or collected from an insured
and/or premium payor by a county mutual insur-
ance company, shall constitute taxable premiums
to the county mutual; except any interest or fi-
nance charge clearly identified in a premium note
or other evidence of premium payable shall not be
included as taxable premiums. The provisions of
this section shall not apply to any county mutual
insurance company whose business is devoted ex-
clusively to the writing of industrial fire insurance
policies covering dwellings, household goods, and
wearing apparel on a weekly, monthly, or quarter-
ly basis on a continuous premium payment plan.

Source: The provisions of this §7.20 adopted to be effective
January 1, 1976; amended to be effective January 13, 1983, 7
TexReg 4565.

## § 7.21.  Admitted Assets, the Texas Insurance
Code, Article 6.12, §5, and Article
8.07, §2

To be classified as an "admitted asset" of an
insurance company in accordance with the provi-

sions of the Texas
and 8.07, all electi
data processing sys
office equipment, f
saving devices here
for and used in con
insurance company
quirements.

(1) The total va
constitute less tha
ted assets of such

(2) The total va
exceed $2,000.

(3) All such pro
30, 1965, may l
market value by
ed that the comp
cash market valι
value thus shown
a period not to e

(4) All such pι
August 30, 1965,
the cost of all su
in full over a peri
date of acquisitio

Source: The provisions
April 20, 1983, 8 TexReg

## § 7.22.  Certifica
Paid,
Taxes
Catast
sociati
Code,

(a) On or before
each year, the Texa
ance Association sh
Insurance the total
members and the tι
the association du
year, which certific
of the total amour
preceding calendar
in which the losses
aggregate amount
claims paid on los
single calendar ye:
association shall li
excess of $100 milli
individual insurer.
ing the amount at
member insurer of
two or more indivi

# ADMINISTRATIVE PROCEDURES ACT

# MISCELLANEOUS HISTORIC RULES

**NOTE**: These rules predate the APA database and numbering system.

Entitled:

## BISHCA:  Regulations 76-2; Salvage and Subrogation.

**YEAR:  11/15/1976**

**BOX   MHR-9**

**FOLDER   MHR9-85**

Note:

GOVERNMENT
EXHIBIT

14

25



**STATE OF VERMONT**
**DEPARTMENT OF BANKING AND INSURANCE**
**MONTPELIER 05602**
TEL. 802-828-3301

**DIVISIONS OF:**
**BANKING**
**INSURANCE**
**SECURITIES**

## REGULATION 76-2

### SALVAGE AND SUBROGATION

Section 1.    Authority.

This rule is promulgated pursuant to 8 V.S.A., §§ 75 and 3561.

Section 2.    Purpose.

8 V.S.A., § 3561 requires that every insurance company doing business in this State file an annual statement, under oath, in the form of the annual statement as currently in general and customary use in the United States.  The Annual Convention Blank form adopted by The National Association of Insurance Commissioners, which is, pursuant to 8 V.S.A., § 3561, furnished to this Department, provides in the instructions for completion of the form, that a company is to make no deductions for anticipated salvage or subrogation.  The following rule is hereby adopted in order to reaffirm this Department's long-standing express position regarding the treatment of salvage and subrogation.

Section 3.    Salvage and Subrogation Recoveries.

Due to the difficulty of estimating the value of items which may be recovered as salvage or subrogation on paid losses, insurance companies incorporated under the laws of this State and foreign and alien companies licensed to do business in this State shall not take credit in any annual statement or interim statement filed with this Department for salvage or subrogation recoveries until such recoveries shall have been reduced to cash or its equivalent.  Salvage or Subrogation recoveries reduced to cash or its equivalent shall be accounted for as an offset to losses paid, in accordance with existing practices.

Section 4.    Effective Date.

This rule shall take effect on November 15, 1976.

JEAN B. BALDWIN
DEPUTY COMMISSIONER OF INSURANCE

25



## VERMONT DEPARTMENT OF BANKING AND INSURANCE

## REGULATION 76-2

### SALVAGE AND SUBROGATION

**Section 1.   Authority**

This rule is promulgated pursuant to 8 V.S.A. §§ 75 and 3561.

**Section 2.   Purpose**

8 V.S.A. § 3561 requires that every insurance company doing business in this State file an annual statement, under oath, in the form of the annual statement as currently in general and customary use in the United States. The Annual Convention Blank form adopted by The National Association of Insurance Commissioners, which is, pursuant to 8 V.S.A. § 3561, furnished to this Department, provides in the instructions for completion of the form, that a company is to make no deductions for anticipated salvage or subrogation. The following rule is hereby adopted in order to reaffirm this Department's long-standing express position regarding the treatment of salvage and subrogation.

**Section 3.   Salvage and Subrogation Recoveries.**

Due to the difficulty of estimating the value of items which may be recovered as salvage or subrogation on paid losses, insurance companies incorporated under the laws of this State and foreign and alien companies licensed to do business in this State shall not take credit in any annual statement or interim statement filed with this Department for salvage or subrogation recoveries until such recoveries shall have been reduced to cash or its equivalent. Salvage or subrogation recoveries reduced to cash or its equivalent, shall be accounted for as an offset to losses paid, in accordance with existing practices.

**Section 4.   Effective Date.**

This rule shall take effect on November 15, 1976.

Jean B. Baldwin
Deputy Commissioner of Insurance

GEORGETOWN UNIVERSITY
3 0700 00153 8841

# 1989
# WASHINGTON ADMINISTRATIVE CODE



THE SEAL OF THE STATE OF WASHINGTON 1889

## AGENCY RULES

# Volume 5

**Title**

| | |
|---|---|
| 275 | Social and Health Services—Institutions, Div. of |
| 284 | Insurance Commissioner |
| 286 | Interagency Comm. for Outdoor Recreation |
| 287 | Investment Board, St. |
| 289 | Corrections Standards Bd. |
| 290 | Judicial Retirement Board |
| 296 | Labor & Industries |

**Chapters**

| | |
|---|---|
| -04 | Internal Rules—State Appren. & Trng. Cncl. |
| -06 | Public Records |
| -07 | SEPA Guidelines |
| -08 | Practice & Procedure |
| -09 | P&P—Boiler Rules |
| -10 | P&P—Indus. Welf. Comm. |
| -11 | P&P—Pilotage Comm'rs |
| -13 | P&P—Elec. Adv'y & Exam. Board |
| -14 | Indus. Insurance |
| -15 | Work. Comp. Self-Insurance |
| -15A | Industrial Ins. Discrimination |
| -16 | Reemployment Incentives |
| -17 | Rating System—Work. Comp. |
| -18A | Rehabilitation Review |
| -20 | Medical Aid Rules |
| -21 | Medical Fees |
| -22 | Surgical Fees |
| -23 | Radiology, etc. |
| -23A | Hospitals |
| -24 | General Safety & Health Stds. |

HIST
CORE
KFW
55
A23
.80
v.5
1989

*Published by The Statute Law Committee under authority of Chapter 34.05 RCW*

GOVERNMENT EXHIBIT
15

(2) The financial condition of the proposed insurer as reported in its annual statement as of the end of the calendar year next preceding;

(3) The number of years the company has been writing the specific class of insurance;

(4) The reinsurance agreements backing up the class of coverage or the company;

(5) Written acknowledgement signed by the proposed insured to the effect that the insured is informed that the coverage is to be issued by an insurer (or insurers) which is not an authorized insurer in the state of Washington, that financial requirements for surplus line insurers otherwise applicable have been waived by all parties concerned to enable this coverage to be obtained, and that there is no protection under the Washington Insurance Guaranty Association;

(6) For jumbo accounts requiring a multiplicity of insurers, the commissioner may, in lieu of the requirements in subsections (2), (3), and (4) of this section, accept certification from an experienced surplus lines broker that the broker has investigated the financial condition of the prospective insurers and is satisfied that they are capable of underwriting the attendant risks. Records and documents supporting the broker's certification must be maintained by the broker for the life of the policies and as long thereafter as a claim may be litigated, but in no case less than five years.

[Statutory Authority: RCW 48.02.060. 89–03–060 (Order R 89–2), § 284–15–050, filed 1/17/89; 81–03–082 (Order R 81–1), § 284–15–050, filed 1/21/81.]

## Chapter 284–16 WAC
## INSURERS

**WAC**
284–16–030    Title insurers—Defining "complete set of tract indexes."
284–16–050    Accounting for salvage and subrogation recoveries, annual statement.
284–16–060    Disability insurance—Minimum reserve standards.
284–16–100    Investments—Encumbrance—Interpretation of RCW 48.13.130.
284–16–110    F.H.A. mortgage loans and investments.
284–16–150    Purpose.
284–16–160    Definitions.
284–16–170    Usual valuation of stock of a subsidiary.
284–16–180    Other methods of valuing stock of a subsidiary.
284–16–190    Limitation on values.
284–16–200    Additional provisions.
284–16–210    Adjustment procedure.
284–16–220    Cumulative limitations.

**DISPOSITION OF SECTIONS FORMERLY CODIFIED IN THIS CHAPTER**

284–16–010    Health care services—Certificates of registration. [Rule made 5/25/55, filed with code reviser 3/22/60.] Repealed by Order R–68–2, filed 5/1/68.

**WAC 284–16–030  Title insurers—Defining "complete set of tract indexes."** (1) The phrase "a complete set of tract indexes," as used in RCW 48.29.020 and 48.29.040, is defined to mean a set of indexes from which the record ownership and condition of title to all land within the particular county can be traced and ascertained, such set of indexes to be complete from the inception of title from the United States of America.

(2) The basic component parts of such a set of indexes are:

(a) An index or indexes in which the reference is to geographic subdivisions of land, classified according to legal description (as distinguished from an index or indexes in which the reference is to the name of the title holder, commonly called a grantor–grantee index) wherein notations of or references to:

(i) All filed or recorded instruments affecting title to particularly described parcels of real property and which impart constructive notice under the recording laws; and

(ii) All judicial proceedings in the particular county affecting title to particularly described parcels of real property are posted, filed, entered or otherwise included in that part of the indexing system which designates the particular parcel of real property; provided, no reference need be made in such index to any judicial proceeding which is referred to or noted in the name index defined in subparagraph (b) below.

(b) A name index or indexes wherein notations of or references to all instruments, proceedings and other matters of record in the particular county which affect or may affect title to all real property (as distinguished from particularly described parcels of real property) of the person, partnership, corporation or other entity named therein and affected thereby, are posted, filed, entered or otherwise included in that part of the indexing system which designates that name.

(3) The indexes prescribed in numbered subsection (2) above, may be maintained in bound books, loose–leaf books, jackets or folders, on card files, or in any other form or system, whether manual, mechanical, electronic or otherwise; or in any combination of such forms or systems.

(4) The extent to which the prescribed indexes shall be sub–divided or defined is dependent upon all relevant circumstances. The population of the particular county, the extent to which land within the particular county has been subdivided and passed into separate ownerships, and all other factors which are reasonably related to the purpose of the statutory requirement, are entitled to consideration in such determination.

[Order 127, adopted 12/12/60, filed 12/14/60.]

**WAC 284–16–050  Accounting for salvage and subrogation recoveries, annual statement.** (1) Each authorized insurer is required to file with the commissioner an annual statement, pursuant to RCW 48.05.250, which statement shall be in general form and context as approved by the National Association of Insurance Commissioners (NAIC). The instructions for completing fire and casualty annual statement blanks, approved by the NAIC, provide that an insurer is to make no deductions for *anticipated* salvage or subrogation recoveries. Because of that and because of the difficulty in ascertaining the value of items received as salvage and in determining the amount which might be recovered by

subrogation, each insurer authorized to do business in this state shall comply with the following:

(a) It shall not take credit, in any annual statement or erim statement filed with the commissioner, for salvage or subrogation recoveries until such recoveries shall have been reduced to cash or its equivalent.

(b) It shall account for salvage or subrogation recoveries as an offset to losses paid when such recoveries are reduced to cash or its equivalent.

(2) This rule reaffirms the commissioner's longstanding express position regarding the treatment of salvage and subrogation.

[Order R-76-3, § 284-16-050, filed 7/26/76.]

**WAC 284-16-060  Disability insurance—Minimum reserve standards.** All insurers authorized to write disability insurance in the state of Washington shall use the recommendations in the report of the industry advisory committee adopted by the national association of insurance commissioners on December 2, 1964, as minimum reserve standards for individual accident and health policies issued on and after January 1, 1967, provided that any insurer may elect to establish and maintain said minimum reserve standards for such policies issued prior to January 1, 1967. In case of such noncancellable accident and health loss of time contracts subject to the provisions of RCW 48.12.060, all insurers authorized to write disability insurance in the state of Washington shall use the 1964 commissioner's disability table as a minimum reserve standard, provided that the aggregate the active and disabled life reserves according to said table is at least equal to the statutory minimum reserve.

[Order 282, filed 7/22/66.]

**WAC 284-16-100    Investments—Encumbrance—Interpretation of RCW 48.13.130.** With reference to RCW 48.13.130 entitled "Encumbrance" defined, it has recently come to my attention that there has been some difficulty in the application of this provision of the code with reference to restrictions and covenants, particularly the words "common to the community in which the property is located." It has been found that restrictions and covenants are different in tracts, plats, maps or other subdivisions of land in the same community. Pursuant to the authority vested in me in RCW 48.02.060, the following ruling is hereby made, interpreting RCW 48.13.130 as follows:

(1) The wording "common to the community in which the property is located" may be regarded as applying only to the tract, plat, map, or other subdivision of land in which the real property is located.

(2) Where any right of reversion is outstanding and where a specific waiver thereof is not obtainable, the lender may consider such right not to be an "encumbrance" under the code:

*Provided,* A title insurance company, authorized to transact such business within the state in which the real property involved is situated, shall specifically indemnify the lender against any loss or damage arising as a result of such right.

[Title 284 WAC—p 22]

[Rule made 5/15/53, filed 3/22/60.]

**Reviser's note:** Subsection (1) above is an interpretation of RCW 48.13.130 before it was revised by section 2, chapter 303, Laws of 1955. The old section contained the phrase "common to the community in which the property is located."

**WAC 284-16-110  F.H.A. mortgage loans and investments.** Whereas, under the provisions of the insurance code of the state of Washington which became effective as of October 1, 1947, certain limitations are placed upon the amount of money which may be loaned by domestic insurers upon the security of a mortgage upon real estate with relation to the value of such real estate, and which limitations should not be made applicable to mortgages which the federal housing administrator has insured or has made a commitment to insure, and Whereas, it is desirable that domestic insurers be able to continue to exercise the privilege of investing in or making loans upon such federal housing administration insured mortgages as was permissible under laws in force immediately prior to October 1, 1947; now therefore, it is hereby ordered:

(1) That until further order of the insurance commissioner, and pursuant to the provisions of RCW 48.13.250, consent is hereby given to domestic insurers, any other provision of the insurance code notwithstanding, to invest in or loan upon the security of real estate mortgages which the federal housing administrator has insured or has made a commitment to insure, and to make such other investments and loans, all as provided in RCW 39.60.010.

(2) That such investments or loans may be credited toward investments of minimum capital, surplus, or reserves as required by RCW 48.13.260.

[Order 1001, issued 10/2/47, filed 3/22/60.]

**WAC 284-16-150  Purpose.** The purpose of this regulation, WAC 284-16-150 through 284-16-220, is to implement RCW 48.12.180(3) by establishing rules for the valuation of stock of a subsidiary of an insurer.

[Order R 76-7, § 284-16-150, filed 11/30/76.]

**WAC 284-16-160  Definitions.** For purpose of this regulation: (1) The term "subsidiary" shall have the same meaning given it by RCW 48.31A.010;

(2) The term "book value" shall mean that value determined by dividing the amount of its capital and surplus as shown in its last annual statement or subsequent report of examination (excluding from surplus, reserves required by statute and any portion of surplus properly allocable to policyholders, rather than stockholders) less the value (par of redemption value, whichever is the greater) of all of its preferred stock, if any, outstanding, by the number of shares of its common stock issued and outstanding.

[Order R 76-7, § 284-16-160, filed 11/30/76.]

**WAC 284-16-170  Usual valuation of stock of a subsidiary.** The common stock of any subsidiary of an insurer may always be valued on the basis of the value of only such of the assets of such subsidiary as would

Westlaw.

WAC Ch. 284-16, Disp Table
Wash. Admin. Code Ch. 284-16, Disp Table

**WASHINGTON ADMINISTRATIVE CODE**
**TITLE 284. OFFICE OF THE INSURANCE COMMISSIONER**
**CHAPTER 284-16. INSURERS**
Current with amendments included in the Washington State Register,
Issue 07-07, dated April 4, 2007.

**DISPOSITION TABLE**

DISPOSITION OF SECTIONS FORMERLY CODIFIED IN THIS CHAPTER

284-16-010. Health care services--Certificates of registration. (Rule
made 5/25/55, filed with code reviser 3/22/60.) Repealed by Order R-68-2,
filed 5/1/68.

284-16-050. Accounting for salvage and subrogation recoveries, annual
statement. (Order R-76-3, § 284-16-050, filed 7/26/76.) Repealed by
92-22-075 (Order 92-11), filed 11/2/92, effective 12/3/92. Statutory
Authority: RCW 48.02.060.

284-16-060. Disability insurance--Minimum reserve standards. (Order 282,
filed 7/22/66.) Repealed by 92-19-038 (Order R 92-8), filed 9/9/92,
effective 10/10/92. Statutory Authority: RCW 48.02.060.

WA ADC Ch. 284-16, Disp Table
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Kansas
# Administrative
# Regulations



Containing All of the Regulations of
Agencies 33 Through 80
Approved For Printing by the
State Rules and Regulations Board

Compiled by the Office of the Secretary of State of Kansas
Bill Graves, Secretary of State

Under Authority of K.S.A. 77-415 et. seq.

ASTRA PER ASPERA

DIVISION OF PRINTING—DEPARTMENT OF ADMINISTRATION
TOPEKA, KANSAS 1989

GOVERNMENT
EXHIBIT

16

**40-1-29**                         INSURANCE DEPARTMENT

acquire or exchange any voting securities of the insurer, and if distributed, of additional soliciting material relating thereto, any proposed employment, consultation, advisory or management contracts concerning the insurer, annual reports to the stockholders of the insurer and the applicant for the last two fiscal years, and any additional documents or papers required by form A or K.S.A. 40-3304."

(r) item 13 is amended by substituting "K.S.A. 40-3304" for "Section 3 of the Act";

(s) the second sentence of item 2(c) of form A is not adopted;

(t) the second sentence of item 2 of form B is not adopted;

(u) item 5 of form B is amended by substituting "K.S.A. 40-3305" for "Section 4 of the Act";

(v) item 10 of form B is amended by substituting "K.S.A. 40-3305" for "Section 4 of the Act"; and

(w) the signature section of form C is amended by substituting "K.S.A. 40-3305" for "Section 4 of the Act". (Authorized by K.S.A. 40-103, 40-3309; implementing K.S.A 40-3304(a) and (b); 40-3305; and 40-3306(c); effective May 1, 1976; amended May 1, 1979; amended May 1, 1986; amended May 1, 1988.)

**40-1-29.** (Authorized by K.S.A. 40-103, 40-3309; implementing K.S.A. 40-3306(c); effective May 1, 1976; amended May 1, 1986; revoked May 1, 1988.)

**40-1-30. Annual statements; assets.** An insurance company or fraternal benefit society doing business in this state shall not include any salvage or subrogation recoveries as an asset in the annual statement filed with this department until the salvage or recoveries have been reduced to cash or its equivalent. (Authorized by K.S.A. 40-103; implementing K.S.A. 40-222, 40-225; effective Feb. 15, 1977; amended May 1, 1986.)

**40-1-31. Insurance policies; prohibiting certain discriminations.** An insurance policy, plan or binder, or a rider or endorsement thereto, shall not be delivered or issued for delivery in this state if the amount of benefits payable, or a term, condition, or type of coverage is or may be restricted, modified, excluded, or reduced on the basis of the sex or marital status of the insured or prospective insured. This requirement shall not apply when the amount of benefits, terms, conditions, or type of coverage vary as a result of the application of rate differentials permitted under chapter 40, Kansas statutes annotated, or as a result of negotiations between the insurer and insured. Nothing in this regulation shall prohibit an insurer from taking marital status into account for the purpose of defining persons eligible for dependents benefits. (Authorized by K.S.A. 40-2404a; implementing K.S.A. 40-2404(7); effective Feb. 15, 1977; amended May 1, 1986.)

**40-1-32. Insurance companies; riders or endorsements; change in coverage or benefits; consent of policyholder.** Consent of the policyholder is required if an endorsement or rider attached to an insurance contract or policy subsequent to the issuance date of such contract or policy reduces or eliminates coverage or benefits of the contract or policy. (Authorized by K.S.A. 40-103, 40-2404(a); implementing K.S.A 40-928, 40-1113, 40-2404; effective May 1, 1979; amended May 1, 1986; amended May 1, 1987.)

**40-1-33. Suspension of form filing requirements.** The filing requirements of K.S.A. 40-216 shall be suspended when insurance policies, endorsements, riders, and other forms cannot be filed before use because:

(a) A change in company officers makes obsolete the signatures appearing on existing forms. If the validity of contracts issued subsequent to such a change in officers would be affected, the filing requirements shall not be suspended; or

(b) an existing supply of forms is depleted and the replacement forms bear a different printing date or edition identity.

This suspension shall not apply to any other changes. (Authorized by K.S.A. 40-103, 40-216; implementing K.S.A. 40-216; effective May 1, 1981; amended May 1, 1986.)

**40-1-34. Unfair claims settlement practices.** National association of insurance commissioners' unfair claims settlement

82

Westlaw.

KS ADC 40-1-30

K.A.R. 40-1-30

Kan. Admin. Regs. 40-1-30

**KANSAS ADMINISTRATIVE REGULATIONS**
**AGENCY 40. INSURANCE DEPARTMENT**
**ARTICLE 1. GENERAL**

Copr. (C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Current with amendments included in the Kansas Register,
Volume 26, Number 14, dated April 5, 2007.

40-1-30 Revoked.

### CREDIT(S)

Authorized by K.S.A. 40-103; implementing K.S.A. 40-222, 40-225; effective Feb. 15, 1977; amended May 1, 1986; revoked May 25, 2001.

K.A.R. 40-1-30, KS ADC 40-1-30

KS ADC 40-1-30
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# CODE OF LAWS OF SOUTH CAROLINA 1976

## Regulations

**Chapter 69.** Insurance Department
(Regulations 69-15 to 69-42)

GOVERNMENT
EXHIBIT

17

COPYRIGHT © 1982

BY

THE STATE OF SOUTH CAROLINA


COPYRIGHT © 1989

BY

THE STATE OF SOUTH CAROLINA



**69-15.**

Unde
alien in
transact
require
in acco
sioner i
limits s
subsequ
of any p

The a
its surp
insurers
in its m
§ 38-13-
with the

R 69-25    INSURANCE DEPARTMENT

Section 2. Applicability. This Regulation shall apply to all group disability income policies delivered or issued for delivery in this State after the effective date hereof; and to existing group policies on the renewal anniversary date.

Section 3. Prohibition. No group disability income policy which integrates benefits with social security benefits shall provide that the amount of any disability benefit actually being paid to the disabled person shall be reduced by changes in the level of social security benefits resulting either from changes in the social security law or due to cost of living adjustments which become effective after the first day for which disability benefits become payable.

Section 4. Effective Date. This Regulation shall take effect 120 days after it has been filed with the Secretary of State.

## 69-26. Salvage and Subrogation.

Section 38-11-10 of the Code of Laws of South Carolina, 1976, as amended, is quoted in part: "It is hereby declared to be the legislative intent that policyholder obligations and the minimum capital, or guaranty fund, and surplus required by law, shall be covered only by assets of unquestioned integrity and stability . . . ."

Obviously, assets representing items actually received as salvage on losses (whether paid or unpaid) and assets representing anticipated recoveries by subrogation on losses (whether paid or unpaid) cannot be considered assets of unquestioned integrity and stability, due to the difficulty in ascertaining the values thereof.

Therefore, insurance companies incorporated under the laws of this State and foreign and alien companies licensed to do business in this State shall not report assets for salvage or subrogation recoveries in any annual statement or interim statement filed with this Department until such recoveries shall have been reduced to cash or its equivalent.

## 69-27. Guaranty Act—Applicability.

Section 1. Purpose. The purpose of this regulation is to require that brokers fully and fairly disclose to all policyholders of insurers not licensed to do business in this State that the provisions of the South Carolina Insurance Guaranty Association Act, (Sections 38-31-30 et seq., Code of Laws of South Carolina, 1976, as amended) which protect policyholders in the event of a property and casualty company insolvency, do not apply to an unauthorized, unlicensed carrier.

Section 2. Requirement. Consistent with the above stated pur-

54

Westlaw.

SC ADC 69-26, Repealed

SC Code Regs 69-26, Repealed
SC ADC 69-26, Repealed

SOUTH CAROLINA CODE OF REGULATIONS
REGULATIONS
CHAPTER 69. DEPARTMENT OF INSURANCE
Current with amendments included in the South Carolina State
Register, Volume 31, Issue Number 3, dated March 23, 2007.

**69-26. Repealed**

CREDIT(S)

History: Repealed by State Register Volume 26, Issue 6, Part 2, eff June 28, 2002.

EDITOR'S NOTES:

Former Regulation 69-26 was entitled: Salvage and Subrogation.
CHAPTER 69. DEPARTMENT OF INSURANCE -- General Materials

SC ADC 69-26, Repealed
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# FEDERAL TAXATION OF INSURANCE COMPANIES

by Partners of KPMG Peat Marwick
Contributing Authors

Mark E. Anderson, Atlanta, Georgia
Charles J. Auer, Columbus, Ohio
James W. Blankenship, Hamilton, Bermuda
James P. Breen, Chicago, Illinois
Richard N. Bush, New York, New York
Walter M. Duer, Houston, Texas
John F. Duff, Boston, Massachusetts
Thomas Dyson, Hartford, Connecticut
Graham Ellison, Hartford, Connecticut
Greg A. Engel, Houston, Texas
Joseph M. Jordan, New York, New York
John W. Kelly, Minneapolis, Minnesota
Catherine L. Madlinger, Chicago, Illinois
Dennis G. Nelson, Minneapolis, Minnesota
Edward L. Robbins, Chicago, Illinois
Arthur C. Schneider, Chicago, Illinois
David Schulz, Chicago, Illinois
Kim C. Sellers, Los Angeles, California
Frank M. Svoboda, Dallas, Texas
David L. Veeder, Dallas, Texas
Stanley C. Wiseberg, Washington, D.C.

RESEARCH INSTITUTE OF AMERICA

GOVERNMENT EXHIBIT

18

## Taxation of Insurance Companies

¶14.19

taxable income estimated salvage recoverable for 1990 and later accident years despite the fact that the anticipated salvage recoverable had already been recognized in statutory income. This results in a doubling up on salvage recoverable for tax purposes. However, the insurance industry reached a compromise with the IRS regarding the "unpaid loss disallowance rule." In December 1991, the IRS issued Notice 92-1 addressing this issue.[31]

The notice and the subsequent final regulations allow an insurance company that has anticipated estimated salvage recoverable to increase undiscounted unpaid losses by the anticipated estimated salvage recoverable. This "gross-up" of unpaid losses is permitted only if the company either:

1. Discloses on its annual statement, by line of business and accident year, the extent to which estimated salvage recoverable is taken into account in computing unpaid losses shown on the annual statement filed by the company for the calendar year ending before December 31, 1991, which discloses by line of business and accident year the extent to which estimated salvage recoverable is taken into account in computing unpaid losses; or

2. Files a statement with the insurance department of each state in which the company files an annual statement, on or before the due date determined (without regard to extensions) of its federal income tax return or before March 17, 1992, for a taxable year ending before December 31, 1991, which discloses by line of business and accident year the extent to which estimated salvage recoverable is taken into account in computing unpaid losses. The statement must be captioned "DISCLOSURE CONCERNING LOSS RESERVES".[32]

The regulations provide that if a company fails in a subsequent year to meet the disclosure requirements, the company cannot increase its undiscounted unpaid losses by the anticipated salvage recoverable for that year or any subsequent years without the consent of the Commissioner.[33]

The final regulations issued January 27, 1992, adopt with some modification the proposed regulations previously issued concerning salvage and subrogation and incorporate some provisions contained in Revenue Procedure 91-48. The final regulations are effective for taxable years beginning after December 31, 1989.

The final regulations provide that estimated salvage recoverable must be discounted using the discount factors published by the Commissioner for salvage recoverable or by using the same discount factors as are used in discounting unpaid loss reserves except as otherwise provided in guidance published by the Commissioner.[34] This statement in the final regulations seemed to empower the Commissioner to consider circumstances in which a company could discount salvage on the basis of its own experience. However, in Revenue Procedures 92-52[35] and 92-53[36] use of a taxpayer's own experience is specifically prohibited by the Commissioner for the 1991 and 1992 accident years.

Like the proposed regulations, the final regulations provide that a company claiming the special deduction for anticipated salvage must establish to the satis-

[Footnote ¶14.19 continued]
(3.1) IRB 1992-2, January 13, 1992
(3.2) Reg §1.832-4(d)
(3.3) Reg §1.832-4(d)(3)
(3.4) Reg §1.832-4(c)
(3.5) IRB 1992-27, July 6, 1992.
(3.6) Id.

## Life Insurance Reserves

¶14.19

faction of the district director that the deduction represents only the discounted amount of estimated salvage recoverable that was actually taken into account by the company in computing losses incurred.[37] As discussed previously, the proposed regulations provided several disclosures that would satisfy this requirement. However, the proposed regulations were unclear as to whether the disclosure requirements were merely a "safe harbor" provision or the only means by which the company could establish that salvage was anticipated in setting December 31, 1989, loss reserves. Revenue Procedure 91-48 provided new disclosure requirements and clarified that these disclosure requirements were in fact a "safe harbor." The final regulations adopt these disclosure requirements of Revenue Procedure 91-48 as a "safe harbor" in establishing that salvage was anticipated in setting December 31, 1989, loss reserves.[38]

The final regulations provide some limitations on a company's ability to claim the special deduction. The special deduction is available only to insurance companies subject to tax under IRC §831.[39] In addition, the final regulations contain the "mutually exclusive rule" created in Revenue Procedure 91-48. This rule prohibits a company that claims the special deduction from also claiming the fresh-start benefit on unanticipated salvage recoverable.[310] Finally, the final regulations prohibit a company that claimed the benefit of fresh-start with respect to estimated salvage recoverable under Section 1023(e) of TRA '86 from also claiming the special deduction to the extent of the fresh-start previously claimed.[311]

An additional complexity exists if the insurance company is a participant in an insurance pool. If such participation exists, the insurance company will need to determine whether the unpaid losses reported to the company by the pool are gross or net of anticipated salvage and make all adjustments necessary.[312]

**Pre-OBRA '90 Cases and Rulings.** Before OBRA '90, there was ongoing controversy between the property and liability insurance industry and the IRS as to when salvage and subrogation should be accounted for for federal income tax purposes. Regulation §1.832-4(c), adopted in 1963, provided that salvage recoverable should include salvage in the course of liquidation.

Salvage in the course of liquidation includes all property (other than cash), real or personal, tangible or intangible, except property not included by reason of express statutory provisions (or rules and regulations of an insurance department) of any state or territory or the District of Columbia in which the company does business. Such salvage must be taken into account to the extent of its value at the end of the tax year as determined from a fair and reasonable estimate based on either the facts in each case or the company's experience with similar cases.[4]

This provision led to controversy over when salvage should be estimated. In the Continental Insurance Company case, the Court of Claims (now the United States

[Footnote ¶14.19 continued]
(37) Reg §1.832-4(f)(1)
(38) Reg §1.832-4(f)(2)
(39) Reg §1.832-4(f)(3)(i)
(310) Reg §1.832-4(f)(3)(ii)
(311) Reg §1.832-4(f)(3)(iii)
(312) See Revenue Procedure 92-78, 1992-2 CB 456.
(4) Temp. Reg §1.832-4(f)(e).

Case 1:05-cv-11048-RCL     Document 75-20     Filed 09/04/200

GOVERNMENT
EXHIBIT
19

# Federal Income Taxation of Property and Casualty Insurance Companies

ERNST & YOUNG LLP

U.S. DEPT. OF JUSTICE

JUN 1 7 1996

TAX LIBRARY

John Wiley & Sons, Inc.

New York • Chichester • Brisbane • Toronto • Singapore

# PREFACE

In today's rapidly changing business environment, tax professionals and others working in the complex field of property/casualty insurance taxation need a comprehensive planning and reference tool. This text, Ernst & Young's most recent contribution to the field of insurance taxation, was developed to meet that need. It represents the culmination of several years of effort on the part of Ernst & Young partners and staff and is based on our firm's broad base of technical skill and extensive experience in the field of property/casualty taxation.

The book provides a comprehensive discussion of the tax issues confronting property/casualty insurers, along with a review and analysis of compliance challenges and creative tax-planning concepts. It complements Ernst & Young's earlier publication, *Federal Income Taxation of Life Insurance Companies* (Matthew Bender, second edition). Readers requiring a more extensive discussion of the tax issues faced by life insurers are urged to consult that publication.

The book is intended to serve as a thought provoking resource for property/casualty professionals as they address the unique tax issues facing their companies. Others may use it as their primary tax reference source. Attorneys and accountants working in the area of property/casualty taxation will find the text planning concepts useful in their work, and tax directors at manufacturing companies with captive insurance companies should find the book valuable in developing effective tax strategies.

We are grateful for the dedicated work of those who have assisted in the preparation of this book and are pleased to share our views with tax professionals who are working with this challenging but vitally important subject.

ROBERT STEIN
National Director of Insurance

TERRY A. JACOBS
National Director of Insurance Tax Services

This text is printed on acid-free paper.

Copyright © 1996 by Ernst & Young LLP
Published by John Wiley & Sons, Inc.

All rights reserved. Published simultaneously in Canada.

Reproduction or translation of any part of this work beyond that permitted by Section 107 or 108 of the 1976 United States Copyright Act without the permission of the copyright owner is unlawful. Requests for permission or further information should be addressed to the Permissions Department, John Wiley & Sons, Inc.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is said with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

Library of Congress Cataloging-in-Publication Data:

0-471-13030-3

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

## § 6.7 SALVAGE AND SUBROGATION

For taxable years beginning after December 31, 1989, the 1990 Tax Act amended Section 832(b)(5)(A) to require the deduction for losses incurred, both paid and unpaid, be reduced by estimated salvage recoverable attributable to such losses. The adjustment to losses incurred is made irrespective of whether the salvage is treated as an asset for state statutory accounting purposes. In general, salvage consists of (1) amounts that are recouped or could be recouped by the insurer through the sale of damaged property to which it has taken title (*salvage*), and (2) amounts that the insurer recovers from third parties who are found to be ultimately responsible for the damage sustained by the insured (*subrogation*).

The amount of salvage to be taken into consideration is determined on a discounted basis in accordance with procedures established by the Treasury. Guidance regarding the accounting for accrued salvage and subrogation was originally provided in March 1991 in the form of proposed regulations. Further guidance was provided by Revenue Procedure 91-48[135] in August 1991, and Notice 92-1[136] in December 1991. Final regulations were issued in January 1991 regarding salvage and subrogation and are effective for taxable years beginning after December 31, 1989.[137]

Prior to the 1990 Tax Act, the treatment of salvage and subrogation was the subject of controversy between the Service and the property/casualty insurance industry. Regulations under Section 832 provided that companies were able to exclude salvage recoverable if any state in which the company transacted business prohibited the company from reporting these recoverable amounts for annual statement purposes. Generally, most states did not permit the recognition of salvage or subrogation on the annual statement until reduced to cash or cash equivalent. Accordingly, many property/casualty insurance companies recognized salvage and subrogation for tax purposes on a cash basis, which usually followed the companies' annual statement treatment of salvage and subrogation.

### [1] Discounting of Estimated Salvage and Subrogation Recoverable

Estimated salvage and subrogation recoverable is to be determined on a discounted basis in accordance with procedures established by the Treasury.[138] Revenue Procedure 91-48[139] sets forth the discount factors for pre-1991 accident years. For companies that elected alternative 1 under Revenue Procedure 91-48, Revenue Procedure 92-52[140] and 92-52A[141] set forth the discount factors to be used for the 1991 accident year. For 1992 and subsequent accident years, all companies are required to use the discount factors for estimated salvage recoverable set forth in the following revenue procedures for the 1992 accident year. These factors are to be used irrespective of whether the companies elected to use their own experience in discounting their unpaid losses.

| Accident Year | Revenue Procedure |
| --- | --- |
| 1992 | Rev. Proc. 92-72[142] |
| 1993 | Rev. Proc. 93-30[143] |
| 1994 | Rev. Proc. 94-50[144] |
| 1995 | Rev. Proc. 95-41[145] |

Under Revenue Procedure 91-48, estimated salvage recoverable for pre-1991 accident years must be discounted under one of two methods: (1) by using the applicable discount factors published by the Internal Revenue Service for estimated salvage recoverable (alternative 1); or (2) by using those factors as elected by the taxpayer in discounting unpaid losses under Section 846 based on the loss payment pattern for a line of business and the applicable interest rate (alternative 2).[146] Revenue Procedure 91-48 required an insurance company to attach a statement to its 1990 tax return electing one of the above two alternatives. Insurance companies that filed their 1990 tax return based on alternative 2 were deemed to have elected alternative 2; however, the revenue procedure allowed insurance companies to amend their 1990 return within 180 days of September 25, 1991, to elect alternative 1. The election applies to all accident years before 1992 and applies to all lines of business. A company claiming the 87% special deduction must use alternative 2 in discounting estimated salvage recoverable for the 1990 and 1991 accident years. Furthermore, under alternative 2, companies that have elected to use their own historical experience to discount unpaid losses under Section 846 must use those discount factors to discount estimated salvage recoverable.[147]

### [2] Gross-Up of Unpaid Losses for Salvage Recoverable

#### [a] General Rules

The regulations allow a taxpayer that has taken into account estimated salvage recoverable in determining the amount of its statutory unpaid losses to increase or gross-up its unpaid losses for tax purposes by the amount of such salvage, provided the taxpayer discloses to state regulatory authorities the amount of such salvage.[148] The final regulations are consistent with the guidance previously set forth in Notice 92-1.[149]

The gross-up provision relieves the potential double-counting of salvage recoverable in determining losses incurred. Salvage could be double-counted in taxable income due to the interaction between the salvage provision added by the 1990 Act and a provision in the tax law existing at the enactment of the 1990 Tax Act: (1) the salvage provisions added by the 1990 Tax Act require taxpayers to separately compute discounted unpaid losses and estimated salvage recoverable in determining losses incurred; and (2) under Section 846(b), discounted unpaid losses are based on the unpaid losses shown in the annual statement filed by the

insurance company. These two provisions, taken together, could result in double-counting of estimated salvage recoverable for a taxpayer that netted salvage recoverable in determining unpaid losses in its annual statement. Salvage recoverable netted against the statutory unpaid losses reduces the discounted unpaid losses and the deduction for losses incurred. In addition, salvage recoverable must be separately determined in calculating losses incurred.

The following example illustrates the double-counting problem and the gross-up relief:

**Example:** A property/casualty insurance company takes salvage recoverable into consideration in determining its unpaid losses shown on its annual statement. Reserves and accrued salvage for year one and year two are as follows:

| Annual Statement | Year 1 | Year 2 |
|---|---|---|
| Gross unpaid loss reserves | $1,000 | $1,100 |
| Estimated salvage recoverable | (100) | (110) |
| Net unpaid loss reserves | $900 | $990 |

Assume that there are no loss payments or salvage received during year two and that there is no discounting of the unpaid losses for tax purposes. Without the gross-up relief provided in the regulations, the insurance company's incurred loss deduction for year two is $80, the $90 change in net unpaid losses (end of year $990 less beginning of year $900) less the $10 change in estimated salvage recoverable. With the gross-up relief provisions in the regulations, the insurance company's incurred loss deduction is $90, the $100 change in gross unpaid losses (end of year $1,100 less beginning of year $1,000) less the $10 change in estimated salvage recoverable.

### [b] Disclosure Requirements

While insurance companies can avoid the double-counting of salvage recoverable by grossing-up their reserves for annual statement purposes, grossing-up statutory reserves may not be desirable or feasible. The regulations allow insurance companies to gross-up unpaid losses for tax purposes by the amount of accrued salvage, provided that state regulatory authorities are properly informed that salvage has been netted in computing annual statement reserves.

A disclosure in the annual statement is considered to be adequate if it discloses by line of business and accident year the extent to which estimated salvage recoverable has been taken into account in computing the unpaid losses shown on the annual statement. Alternatively, the insurance company can file a statement with the appropriate regulatory authority of each state in which the company is required to submit an annual statement. The statement(s) must be filed on or

before the due date of the company's federal income tax return, determined *without* regard to extensions.[150] The statement must be contained in a separate document captioned "Disclosure Concerning Loss Reserves" and must disclose, by line of business and accident year, the extent to which estimated salvage is taken into account in computing unpaid losses shown on the annual statement.

The regulations contain a provision that prevents an insurance company from controlling its taxable income by making or not making an adequate disclosure in successive years. Under this provision, if a company makes an adequate disclosure and increases its unpaid losses for salvage but in a subsequent year fails to meet the disclosure requirements, the company cannot gross-up its reserves for salvage in any subsequent tax year without the consent of the Commissioner.[151]

If a company implemented the gross-up provision for any taxable year beginning on or before 1993, Revenue Procedure 92-77 permitted the insurance company to adjust only the reserve for unpaid losses at the end of that year. No adjustment was required for the reserve for unpaid losses at the beginning of the taxable year. As a result, the entire effect of the double-counting of salvage was eliminated in one year.

If a company implements the gross-up of its unpaid losses after 1992, Revenue Procedure 92-77 requires that both beginning- and end-of-year unpaid loss reserves must be adjusted. The increase in the beginning-of-the-year reserve, after discounting, is deducted over four years beginning in the year the adjustment is made, rather than being taken into account entirely in the year of the gross-up.

### [3] 1990 Tax Act Transitional Rules

#### [a] Fresh-Start Adjustment

The 1990 Act provided a "fresh-start" adjustment, a permanent forgiveness of salvage and subrogation income that would otherwise be includable in gross income. By requiring insurance companies to take estimated salvage into account in computing losses incurred, the 1990 Tax Act changed the method by which companies computed the loss incurred deduction.[152] Usually, a change in accounting method would result in a Section 481 adjustment equal to the effect of the new accounting method (i.e., the accrued salvage and subrogation at December 31, 1989),[153] spread over a several-year period. The fresh start was accomplished by determining the amount of income required to be recognized as a Section 481 adjustment. Eighty-seven percent of the adjustment caused by the change in method was forgiven under a fresh-start provision.[154] The remaining 13% of the adjustment generally was taken into income over a period not to exceed four years, beginning with the first taxable year beginning after December 31, 1989.

To determine the amount of the Section 481(a) adjustment, an insurance company must determine the discounted amount of estimated salvage recoverable as of the end of the 1989 taxable year, based on the assumption that the discounted

amount of estimated salvage recoverable had always been taken into account in determining taxable income. The Section 481(a) adjustments for each accident year of each line of business are aggregated to determine the taxpayer's total Section 481(a) adjustment for all lines of business. The Section 481 adjustment is not reduced by the amount of salvage recoverable that the taxpayer may have considered in the estimation of undiscounted unpaid losses under Section 846(b)(1) of the Code. The taxpayer may not, in determining the Section 481(a) adjustment, take into account salvage in the course of liquidation that was taken into account in computing paid losses.[155]

Revenue Procedure 91-48 provides that if a property and casualty insurance company does not change its method of accounting for salvage and subrogation on its 1990 tax return, the company would need to request a change in method in accordance with Revenue Procedure 84-74.[156] In this event, the company would not receive any benefit of the fresh-start adjustment.

The 1990 Act contains a special provision for companies that had taken salvage recoverable into account in determining losses incurred for its last taxable year beginning before January 1, 1990, (i.e., "netters"). These companies are allowed a deduction amounting to 87% of the discounted amount of estimated salvage recoverable as of the close of such last taxable year.[157] Revenue Procedure 91-48 refers to this as the "special deduction." Like the fresh-start adjustment, this deduction is to be claimed ratably over a four-year period beginning in 1990. Any company claiming the special deduction must establish to the satisfaction of the Internal Revenue Service that the deduction is equal to the discounted amount of the salvage and subrogation recoverable that was actually taken into account by the company in computing losses incurred.[158]

Revenue Procedure 91-48 provides a safe harbor where this requirement is deemed satisfied if certain disclosure requirements are met. The safe harbor, which was adopted by the final regulations, requires the taxpayer to do the following:

1. File a statement by September 16, 1991, with the insurance regulatory authority of the company's state of domicile disclosing the extent to which its losses incurred for each line of business reported on its 1989 annual statement were reduced by estimated salvage recoverable.

2. Attach a statement to its 1990 federal income tax return agreeing to apply the special rule for overestimates to the amount of estimated salvage recoverable for which it has taken the special deduction. Furthermore, if any member of a consolidated group seeks to use the safe harbor, then all companies in a consolidated group must agree to apply the overestimate rule.[159]

Revenue Procedure 91-48 also requires that companies claiming the special deduction must attach a schedule to their 1990 federal income tax return[160] showing for each accident year and each line of business the following information:

1. Discounted unpaid losses as of December 31, 1988, and December 31, 1989.

2. The amount of discounted estimated salvage recoverable included in discounted unpaid losses as of December 31, 1988, and December 31, 1989.

3. The actual salvage recovered during 1989.

4. The amount of discounted unpaid losses as of December 31, 1988, and December 31, 1989, that would have been reported if estimated salvage recoverable had not been taken into account.

The final regulations adopted a rule, originally set forth in Revenue Procedure 91-48, that prohibits a company that claims a special deduction from also claiming a fresh-start benefit on anticipated salvage recoverable ("mutually exclusive rule").[161] A taxpayer that claims both the special deduction and the Section 481 adjustment is allowed the special deduction but not the Section 481 adjustment.[162]

Revenue Procedure 91-48 allows a company that claims a special deduction and includes estimated salvage recoverable in determining the undiscounted unpaid losses for the 1990 accident year to defer the accounting method change for estimated salvage recoverable for one year. To make this election, the taxpayer must attach a statement to its 1990 federal income tax return identifying the amount of estimated salvage recoverable taken into account in determining undiscounted unpaid losses for the 1990 accident year as shown on its annual statement. The statement must also set forth the taxpayer's agreement to apply the special rule for overestimates.

### [b] Fresh-Start Recapture

The 1990 Act also provided a rule for the recapture of an overestimation of the fresh-start amount.[163] In the tax year in which it is determined that there is an overestimation of the Section 481 adjustment, 87% of the discounted overestimate must be included in taxable income. An overestimate occurs if, at the end of any taxable year after 1989, the undiscounted Section 481 adjustment exceeds the total of actual salvage recoveries and the remaining undiscounted estimated salvage recoverable attributable to losses incurred in pre-1990 accident years.[164]

Taxpayers subject to the Section 481 adjustment, taxpayers that claimed the special deduction and filed a safe harbor disclosure statement with state regulators by September 16, 1991, and taxpayers that claimed a special deduction but elected to defer the accounting method change to 1991 are subject to the overestimate rule.

According to Revenue Procedure 91-48, the discount factor for each accident year within a line of business for which the overestimate occurred need not be applied to the accident year overestimate. Rather, a blend of the discount factor for the overall line of business at December 31, 1989, is used to determine the income inclusion related to the overestimate for that particular line of business. A 1992 Private Letter Ruling clarified that, for pre-1990 accident years, taxpayers

ernal Revenue Service
Montvale Avenue
Stoneham, MA  02180-3564

Date:  March 15, 1990

Liberty Mutual Insurance Company
and Affiliated Subsidiaries
175 Berkley Street
Boston, MA 02117-0140

Department of the Treasury

In Reply Refer to:
    E:1103
Person to Contact:
    Kevin Fay
Contact Telephone Number:
    (617) 279-1537
        Tax Year
Ended/Deficiency

| 9012 | $51,783,685 |
| 8912 | $48,722,565 |
| 8812 | $26,440,245 |
| 8712 | ($56,783) |
| 8612 | ($1,225,155) |
| 8512 | ($202,435) |

Dear Sir:

We are enclosing a report proposing adjustments to the amount of your tax for the years(s) shown above.  Please read the report, decide whether you agree or disagree with us, and respond within 30 days from the date of this letter. [Our report may not reflect the results of examinations of flow-through entities (partnerships, S corporations, trusts, etc.) in which you may have an interest.]

**IF YOU AGREE**, you should:
1.  Sign and date the enclosed agreement form.
2.  Return the signed agreement form to us in the enclosed envelope.
3.  Enclose payment of the tax and interest if additional tax is due, if you wish to stop the further running of interest. (The person whose name and telephone number appear above will be able to tell you how much interest is due to the date you intend to make payment.  See the enclosed Publication 5 for additional payment information.)

After we receive your signed agreement form, we will close your case and bill you for any unpaid tax or interest.

**IF YOU DO NOT AGREE** and wish a conference with the Regional Office of Appeals, you **MUST LET US KNOW** within 30 days.
1.  If the proposed change to your tax is $2,500 OR LESS for any tax period, you may call the person whose name and telephone number appear above; he or she will arrange for your case to be forwarded to Appeals.  Or, you may send us your request by checking the appropriate section at the end of this letter; an additional copy of this letter is provided for this purpose.  Mail this to us in the enclosed envelope.
2.  If the proposed change to your tax is more than $2,500 but is $10,000 or less for any tax period, you must provide us with a **BRIEF** written statement of the disputed issues.  This should be shown in the area found at the end of this letter; an additional copy of this letter is provided for this purpose.  Mail this to us in the enclosed envelope.
3.  If the proposed change to your tax is **MORE THAN** $10,000 for any tax period, we will require a written protest.  Follow the instructions in the enclosed Publication 5.  Mail the protest to us in the enclosed envelope.

LIB - 000001

Letter 950 (DO)(Rev. 11-87)

GOVERNMENT
EXHIBIT
20

-2-

An Appeals Officer, who has not previously examined your return, will take a fresh look at your case. The Appeals Office is independent of the District Director. Most disputes considered by Appeals are resolved informally and promptly. By going to Appeals, you may avoid court costs (such as the Tax Court's $60 filing fee), clear up this matter sooner, and prevent interest from running. An Appeals Officer will telephone you and, if necessary, arrange an appointment.

Under Code section 6673 the Tax Court is authorized to award damages of up to $5,000.00 to the United States where a taxpayer unreasonably fails to pursue available administrative remedies. Damages could be awarded under this provision, for example, if the Court concludes that it was unreasonable for a taxpayer to bypass Appeals and then file a petition in the Tax Court. The Tax Court will make that determination based upon the facts and circumstances of each case. Generally, the service will not ask the Court to award damages under this provision if you made a good faith effort to meet with Appeals and to settle your case before petitioning the Tax Court.

If you do not reach an agreement with Appeals, or if you do not respond to this letter, you will receive another letter that will tell you how to obtain Tax Court review. If you decide to bypass Appeals and petition the Tax Court, your case will normally be assigned for settlement to an Appeals Office before the Tax Court hears the case. IF YOU ARE UNSURE of what to do or have other questions, call the person whose name and telephone number appear above. We will be glad to discuss your choices.

Sincerely yours, Enclosures:

Copy of this Letter Examination Report Agreement Form
District Director Publication 5 Envelope

<u>STATEMENT OF DISPUTED ISSUES</u>

Check appropriate block:
[ ]    TAX IN DISPUTE IS $2,500 OR LESS FOR ANY TAX PERIOD
       (Note: You may call us with this request if you prefer.)
       I disagree and wish a conference with an Appeals Officer.

_____
Signature                  Date

[ ]    TAX IN DISPUTE IS OVER $2,500 BUT IS $10,000 OR LESS FOR ANY
       TAX PERIOD
       Unagreed Adjustment(s):          Reason for Disagreement:

                                        _____
                                        _____
                                        _____
(If more space is needed,               _____
attach a separate sheet.)

                                        _____
                                        Signature              Date

Letter 950 (DO)(Rev.11-87)

LIB - 000002

| Form 870<br>(Rev. February 1986) | Department of the Treasury - Internal Revenue Service<br>**Waiver of Restrictions on Assessment and Collection of<br>Deficiency in Tax and Acceptance of Overstatement** | Date Received by<br>Internal Revenue Service |
|---|---|---|

| Name and address of taxpayers ( Number, street, city, or town, State, ZIP code)<br><br>Liberty Mutual Insurance Company and<br>Affiliated Subsidiaries<br>175 Berkley Street<br>Boston, MA 02117 | Social Security or employer<br>Identification Number<br><br>04-1543470 |
|---|---|

### Increase(Decrease) in Tax and Penalties

| Tax year ended | Tax | Penalties | | |
|---|---|---|---|---|
| 12/31/90 | $51,783,685 | | | |
| 12/31/89 | $48,722,565 | | | |
| 12/31/88 | $26,440,245 | | | |
| 12/31/87 | ($56,783) | | | |
| 12/31/86 | ($1,225,155) | | | |
| 12/31/85 | ($202,435) | | | |
| | | | | |

**Consent to Assessment and Collection**

   I consent to the immediate assessment and collection of any deficiencies (increase in tax and penalties) and accept any overassessment (decrease in tax and penalties) shown above, plus any interest provided by law.  I understand that by signing this waiver, I will not be able to contest these years in the United States Tax Court, unless additional deficiencies are determined for these years.

| Taxpayer's<br>Representative | | | Date |
|---|---|---|---|
| Corporate<br>Name | Liberty Mutual Insurance Company | | Date |
| Corporate<br>Officer(s)<br>Signature | | Title | Date |
| | | Title | Date |

3/15/95

Form 870 (Rev. 2-86)

LIB - 000003

## Index to RAR - Liberty Mutual Insurance Company and Affiliated Subsidiaries

| Issue | Page |
|---|---|
| Form 4549-A | 1 |
| 1986-1987 Claim for Refund | 3 |
| Schedule of Return Taxable Income and ITC | 4 |
| Schedule of Tax Computation 1986 - 1987 | 5 |
| Computation of Alternative and Environmental Tax | 7 |
| 4549-B Consolidated by Company | 11 |
| | |
| 4549-B Pool Adjustments | 13 |
| LMIP  1     Premium Earned | 14 |
| LMIP  2     Capital lease | 17 |
| LMIP  3     Other deductions: Meals | 18 |
| LMIP  4     Premium Earned: Audit Prem. | 19 |
| LMIP  5     Premium taxes | 25 |
| LMIP  6     Other taxes | 26 |
| LMIP  7     LAE: Grass root lobbying | 27 |
| LMIP  8     Uninsured losses | 28 |
| LMIP  9     Canadian underwriting | 31 |
| LMIP  10    Losses incurred | 32 |
| LMIP  11    Foreign taxes | 35 |
| LMIP  12    Subpart F income | 36 |
| LMIP  13    Affirmative increasing 1988 NOL | 38 |
| LMIP  14    Sale of Salvage & Subro. Recoverable | 48 |
| LMIP  15    Affirmative-Salvage & Subrogation | 58 |
| LMIP  16    Affirmative-Deferred Comp. | 61 |
| LMIP  17    Affirmative-Pool Salvage | 62 |
| LMIP  18    Dividends to Policyhol | 65 |
| LMIP  19    Loss Reserves: Gross-Up | 68 |
| | |
| 4549-B  Liberty Mutual Insurance Company | 71 |
| LMIC  1     Affirmative - Pension Expense | 73 |
| LMIC  2     Asbestos Removal Costs | 74 |
| LMIC  3     Affirmative - Depreciation | 75 |
| | |
| 4549-B  Liberty Insurance Company | 76 |
| LIC  1     Affirmative - Pension Expense | 77 |
| | |
| 4549-B  Liberty International Insurance Agency | 78 |
| LIIA  1     Deferred Income Adjustment | 79 |

LIB - 000004

## Index to RAR - Liberty Mutual Insurance Company and Affiliated Subsidiaries

| Issue | | Page |
|---|---|---|
| 4549-B  Maumee Bay Agency, Inc. | | 80 |
| MBAI  1 | Affirmative Issue - Subsidiary Loss | 81 |
| | | |
| 4549-B  NFS Agency, Inc. | | 83 |
| NSFA  1 | Affirmative Issue - Subsidiary Loss | 84 |
| | | |
| 4549-B  Stein Roe & Farnham, Inc. | | 86 |
| SRF  1 | Amortization of legal expenses | 88 |
| SRF  2 | Amortization settlement adjustment | 89 |
| SRF  3 | Depreciation adjustment | 90 |
| | | |
| 4549-B  The PAMCO Group, Inc. | | 91 |
| PG  1 | Intangibles Settlement Initiative | 92 |
| | | |
| 4549-B  PAMCO Insurance Services Agency, Inc. | | 93 |
| PISA  1 | Affirmative Issue - Subsidiary Loss | 94 |
| | | |
| 4549-B  Liberty Northwest Insurance Company | | 96 |
| LNW  1 | Environmental Tax Credit | 97 |
| | | |
| Non-Life Operations Loss Deduction | | 98 |
| | | |
| 4549-B  Liberty Life Assurance Company of Boston | | 99 |
| LLAC  1 | Change in model premium | 101 |
| LLAC  2 | Universal life CRVM reserves | 102 |
| LLAC  3 | Net cash surrender value | 103 |
| LLAC  4 | Reserve strengthening GLTD | 104 |
| LLAC  5 | Discounting UPR and rate credit | 105 |
| LLAC  6 | Group long term disabilities | 106 |
| LLAC  7 | Special life ins. co. deduction | 108 |
| LLAC  8 | Special contingency reserves | 109 |
| LLAC  9 | Experience refund | 110 |
| LLAC  10 | Operations Loss Carryback | 111 |
| | | |
| Life Sub-group Operations Loss Deduction | | 112 |

LIB - 000005

| Form 886-A | EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer **Liberty Mutual Insurance Pool** | | Year/Period Ended **1988 - 1990** |

| LMIP 10 Losses Incurred | 1988 | 1989 | 1990 |
|---|---|---|---|
| – Salvage and Subrogation | -0- | -0- | 66,528,275 |

**Issue:**

Whether the taxpayer will be allowed to follow both the provisions of section 11305(c)(2) with respect to the section 481 adjustment and of section 11305(c)(3) with respect to the Special Deduction.

**Facts:**

Prior to 1990 Liberty Mutual Insurance Company and Affiliated Subsidiaries and Liberty Mutual Fire Insurance Company, (hereinafter referred to as Liberty), deductions for losses incurred had been netted for estimated salvage recoverable on all lines of business except auto physical damage which was partially netted. The total amount of anticipated salvage and subrogation at December 31, 1989 for the netted lines of business was $187,218,485 (which was later revised to $200,469,186 excluding unanticipated salvage and subrogation on the auto physical damage line of business). The amount of unanticipated salvage and subrogation on the auto physical damage line of business at December 31, 1989 was $68,763,075, (this figure was not subsequently revised). On their 1990 Federal income tax return Liberty claimed the special deduction as provided by section 11305(c)(3) of RRA of 1990 on all the lines of business for which estimated salvage recoverable had been taken into account in computing losses incurred and on the portion of auto physical damage which had been anticipated. On the portion of auto physical damage which estimated salvage recoverable had not been anticipated the taxpayer made a section 481 adjustment with the 87 percent "fresh start" as provided by Sec. 11305(c)(2)(B) of the RRA of 1990. The special deduction for 1990 was $40,720,020 and 3.25% (1/4 of 13%) of the 481 adjustment to be included in income totaled $2,234,800, for a net decrease to taxable income $38,485,221. (This net decrease will also affect taxable income for 1991, 1992 and 1993 in an equal amount each year).

Liberty included on their Federal income tax return a disclosure under section 6662 that they are not in agreement with the provisions of Rev. Proc. 91-48 with respect to the mutually exclusive rule contained in sections 8 and 9 are not following them in their return for the year ending December 31, 1990. Liberty also stated "[f]urther clarification resulting from industry discussions with the IRS on these items may result in the taxpayer filing an amended return."

Liberty continues "[a]lso, the taxpayer understands that if an election is not made under section 11 of the Revenue Procedure with respect to

| Form 886-A | EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer Liberty Mutual Insurance Pool | | Year/Period Ended 1988 - 1990 |

the 'deferral of an accounting change', then the taxpayer who claims the special deduction will be forever precluded from making an election to defer the accounting change. The taxpayer intends to make a protective election under section 11 of the Revenue Procedure, pending clarification of section 8 and 9 of the Revenue Procedure."

Liberty also agreed to apply the special rule for overestimates pursuant to Sec. 13 of Rev. Proc. 91-48 and made a protective election pursuant to Sec. 11 of Rev. Proc. 91-48, "Election By A Taxpayer Claiming Special Deduction to Defer Accounting Change."

Liberty has also indicated that they no longer wish to make a protective election under section 11 of Rev. Proc. 91-48 for a deferral of the accounting change.

**Law:**

**Prior Law:**  For tax years prior to January 1, 1990 property and casualty insurers were not required to reduce their losses incurred by salvage and subrogation until it was reduced to cash or a cash equivalent. This applied to property and casualty insurers in states where regulations provided that the salvage and subrogation could not be treated as an asset for statutory accounting purposes until reduced to cash or its equivalent.

**The Omnibus Reconciliation Act Of 1990.**  The Omnibus Reconciliation Act of 1990, Public Law 101-508, Section 11305 amended IRC section 832(b)(5)(A) for tax years beginning after December 31, 1989 to require all property and casualty insurers to account for estimated salvage recoverable in the computation of the deduction for losses incurred. IRC section 832(b)(5)(A), as amended, provides "In general. The term 'losses incurred' means losses incurred during the taxable year on insurance contracts computed as follows:  (i) To losses paid during the taxable year, deduct salvage and reinsurance recovered during the taxable year.  (ii) To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses (as defined in section 846) outstanding at the end of the taxable year and deduct all unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year. (iii) To the results so obtained, add estimated salvage and reinsurance recoverable as of the end of the preceding taxable year and deduct estimated salvage and reinsurance recoverable as of the end of the taxable year.  The amount of estimated salvage recoverable shall be determined on a discounted basis in accordance with procedures established by the Secretary."

LIB - 000048

| Form 886-A | EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer **Liberty Mutual Insurance Pool** | | Year/Period Ended **1988 - 1990** |

Rev. Proc. 91-48, 1991-2 C.B. 760, was issued for the purpose of setting forth the discount factors and salvage recovery patterns that property and casualty insurance companies. It also contains guidance on the 481 adjustment, the special deduction, special rule for overestimates and changes in estimates of salvage recoverable.

Section 9.03 of Rev. Proc. 91-48 provides "[f]or taxpayers claiming the special deduction, any change in the method of computing undiscounted unpaid losses attributable to pre-1990 accident years to exclude estimated salvage recoverable is a change in method of accounting within the meaning of section 446 of the Code, but is not a change required by the 1990 Act. Accordingly, the 87 percent forgiveness provided by section 11305(c)(2)(B) of the 1990 Act does not apply to any section 481(a) adjustment resulting from this change.

Treas. Reg. 1.832-4(f)(3)(iii) provides "[a] company that claims the special deduction is precluded from also claiming the section 481 adjustment provided in paragraph (e)(2)(ii) of this section for pre-1990 accident years."

**Government's Position:**

The government contends that Liberty may not claim both the "fresh start" pursuant section 11305(c)(2) of RRA of 1990 and the "special deduction" pursuant section 11305(c)(3). The government bases its position on Treas. Reg. 1.832-4(f)(3)(iii) which precludes a company from claiming the "fresh start" that has claimed the "special deduction."

Accordingly, the taxpayer shall not be allowed a "fresh start" on the portion of the line of business, auto physical damage, not anticipated prior to January 1, 1990 in the computation of unpaid losses due to the fact that the special deduction was claimed on the netted lines of business.

**Conclusion:**

Accordingly, taxable income is increased in the amount of $66,528,275 computed as follows:

| | |
|---|---|
| Amount of Auto Physical Damage LOB Salvage & Subrogation Not Anticipated | $ 68,763,075 |
| Less: Amount Previously Reported as section 481 Adjustment | 2,234,800 |
| Total Adjustment - Increase to Taxable Income | $ 66,528,275 |

**Liberty Mutual Insurance Company and Subsidiaries**
175 Berkeley Street
Boston, MA 02117
EIN: 04-1543470

## CLAIM FOR REFUND FOR TAXABLE YEAR 1990

### Statement of Grounds and Authorities

This statement forms a part of the Claim for Refund filed on Form 1120X by Liberty Mutual Insurance Company and Subsidiaries ("Taxpayer") with respect to its 1990 Federal income taxes. Taxpayer hereby claims a refund of $39,129,507 in tax for 1990, or such other amount as allowed by law with respect to such taxes, together with any overpayment of deficiency interest, plus refund interest on the amount to be refunded.

In 1990, section 832(b)(5) was amended to require that Taxpayer take all salvage recoverable into account on an estimated basis, effective for taxable years beginning after 1989. Revenue Reconciliation Act of 1990, section 11305(a), Pub. L. No. 101-508 ("1990 Act"). As a transition rule, section 11305(c)(2) of the 1990 Act provided that the change in law was to be treated as a change in method of accounting and that only 13% of the adjustment otherwise required to be taken into account under section 481 needed to be taken into account. The 13% section 481 adjustment was to be spread equally over 4 years. (Under this transition rule ("Fresh Start"), the remaining 87% of what otherwise would be taken into account under section 481 was forgiven and never required to be included in income.) In addition, section 11305(c)(3) of the 1990 Act provided that in the case of any company which took estimated salvage into account for a year before 1990, a "Special Deduction" was allowed equal to 87% of the amount of estimated salvage recoverable taken into account at the close of 1989, spread equally over 4 years.

At December 31, 1989, Taxpayer had estimated salvage recoverable of $242,705,925, of which it took $180,819,160 into account (by netting it against unpaid losses) for tax purposes at the end of 1989 ("Booked Salvage"), and it did not take $61,886,766 into account ("Non-Booked Salvage"). Because the 1990 amendment required Taxpayer to change its accounting method with respect to Non-Booked Salvage, the amount of the section 481 adjustment otherwise required to be taken into account would have been equal to the amount of closing 1989 Non-Booked Salvage. In its original federal income tax return for 1990, Taxpayer took all salvage recoverable into account on an estimated basis. In addition, for the year 1990, under the Fresh Start transition rule, Taxpayer reported in income one-fourth of 13% of its closing 1989 Non-Booked Salvage. At the same time, for the year 1990, Taxpayer claimed a Special Deduction of $37,511,254 attributable to 1989 Booked Salvage. Because of the lack of final guidance from the IRS concerning the salvage transition rules, Taxpayer included in its original 1990 tax return a statement reserving the right to claim different treatment on an amended return.

Guidance came in the form of an IRS revenue procedure. On September 21, 1992 the IRS published Rev. Proc. 92-77, which allowed taxpayers with Booked Salvage to gross up their

GOVERNMENT
EXHIBIT

21

year-end 1989 loss reserves for the estimated salvage reflected in those reserves and take the statutory Fresh Start for estimated total salvage – on both gross and net lines. Rev. Proc. 92-77 also allowed the entire deduction effect of the gross-up to be taken into account in 1990.

In light of this new IRS guidance, on September 15, 1993, Taxpayer filed a request for an affirmative adjustment for 1990 with respect to the transition treatment of estimated salvage recoverable. The affirmative adjustment, consistent with Rev. Proc. 92-77, claimed a gross-up of loss reserves in 1990 for the amount of Booked Salvage, and a Fresh Start with respect to the full amount of Booked Salvage and Unbooked Salvage combined. The affirmative adjustment also claimed a correction in the amount of Booked Salvage, augmenting the amount of salvage with respect to pools.

On audit, the Examining Agent agreed to the correction claimed by Taxpayer to the amount of Booked Salvage and allowed an additional Special Deduction of $2,593,825 because of the correction. The Examining Agent disallowed the application of Rev. Proc. 92-77 claimed by Taxpayer and also disallowed the Fresh Start with respect to Taxpayer's Booked Salvage. Instead, the IRS adjusted Taxpayer's income to include the full amount of Booked Salvage (rather than just 13%) in income in 1990 (rather than spread over 4 years). The IRS did not apply the cut-off method for Non-Booked Salvage provided by Treas. Reg. § 1.832-4(e)(2)(iii). After resolving other issues for 1990 with the Appeals Division of the IRS, on or after November 22, 2002, Taxpayer paid additional tax and interest proposed by the IRS to be due for 1990 in the amount of $80,515,174.

Taxpayer's refund claim is based on the ground that it is entitled to the treatment provided by Rev. Proc. 92-77. Taxpayer claims a gross-up of its loss reserves in 1990 for the amount of closing 1989 Booked Salvage and Fresh Start treatment with respect to the combined amount of Booked Salvage and Non-Booked Salvage. Thus, on this ground, in 1990 Taxpayer would receive a deduction equal to the amount of Booked Salvage (before discounting) and include in income one-fourth of 13% of the full December 31, 1989 amount of estimated salvage recoverable, but would not get the benefit of any Special Deduction.

Alternatively, Taxpayer's refund claim is based on the ground that Taxpayer is entitled under the 1990 Act to apply the Fresh Start transition rule with respect to its Non-Booked Salvage, together with the Special Deduction with respect to its Booked Salvage. On this ground, in 1990 Taxpayer would include in income one-fourth of 13% of Non-Booked Salvage and receive a Special Deduction equal to one-fourth of 87% of Booked Salvage.

Alternatively, Taxpayer's refund claim is based on the ground that for Non-Booked Salvage Taxpayer is entitled to use the cut-off method provided by Treas. Reg. § 1.832-4(e)(2)(iii), together with a Special Deduction with respect to Booked Salvage. On this ground, in 1990 Taxpayer would include in income the amount of Non-Booked Salvage actually received and receive a Special Deduction equal to one-fourth of 87% of Booked Salvage.

Regardless of whether the transition rule is implemented by the principles of Rev. Proc. 92-77, the language of the statute, or Treas. Reg. § 1.832-4(e)(2)(iii), there is no authority to support the position of the Examining Agent that the full amount of Non-Booked Salvage is to be included in taxable income in 1990.

Further, the positions of Taxpayer on the foregoing issues may have corollary tax effects under the provisions of the Code that have not been specifically referred to in this claim for refund. Taxpayer claims that it is entitled to any refund attributable to such corollary tax effects. Taxpayer also claims that it is entitled to a refund to the extent that any adjustment made by the Service for some other year has a corollary tax effect in the current year (e.g., the inclusion of an item in income for a later year by the Service on the grounds that it accrued in that later year removes such item from Taxpayer's gross income for the current year). Taxpayer further claims that it is entitled to a refund to the extent that an adjustment made by the Service for some other year would result in a reduction of tax if a similar adjustment is made for the current year. Taxpayer incorporates by reference in this claim all previously filed claims and protests and all materials and information submitted to the Service in support of such claims and protests.

On the foregoing grounds, Taxpayer files this claim for a refund of tax as set forth above, or such other amount as may be allowed, together with any overpayment of deficiency interest, plus refund interest on the amount to be refunded.[*]

---

[1]Taxpayer claims a net interest rate of zero, including for all periods prior to the effective date of section 6621(d) to the greatest extent permitted by law. Taxpayer also claims a refund of any deficiency interest for any year for which an estimated tax overpayment was made and credited to another period, to the extent the deficiency interest relates to a period during which the credit for the other period was not needed to satisfy the smallest amount of estimated tax required to avoid an estimated tax penalty for such other period. See Rev. Rul. 99-40, 1999-2 C.B. 441; May Department Stores Co. v. United States, 36 Fed. Cl. 680 (1996). Finally, the computation of the interest on any refund of an overpayment received by Taxpayer after December 31, 1994, must be made by applying the GATT interest rate prescribed by section 713 of the Uruguay Round Agreements Act, Pub. L. No. 103-465 (1994), only to the overpayment in excess of $10,000 and not to the amount of interest that accrued on any overpayment prior to January 1, 1995. Accordingly, to the extent that the overpayment interest is computed differently, Taxpayer hereby requests a refund based on the proper application of the GATT interest rate.

LIBERTY MUTUAL INSURANCE COMPANY AND SUBSIDIARIES
EIN: 04-1543470
Consolidated Taxable Income Calculation
Attachment to Form 1120X

| | 1990 As Originally Filed | | | 1990 After Appeals | | | 1990 Per S&S 1120X | | |
|---|---|---|---|---|---|---|---|---|---|
| | Consolidated | Non-Life | Life | Consolidated | Non-Life | Life | Consolidated | Non-Life | Life |
| Taxable Income before NOL and Special Deductions | 259,742,636 | 244,148,266 | 15,594,370 | 335,682,880 | 320,858,456 | 14,824,424 | 141,203,621 | 126,379,154 | 14,824,466 |
| Net Operating Loss Deduction | 201,205,608 | 201,205,608 | - | 114,256,918 | 114,256,918 | - | 104,440,947 | 99,287,957 | 5,152,989 |
| Special Deductions | 27,192,837 | 27,091,197 | 101,640 | 27,192,837 | 27,091,197 | 101,640 | 27,192,837 | 27,091,837 | 101,640 |
| Taxable Income | 31,344,191 | 15,851,461 | 15,492,730 | 194,233,125 | 179,510,341 | 14,722,784 | 9,569,837 | - | 9,569,837 |
| Tax before Credits | 10,657,025 | | | 66,039,263 | | | 3,253,745 | | |
| Foreign Tax Credit | - | | | - | | | - | | |
| Nonconventional source fuel credit | - | | | - | | | - | | |
| GBC | 1,980,672 | | | 1,735,076 | | | 1,735,076 | | |
| AMT Credit | - | | | - | | | - | | |
| Tax after credits | 8,676,353 | | | 64,304,186 | | | 1,518,668 | | |
| ITC recapture | 5,294 | | | 5,294 | | | 5,294 | | |
| Regular tax liability | 8,681,647 | | | 64,309,480 | | | 1,523,962 | | |
| Total minimum tax | 37,180,105 | | | 21,881,236 | | | 45,770,902 | | |
| Environmental tax | 538,596 | | | 630,194 | | | 396,538 | | |
| Schedule J line 10 | 46,400,348 | | | 86,820,910 | | | 47,691,403 | | |

LIBERTY MUTUAL INSURANCE COMPANY AND SUBSIDIARIES
EIN: 04-1543470
Consolidated Alternative Minimum Taxable Income Calculation
Attachment to Form 1120X

| | 1990 As Originally Filed | | | 1990 After Appeals | | | 1990 Per S&S 1120X | | |
|---|---|---|---|---|---|---|---|---|---|
| | Consolidated | Non-Life | Life | Consolidated | Non-Life | Life | Consolidated | Non-Life | Life |
| Taxable Income before NOL | 232,549,799 | 217,057,069 | 15,492,730 | 308,490,043 | 293,767,259 | 14,722,784 | 114,010,784 | 99,287,957 | 14,722,826 |
| Adjustments: | | | | | | | | | |
| Depreciation | 7,877,110 | 7,877,110 | - | 7,877,110 | 7,877,110 | - | 7,877,110 | 7,877,110 | - |
| Line 4 Pre-adjusted AMTI | 240,426,909 | 224,934,179 | 15,492,730 | 316,367,153 | 301,644,369 | 14,722,784 | 121,887,894 | 107,165,067 | 14,722,826 |
| Adjusted Current Earnings | | | | | | | | | |
| Tax Exempt Interest | 237,210,871 | 237,210,871 | | 237,210,871 | 237,210,871 | | 237,210,871 | 237,210,871 | |
| Depreciation | 15,529,294 | 15,529,294 | | 15,529,294 | 15,529,294 | | 15,529,294 | 15,529,294 | |
| Acquisition Expenses of Life Insurance Companies | 1,449,982 | | 1,449,982 | 1,449,982 | | 1,449,982 | 1,449,982 | | 1,449,982 |
| Other Adjustments | (549,734) | (549,734) | (4,419) | (549,734) | (549,734) | (4,419) | (549,734) | (549,734) | (4,419) |
| Dividend Received Deduction | (554,153) | (554,153) | | (554,153) | (554,153) | | (554,153) | (554,153) | |
| Total ACE Adjustments | 280,218,697 | 278,773,134 | 1,445,563 | 280,218,697 | 278,773,134 | 1,445,563 | 280,218,697 | 278,773,134 | 1,445,563 |
| Line 4a Adjusted current earnings (ACE) | 520,645,606 | 503,707,313 | 16,938,293 | 596,585,850 | 580,417,503 | 16,168,347 | 402,106,591 | 385,938,201 | 16,168,389 |
| Line 4b Subtract PAMTI from ACE | 280,218,697 | 278,773,134 | 1,445,563 | 280,218,697 | 278,773,134 | 1,445,563 | 280,218,697 | 278,773,134 | 1,445,563 |
| Line 4c Multiply 4b by 75% | 210,164,023 | 209,079,851 | 1,084,172 | 210,164,023 | 209,079,851 | 1,084,172 | 210,164,023 | 209,079,851 | 1,084,172 |
| Combine PAMTI and line 4c | 450,590,932 | 434,014,030 | 16,576,902 | 526,531,176 | 510,724,220 | 15,806,956 | 332,051,916 | 316,244,918 | 15,806,998 |
| AMT NOL Deduction: | 211,405,280 | 211,405,280 | | 86,928,682 | 86,928,682 | | 86,928,682 | 86,928,682 | |
| Alternative minimum taxable income | 239,185,652 | 222,608,750 | 16,576,902 | 439,602,494 | 423,795,538 | 15,806,956 | 245,123,234 | 229,316,236 | 15,806,998 |
| AMT at 20% before AMT FTC | 47,837,130 | | | 87,920,499 | | | 49,024,647 | | |
| AMT FTC | | | | | | | | | |
| Tentative minimum tax | 47,837,130 | | | 87,920,499 | | | 49,024,647 | | |
| Regular tax liability (After Credits) | 10,657,025 | | | 66,039,263 | | | 3,253,745 | | |
| AMT | 37,180,105 | | | 21,881,236 | | | 45,770,902 | | |
| PAMTI without regard to ETC Deduction | 450,829,870 | | | 527,161,358 | | | 332,448,455 | | |
| Less: $2M exemption | (2,000,000) | | | (2,000,000) | | | (2,000,000) | | |
| Adjusted Income for Environmental Tax Calculation | 448,829,870 | | | 525,161,358 | | | 330,448,455 | | |
| Environmental tax at .12% | 538,596 | | | 630,194 | | | 396,538 | | |

## Liberty Mutual Fire Insurance Company
175 Berkeley Street
Boston, MA 02117
EIN: 04-1924000

# CLAIM FOR REFUND FOR TAXABLE YEAR 1990

## Statement of Grounds and Authorities

This statement forms a part of the Claim for Refund filed on Form 1120X by Liberty Mutual Fire Insurance Company ("Taxpayer") with respect to its 1990 Federal income taxes. Taxpayer hereby claims a refund of $3,486,552 in tax for 1990, or such other amount as allowed by law with respect to such taxes, together with any overpayment of deficiency interest, plus refund interest on the amount to be refunded.

In 1990, section 832(b)(5) was amended to require that Taxpayer take all salvage recoverable into account on an estimated basis, effective for taxable years beginning after 1989. Revenue Reconciliation Act of 1990, section 11305(a), Pub. L. No. 101-508 ("1990 Act"). As a transition rule, section 11305(c)(2) of the 1990 Act provided that the change in law was to be treated as a change in method of accounting and that only 13% of the adjustment otherwise required to be taken into account under section 481 needed to be taken into account. The 13% section 481 adjustment was to be spread equally over 4 years. (Under this transition rule ("Fresh Start"), the remaining 87% of what otherwise would be taken into account under section 481 was forgiven and never required to be included in income.) In addition, section 11305(c)(3) of the 1990 Act provided that in the case of any company which took estimated salvage into account for a year before 1990, a "Special Deduction" was allowed equal to 87% of the amount of estimated salvage recoverable taken into account at the close of 1989, spread equally over 4 years.

At December 31, 1989, Taxpayer had estimated salvage recoverable of $26,526,336, of which it took $19,650,029 into account (by netting it against unpaid losses) for tax purposes at the end of 1989 ("Booked Salvage"), and it did not take $6,876,308 into account ("Non-Booked Salvage"). Because the 1990 amendment required Taxpayer to change its accounting method with respect to Non-Booked Salvage, the amount of the section 481 adjustment otherwise required to be taken into account would have been equal to the amount of closing 1989 Non-Booked Salvage. In its original federal income tax return for 1990, Taxpayer took all salvage recoverable into account on an estimated basis. In addition, for the year 1990, under the Fresh Start transition rule, Taxpayer reported in income one-fourth of 13% of its closing 1989 Non-Booked Salvage. At the same time, for the year 1990, Taxpayer claimed a Special Deduction of $4,072,002 attributable to 1989 Booked Salvage. Because of the lack of final guidance from the IRS concerning the salvage transition rules, Taxpayer included in its original 1990 tax return a statement reserving the right to claim different treatment on an amended return.

Guidance came in the form of an IRS revenue procedure. On September 21, 1992 the IRS published Rev. Proc. 92-77, which allowed taxpayers with Booked Salvage to gross up their

GOVERNMENT
EXHIBIT
22

Liberty Mutual Fire Insurance Company EIN: 04-1924000
Protective Claim for Refund for Taxable Year 1990
Page 2

year-end 1989 loss reserves for the estimated salvage reflected in those reserves and take the statutory Fresh Start for estimated total salvage – on both gross and net lines. Rev. Proc. 92-77 also allowed the entire deduction effect of the gross-up to be taken into account in 1990.

In light of this new IRS guidance, on September 15, 1993, Taxpayer filed a request for an affirmative adjustment for 1990 with respect to the transition treatment of estimated salvage recoverable. The affirmative adjustment, consistent with Rev. Proc. 92-77, claimed a gross-up of loss reserves in 1990 for the amount of Booked Salvage, and a Fresh Start with respect to the full amount of Booked Salvage and Unbooked Salvage combined. The affirmative adjustment also claimed a correction in the amount of Booked Salvage, augmenting the amount of salvage with respect to pools.

On audit, the Examining Agent agreed to the correction claimed by Taxpayer to the amount of Booked Salvage and allowed an additional Special Deduction of $288,203 because of the correction. The Examining Agent disallowed the application of Rev. Proc. 92-77 claimed by Taxpayer and also disallowed the Fresh Start with respect to Taxpayer′s Booked Salvage. Instead, the IRS adjusted Taxpayer′s income to include the full amount of Booked Salvage (rather than just 13%) in income in 1990 (rather than spread over 4 years). The IRS did not apply the cut-off method for Non-Booked Salvage provided by Treas. Reg. §1.832-4(e)(2)(iii). After resolving other issues for 1990 with the Appeals Division of the IRS, on or after November 26, 2002, Taxpayer paid additional tax and interest proposed by the IRS to be due for 1990 in the amount of $4,433,536.

Taxpayer′s refund claim is based on the ground that it is entitled to the treatment provided by Rev. Proc. 92-77. Taxpayer claims a gross-up of its loss reserves in 1990 for the amount of closing 1989 Booked Salvage and Fresh Start treatment with respect to the combined amount of Booked Salvage and Non-Booked Salvage. Thus, on this ground, in 1990 Taxpayer would receive a deduction equal to the amount of Booked Salvage (before discounting) and include in income one-fourth of 13% of the full December 31, 1989 amount of estimated salvage recoverable, but would not get the benefit of any Special Deduction.

Alternatively, Taxpayer′s refund claim is based on the ground that Taxpayer is entitled under the 1990 Act to apply the Fresh Start transition rule with respect to its Non-Booked Salvage, together with the Special Deduction with respect to its Booked Salvage. On this ground, in 1990 Taxpayer would include in income one-fourth of 13% of Non-Booked Salvage and receive a Special Deduction equal to one-fourth of 87% of Booked Salvage.

Alternatively, Taxpayer′s refund claim is based on the ground that for Non-Booked Salvage Taxpayer is entitled to use the cut-off method provided by Treas. Reg. §1.832-4(e)(2)(iii), together with a Special Deduction with respect to Booked Salvage. On this ground, in 1990

Liberty Mutual Fire Insurance Company EIN: 04-1924000
Protective Claim for Refund for Taxable Year 1990
Page 3

Taxpayer would include in income the amount of Non-Booked Salvage actually received and receive a Special Deduction equal to one-fourth of 87% of Booked Salvage.
Regardless of whether the transition rule is implemented by the principles of Rev. Proc. 92-77, the language of the statute, or Treas. Reg. §1.832-4(e)(2)(iii), there is no authority to support the position of the Examining Agent that the full amount of Non-Booked Salvage is to be included in taxable income in 1990.

Further, the positions of Taxpayer on the foregoing issues may have corollary tax effects under the provisions of the Code that have not been specifically referred to in this claim for refund. Taxpayer claims that it is entitled to any refund attributable to such corollary tax effects. Taxpayer also claims that it is entitled to a refund to the extent that any adjustment made by the Service for some other year has a corollary tax effect in the current year (e.g., the inclusion of an item in income for a later year by the Service on the grounds that it accrued in that later year removes such item from Taxpayer's gross income for the current year). Taxpayer further claims that it is entitled to a refund to the extent that an adjustment made by the Service for some other year would result in a reduction of tax if a similar adjustment is made for the current year. Taxpayer incorporates by reference in this claim all previously filed claims and protests and all materials and information submitted to the Service in support of such claims and protests.

On the foregoing grounds, Taxpayer files this claim for a refund of tax as set forth above, or such other amount as may be allowed, together with any overpayment of deficiency interest, plus refund interest on the amount to be refunded.[*]

---

[*]Taxpayer claims a net interest rate of zero, including for all periods prior to the effective date of section 6621(d) to the greatest extent permitted by law. Taxpayer also claims a refund of any deficiency interest for any year for which an estimated tax overpayment was made and credited to another period, to the extent the deficiency interest relates to a period during which the credit for the other period was not needed to satisfy the smallest amount of estimated tax required to avoid an estimated tax penalty for such other period. See Rev. Rul. 99-40, 1999-2 C.B. 441; May Department Stores Co. v. United States, 36 Fed. Cl. 680 (1996). Finally, the computation of the interest on any refund of an overpayment received by Taxpayer after December 31, 1994, must be made by applying the GATT interest rate prescribed by section 713 of the Uruguay Round Agreements Act, Pub. L. No. 103-465 (1994), only to the overpayment in excess of $10,000 and not to the amount of interest that accrued on any overpayment prior to January 1, 1995. Accordingly, to the extent that the overpayment interest is computed differently, Taxpayer hereby requests a refund based on the proper application of the GATT interest rate.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY**
**EIN: 04-1924000**
**Taxable Income Calculation**
**Attachment to Form 1120X**

| | As Originally Filed | As Adjusted per Appeals | As Amended per 1120X |
|---|---|---|---|
| Taxable Income before NOL and Special Deductions | 29,803,112 | 38,140,929 | 16,862,477 |
| Net Operating Loss Deduction | 33,090,363 | 27,337,228 | 15,313,398 |
| Special Deductions | 1,549,079 | 1,549,079 | 1,549,079 |
| Taxable Income | (4,836,330) | 9,254,622 | - |
| | | | |
| Tax before Credits | - | 3,146,571 | - |
| | | | |
| Foreign Tax Credit | - | - | - |
| Nonconventional source fuel credit | - | | - |
| GBC | - | 794,679 | - |
| AMT Credit | - | - | - |
| | | | |
| Tax after credits | - | 2,351,892 | - |
| ITC recapture | 588 | 588 | 588 |
| Regular tax liability | 588 | 2,352,480 | 588 |
| | | | |
| Total minimum tax | 3,725,082 | 4,393,550 | 3,284,431 |
| Environmental tax | 61,689 | 71,768 | 46,216 |
| | | | |
| Schedule J line 10 | 3,787,359 | 6,817,799 | 3,331,235 |

**LIBERTY MUTUAL FIRE INSURANCE COMPANY**
**EIN: 04-1924000**
**Alternative Minimum Taxable Income Calculation**
**Attachment to Form 1120X**

| | As Originally Filed | As Adjusted per Appeals | As Amended per 1120X |
|---|---|---|---|
| Taxable Income before NOL | 28,254,033 | 36,591,850 | 15,313,398 |
| | | | |
| Adjustments: | | | |
| Depreciation | 794,877 | 794,877 | 794,877 |
| | | | |
| Line 4 Pre-adjusted AMTI | 29,048,910 | 37,386,727 | 16,108,275 |
| | | | |
| Adjusted Current Earnings | 29,527,208 | 29,527,208 | 29,527,208 |
| Tax Exempt Interest | 1,589,755 | 1,589,755 | 1,589,755 |
| Depreciation | (76,543) | (76,543) | (76,543) |
| Charitable Contributions | - | - | - |
| Other Adjustments | 1,437,570 | 1,437,570 | 1,437,570 |
| Dividend Received Deduction | 32,477,990 | 32,477,990 | 32,477,990 |
| Total ACE Adjustments | | | |
| | | | |
| Line 4a Adjusted current earnings (ACE) | 61,526,900 | 69,864,717 | 48,586,265 |
| | | | |
| Line 4b Subtract PAMTI from ACE | 32,477,990 | 32,477,990 | 32,477,990 |
| Line 4c Multiply 4b by 75% | 24,358,493 | 24,358,493 | 24,358,493 |
| | | | |
| Combine PAMTI and line 4c | 53,407,403 | 61,745,219 | 40,466,767 |
| AMT NOL Deduction: | 34,781,992 | 24,044,610 | 24,044,610 |
| Alternative minimum taxable income | 18,625,411 | 37,700,609 | 16,422,157 |
| | | | |
| AMT at 20% before AMT FTC | 3,725,082 | 7,540,122 | 3,284,431 |
| AMT FTC | - | - | - |
| Tentative minimum tax | 3,725,082 | 7,540,122 | 3,284,431 |
| Regular tax liability (After Credits) | | 3,146,571 | |
| AMT | 3,725,082 | 4,393,550 | 3,284,431 |
| | | | |
| PAMTI without regard to ETC Deduction | 53,407,403 | 61,806,939 | 40,512,983 |
| Less: $2M exemption | (2,000,000) | (2,000,000) | (2,000,000) |
| Adjusted Income for Environmental Tax Calculation | 51,407,403 | 59,806,939 | 38,512,983 |
| Environmental tax at .12% | 61,689 | 71,768 | 46,216 |

**[JOINT COMMITTEE PRINT]**

# DESCRIPTION OF MISCELLANEOUS TAX PROPOSALS

SCHEDULED FOR HEARINGS

BEFORE THE

## HOUSE COMMITTEE ON WAYS AND MEANS

ON JULY 11–13, 1995

---

PREPARED BY THE STAFF

OF THE

## JOINT COMMITTEE ON TAXATION



JULY 10, 1995

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1995

91–873                                                    JCS–19–95

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-047374-8

GOVERNMENT
EXHIBIT

23

183

## V. Insurance

### 1. Treatment of salvage and subrogation of property and casualty insurance companies

#### *Present Law*

Under present law, property and casualty insurance companies are required to reduce the deduction allowed for losses incurred (both paid and unpaid) by estimated recoveries of salvage and subrogation attributable to such losses (sec. 832(b)(5)(A)). This rule was enacted in the Revenue Reconciliation Act of 1990 (the "1990 Act").

The 1990 Act provided that, in the case of a property and casualty insurance company that did not take into account estimated salvage and subrogation recoverable in determining losses incurred for its last taxable year beginning before January 1, 1990, a "fresh start" (i.e., income forgiveness) transition rule applied with respect to 87 percent of the discounted amount of the estimated salvage and subrogation recoverable as of the close of the last taxable year beginning before January 1, 1990. The remaining 13 percent is required to be recognized over a 4-year period.

The 1990 Act also provided parallel transition relief in the case of any property and casualty insurance company that did take into account estimated salvage and subrogation recoverable in determining losses incurred for its last taxable year beginning before January 1, 1990. In such a case, 87 percent of the discounted amount of the estimated salvage and subrogation amount recoverable as of the close of the last taxable year beginning before January 1, 1990, is allowed as a special deduction ratably over the first 4 taxable years beginning after December 31, 1989.

Treasury regulations implementing the salvage and subrogation provision of the 1990 Act provide a rule of mutual exclusivity for the two types of transition relief. The regulations provide that an insurance company that claims the benefit of the "fresh start" with respect to estimated salvage recoverable may not claim the special deduction, and a company that claims the special deduction may not claim the benefit of the "fresh start" (Treas. Reg. 1.832–4(f)(3)). The regulations effectively prevent a company from claiming both a special deduction for some lines of business and a "fresh start" for other lines of business.

The 1990 Act also provides a special rule for overestimates, which requires a company to include in income (in a subsequent taxable year) the amount of the "fresh start" benefit attributable to an overestimate of salvage recoverable under the provision. The special rule for overestimates does not apply to the special deduction under the provision.

#### *Description of Proposal*

The proposal would eliminate the Treasury regulations' rule of mutual exclusivity for the two types of transition relief under the salvage and subrogation provision of the 1990 Act. Thus, the proposal would provide that a property and casualty insurance company that took estimated salvage and subrogation into account with respect to some, but not with respect to other lines of busi-

184

ness, could take the "fresh start" benefit with respect to those lines of business for which it did *not* take into account estimated salvage and subrogation recoverable in determining losses incurred for its last taxable year beginning before January 1, 1990, and could take the special deduction with respect to those lines of business for which it *did* take such estimated salvage and subrogation into account, provided that all the requirements for the "fresh start" benefit and the special deduction, respectively, are met.

The proposal would also extend the special income inclusion rule for overestimates of salvage recoverable (which currently applies in the case of the "fresh start" benefit) to the special deduction. Thus, under the proposal, the income inclusion rule would also apply with respect to overestimates of estimated salvage recoverable in the case of the special deduction.

In addition, the proposal would clarify that these rules apply to property and casualty insurance companies but not life insurance companies.

### Effective Date

The proposal would be effective as if enacted with the provisions of the 1990 Act regarding salvage and subrogation.

## 2. Health insurance organizations eligible for benefits of section 833

### Present Law

An organization described in section 501(c)(3) or (4) of the Code is exempt from tax only if no substantial part of its activities consists of providing commercial-type insurance (sec. 501(m)). Special rules apply to certain eligible health insurance organizations. Eligible health insurance organizations are (1) Blue Cross or Blue Shield organizations existing on August 16, 1986, which have not experienced a material change in structure or operations since that date, and (2) other organizations that meet certain community-service-related requirements and substantially all of whose activities involve the providing of health insurance. Section 833 provides that eligible organizations are generally treated as stock property and casualty insurance companies.

Section 833 provides a special deduction for eligible organizations, equal to 25 percent of the claims and expenses incurred during the year, less the adjusted surplus at the beginning of the year. This deduction is calculated by computing surplus, taxable income, claims incurred, expenses incurred, tax-exempt income, net operating loss carryovers, and other items attributable to health business. The deduction may not exceed taxable income attributable to health business for the year (calculated without regard to this deduction).

In addition, section 833 eliminates, for eligible organizations, the 20-percent reduction in unearned premium reserves that applies generally to all property and casualty insurance companies.